## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

CONLEY F. MONK JR.,

        *Plaintiff*,

        v.

UNITED STATES OF AMERICA,

        *Defendant*.

Civil Action No. 3:22-cv-1503

November 28, 2022

## COMPLAINT

1.      The U.S. Department of Veterans Affairs and its predecessor, the Veterans' Administration (collectively "VA"), have operated generous programs of education, housing, disability compensation, and other benefits since World War II. For decades, there have been anecdotal reports and widespread suspicion of racial discrimination in these programs.

2.      In 2021, in response to Freedom of Information Act (FOIA) litigation, VA disclosed records confirming these long-held suspicions for the first time. Analysis of these records reveals a statistically significant difference in VA disability compensation claim determinations based on race from 2001 to 2020, the period for which VA disclosed data. Each year, VA was more likely to reject applications of Black veterans than of white veterans.

3.      The result of VA's racial discrimination has been to deny countless meritorious applications by Black veterans, depriving them and their families of care and support that their faithful service had earned.

4.      Plaintiff Conley Monk Jr. is one of these veterans. Mr. Monk comes from a family of Black service members; his father was in a segregated U.S. Army unit during World War II and fought at Normandy, and a number of his siblings served in the armed forces. Mr.

Monk himself joined the U.S. Marine Corps after high school and served in combat in Vietnam, where he was promoted to lance corporal and also seriously wounded.

5.      For nearly fifty years after he returned home to Connecticut in 1970, the VA improperly denied Mr. Monk's applications for education, housing, and disability benefits. Mr. Monk suspected racial bias at the VA but had no way to prove it.

6.      VA eventually granted Mr. Monk benefits in 2015 and again in 2020, confirming that he was disabled by wounds suffered during his military service and eligible for disability compensation. But VA has never fully compensated him for the harm it caused by repeatedly denying his benefits appplications.

7.      Last year, for the first time, Mr. Monk learned of concrete evidence of persistent racial disparities in VA benefits programs, namely the 2021 statistical analysis described above. This analysis was based on records that VA disclosed in FOIA litigation brought by Mr. Monk's organization, the National Veterans Council for Legal Redress, and the Black Veterans Project.

8.      In early 2022 Mr. Monk filed an administrative claim with the VA. He alleged that because VA leaders knew or should have known of pervasive racial disparities in the award of VA benefits, and because they nevertheless failed to address these disparities, VA leadership negligently breached its statutory duty of care under 38 U.S.C. § 303 (2018) and 38 U.S.C. § 210(b) (1958). VA has not responded to Mr. Monk's administrative claim.

9.      Mr. Monk is not seeking to relitigate his individual benefits requests. Instead, he seeks to recover for the harm caused to him by VA leaders' negligent failure to redress the longstanding racial disparities in veterans' benefits administration, about which leadership has known or should have known for decades.

10.     VA's tortious conduct caused Mr. Monk to suffer periods of housing insecurity,

financial hardship, and difficulty accessing proper medical care. He suffered severe emotional harm when he was forced to repeatedly relive the most traumatic moments of his life as part of his applications and re-applications for disability compensation. And he suffered dignitary and reputational harm as a result of VA's discriminatory actions.

11.     Having exhausted his administrative remedies, Mr. Monk brings this action pursuant to the Federal Tort Claims Act. He asserts claims for negligence, negligent infliction of emotional distress, and negligent supervision, and seeks thereby to redress the harms caused to him by the failure of VA leaders and staff to administer their benefits programs in a manner free from racial discrimination against Black veterans.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

13.     Venue is proper under 28 U.S.C. §§ 1402(b) and 1391(e)(1) because Plaintiff resides in the District of Connecticut, a substantial part of the events, acts, or omissions giving rise to the claims occurred in this District, and no real property is involved in this action.

## PARTIES

14.     Plaintiff Conley F. Monk Jr. is a 74-year-old resident of New Haven, Connecticut. He is a veteran of the U.S. Marine Corps, served with distinction in the Vietnam War, and continues to advocate for veterans as the co-founder and Director of the National Veterans Council for Legal Redress (NVCLR).

15.     Defendant United States of America is sued under the Federal Tort Claims Act (FTCA) for the tortious acts of its employees, including employees of the Department of Veterans Affairs and its predecessor agency, the Veterans' Administration.

## LEGAL FRAMEWORK

16.     The United States Government has provided assistance for individuals who served in the nation's armed forces since 1776, when the Continental Congress established disability pensions for veterans – the predecessor to today's disability compensation program.

17.     In 1944, President Franklin D. Roosevelt signed the Servicemen's Readjustment Act of 1944 ("G.I. Bill") providing, among other things, sweeping education and home loan benefits to World War II veterans.

18.     At the signing ceremony, President Roosevelt remarked that the G.I. Bill and earlier legislation "provide the special benefits which are due to the members of our armed forces—for they have been compelled to make greater economic sacrifice and every other kind of sacrifice than the rest of us, and are entitled to definite action to help take care of their special problems."

### Education Benefits

19.     The G.I. Bill's education benefits were intended to give servicemembers the opportunity to resume their education or technical training after their discharge from the military. Under the original legislation, eligible veterans who enrolled in a qualifying educational program – including undergraduate and professional schools, vocational schools, apprenticeships, and scientific and technical institutions, among others – could receive monetary assistance for tuition, books, supplies, and other necessary expenses from VA to complete their education.

20.     After the original G.I. Bill expired in 1956, Congress continued to fund and expand education benefits for veterans.

21.     In 1976, when Mr. Monk applied for VA education benefits, eligible veterans could receive a monthly cash benefit (based on their number of dependents) to cover educational

costs and a loan from VA (based on the government's determination of financial need) to cover the cost of tuition.

22.     Approximately 20 million veterans have benefited from the education benefits program initially established by the G.I. Bill. The program has enabled veterans to pursue university courses, certificate programs, on-the-job training, apprenticeship training, flight training, and non-college degree courses.

*Home Loan Benefits*

23.     Like VA education benefits, the VA home loan program was created by the original G.I. Bill in 1944. The program was designed to help veterans purchase and retain their homes through government-guaranteed loans.

24.     Under the original VA home loan program, veterans could apply for home loan guarantees from VA of up to 50 percent of the loan amount, not to exceed $2,000. Since 1944, Congress has amended the program to increase the guaranty to up to $45,000.

25.     In 1983, at the time Mr. Monk applied for a home loan guaranty from VA, veterans could receive a guaranty of up to $27,500.

26.     As of October 2020, VA has guaranteed more than 25 million home loans.

*Disability Compensation*

27.     The VA disability compensation program provides support for veterans who were injured during their military service or whose condition worsened as a result of their service.

28.     Current VA disability compensation provides a monthly tax-free cash benefit to veterans with disabilities that are the result of a disease or injury incurred or aggravated during active military service. Depending on the degree of disability and number of dependents, a veteran may receive more than $4,000 in monthly cash benefits.

29.     The amount of disability compensation that Mr. Monk could have received when he first applied in 1982 is uncertain based on publicly available information. In 2010, the second time Mr. Monk applied for disability compensation, a veteran with a spouse could earn up to $2,823 per month in benefits from VA. In 2012, the last time Mr. Monk applied for disability compensation, a veteran with a spouse could earn up to $2,973 per month in benefits from VA.

30.     In fiscal year 2021, VA provided over $112 billion in disability compensation to approximately 5.6 million veterans and their families.

***Eligibility for Education, Housing, and Disability Benefits***

31.     In addition to eligibility criteria specific to each VA benefits program, individuals are eligible for education, housing, and disability benefits only if they are considered a "veteran" under 38 U.S.C. § 101(2). The statute defines veterans as those individuals who were discharged from the military "under conditions other than dishonorable." *Id.*

32.     Individuals who receive an Honorable, General under Honorable, or Uncharacterized discharge are generally eligible for these VA benefits, unless a statutory bar applies. *See* 38 U.S.C. § 5303; 38 C.F.R. § 3.12.

33.     Individuals who receive a Dishonorable discharge are not considered veterans and are ineligible for these VA benefits. 38 U.S.C. § 101(2).

34.     Individuals who receive an Other than Honorable (previously "Undesirable") or Bad Conduct discharge may be eligible for VA benefits. When a person with such a discharge applies for benefits, VA must conduct a "character of discharge" (COD) assessment to determine whether such a discharge was "under conditions other than dishonorable," taking into consideration the person's military records and any other evidence submitted. 38 C.F.R. § 3.12.

*VA's Duty to Administer Education, Housing, and Disability Benefits*

35.     The U.S. Department of Veterans Affairs and its predecessor agency, the Veterans' Administration, have been responsible for administering veterans' education, housing, and disability benefits programs.

36.     On July 3, 1930, Congress established the Veterans' Administration, headed by the VA Administrator.

37.     Until 1957, federal law stated that the VA Administrator, "under the direction of the President, shall have the control, direction, and management of the various agencies and activities [enumerated herein]" concerning the "administration of the laws relating to the relief and other benefits provided by law" for veterans. 38 U.S.C. § 11 (1934).

38.     In 1957, Congress amended the statute, providing that the "Administrator . . . is responsible for the *proper execution and administration* of all laws administered by the Veterans' Administration and for the control, direction, and management of the Veterans' Administration." Veterans' Benefits Act of 1957, Pub. L. No. 85-56, 71 Stat. 83, 91-92 (1957) (emphasis added); 38 U.S.C. § 210(b) (1958).

39.     In October 1988, President Reagan elevated the Veterans' Administration to a Cabinet-level department. The Veterans' Administration officially became the modern-day U.S. Department of Veterans Affairs on March 15, 1989.

40.     On August 6, 1991, Congress passed the Department of Veterans Affairs Codification Act, establishing the purpose and structure of the new Department. Congress imposed the same duty of care on the Secretary of Veterans Affairs as it did on the former VA Administrator, providing that the VA Secretary is "responsible for the *proper execution and administration* of all laws administered by the Department and for the control, direction, and

management of the Department." 38 U.S.C. § 303 (emphasis added).

**FACTUAL ALLEGATIONS**

A.     **VA Officials Breached Their Duty of Care by Administering Benefits in a Racially Discriminatory Manner**

41.     On February 22, 2021, Mr. Monk's organization, NVCLR, along with the Black Veterans Project (BVP) filed Freedom of Information Act (FOIA) requests with three components of VA. These FOIA requests sought information regarding the administration of service-connected disability compensation, as that program is the largest veterans' benefits program and serves the most veterans. The disability compensation program also directly harmed Mr. Monk, as he was repeatedly denied benefits for years.

42.     VA provided responses to some, but not all, of these FOIA requests. Due to the inadequacy of VA's response, NVCLR and BVP filed administrative appeals and, after VA failed to respond fully and adequately, a complaint in U.S. district court. After months of litigation, in 2021 VA conducted further searches and produced additional documents.

43.     The records disclosed by VA included claims outcomes for veterans from 2001 to 2020. The data did not cover previous years because, VA represented, it did not link ratings decision data to specific files and did not fully retain disability decision data prior to 2001.

44.     Through their counsel, NVCLR and BVP consulted a Yale University statistician to analyze the VA records.

45.     The analysis found a statistically significant difference in VA claim outcomes (the number of claims denied, partially granted, or granted) between: (1) Black veterans and white veterans; (2) Black male veterans and white male veterans; and (3) Black female veterans and white female veterans.

8

46.     VA denied Black veterans, Black male veterans, and Black female veterans disability compensation at statistically higher rates than their white counterparts. For instance, between 2001 to 2020, the average denial rate for disability compensation was 29.5% for Black veterans and 24.2% for white veterans.

47.     In addition, the statistician's analysis found that the VA's average grant rate for disability compensation was 30.3% for Black veterans and 37.1% for white veterans. This is also a statistically significant disparity.

48.     The data showed that from 2002 to 2020, a Black veteran applying for disability compensation was more likely to be denied than a white veteran. This data is displayed below.



49.     On information and belief, additional records possessed by VA and not yet publicly disclosed further confirm racial disparities in the administration of VA benefits programs since World War II and a disparate impact on Black veterans, of which VA leaders knew or should have known and negligently failed to redress.

**B.     VA Knew or Should Have Known About Racial Discrepancies and Failed to Remedy Them**

50.     VA officials violated their statutory obligation and duty of care to properly execute and administer the law when they administered benefits in a manner they knew or should have known resulted in racially disparate outcomes, and when VA leadership negligently failed to redress those pervasive racial disparities.

51.     These officials included every VA Administrator or Secretary since World War II, from Frank Hines (VA Administrator until 1945) to Secretary Denis McDonough (VA Secretary 2021-present), as well as each Under Secretary of Veterans Affairs for Benefits and other senior VA officials responsible for administering veterans' benefits programs in the same period.

52.     For example, the training, supervision, auditing, and record-keeping practices implented by VA leaders caused a disparate impact on Black veterans applying for benefits as compared to white veterans.

53.     The records that NVCLR and BVP received from VA through their FOIA requests demonstrate that for decades VA leadership, including VA Secretaries, knew or should have known of pervasive, longstanding racial disparities in veterans' benefits for Black veterans. And for decades, VA officials have negligently failed to redress these disparities.

54.     VA officials also knew or should have known that racial bias in the military justice system was affecting the discharge status of Black veterans like Mr. Monk, who initially received an Undesirable (now, Other Than Honorable) discharge.

55.     The Defense Department's own analysis shortly after Mr. Monk's discharge demonstrated that Black servicemembers were substantially more likely than white servicemembers to face military justice or disciplinary action. TASK FORCE ON THE ADMIN. OF MIL. JUST. IN THE ARMED FORCES, OFF. OF THE ASSISTANT SEC'Y OF DEF., REPORT OF THE TASK

FORCE ON THE ADMINISTRATION OF MILITARY JUSTICE IN THE ARMED FORCES VOL. I 32 (1972);

*see also* PETER G. NORDLIE ET AL., U.S. ARMY RESEARCH INSTITUTE FOR THE BEHAVIORAL AND

SOCIAL SCIENCES, MEASURING CHANGES IN INSTITUTIONAL RACIAL DISCRIMINATION IN THE

ARMY 25 (1975) (finding "a strong relationship between skin color and type of discharge").

56.     More recent analyses have reached similar conclusions. DANIEL P. MACDONALD,

ET AL., DEFENSE EQUAL OPPORTUNITY MANAGEMENT INSTITUTE DIRECTORATE OF RESEARCH

DEVELOPMENT AND STRATEGIC INITIATIVES, REPORT OF RACIAL DISPARITIES IN THE MILITARY

JUSTICE SYSTEM 17 (2017) (finding that Black servicemembers were 36.6% and 50% more likely

to face courts-martial and non-judicial punishments, respectively, than white servicemembers).

57.     After the 1972 Defense Department Report, the U.S. Equal Employment

Opportunity Commission (EEOC) concluded that military discharges were so tainted by race

discrimination that an employer who required an honorable discharge as a condition of hiring

violated Title VII of the Civil Rights Act of 1964, absent a business necessity. EEOC Decision

No. 74-25 (1973); *see also* EEOC Decision No. 76-13 (1975) (same, as to blanket refusal to hire

or re-employ veteran with less-than-honorable discharge), *overruled in part on other grounds by*

EEOC Decision No. 80-26 (1980); *Dozier v. Chupka*, 395 F. Supp. 836 (S.D. Ohio 1975)

(holding municipal fire department disqualification of applicants with less-than-honorable

discharges has impermissible adverse impact based on race).

58.     Because VA looks to veterans' service records and discharge status in making

COD determinations, VA knew or should have known that bias in the military justice system

would likely lead to racial disparities in its COD determinations absent a concerted effort to

identify and correct for this effect.

59.     VA leaders also knew or should have known that placing undue weight on the

ostensibly voluntary nature of an Other than Honorable discharge contributes to racial disparities in COD determinations and has the same sort of impermissible disparate impact that the EEOC determined was unlawful in employment settings.

60.     VA failed to rectify these issues, resulting in COD determinations that were based on racially disparate discharge statuses.

61.     The negligence of VA leadership, and their failure to train, supervise, monitor, and instruct agency officials to take steps to identify and correct racial disparities, led to systematic benefits obstruction for Black veterans.

62.     VA officials also negligently failed to collect and aggregate claims data prior to 2001 in a manner that would have enabled VA to identify the nature and scope of these disparities. Further, VA leaders failed to properly train, supervise, and instruct employees on procedures and practices that would administer benefits in nondiscriminatory ways.

63.     VA acknowledged its record-keeping negligence in its FOIA responses, conceding that "rating decision data was never directly linked to the Pending Issue File or to the CPMR, limiting our ability to link outcomes to claims." In addition, disability decision data was not fully retained by VA prior to 2001. VA's negligence in maintaining a system that could not track and rectify racial discrepancies harmed thousands of Black veterans.

64.     VA's negligence in failing to create and maintain a system to track claims and identify racial disparities led the agency to fail to properly execute and administer the law, as required by statute.

**C.     Conley Monk Jr.'s Military Service and Service to Veterans**

65.     Conley Monk Jr. is a proud Black Vietnam War veteran who has been a leader, advocate, and counselor to other veterans for more than 50 years. He is one of thousands of

Black veterans harmed by VA's tortious conduct.

66.    Mr. Monk was born in Rocky Mount, North Carolina, in 1948 into the accomplished Monk family that includes the jazz musician Thelonius Monk, the Hall of Fame football player Art Monk, and generations of teachers, police officers, and public servants.

67.    Mr. Monk's father, Conley Monk Sr., served in a segregated unit in the U.S. Army during World War II and participated in the Normandy invasion.

68.    Mr. Monk moved with his family to Connecticut when he was very young. He grew up and attended public schools in New Haven, and during high school he worked part-time at the VA Hospital in West Haven.

### *Mr. Monk's Military Service*

69.    On November 12, 1968, at 20 years old, Mr. Monk voluntarily enlisted in the U.S. Marine Corps and continued a long tradition of family service.

70.    He completed boot camp at Parris Island, South Carolina, and Motor Vehicle Operations School at Camp Lejeune, North Carolina. He then deployed to Vietnam.

71.    Mr. Monk arrived in Vietnam on July 20, 1969. Moments after he touched ground in Da Nang, while still disembarking from the airplane, Mr. Monk and the men with whom he arrived were barraged by enemy forces firing mortar rounds into the base. Mr. Monk felt defenseless against the attack, as neither he nor any of the men on their first deployment had been issued weapons yet.

72.    The next morning, Mr. Monk was driven through an area under enemy fire to meet his unit in Quang Tri. Quang Tri was one of the most contested areas in south Vietnam, and American troops there regularly engaged in heavy ground fighting.

73.    As a motor vehicle operator, Mr. Monk was responsible for transporting troops

and equipment. He also performed interior and perimeter guard duty.

74.     Because Quang Tri was located less than 20 kilometers from the Demilitarized Zone (DMZ), Mr. Monk regularly drove into the DMZ, where fighting was heavy. Mr. Monk's convoys were frequently attacked. Indeed, his convoy truck had bullet holes throughout it. Mr. Monk saw daily reminders that death could come at any time. As he drove through the combat zone, he passed the bodies of fallen Viet Cong fighters on the side of the road.

75.     One of his most gruesome memories arises from witnessing a fellow Marine drive over a Vietnamese man who had jumped in front of their vehicle without warning. Unsure of whether the man was going to attack, the driver ran the man over, right before Mr. Monk's eyes. Memories of the grisly death and the uncertainty of whether his comrade had been right to run over the Vietnamese man haunt Mr. Monk to this day.

76.     Despite the intensity of the violence, Mr. Monk performed his duties faithfully. He ultimately received a Rifle Marksman Badge, a National Defense Service Medal, a Vietnam Service Medal with one star, and a Vietnam Combat Medal with Device.

77.     In November 1969, Mr. Monk's unit was pulled out of Vietnam. He was transferred to the 3rd Battalion of the 3rd Marine Division, temporarily stationed in Okinawa, Japan.

78.     Mr. Monk began to fully experience the onset of Post-Traumatic Stress Disorder (PTSD) in Okinawa. He was in a constant state of fear and hypervigilance. Mr. Monk's PTSD led to two altercations in Okinawa that resulted in him spending time in base prison. Mr. Monk was told that he would stay in base prison until he signed papers agreeing to an Undesirable discharge and waiving his right to a court-martial.

79.     Mr. Monk did not understand that by accepting an Undesirable discharge, he

would not only forfeit his eligibility for medical care and other financial support and benefits for veterans, but also face a lifetime of stigma. Depressed and symptomatic with PTSD, Mr. Monk signed the discharge papers.

80.    Mr. Monk was discharged on September 15, 1970. He received an Undesirable discharge (now known as a discharge "Under Other than Honorable" conditions).

### Mr. Monk's Return Home and Service to Veterans

81.    Upon his return home, Mr. Monk's condition worsened. He reacted instinctively to loud sounds, conflating them with blasts from Vietnam. Whenever he went into a restaurant or was near a window, Mr. Monk would put his back up against the wall to feel safe. Over time, he resorted to self-medication to cope with his symptoms and developed an addiction to drugs.

82.    In the early 1970s, Mr. Monk consulted a psychiatrist for help with his substance use and mental health. However, as the American Psychiatric Association's Diagnostic and Statistical Manual did not recognize PTSD as a medical condition until 1980, there was little understanding of PTSD at the time. As a result, Mr. Monk's PTSD went untreated and undiagnosed for years.

83.    Faced with his family's disappointment and dismay, Mr. Monk resolved to get clean from his drug addiction. He enrolled in the Connecticut Mental Health Center substance use program and ended his addiction. While in the program, Mr. Monk noticed that many of the men seeking treatment were veterans facing special challenges that the program was not able to address. Mr. Monk wanted to help these men whose experiences he recognized in himself.

84.    Following his treatment, Mr. Monk became an addiction counselor certified by the Addiction Prevention Treatment Foundation. He later joined the Yale Department of Psychology where he worked for four years, first as a drug counselor and later as a senior

rehabilitation counselor.

85.     Informed by his own experiences and time working with Vietnam veterans, Mr. Monk started a group called "The Undesirables" to help veterans with Other than Honorable discharges apply for discharge upgrades and medical benefits. Mr. Monk built the organization from the ground up, using books at the public library to teach himself how to write the bylaws, and recruiting pro bono lawyers and accountants.

86.     The group later changed its name to the National Veterans Council for Legal Redress. Today, NVCLR is a Connecticut-based non-profit veterans service organization that engages in advocacy and public education to promote the respect and acceptance of all who served our country and works to secure benefits for veterans and their families. Mr. Monk continues to serve as the Director of NVCLR.

### D.     VA Repeatedly Denies Mr. Monk Benefits

87.     Soon after Mr. Monk left the U.S. Marine Corps, he applied for unemployment compensation in Connecticut. The state unemployment agency sought information from the Veterans' Administration regarding Mr. Monk's eligibility.

88.     The VA conducted a COD determination and, in a March 1971 administrative decision, found that Mr. Monk was "discharged under dishonorable conditions and is not therefore entitled to any benefits administered by the Veterans' Administration." As a result, Mr. Monk was denied unemployment compensation in Connecticut. Mr. Monk requested the VA reconsider its decision, but VA refused to do so in May 1971.

89.     The VA's 1971 COD determination was flawed because it relied exclusively on a finding that Mr. Monk voluntarily signed his discharge papers, and it was not based on all of the facts and circumstances surrounding the incidents that led to Mr. Monk's discharge, as required

16

by law. The agency's failure to conduct a meaningful COD determination, and its stubborn refusal to reconsider that initial conclusion negatively impacted Mr. Monk for decades.

90.    In 1976, Mr. Monk applied for VA education benefits in connection with his enrollment in a degree program at the University of New Haven. At the time, Mr. Monk and his partner were raising his two young daughters, and Mr. Monk had enrolled at University of New Haven to better his life and opportunities for his young family.

91.    In a decision dated April 12, 1976, VA denied Mr. Monk's application for education benefits based on his discharge status. VA relied exclusively on the flawed 1971 COD determination and failed to make a new COD determination in connection with this application for educational assistance.

92.    After VA denied his benefits application, Mr. Monk continued his education but had to pay out-of-pocket while also working two jobs. However, in 1979, just three and a half credits short of completion, Mr. Monk was forced to give up his studies because of the financial strain on his family. He was never able to complete his education or obtain his degree, which impaired his ability to support his family and achieve financial stability in his household.

93.    In 1982, upon learning about the newly-defined medical condition of PTSD, Mr. Monk recognized the symptoms in himself and applied to VA for disability compensation benefits for PTSD.

94.    However, VA denied his application, continuing to rely on the flawed 1971 COD determination and declining to make a new COD determination. VA's decision left Mr. Monk feeling hopeless and as if the military had abandoned him despite his years of dedicated service.

95.    In 1983, now a father of four, Mr. Monk applied for VA home loan benefits. Mr. Monk and his partner were excited to move their family into a nice home in West Haven,

Connecticut. Despite his previous denials, Mr. Monk hoped that VA would look favorably on him given his continued service to veterans. He also knew of other veterans with Other than Honorable discharges who were receiving VA benefits.

96.     Nevertheless, VA concluded that Mr. Monk was ineligible for VA home loan guaranty benefits. VA relied on the flawed 1971 COD determination and, again, failed to make a new COD determination.

97.     After VA denied Mr. Monk's home loan application, Mr. Monk spent months applying to other financial institutions to secure a home loan. He was homeless for a period of time because of his inability to pay for housing. Although Mr. Monk eventually succeeded in securing a home loan, the delay harmed him and his family as they lost the economic and social benefits associated with homeownership.

98.     Feeling abandoned by VA and the military, Mr. Monk stopped applying for benefits for over two decades. He believed VA's benefits system to be plagued by racial bias and feared that he would never receive help from the country he had faithfully served.

99.     In 2007, Mr. Monk suffered a severe stroke as the result of his undiagnosed diabetes. The stroke left him unable to read, write, or walk for months. Soon thereafter, Mr. Monk was diagnosed with type II diabetes mellitus as a result of his exposure to Agent Orange in Vietnam. Due to his financial constraints, Mr. Monk's physician treated him with free medication samples that he otherwise could not afford. Mr. Monk's wife and oldest daughter helped him pay for his medical care.

100.     In 2010, hoping for additional assistance, Mr. Monk again applied for VA disability compensation, this time for his type II diabetes mellitus.

101.    As the 2021 statistical evidence establishes, VA was significantly more likely to deny the application of Mr. Monk, a Black veteran, than that of a white veteran. And indeed, in a decision dated December 8, 2010, VA rejected his application, relying again on the flawed 1971 COD determination and failing to make a new COD determination. VA also reminded Mr. Monk that it had previously denied his 1976 and 1982 applications for assistance.

102.    VA's denial reaffirmed Mr. Monk's disillusion and feelings of hopelessness. It also compounded the financial stress on his family as they continued to pay for Mr. Monk's medical care.

103.    In September 2011, Mr. Monk asked the Veterans Legal Services Clinic at Yale Law School for assistance in seeking a discharge upgrade and VA benefits. The Clinic referred Mr. Monk to a psychiatrist for evaluation. Over a total of four hours, Mr. Monk retold the psychiatrist the traumatic events that caused his PTSD. He relived the worst experiences of his life, over and over again, to support his re-application for disability compensation.

104.    The psychiatrist concluded Mr. Monk had a severe case of PTSD, which arose from his military service in Vietnam.

105.    In February 2012, this time represented by the Clinic, Mr. Monk applied again for disability compensation for PTSD, diabetes, and diabetic peripheral neuropathy in his arms and legs. As the 2021 statistical analysis indicated, VA was more likely to deny Mr. Monk's 2012 application than that of a white veteran. And VA did so again, still relying on his discharge status and the flawed 1971 COD determination. VA did not conduct a new COD determination.

106.    Mr. Monk appealed. In September 2015, after Mr. Monk had obtained an upgrade of his discharge status through a separate application to the Board for Correction of Naval

Records and litigation in U.S. district court, VA granted Mr. Monk's disability compensation for PTSD with a 100% rating, as well as for diabetes and associated peripheral neuropathy.

107.     When VA finally granted Mr. Monk benefits, it erroneously assigned his claim an "effective date" based solely on his discharge upgrade. VA refused to consider whether he was eligible any earlier, as it continued to rely on its flawed and cursory 1971 COD determination. This VA mistake cost Mr. Monk thousands of dollars in retroactive benefits.

108.     Mr. Monk appealed again. The U.S. Court of Appeals for Veterans Claims held that VA had erred in refusing to consider his eligibility for benefits before the date of his discharge upgrade. *Monk v. Wilkie*, 2020 WL 2461722 (Vet. App. May 13, 2020).

109.     On remand, the Board of Veterans Appeals agreed, at long last, that even before it was upgraded, "his discharge . . . was *not* a bar to benefits." *In re Monk*, 2020 WL 8912950, at *1 (Bd. Vet. App. Dec. 15, 2020) (emphasis added) (granting disability compensation beginning February 2012). This decision effectively overturned VA's cursory 1971 COD determination that had wrongly barred Mr. Monk from vital benefits and services for decades. *Id.*

110.     VA's decision granting disability compensation changed Mr. Monk's life. For the first time, he felt truly recognized by VA for his service. He no longer felt beneath veterans who received benefits from VA. And most importantly, he could now provide for his family, his church, and his community in ways that he previously could not.

**E.     VA's Negligent Administration of Benefits Harmed Mr. Monk**

111.     VA's belated acknowledgement that Mr. Monk was eligible for benefits and services even in the period before his discharge status was upgaded did not, however, make him whole. Mr. Monk was and continues to be a victim of VA's negligent administration of housing, education, and disability benefits.

112.    VA's negligence caused Mr. Monk to be denied veterans' benefits to which he was entitled.

113.    VA's negligence harmed Mr. Monk and his family both financially and emotionally.

114.    Each time Mr. Monk applied for VA benefits, he submitted extensive supporting documentation, filled out various VA forms, and interacted with VA officials.

115.    In the case of his third disability compensation application in 2012, Mr. Monk also underwent psychiatric evaluations. Through painstaking detail, Mr. Monk relived and retold his trauma to numerous individuals – including doctors, his counsel, and character references – to prove his eligibility for disability compensation.

116.    Mr. Monk also endured the emotional trauma of applying for VA benefits repeatedly when VA initially denied his 2012 application, forcing him to navigate the appeal system and litigate two federal lawsuits to secure his benefits.

117.    The entire process exacerbated Mr. Monk's PTSD and caused significant emotional distress.

118.    Upon returning home from his military service, Mr. Monk also suffered the severe reputational and dignitary harms associated with his benefit denials. The veterans' community that once embraced Mr. Monk as a son of a World War II veteran now looked down upon him. The shame and stigma associated with his benefit denials caused Mr. Monk to feel like an outsider and a failure. He suffered significant emotional, dignitary, and reputational harm because of VA's actions.

119.    Mr. Monk also suffered harm stemming from his perception of racial discrimination within the VA benefits system. He experienced this discrimination as an affront to

his dignity, and it caused him emotional distress.

120.   Not only did Mr. Monk suffer significant emotional distress because of VA's negligent administration of benefits, but he also lost hundreds of thousands of dollars in educational, housing, and health care benefits.

121.   VA's denial of education benefits forced Mr. Monk to leave the University of New Haven before he could obtain his degree. Without the financial means to pay for college, he lost both the opportunity to complete his associate's degree as well as the earning potential associated with the degree. He and his family were thus deprived of the lifetime income and financial stability that a college degree would have provided.

122.   After VA denied Mr. Monk's home loan application, Mr. Monk spent months applying to other financial institutions to secure a home loan. He was homeless for a period of time because of his inability to pay for housing. Although Mr. Monk eventually succeeded in securing a private home loan years later, the delay impacted him and his family as they lost the economic and social benefits associated with homeownership.

123.   Finally, and most prominently, Mr. Monk and his family struggled to pay the costs of his health care. For years, Mr. Monk's family was forced to pay for medication and treatments that would have been covered by VA had the agency granted his 1982 and 2010 applications.

124.   VA eventually provided some benefits to Mr. Monk but only after years of delay and traumatization. However, the benefits he has received are inadequate, and not designed to contemplate, the unique harm Mr. Monk suffered due to VA's pattern of racial discrimination and the disparate impact on Black veterans. The indignity of racial discrimination is a distinct injury, and this suit seeks redress for this harm VA caused to Mr. Monk.

### F.      Mr. Monk Timely Files This Complaint

125.      Mr. Monk spent decades trying to obtain his rightfully owed benefits through VA's administrative channels, but he was unaware of the pervasive and systematic racial bias affecting his eligibility for veterans' benefits until VA disclosed long-withheld records to NVCLR in 2021, and those records were analyzed.

126.      However, as evidenced by the data analysis discussed above, Mr. Monk now knows that he is one of thousands of Black veterans treated in a discriminatory manner by VA and subject to the racially disparate impact of VA's operation of its benefits programs.

127.      While there was speculation for years that racial disparities existed in VA's benefits system, there was no data available to substantiate these claims prior to September 2021, when Mr. Monk, NVCLR, and BVP received the statistical analysis of the data from their FOIA requests. There had been some publicly available reporting on the issue, but the full extent of the harm was not known until after this data was analyzed.

128.      Mr. Monk did not know, and had no way of knowing, about the racial disparities in VA's administration of benefits until the records were disclosed and analyzed in 2021.

129.      Having discovered VA's tortious conduct in September 2021, Mr. Monk submitted an administrative claim under the Federal Tort Claims Act in February 2022 and now timely files this Complaint. He seeks not to relitigate his flawed 1971 COD determination and specific benefits denials, but rather to hold VA accountable for its illegal, tortious, and racially discriminatory administration of benefits.

### G.      Mr. Monk has Exhausted his Administrative Remedies Under the Federal Tort Claims Act

130.      The United States is liable pursuant to the Federal Tort Claims Act (FTCA) for the tortious acts of its employees in "circumstances where the United States, if a private person,

would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

131.    Pursuant to 28 U.S.C. § 2675(a), a claimant must tender an administrative claim to the federal government before filing suit under the FTCA. An agency's failure to make a final disposition of a claim within six months after it is filed "shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." 28 U.S.C. § 2675(a).

132.    At all times relevant to this Complaint, VA officials acted within the scope of their employment and/or their official duties as employees of VA, an agency of the federal government.

133.    On February 25, 2022, Mr. Monk filed an FTCA administrative claim with VA for the tortious actions alleged here and committed by VA leadership and officials acting under the supervision of VA Administrators and, subsequently, VA Secretaries.

134.    As of the filing of this Complaint, VA has not responded to Mr. Monk's FTCA claim. VA's failure to dispose of Mr. Monk's FTCA claim within six months of filing constitutes a final denial. *See* 28 U.S.C. § 2675(a).

135.    Mr. Monk has administratively exhausted his claim under the FTCA.

### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligence**

136.    Mr. Monk repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

137.    Under Connecticut law, negligence requires a showing of: (1) a duty of care to the plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff. *Lawrence v. O & G Indus.*, 126 A.3d 569, 574 (Conn. 2015).

138.    Federal law imposes a duty of care on the VA Secretary to administer veterans' benefits in a non-discriminatory manner. 38 U.S.C. § 303 (2018); 38 U.S.C. § 210(b) (1958).

139.    VA Administrators and Secretaries, and other senior officials, breached this duty when through training, supervision, auditing, record-keeping, and other measures, they failed to redress longstanding, pervasive race discrimination and disparate impacts of which they knew or should have known.

140.    Due to this benefits obstruction, Mr. Monk was denied hundreds of thousands of dollars' worth of education, housing, and disability compensation. He also suffered significant emotional, psychological, and dignitary harm.

**SECOND CLAIM FOR RELIEF**
**28 U.S.C. § 1346(b) – FTCA – Negligent Infliction of Emotional Distress**

141.    Mr. Monk repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

142.    In Connecticut, a defendant engages in the tort of negligent infliction of emotional distress when: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127 (Conn. 2003).

143.    For over four decades, VA employees repeatedly denied Mr. Monk's requests for VA education, housing, and disability compensation benefits. He endured numerous psychological and physical evaluations to apply for VA benefits.

144.    The failure of VA officials and employees to maintain a racially neutral system of administering benefits led to a higher likelihood that he would be denied benefits, thus creating a risk of psychological harm.

145.     It was foreseeable that Mr. Monk would experience emotional distress from having to relitigate his claims and navigate the VA benefits process over and over again.

146.     VA officials caused Mr. Monk to be so severely emotionally distressed that it might result in illness or bodily harm.

147.     As a result of the actions of VA officials and employees, Mr. Monk suffered severe emotional distress, including exacerbation of his PTSD.

## THIRD CLAIM FOR RELIEF
## 28 U.S.C. § 1346(b) – FTCA – Negligent Supervision

148.     Mr. Monk repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

149.     In Connecticut, negligent supervision occurs when: (1) the plaintiff suffers an injury due to the defendant's failure to supervise an employee; and (2) the defendant had a duty to supervise the employee. *Roberts v. Circuit-Wise, Inc*., 142 F. Supp. 2d 211, 213 (D. Conn. 2001). The defendant has a duty of care where the defendant "knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." *Id*.

150.     VA officials and employees failed to instruct VA staff on how to distribute benefits in a racially neutral way. Leadership failed to create a system in which data related to benefits decisions could be aggregated and potential bias could be identified. Mr. Monk thus had to file his claims in a system that was racially discriminatory, lowering his chances of receiving the benefits he deserved.

151.     VA officials and employees knew or should have known about these failures but failed to rectify them.

152.     VA leadership's negligent supervision of VA managers and adjudicators violated their statutory duty to ensure the proper execution of VA laws.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(1) Award Plaintiff compensatory damages in an amount to be determined at trial;

(2) Require Defendant to pay Plaintiff's reasonable fees, costs, and expenses, including

attorneys' fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(b); and

(3) Grant such other relief as the Court deems just and equitable.

Dated:  November 28, 2022
        New Haven, Connecticut

Respectfully Submitted,

By: /s/ Jason Parkin
Michelle Fraling, Law Student Intern[*]
Rebecca Harris, Law Student Intern[*]
Adam Henderson, Law Student Intern[*]
Beatrice Pollard, Law Student Intern[*]
Michael Sullivan, Law Student Intern[*]
Jason Parkin, ct28499
Michael J. Wishnie, ct27221
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
jason.parkin@ylsclinics.org

---

[*] Motion for law student appearance forthcoming.