**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

CONLEY F. MONK, JR., on behalf of
himself and as Administrator of the Estate
of CONLEY F. MONK, SR., and
NATIONAL VETERANS COUNCIL
FOR LEGAL REDRESS,

No. 3:22-cv-1503 (JBA)

    *Plaintiffs*,

June 5, 2023

    v.

UNITED STATES OF AMERICA,

    *Defendant*.

## AMENDED COMPLAINT

1.     The U.S. Department of Veterans Affairs and its predecessor, the Veterans'
Administration (collectively "VA"), have operated generous programs of education, housing,
disability compensation, and other benefits since World War II. For decades, there have been
anecdotal reports and widespread suspicion of racial discrimination in these programs.

2.     In 2021, statistical evidence confirmed, for the first time, racial discrimination by
VA. In response to Freedom of Information Act (FOIA) litigation, VA disclosed records
demonstrating a statistically significant difference in VA disability compensation claim
determinations based on race in every year from 2001 to 2020, the period for which VA
disclosed data. During this twenty-year period, VA was on average 21.9% more likely to reject
applications of Black veterans than of white veterans.

3.     The hard data confirmed what years of reports of racial bias in VA facilities and
among VA employees, and the lack of racial diversity on promotions lists and among VA
leadership suggested: Black veterans have been subjected to the emotional, dignitary, and

reputational harms of interacting with a racially discriminatory VA benefits system.

4.      The harms of racial discrimination in the military are extensive. Non-white servicemembers are subjected to disproportionately higher levels of discipline and punishment than their white counterparts, and veterans who receive less-than-honorable discharges are significantly more likely than honorably discharged veterans to commit suicide and suffer a range of mental health disorders. These experiences impact not just the servicemember, but their children and future generations.

5.      Similarly, the harms of racial disparities in benefits adjudications go far beyond the financial value of any benefits that may have been granted (or not granted) under a non-discriminatory system and include re-traumatization, emotional distress, reputational damage, and the opportunity cost of time spent reapplying for and appealing denied applications for benefits.

6.      Plaintiff Conley F. Monk Jr., his deceased father Conley F. Monk Sr., and members of Plaintiff National Veterans Council for Legal Redress (NVCLR) such as Michele Barnett are among the veterans subjected to this discriminatory benefits system who suffered dignitary, emotional, and psychological harm caused by the negligence of VA leaders in addressing the racial disparities of which they knew or should have known, and which they had a duty to remedy.

7.      In 2021, for the first time, Mr. Monk Jr. learned of concrete evidence of persistent racial disparities in VA benefits programs, namely the 2021 statistical analysis of records disclosed by VA during FOIA litigation. Members of NVCLR such as Ms. Barnett became aware of this evidence in 2022 and 2023, after Mr. Monk and NVCLR publicized it.

8.      In early 2022, Mr. Monk Jr. filed an administrative claim alleging that because

VA leaders knew or should have known of pervasive racial disparities in the award of VA benefits, and because they nevertheless failed to address these disparities, individuals in VA leadership negligently breached their statutory duty of care under 38 U.S.C. § 303 (2018) and 38 U.S.C. § 210(b) (1958). Later in 2022, Mr. Monk Jr. also filed an administrative claim on behalf of his father, for whose estate Mr. Monk Jr. serves as administrator. Members of NVCLR such as Ms. Barnett have filed similar claims in 2023. VA has acknowledged receipt of some of these claims but has not responded in substance to any of them.

9.      Plaintiffs do *not* seek to relitigate individual benefits requests. Instead, they seek to recover for the harms of interacting with a racially biased veterans' benefits system, of which VA leaders knew or should have known, and negligently failed to redress.

10.      Having exhausted administrative remedies, Mr. Monk Jr. brings this action pursuant to the Federal Tort Claims Act (FTCA) for himself and his father, as does NVCLR on behalf of its members who have or will have exhausted their FTCA administrative remedies.

11.      Plaintiffs seek to redress the harms caused to them by the failure of VA leaders and staff operating under their supervision to administer their benefits programs in a manner free from racial discrimination against Black veterans.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

13.      Venue is proper under 28 U.S.C. §§ 1402(b) and 1391(e)(1) because Plaintiff Conley F. Monk, Jr., on behalf of himself and as administrator of the estate of Conley F. Monk, Sr., and NVCLR all reside in the District of Connecticut and no real property is involved.

## PARTIES

14.      Plaintiff Conley F. Monk Jr. is a 74-year-old resident of New Haven, Connecticut.

He is a veteran of the U.S. Marine Corps, served with distinction in the Vietnam War, and continues to advocate for veterans as the cofounder and Director of NVCLR. He is also administrator of the estate of Conley F. Monk Sr., his deceased father, who was a resident of New Haven, Connecticut and an Army veteran of World War II.

15.     Plaintiff National Veterans Council for Legal Redress is a veterans service organization cofounded by Conley F. Monk Jr. in 1982. NVCLR supports veterans in obtaining employment, meals, clothing, transportation, and housing; operates a referral network to direct veterans to legal assistance and social services, and engages in legal and policy advocacy on behalf of veterans. The organization, whose principal place of business is in New Haven, CT, has long advocated to ensure that all who served our nation can secure crucial benefits and compensation without fear of discrimination. NVCLR members pay dues. Its members include Black veterans with pending and exhausted FTCA claims regarding VA racial discrimination in its benefits programs.

16.     Defendant United States of America is sued under the Federal Tort Claims Act (FTCA) for the tortious acts of its employees, including employees and officials of the Department of Veterans Affairs and its predecessor agency, the Veterans' Administration.

## LEGAL FRAMEWORK

17.     The United States Government has provided assistance for individuals who served in the nation's armed forces since 1776, when the Continental Congress established disability pensions for veterans.

18.     In 1944, when President Franklin D. Roosevelt signed the Servicemen's Readjustment Act ("G.I. Bill") providing, among other things, education and home loan benefits to World War II veterans, he observed that the bill and earlier legislation "provide the special

benefits which are due to the members of our armed forces—for they have been compelled to make greater economic sacrifice and every other kind of sacrifice than the rest of us, and are entitled to definite action to help take care of their special problems."

**Education Benefits**

19.     The G.I. Bill's education benefits were intended to give servicemembers the opportunity to resume education or technical training after their discharge from the military. Under the original legislation, eligible veterans who enrolled in a qualifying educational program—including undergraduate and professional schools, vocational schools, apprenticeships, and scientific and technical institutions, among others—could receive monetary assistance for tuition, books, supplies, and other necessary expenses to complete their education.

20.     After the original G.I. Bill expired in 1956, Congress continued to fund and expand education benefits for veterans. Eligible veterans can receive a monthly cash benefit to cover educational costs and a loan from VA for the cost of tuition.

21.     Approximately 20 million veterans have benefited from the education assistance programs initially established by the G.I. Bill, in university courses, certificate programs, on-the-job training, apprenticeship training, flight training, and non-college degree courses.

**Home Loan Benefits**

22.     Like VA education benefits, the VA home loan program was created by the original G.I. Bill in 1944. It helps veterans purchase and retain their homes through government-guaranteed loans.

23.     Under the original VA home loan program, veterans could apply for home loan guarantees from VA of up to 50% of the loan amount, not to exceed $2,000. Since 1944, Congress has amended the program to increase the guaranty to up to $45,000.

24.     As of October 2020, VA has guaranteed more than 25 million home loans.

*Disability Compensation*

25.     The VA disability compensation program provides support for veterans who were injured during their military service or whose condition worsened as a result of their service.

26.     Current VA disability compensation provides a monthly tax-free cash benefit to veterans with disabilities that are the result of a disease or injury incurred or aggravated during active military service. Depending on the degree of disability and number of dependents, a veteran may receive more than $4,000 in monthly tax-free cash benefits.

27.     In fiscal year 2022, VA provided over $154 billion in disability compensation to approximately 5.9 million veterans and their families.

*Eligibility for Education, Housing, and Disability Benefits*

28.     In addition to eligibility criteria specific to each VA benefits program, individuals are eligible for education, housing, and disability benefits only if they are considered a "veteran" under 38 U.S.C. § 101(2). The statute defines veterans as those individuals who were discharged from the military "under conditions other than dishonorable." *Id*.

29.     Individuals who receive an Honorable, General under Honorable, or Uncharacterized discharge are generally eligible for these VA benefits, unless a statutory bar applies. *See* 38 U.S.C. § 5303; 38 C.F.R. § 3.12. Those who receive a Dishonorable discharge are not considered veterans and are ineligible for these VA benefits. 38 U.S.C. § 101(2).

30.     Individuals who receive an Other than Honorable or Bad Conduct discharge may be eligible for VA benefits. When a person with such a discharge applies for benefits, VA must conduct a "character of discharge" (COD) assessment to determine whether such a discharge was "under conditions other than dishonorable," taking into consideration the person's military

records and any other evidence submitted. 38 C.F.R. § 3.12.

***VA's Duty to Administer Education, Housing, and Disability Benefits***

31.     The U.S. Department of Veterans Affairs and its predecessor agency, the

Veterans' Administration, have been responsible for administering veterans' education, housing,

and disability benefits programs.

32.     On July 3, 1930, Congress established the Veterans' Administration, headed by

the VA Administrator. Until 1957, federal law stated that the VA Administrator, "under the

direction of the President, shall have the control, direction, and management of the various

agencies and activities [enumerated herein]" concerning the "administration of the laws relating

to the relief and other benefits provided by law" for veterans. 38 U.S.C. § 11 (1934).

33.     In 1957, Congress amended the statute, providing that the "Administrator . . . is

responsible for the *proper execution and administration* of all laws administered by the

Veterans' Administration and for the control, direction, and management of the Veterans'

Administration." Veterans' Benefits Act of 1957, Pub. L. No. 85-56, 71 Stat. 83, 91-92 (1957)

(emphasis added); 38 U.S.C. § 210(b) (1958).

34.     In October 1988, President Reagan elevated the Veterans' Administration to a

Cabinet-level department. The Veterans' Administration officially became the modern-day U.S.

Department of Veterans Affairs on March 15, 1989.

35.     On August 6, 1991, Congress passed the Department of Veterans Affairs

Codification Act, establishing the purpose and structure of the new Department. Congress

imposed the same duty of care on the Secretary of Veterans Affairs as it had on the former VA

Administrator, providing that the VA Secretary is "responsible for the *proper execution and*

*administration* of all laws administered by the Department and for the control, direction, and

management of the Department." 38 U.S.C. § 303 (emphasis added).

## FACTUAL ALLEGATIONS

36.     VA officials knew or should have known about the racially disparate outcomes in

benefits administration, and yet were negligent and deliberately indifferent to the discrepancies.

The failure of VA leadership to redress these discrepancies through improved training,

supervision, auditing, monitoring, and quality control resulted in subjecting Mr. Monk Jr., Mr.

Monk Sr., and members of NVCLR to a racially discriminatory system, causing distinct

emotional, reputational, and dignitary harm.

     **A.**    **VA Officials Breached Their Duty of Care by Administering Benefits in a
Racially Discriminatory Manner.**

37.     On February 22, 2021, NVCLR and the Black Veterans Project (BVP) filed

Freedom of Information Act (FOIA) requests with three components of VA. The requests sought

information regarding the administration of service-connected disability compensation, as that

program is the largest veterans' benefits program and serves the most veterans. The disability

compensation program also directly harmed the plaintiffs, who were denied benefits for years.

38.     VA provided responses to some, but not all, of these FOIA requests. NVCLR and

BVP filed administrative appeals and then a complaint in U.S. district court. After months of

litigation, in 2021 VA conducted further searches and produced additional documents.

39.     The records disclosed by VA included claims outcomes from 2001 to 2020. VA

represented that the data did not cover previous years because it did not link ratings decision data

to specific files and did not fully retain disability decision data prior to 2001.

40.     Through their counsel, NVCLR and BVP consulted a Yale University statistician

to analyze the VA records. The analysis found a statistically significant difference in VA claim

outcomes (the number of claims denied, partially granted, or granted) between: (1) Black

veterans and white veterans; (2) Black male veterans and white male veterans; and (3) Black female veterans and white female veterans.

41.     VA denied Black veterans, Black male veterans, and Black female veterans disability compensation at statistically higher rates than their white counterparts. For instance, between 2001 to 2020, the average denial rate for disability compensation was 29.5% for Black veterans and 24.2% for white veterans — meaning a Black veteran was on average 21.9% more likely to have their claim denied by VA, compared to a white veteran.

42.     In addition, the statistician's analysis found that VA's average grant rate for disability compensation was 30.3% for Black veterans and 37.1% for white veterans – meaning a white veteran was on average 22.4% more likely to have their claim granted by VA, compared to a Black veteran. This is also a statistically significant disparity.

43.     The data showed that from 2002 to 2020, a Black veteran applying for disability compensation was more likely to be denied than a white veteran. This data is displayed below.



44.     On information and belief, additional records possessed by VA and not yet publicly disclosed further confirm racial disparities in the administration of VA benefits programs since World War II, which disproportionately harmed Black veterans. VA leaders knew or should have known about these disparities, yet negligently failed to redress them.

**B.      VA Knew or Should Have Known About Racial Discrepancies and Failed to Remedy Them.**

45.     On information and belief, the discriminatory pattern confirmed by data for the 2001-2020 period was also present in prior periods. Plaintiffs are not aware of any changes in VA practices, policies, or procedures in or around 2001 that would suggest the discriminatory trend between 2001 and 2020 represented a departure from prior periods. To the contrary, Plaintiffs reasonably expect discovery to confirm that the same or similar discriminatory trends were present in prior periods as well.

46.     VA officials violated their statutory obligation and duty of care to properly execute and administer the law when they administered benefits in a manner they knew or should have known resulted in racially disparate outcomes which subjected Black veterans to dignitary, reputational, and psychological harm.

47.     VA officials were deliberately indifferent to those outcomes because they knew about pervasive disparities yet failed to redress them; this deliberate indifference constituted intentional discrimination as well.

48.     The records that NVCLR received from VA through their FOIA requests demonstrate that for decades VA leadership, including VA Secretaries, knew or should have known of, and were deliberately indifferent to, racial disparities in veterans' benefits for Black veterans. And for decades, VA officials have negligently failed to redress these disparities.

49.     These officials included every VA Administrator or Secretary since World War II as well as each Under Secretary of Veterans Affairs for Benefits and other senior VA officials responsible for administering veterans' benefits programs in the same period.

50.     VA Administrators include Frank T. Hines (1930-1945), Omar Bradley (1945-1948), Carl R. Gray Jr. (1948-1953), Harvey V. Higley (1953-1957), Sumner G. Whittier (1957-1961), John S. Gleason (1961-1965), William J. Driver (1965-1969), Donald E. Johnson (1969-1974), Richard L. Roudebush (1974-1977), Max Cleland (1977-1981), Robert Nimmo (1981-1983), Harry N. Walters (1983-1986), Thomas K. Turnage (1986-1989), and Edward Derwinski (1989).

51.     VA Secretaries include Edward Derwinski (1989-1992), Anthony Principi (1992-1993; 2001-2005), Jesse Brown (1993-1997), Hershel W. Gober (1997-1998; 2000-2001), Togo D. West Jr. (1998-2000), Anthony Principi (2001-2005), Jim Nicholson (2005-2007), Gordon H. Mansfield (2007), James Peake (2007-2009), Eric Shinseki (2009-2014), Sloan D. Gibson (2014), Bob McDonald (2014-2017), Robert Snyder (2017), David Shulkin (2017-2018), Robert Wilkie (2018; 2018-2021), Peter O'Rourke (2018), Dat Tran (2021), and Denis McDonough (2021-present).

52.     Under Secretaries of VA Benefits include Raymond John Vogel (1994-1997), Joseph Thompson (1997-2001), Daniel Cooper (2002-2008), Patrick W. Dunne (2008-2010), Michael Walcoff (2010-2011), Allison A. Hickey (2011-2015), Thomas Murphy (2016-2018; 2021-2022) Paul R. Lawrence (2018-2021), and Joshua Jacobs (2022-present).

53.     For example, the lack of training, supervision, auditing, quality-control, and record-keeping practices implemented by these and other VA leaders designed to prevent or to

11

mitigate racial discrimination has caused a disparate impact on Black veterans applying for benefits as compared to white veterans.

54.     The long history of negligence and deliberate indifference of VA leadership, and their failure to train, supervise, monitor, and instruct agency officials to take steps to identify and correct racial disparities, has led to systematic benefits obstruction for Black veterans, and a system rife with racial discrimination.

55.     VA leaders have failed to properly train, supervise, and instruct employees on procedures and practices that would administer benefits in nondiscriminatory ways.

56.     VA policy requires that all Veterans Benefits Administration (VBA) claims adjudication employees attend multiple hours of professional development training per year, in addition to extensive initial job training.

57.     To its credit, VA has recently implemented training to address bias in its workplace. However, and on information and belief, training on identifying, remedying, and eliminating racial bias in VA benefits program administration has been minimal or nonexistent.

58.     The manuals that VA leadership write, edit, and distribute to veterans' benefits adjudicators to provide detailed guidance in claim adjudication include no or minimal guidance on eliminating racial bias in decision-making, or identifying and remedying bias in prior decisions.

59.     In 2017, a Veterans Law Judge (VLJ) and attorney-advisor with the Board of Veterans' Appeals (BVA) were fired after they and other colleagues were found to have created an email chain, they called the "forum of hate" in which they sent and received racist messages targeting Black VA benefits claimants, as well as hateful messages targeting other minorities.

60.     On information and belief, VA leadership did not make systemic changes to its VLJ or BVA staff trainings or operations guides to provide guidance on eliminating racial bias in its own decision-making, or identifying and remedying racial bias in decision-making at the Regional Office level, even after discovering that its culture allowed a VLJ and BVA staff to comfortably exchange grossly racist emails from their official government accounts for years.

61.     On information and belief, the only training, instruction, or supervision that VA leadership ensures VBA employees and supervisors receive related to racial bias and discrimination is in the form of equal opportunity-style trainings that focus on relationships between coworkers, not VA employees and claimants.

62.     Even that training is insufficient. The American Federation of Government Employees (AFGE) discovered disparities in VA hiring and promotion practices from 2017-2020 through a FOIA request. The data showed that white employees were twice as likely to be promoted than Black employees. *See New Data: White Employees Twice as Likely to be Promoted Than Black Employees at the Veterans Affairs Department.* AFGE (Oct. 15, 2020)

63.     On May 6, 2021, during a House Veterans Affairs Subcommittee on Oversight and Investigations hearing, U.S. Rep. Chris Papas (D-NH) revealed that while 43% of the department's 400,000 employees are a racial minority, people of color and women are under-represented in senior roles. Black women comprise 17% of VA's workforce but hold fewer than 6% of senior positions. By contrast, white men make up 23% of the workforce but hold nearly half of the senior positions.

64.     Moreover, a 2020 survey of 1,500 VA employees found that 78% of respondents said that endemic racism is a moderate or serious problem at VA, and more than half reported witnessing discrimination against the veterans the agency serves. *See 78 Percent of Union*

*Veterans Affairs Employees Surveyed Say Racism is a Problem at the VA*. AFGE (Aug. 7, 2020)

65.     VA's Advisory Committee on Minority Veterans formally raised concerns to VBA leadership in 2013, 2015, 2016, 2017, and 2018 that minority veterans believed their disability compensation ratings were lower than non-minority veterans' ratings, especially for Post-Traumatic Stress Disorder (PTSD).

66.     Rather than respond with action to these concerns when they were first raised, VA leadership publicly stated that while it "concur[red] in principle" that any disparities should be identified, doing so would potentially raise "litigation concerns."

67.     Privately, VA did study and uncover dramatic racial disparities harming Black veterans in VA benefits adjudications. Rather than act to remedy the disparities, VA leadership intentionally concealed the information from the public, and did nothing in response.

68.     In 2023, NVCLR received additional FOIA responses from VA that showed VA leaders knew about large racial disparities in 2017, based on VA's own internal analysis of its data since 2010, but failed to correct them.

69.     A 2017 draft VA report showed that there was a significant disparity in grant rates for PTSD claims between Blacks and other groups. VA's own report found that "Non-Hispanic Blacks have the lowest grant rate at 43% and are the largest outlier in terms of grant rate," as shown in the extracted table below.

| Ethnorace (group) | | Service Connected PTSD | |
| --- | --- | --- | --- |
| | | Denied | Granted |
| Hisp. White | Vets count | 38,871 | 60,958 |
| | % | 39% | 61% |
| Non-hisp. White | Vets count | 264,213 | 346,190 |
| | % | 43% | 57% |
| American Indian/Alaskan, Asian/Pacific, Hisp. Black | Vets count | 6,887 | 9,113 |
| | % | 43% | 57% |
| Non-hisp. Black | Vets count | 80,274 | 61,153 |
| | % | 57% | 43% |
| Grand Total | Vets count | 390,245 | 477,414 |
| | % | 45% | 55% |

70.     VA leaders refused to release this report publicly, took no steps to redress the dramatic racial disparities VA itself had uncovered, and failed to meaningfully change its benefits administration processes to account for and rectify these discrepancies.

71.     VA officials negligently failed to collect and aggregate claims data prior to 2001 in a manner that would allow VA to identify the nature, scope, and collateral effects of these disparities sooner. In addition, VA leaders have not fully retained disability decision data from before 2001.

72.     VA's negligence in maintaining a system that could not track or rectify racial discrepancies harmed thousands of Black veterans by subjecting them to a racially discriminatory benefits system.

73.     VA acknowledged its record-keeping negligence in response to the FOIA requests from NVCLR and BVP, conceding that "rating decision data was never directly linked to the Pending Issue File or to the CPMR, limiting our ability to link outcomes to claims." The CPMR is the Compensation and Pension Master Record, which was a payment system used by VA.

74.     VA leadership's negligence and deliberate indifference in failing to create and

maintain a system to track claims and identify racial disparities led the agency to fail to properly execute and administer the law, as required by statute and their duty of care to veterans.

75.     Even without adequate internal data tracking, VA officials also knew or should have known that racial bias in the military justice system was affecting the discharge status of Black veterans with less-than-Honorable discharges like Mr. Monk Jr.—and affecting their access to benefits as a result.

76.     The Defense Department's own analysis shortly after Mr. Monk's discharge demonstrated that Black servicemembers were substantially more likely than white servicemembers to face military justice or disciplinary action. Task Force on the Admin. of Mil. Just. in the Armed Forces, Off. of the Assistant Sec'y of Def., *Report of the Task Force on the Administration of Military Justice in the Armed Forces Vol. I* 32 (1972); *see also* Peter G. Nordlie et al., *U.S. Army Research Institute for the Behavioral and Social Sciences, Measuring Changes in Institutional Racial Discrimination in the Army* 25 (1975) (finding "a strong relationship between skin color and type of discharge").

77.     More recent analyses have reached similar conclusions. Daniel P. MacDonald, et al., *Defense Equal Opportunity Management Institute Directorate of Research Development and Strategic Initiatives, Report of Racial Disparities in the Military Justice System* 17 (2017) (finding that Black servicemembers were 36.6% and 50% more likely to face courts-martial and non-judicial punishments, respectively, than white servicemembers).

78.     After the 1972 Defense Department Report, the U.S. Equal Employment Opportunity Commission (EEOC) concluded that military discharges were so tainted by race discrimination that an employer who required an honorable discharge as a condition of hiring violated Title VII of the Civil Rights Act of 1964, absent a business necessity. EEOC Decision

No. 74-25 (1973); *see also* EEOC Decision No. 76-13 (1975) (same, as to blanket refusal to hire or re-employ veteran with less-than-honorable discharge), *overruled in part on other grounds by* EEOC Decision No. 80-26 (1980); *Dozier v. Chupka*, 395 F. Supp. 836 (S.D. Ohio 1975) (holding municipal fire department disqualification of applicants with less-than-honorable discharges has impermissible adverse impact based on race).

79.     Yet VA continued to rely on military discharges to make COD determinations, guaranteeing that racial discrimination would be baked into its adjudication process. Because VA looks to veterans' service records and discharge status in making COD determinations, VA knew or should have known that bias in the military justice system would likely lead to racial disparities in its COD determinations absent a concerted effort to identify and correct for this effect.

80.     VA leaders also knew or should have known that placing undue weight on the ostensibly voluntary nature of an Other than Honorable discharge contributes to racial disparities in COD determinations and has the same sort of impermissible disparate impact that the EEOC determined was unlawful in employment settings.

81.     VA leaders negligently, and with deliberate indifference, failed to rectify these issues, resulting in COD determinations that were based on racially disparate discharge statuses.

82.     VA leadership's negligence and deliberate indifference to racial disparities of which it knew or should have known has led to systematic benefits obstruction for Black veterans and a system rife with racial discrimination.

**C.     VA Leadership's Negligent Administration of Benefits Harmed Mr. Monk Jr**.

83.     Conley F. Monk Jr. is a proud Black Vietnam War veteran who has been a leader, advocate, and counselor to other veterans for more than 50 years. He is one of thousands of

Black veterans harmed by VA's tortious conduct.

84.    Mr. Monk Jr. was born in Rocky Mount, North Carolina, in 1948 into the accomplished Monk family that includes the jazz musician Thelonious Monk, the Hall of Fame football player Art Monk, and generations of teachers, police officers, and public servants.

85.    Mr. Monk Jr. moved with his family to Connecticut when he was very young. He grew up and attended public schools in New Haven, and during high school worked part-time at the VA Hospital in West Haven.

86.    On November 12, 1968, at 20 years old, Mr. Monk Jr. voluntarily enlisted in the U.S. Marine Corps and continued a long tradition of family service.

87.    He completed boot camp at Parris Island, South Carolina, and Motor Vehicle Operations School at Camp Lejeune, North Carolina. He then deployed to Vietnam.

88.    Mr. Monk Jr. arrived in Vietnam on July 20, 1969. Moments after he touched ground in Da Nang, while still disembarking from the airplane, Mr. Monk Jr. and the men with whom he arrived were barraged by enemy mortar rounds. Mr. Monk felt defenseless against the attack, as he and the other men on their first deployment had not yet been issued weapons.

89.    The next morning, Mr. Monk Jr. was driven through an area under enemy fire to meet his unit in Quang Tri. Quang Tri was one of the most contested areas in south Vietnam, and American troops there regularly engaged in heavy ground fighting.

90.    As a motor vehicle operator, Mr. Monk Jr. was responsible for transporting troops and equipment. He also performed interior and perimeter guard duty.

91.    Because Quang Tri was located less than 20 kilometers from the Demilitarized Zone (DMZ), Mr. Monk regularly drove into the DMZ, where fighting was heavy. Mr. Monk Jr.'s convoys were frequently attacked. Indeed, his convoy truck had bullet holes throughout it.

Mr. Monk Jr. saw daily reminders that death could come at any time. As he drove through the combat zone, he passed the bodies of fallen Viet Cong fighters on the side of the road.

92.     One of his most gruesome memories arises from witnessing a fellow Marine drive over a Vietnamese man who had jumped in front of their vehicle without warning. Unsure of whether the man was going to attack, the driver ran the man over, right before Mr. Monk's eyes. Memories of the grisly death and the uncertainty of whether his comrade had been right to run over the Vietnamese man haunt Mr. Monk Jr. to this day.

93.     Despite the intensity of the violence, Mr. Monk Jr. performed his duties faithfully. He received a Rifle Marksman Badge, a National Defense Service Medal, a Vietnam Service Medal with one star, and a Vietnam Combat Medal with Device.

94.     In November 1969, Mr. Monk Jr.'s unit was pulled out of Vietnam. He was transferred to the 3rd Battalion of the 3rd Marine Division, which was temporarily stationed in Okinawa, Japan.

95.     Mr. Monk Jr. began to fully experience the onset of Post-Traumatic Stress Disorder (PTSD) in Okinawa. He was in a constant state of fear and hypervigilance. Mr. Monk Jr.'s PTSD led to two altercations in Okinawa that resulted in him spending time in base prison. Mr. Monk was told that he would stay in base prison until he signed papers agreeing to an Undesirable discharge and waiving his right to a court-martial.

96.     Mr. Monk Jr. did not understand that by agreeing, he would forfeit eligibility for medical care and other veterans' benefits and also face a lifetime of stigma. Depressed and symptomatic with PTSD, Mr. Monk Jr. signed the discharge papers.

97.     Mr. Monk Jr. was separated on September 15, 1970 with an Undesirable discharge (now known as a discharge "Under Other than Honorable" conditions).

98.     Upon his return home, Mr. Monk Jr.'s condition worsened. He reacted instinctively to loud sounds, conflating them with blasts from Vietnam. When he entered a restaurant or was near a window, Mr. Monk Jr. would keep his back against a wall for safety. Over time, he self-medicated to cope with his symptoms and developed an addiction to drugs.

99.     In the early 1970s, Mr. Monk Jr. consulted a psychiatrist for help with his substance use and mental health. However, the American Psychiatric Association's Diagnostic and Statistical Manual did not recognize PTSD as a medical condition until 1980, and there was little understanding of PTSD at the time. Mr. Monk Jr.'s PTSD went untreated and undiagnosed for years.

100.    Faced with his family's disappointment and dismay, Mr. Monk Jr. resolved to get clean from his drug addiction. He enrolled in the Connecticut Mental Health Center substance use program and ended his addiction. While in the program, Mr. Monk Jr. noticed that many of the men seeking treatment were veterans facing special challenges that the program was not able to address. Mr. Monk Jr. wanted to help these men whose experiences he recognized in himself.

101.    Mr. Monk Jr. became an addiction counselor certified by the Addiction Prevention Treatment Foundation. He later joined the Yale Department of Psychology where he worked for four years, first as a drug counselor and later as a senior rehabilitation counselor.

102.    Informed by his own experiences and time working with Vietnam veterans, Mr. Monk Jr. cofounded a group called "The Undesirables" to help veterans with Other than Honorable discharges apply for discharge upgrades and medical benefits. Mr. Monk built the organization from the ground up, using books at the public library to teach himself how to write the bylaws, and recruiting pro bono lawyers and accountants. The group later changed its name to NVCLR. Mr. Monk Jr. continues to serve as its Director.

103.     Soon after Mr. Monk Jr. left the U.S. Marine Corps, he applied for unemployment compensation in Connecticut. The state unemployment agency sought information from the Veterans' Administration regarding Mr. Monk Jr.'s eligibility.

104.     VA conducted a COD determination and, in a March 1971 administrative decision, found that Mr. Monk Jr. was "discharged under dishonorable conditions and is not therefore entitled to any benefits administered by the Veterans' Administration." As a result, Mr. Monk, Jr. was denied unemployment compensation. He requested that VA reconsider its decision, but VA refused to do so in May 1971.

105.     VA's 1971 COD determination was flawed. It relied on a finding that Mr. Monk Jr. voluntarily signed his discharge papers, and it was not based on all of the facts and circumstances surrounding the incidents that led to Mr. Monk Jr.'s discharge, as required by law. The agency's failure to conduct a meaningful COD determination, and its stubborn refusal to reconsider that initial conclusion negatively impacted Mr. Monk Jr. for decades.

106.     In 1976, Mr. Monk Jr. applied for VA education benefits in connection with his enrollment in a degree program at the University of New Haven. At the time, Mr. Monk Jr. and his partner were raising his two young daughters, and Mr. Monk Jr. had enrolled at the University of New Haven to better his life and opportunities for his young family.

107.     In a decision dated April 12, 1976, VA denied Mr. Monk Jr.'s application for education benefits based on his discharge status. VA relied exclusively on the flawed 1971 COD determination and failed to make a new COD determination in connection with this application for educational assistance.

108.     After VA denied his benefits application, Mr. Monk Jr. continued his education but had to pay out-of-pocket while also working two jobs. However, in 1979, just 3.5 credits

short of completion, Mr. Monk Jr. was forced to give up his studies because of the financial strain on his family. He was never able to obtain his degree, which impaired his ability to support his family and achieve financial stability in his household.

109.    In 1982, upon learning about the newly-defined medical condition of PTSD, Mr. Monk Jr. recognized his own symptoms and applied for VA disability compensation for PTSD.

110.    VA denied his application, continuing to rely on the flawed 1971 COD determination and declining to make a new COD determination. VA's ruling left Mr. Monk Jr. feeling hopeless and as if the military had abandoned him despite his years of dedicated service.

111.    In 1983, now a father of four, Mr. Monk Jr. applied for VA home loan benefits. Mr. Monk Jr. and his partner were excited to move their family into a nice house in West Haven, Connecticut. Despite his previous denials, Mr. Monk Jr. hoped that VA would look favorably on him given his continued service to veterans. He also knew of other veterans with Other than Honorable discharges who were receiving VA benefits.

112.    Nevertheless, VA concluded that Mr. Monk Jr. was ineligible for VA home loan guaranty benefits. VA relied on the flawed 1971 COD determination and, again, failed to make a new COD determination.

113.    After VA denied Mr. Monk Jr.'s home loan application, Mr. Monk spent months applying to other financial institutions to secure a loan. He was homeless for a period of time because of his inability to pay for housing. Although Mr. Monk Jr. eventually obtained a home loan, the delay cost him and his family economic and social benefits of homeownership.

114.    Feeling abandoned by VA and the military, Mr. Monk Jr. stopped applying for benefits for over two decades. He believed VA's benefits system to be plagued by racial bias and feared that he would never receive help from the country he had faithfully served.

115.    In 2007, Mr. Monk Jr. suffered a severe stroke as the result of his undiagnosed diabetes. The stroke left him unable to read, write, or walk for months. Soon thereafter, Mr. Monk Jr. was diagnosed with type II diabetes mellitus as a result of his exposure to Agent Orange in Vietnam. Due to his financial constraints, Mr. Monk Jr.'s physician treated him with free medication samples that he otherwise could not afford. Mr. Monk Jr.'s wife and oldest daughter helped him pay for his medical care.

116.    In 2010, hoping for additional assistance, Mr. Monk Jr. again applied for VA disability compensation, this time for his type II diabetes mellitus.

117.    As the 2021 statistical evidence establishes, VA was significantly more likely to deny the application of Mr. Monk Jr., a Black veteran, than that of a white veteran. And indeed, in a decision dated December 8, 2010, VA rejected his application, relying again on the flawed 1971 COD determination and failing to make a new COD determination. VA also reminded Mr. Monk Jr. that it had previously denied his 1976 and 1982 applications for assistance.

118.    VA's denial reaffirmed Mr. Monk Jr.'s disillusionment and hopelessness. It also compounded the financial stress on his family, which continued to pay for his medical care.

119.    In September 2011, Mr. Monk Jr. asked the Veterans Legal Services Clinic at Yale Law School for assistance in seeking a discharge upgrade and VA benefits. The Clinic referred Mr. Monk Jr. to a psychiatrist for evaluation. Over a total of four hours, Mr. Monk Jr. retold the psychiatrist the traumatic events that caused his PTSD. He relived the worst experiences of his life to support his re-application for disability compensation.

120.    The psychiatrist concluded Mr. Monk Jr. had a severe case of PTSD, which arose from his military service in Vietnam.

121.    In February 2012, represented by the Clinic, Mr. Monk Jr. applied again for disability compensation for PTSD, diabetes, and diabetic peripheral neuropathy in his arms and legs. As the 2021 statistical analysis indicated, and as VA's own 2017 internal analysis confirmed, the agency was more likely to deny Mr. Monk Jr.'s 2012 application than that of a white veteran. And indeed, VA did so again, still relying on his discharge status and the flawed 1971 COD determination. The agency did not conduct a new COD determination.

122.    Mr. Monk Jr. appealed. In September 2015, after Mr. Monk Jr. had obtained an upgrade of his discharge status through a separate application to the Board for Correction of Naval Records and litigation in U.S. district court, VA granted him disability compensation for PTSD with a 100% rating, as well as for diabetes and associated peripheral neuropathy.

123.    When VA finally granted Mr. Monk Jr. benefits, it erroneously assigned his claim an "effective date" based solely on his discharge upgrade. VA refused to consider whether he was eligible any earlier, as it continued to rely on its flawed and cursory 1971 COD determination. This VA mistake cost Mr. Monk Jr. thousands of dollars in retroactive benefits.

124.    Mr. Monk appealed again. The U.S. Court of Appeals for Veterans Claims held that VA had erred in refusing to consider his eligibility for benefits before the date of his discharge upgrade. *Monk v. Wilkie*, 2020 WL 2461722 (Vet. App. May 13, 2020).

125.    On remand, the Board of Veterans Appeals agreed, at long last, that even before it was upgraded, "his discharge . . . was ***not*** a bar to benefits." *In re Monk*, 2020 WL 8912950, at *1 (Bd. Vet. App. Dec. 15, 2020) (emphasis added) (granting disability compensation beginning February 2012). This decision effectively overturned VA's cursory 1971 COD determination that had wrongly barred Mr. Monk Jr. from vital benefits and services for decades. *Id.*

126.    VA's decision granting disability compensation changed Mr. Monk Jr.'s life. For the first time, he felt truly recognized by VA for his service.

127.    VA's negligence had caused Mr. Monk Jr. to be denied veterans' benefits to which he was entitled; however, those denials of benefits are not in themselves at issue in this litigation.

128.    Instead, VA's negligence harmed Mr. Monk Jr. and his family financially and emotionally because of the toll it took to interact with a biased and improperly trained and supervised system.

129.    Each time Mr. Monk Jr. applied for VA benefits, he submitted extensive supporting documentation, filled out various VA forms, and interacted with VA officials.

130.    In the case of his third disability compensation application in 2012, Mr. Monk Jr. also underwent psychiatric evaluations. Through painstaking detail, Mr. Monk Jr. relived and retold his trauma to numerous individuals—including doctors, his counsel, and character references—to prove his eligibility for disability compensation.

131.    Mr. Monk Jr. also endured the emotional trauma of applying for VA benefits repeatedly when VA initially denied his 2012 application, forcing him to navigate the appeal system and litigate two federal lawsuits to secure his benefits.

132.    The entire process exacerbated Mr. Monk Jr.'s PTSD and caused significant emotional distress.

133.    Upon returning home from his military service, Mr. Monk Jr. suffered the severe reputational and dignitary harms associated with his benefit denials. The veterans' community that once embraced Mr. Monk Jr. as a son of a World War II veteran now looked down upon him. The shame and stigma associated with his benefit denials caused Mr. Monk to feel like an

outsider and a failure. He suffered significant emotional, dignitary, and reputational harm because of VA's actions.

134.    Mr. Monk Jr. suffered harm stemming from racial discrimination within the VA benefits system. He experienced this discrimination as an affront to his dignity, and it caused him emotional distress.

**D.    VA Leadership's Negligent Benefits Administration Harmed Mr. Monk Sr.**

135.    Conley F. Monk Sr. was a Black veteran of the United States Army.

136.    Mr. Monk Sr. was born in 1919 in Johnston, North Carolina, into the accomplished Monk family. He was the father of class representative Conley F. Monk, Jr.

137.    In 1943, at the age of 23, Mr. Monk Sr. voluntarily enlisted into the U.S. Army at Fort Liberty (then Fort Bragg) in North Carolina. He had a primary occupational specialty of motor transport.

138.    Mr. Monk Sr. participated in the Normandy invasion in 1944.

139.    Like all Black servicemembers at the time, Mr. Monk Sr. was forced to serve in a segregated unit.

140.    During his service, Mr. Monk Sr. developed stomach issues, including epigastric pains and an ulcer.

141.    Mr. Monk Sr. was honorably discharged from the Army in January 1946.

142.    VA acknowledged that Mr. Monk Sr.'s stomach troubles were caused by service-connected neurosis, but it nonetheless denied him disability benefits on the basis that his disability rating was less than 10%.

143.    Mr. Monk Sr. also applied for VA benefits so that he could care for his dependent

mother, Mamie Lottin Monk. VA rejected his application, offering only a cursory explanation

that he had not presented evidence "adequate to establish [his mother's] dependence."

144.    Mr. Monk Sr. struggled to find work after returning home to North Carolina, in

large part due to Jim Crow-era laws that significantly limited his employment prospects. With no

stable job and no financial support from VA, Mr. Monk Sr. decided to move his family north.

145.    In 1952, Mr. Monk Sr, his wife Olivia, and his young children—including

Plaintiff Conley F. Monk Jr.— left North Carolina and moved to New Haven, Connecticut.

146.    In New Haven, Mr. Monk Sr. worked two jobs to support his family, one at Yale

New Haven Hospital and the other at Seamless Rubber Company.

147.    Mr. Monk Sr. became a beloved and highly respected leader in the New Haven

community, serving as the Chairman of the Deacon Board at Thomas Chapel Church of Christ in

New Haven and the head of the church's Sunday School program.

148.    Mr. Monk Sr. was also passionate about helping those in his community who

were disadvantaged, particularly young people. He and his wife Olivia often provided struggling

community members with food, shelter, and financial assistance. They also opened their home

and provided care to over 40 foster children.

149.    While he worked to support his family and community, Mr. Monk Sr. was quietly

struggling with several serious health issues. He suffered a stroke at age 55 and was diagnosed

with Parkinson's disease shortly thereafter. His stomach issues also persisted throughout his

lifetime. Based on his VA file, it does not appear that he ever received VA disability benefits for

these service-connected disabilities. Nor did he receive VA housing or education benefits.

150.   After a long struggle with Parkinson's, Mr. Monk Sr. passed away from heart failure on January 20, 1989, several days after surgery for a bowel obstruction.

151.   Mr. Monk Sr. suffered significant emotional distress because of VA's negligent administration of benefits.

152.   Mr. Monk Jr., as administrator for the estate of Mr. Monk Sr., seeks compensation for the negligent failure of VA leaders to redress a process they knew or should have known was racially discriminatory and which resulted in a distinct and separate harm. Simply, the indignity of racial discrimination is a distinct injury, for which this suit seeks redress.

**E.   VA Leadership's Negligent Administration of Benefits Harmed NVCLR Members**

153.   NVCLR is a Connecticut organization based in New Haven. Its purposes include assisting veterans with less than honorable discharge statuses and educating the public about the stigma and struggles these veterans face. In the 1980s, NVCLR also led a successful campaign to erect a monument to Vietnam veterans at Long Wharf in New Haven.

154.   NVCLR is comprised of members who are veterans of the U.S. military, pay yearly membership dues, and attend regular meetings in the New Haven area. It has aided veterans, especially but not exclusively African American veterans, in seeking VA benefits and applying for discharge upgrades.

155.   Approximately 80% of NVCLR's membership has applied for VA disability, education, or housing benefits. A majority of NVCLR's membership is Black.

156.   NVCLR has a Board of Directors whose members are also members of the organization. NVCLR helps members with discharge upgrades, benefits applications, and other benefits or services that veterans might need.

157.   NVCLR assists veterans in applying for benefits in the racially discriminatory system administered by VA leadership, including in initial applications and on appeal. NVCLR connects their members, which include Black veterans, with support and resources after being denied benefits by VA. This can include help with appealing a denial, connection with another support organization, or counseling on next steps.

158.   NVCLR brings this action on behalf of its members who were harmed by the negligence of VA leadership in administering a racially discriminatory benefits program and who have or will have exhausted their administrative remedies under the Federal Tort Claims Act. At least one NVCLR member is a Black veteran who has exhausted her FTCA administrative remedies and at least two other NVCLR members are Black veterans with pending, unexhausted FTCA claims. Michele Barnett is a Black veteran of the United States Navy and a member of NVCLR. Like Mr. Monk Jr. and Mr. Monk Sr., Ms. Barnett is one of thousands of Black veterans who has been harmed by the tortious and discriminatory conduct of VA officials.

159.   Ms. Barnett was born in Brooklyn, New York in 1963.

160.   When Ms. Barnett was in college, a friend encouraged her to join the Navy. Ms. Barnett enlisted in 1983 and completed basic training in Orlando, Florida.

161.   Ms. Barnett initially enjoyed her time in the Navy and formed nurturing relationships with other female servicemembers. After completing basic training, Ms. Barnett was stationed in Norfolk, Virgina. She worked a variety of jobs including cleaning the barracks, working on the tugboats, and shore patrol. Ms. Barnett's main job was a postal clerk.

162.   Ms. Barnett entered the military with no adverse health conditions. However, soon after joining she started to experience symptoms of asthma and severe allergies.

163.    These allergies began during her basic training in Orlando, Florida with symptoms including postnasal drip, sniffing, snorting, clearing of the throat and other issues. The symptoms were occasionally so severe that they caused her to throw up.

164.    Once, while Ms. Barnett was showering, a Company Commander forced her to use a specific type of shampoo. Ms. Barnett suffered a severe allergic reaction to the shampoo and developed an intense rash.

165.    Ms. Barnett was also diagnosed with pelvic inflammatory disease and related conditions in service.

166.    Ms. Barnett received an Honorable discharge from the Navy in 1987 and transferred to the U.S. Navy Reserve. Her active duty was set to expire March of that year, but she was kept on active duty until June because the Navy did not have a trained medical professional available to give Ms. Barnett necessary gynecological care.

167.    In 1989, Ms. Barnett began applying for VA benefits. That year, VA determined that Ms. Barnett had service-connected inflammation of the cervix. Despite this diagnosis, VA gave her a 0% disability rating.

168.    Ms. Barnett became dejected with VA's process, and for a time decided to stop applying for benefits she deserved and needed. She felt abandoned by VA and the trauma she experienced remains difficult for her to discuss. She gave years of service to the military, and felt that VA did not give her even the basic care she needed.

169.    In 1998, Ms. Barnett applied again for benefits for gynecological conditions, and added claims for allergies, asthma, and injuries to her back and forearm.

170.    When being evaluated for these claims during a VA-ordered Compensation & Pension ("C&P") exam, Ms. Barnett experienced unprofessionalism and rude remarks from VA

doctors and medical assistants. She was given no privacy while undressing, despite every civilian

gynecological examiner in her experience providing her with a private space to disrobe. Ms.

Barnett filed a complaint with VA about this C&P exam in 1999, but received no response.

171.    In 2000, VA retained her 0% disability rating for the gynecological issues. VA

also denied her service connection for the other claims.

172.    Ms. Barnett exhausted every avenue to try and obtain the benefits she had earned

from service. She contacted her members of Congress and wrote directly to then-Secretary of

Veterans Affairs Anthony Principi in 2001.

173.    In 2002, VA finally granted Ms. Barnett a 10% disability rating for follicular

cervicitis with pelvic inflammatory disease. After 13 years of advocacy, this was the first time

she received disability compensation from VA.

174.    However, VA continued to deny Ms. Barnett service connection for her other

medical issues, including her allergies and asthma. As the 2021 statistical evidence establishes,

VA was significantly more likely to deny the application of Ms. Barnett, a Black veteran, than

that of a white veteran.

175.    Ms. Barnett appealed these decisions to the Board of Veterans Appeals in 2012.

Nearly seven years after she filed the appeal, the BVA granted her service connection for

allergies, sinusitis, and uterine bleeding in 2019. However, when her case was remanded, the

Regional Office assigned a 0% disability rating for these conditions. Ms. Barnett was thus again

denied additional benefits from VA.

176.    In 2021, the BVA finally granted Ms. Barnett service connection for asthma and

the Regional Office assigned her a disability rating of 30%. VA also finally granted Ms. Barnett

service connection for mental health conditions in 2021, at the 70% level. In 2022, Ms. Barnett

was also granted a 30% disability rating for sinusitis and 30% for allergic rhinitis. These result in a total disability rating of 90%.

177.    While Ms. Barnett does now receive benefits from VA, these do not fully compensate her for the harm caused by VA's negligent administration of benefits. Each time Ms. Barnett applied for VA disability compensation, she submitted extensive supporting documentation, filled out various VA forms, and interacted with VA officials. She was even subjected to traumatic gynecological exams with unprofessional examiners. The process of applying and re-applying for compensation left Ms. Barnett and her family feeling demoralized.

178.    VA's pattern of racial discrimination and its impact on Black veterans inflicted a distinct injury on Ms. Barnett. She suffered the humiliation of applying and being subjected to a racially discriminatory system for years.

179.    Ms. Barnett spent her time, effort, and money exhausting all avenues to advocate for herself as a Black veteran in a racially discriminatory system, and she now seeks redress for the emotional harm caused by the negligence and deliberate indifference of VA leadership.

**F.    The United States is Liable to Plaintiffs Under the FTCA**

180.    The United States is liable pursuant to the Federal Tort Claims Act (FTCA) for "claims against the United States, for money damages, accruing on and after January 1, 1945," where the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

181.    Pursuant to 28 U.S.C. § 2675(a), a claimant must tender an administrative claim to the federal government before filing suit under the FTCA. An agency's failure to make a final disposition of a claim within six months after it is filed "shall, at the option of the claimant any

time thereafter, be deemed a final denial of the claim." 28 U.S.C. § 2675(a).

182.    At all times relevant to this Complaint, VA officials acted within the scope of

their employment and/or their official duties as employees of VA, an agency of the federal

government.

183.    Mr. Monk Jr., Mr. Monk Sr., and members of NVCLR such as Ms. Barnett spent

decades trying to obtain VA benefits their faithful service had earned. They did not have

evidence of the pervasive and systematic racial bias affecting their experience applying for

veterans' benefits until VA disclosed long-withheld records to NVCLR in 2021-23, and those

records were analyzed and then made public in 2022-23.

184.    As evidenced by the analysis of VA data disclosed to NVCLR in 2021 and VA's

2017 internal report disclosed in 2023, Mr. Monk Jr. and members of NVCLR such as Ms.

Barnett now know that they are among the thousands of Black veterans subjected to biased VA

benefits systems and programs, marked by racial disparities of which VA leaders knew or should

have known and which they failed to redress.

185.    While there was speculation for years that racial disparities existed in VA's

benefits system, there was no data available to substantiate these claims prior to September 2021,

when Mr. Monk Jr. and NVCLR received the statistical analysis of the data from their FOIA

requests. Plaintiffs were then able to identify the cause of the injuries they suffered: negligent

administration of benefits programs by VA leadership.

186.    Mr. Monk Jr. and NVCLR did not know, and had no way of knowing, of the torts

committed by VA until the records were disclosed and analyzed in 2021.

187.    Having discovered VA leadership's tortious conduct in September 2021, on

February 25, 2022, Mr. Monk, Jr. filed an FTCA administrative claim with VA for the tortious

actions alleged here and committed by VA leadership and officials acting under the supervision of VA Administrators and, subsequently, VA Secretaries. He seeks not to relitigate his flawed 1971 COD determination and specific benefits denials, but rather to hold VA officials accountable for the distinct harm of their illegal, tortious, and racially discriminatory administration of benefits.

188.     On September 1, 2022, Mr. Monk Jr. was appointed as Administrator of Mr. Monk Sr.'s estate. Mr. Monk Sr.'s right of action against VA survives his death and may be pursued by his son and estate administrator, Conley F. Monk Jr. *See* 38 C.F.R. § 14.3(b); Conn. Gen. Stat. § 52-599 (2022).

189.     On November 28, 2022, Mr. Monk Jr. filed an FTCA administrative claim on behalf of the estate of Mr. Monk Sr., for the tortious actions alleged here and committed by VA leadership and officials acting under the supervision of VA Administrators and, subsequently, VA Secretaries.

190.     On information and belief, Mr. Monk Sr., had no knowledge about the pervasive and systematic racial disparities in VA benefits administration before he died in 1989, nor did his estate until NVCLR received and analyzed FOIA data in 2021. VA acknowledged receipt of this claim on December 22, 2022.

191.     As of the filing of this Amended Complaint, VA has not responded to the FTCA claims submitted by Mr. Monk Jr. on his own behalf, nor to the FTCA claim he submitted as administrator for Mr. Monk Sr.'s estate. VA's failure to dispose of these two FTCA claims within six months of filing constitutes a final denial. *See* 28 U.S.C. § 2675(a). Mr. Monk, Jr. has administratively exhausted the FTCA claims as to himself and the estate of his father.

192.     Ms. Barnett, a member of NVCLR since 2023, learned about concrete evidence of

VA leadership's tortious conduct and deliberate indifference only after public disclosure of the FOIA data and analysis beginning with the filing of this action in November 2022. On March 17, 2023, Ms. Barnett filed an FTCA administrative claim for the tortious actions alleged here and committed by VA leadership and officials acting under the supervision of VA Administrators and, subsequently, VA Secretaries. As of the filing of this Amended Complaint, VA has not responded in substance.

193.    As evidenced by records obtained by Plaintiffs, Defendants' tortious conduct persisted at least into 2020. Plaintiffs, including dozens of NVCLR members, still face the stigma, emotional distress, and other accumulated harms from Defendants' continued negligence in failing to rectify racial disparities in benefits denials.

194.    Defendant may not escape liability by invocation of the FTCA discretionary function exception, 28 U.S.C. § 2680(a), as VA employees lack discretion to violate the United States Constitution. As set forth above, the conduct of VA employees was not only negligent but also deliberately indifferent to the race discrimination in benefits adjudication of which they knew or should have known. This deliberate indifference constitutes intentional discrimination in violation of the equal protection component of the Due Process Clause of the Fifth Amendment. Defendant is thus not shielded from liability by the discretionary function exception. Further, Defendant does not qualify for the discretionary function exception because Defendant failed to exercise due care in executing and administering the laws administered by the Department.

G.    **Class Action Allegations**

195.    **Class Definition**: Plaintiffs bring their claims under Federal Rule of Civil Procedure 23(b)(3) on behalf of themselves and a Class of similarly situated individuals defined as follows: "All Black applicants for veterans' benefits administered by the Department of Veterans Affairs or its predecessor at any time since January 1, 1945 and who have or will in the

future have satisfied the exhaustion requirement imposed by 28 U.S.C. § 2675." Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's predecessors and successors, and any entity in which Defendant has a controlling interest, as well as their officers and directors; (3) Plaintiffs' counsel and Defendant's counsel; and (4) the legal representatives, successors, and assigns of any such excluded persons. Plaintiffs reserve the right to revise the definition of the Class based upon subsequently discovered information.

196.    **Numerosity**: Class members are so numerous that joinder of all of them is impracticable. On information and belief, the Class includes at least 40 persons.

197.    **Commonality and Predominance**: There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class Members. Common questions include, among others, whether (1) Defendant and its officers had a duty of care to Plaintiffs and members of the proposed Class to administer veterans' benefits in a non-discriminatory manner; (2) whether Defendant breached such duty; (3) whether Defendant is liable for the negligent infliction of emotional distress on Plaintiffs and members of the proposed Class; (4) whether Defendant is liable for negligent supervision or training for, inter alia, failing to instruct VA staff on how to adjudicate benefits applications in a racially neutral and non-discriminatory way; and (5) whether Plaintiffs and members of the proposed Class are entitled to damages or other relief based on Defendant's unlawful conduct, and if so, in what amount(s) and what sorts of relief.

198.    **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class inasmuch as Plaintiffs (or, in NVCLR's case, NVCLR members) applied for veterans' benefits

and were injured by Defendant's negligent conduct alleged herein. Further, Plaintiffs and all members of the proposed Class are seeking the same remedies.

199.    **Adequate Representation**: Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class that they seek to represent, Plaintiffs have retained counsel competent and highly experienced in complex class action litigation and veterans' law, and Plaintiffs and Plaintiffs' counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and Plaintiffs' counsel.

200.    **Predominance and Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Class. The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be highly burdensome and extremely inefficient for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. On information and belief, members of the Class can be readily identified and notified based on, *inter alia,* Defendant's records.

**FIRST CLAIM FOR RELIEF**

**28 U.S.C. § 1346(b) – Federal Tort Claims Act – Negligence**

201.    Plaintiffs Mr. Monk Jr., on behalf of himself and the estate of Mr. Monk Sr., and

NVCLR, on behalf of its members who have or will have exhausted their administrative

remedies, repeat and incorporate by reference each and every allegation contained in the

preceding paragraphs as if fully set forth herein. These allegations are also made on behalf of the

proposed Class.

202.    Under Connecticut law, negligence requires a showing of: (1) a duty of care to the

plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage to the plaintiff.

*Lawrence v. O & G Indus.*, 126 A.3d 569, 574 (Conn. 2015).

203.    If the Court determines that District of Columbia law applies, because the tortious

actions of VA leaders occurred there, then a claim alleging negligence must show similar factors.

D.C. law requires "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and

(3) injury to the plaintiff that was proximately caused by the breach." *Poola v. Howard Univ.*,

147 A.3d 267, 289 (D.C. 2016).

204.    VA is liable under the FTCA for negligence when either Connecticut or District

of Columbia law is applied.

205.    Federal law imposes a duty of care on the VA Secretary to administer veterans'

benefits in a non-discriminatory manner. 38 U.S.C. § 303 (2018); 38 U.S.C. § 210(b) (1958).

206.    In addition to the statutory duty of care, VA leaders are subject to an ordinary

duty of reasonable care.

207.    VA Administrators and Secretaries, and other senior officials, breached these

duties when through training, supervision, auditing, record-keeping, and other measures, they

failed to redress longstanding, pervasive race discrimination and disparate impacts of which they knew or should have known.

208.    Due to this benefits obstruction, Mr. Monk Jr., Mr. Monk Sr., members of NVCLR, and members of the proposed Class were subjected to significant emotional, psychological, and dignitary harms as a result of interacting with a racially discriminatory process and a negligently trained and supervised system.

**SECOND CLAIM FOR RELIEF**

**28 U.S.C. § 1346(b) – FTCA – Negligent Infliction of Emotional Distress**

209.    Plaintiffs Mr. Monk Jr., on behalf of himself and the estate of Mr. Monk Sr., and NVCLR, on behalf of its members who have or will have exhausted their administrative remedies, repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein. These allegations are also made on behalf of the proposed Class.

210.    In Connecticut, a defendant engages in the tort of negligent infliction of emotional distress when: (1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress. *Carrol v. Allstate Ins. Co.*, 815 A.2d 119, 127 (Conn. 2003).

211.    If the Court determines that District of Columbia law applies, a plaintiff can make a claim for negligent infliction of emotional distress in two ways. The relevant standard for this case is that a plaintiff must show that "(1) the defendant has a relationship with the plaintiff, or has undertaken an obligation to the plaintiff, of a nature that necessarily implicates the plaintiff's emotional well-being; (2) there is an especially likely risk that the defendant's negligence would

cause serious emotional distress to the plaintiff; and (3) negligent actions or omissions of the defendant in breach of that obligation have, in fact, caused serious emotional distress to the plaintiff." *Clark v. D.C.,* 241 F. Supp. 3d 24, 30 (D.D.C. 2017) (internal quotations omitted).

212.    VA is liable under the FTCA for negligent infliction of emotional distress when either Connecticut or District of Columbia law is applied.

213.    Over decades, VA employees repeatedly denied the requests of Mr. Monk Jr., Mr. Monk Sr., members of NVCLR, and members of the proposed Class for VA education, housing, and disability compensation benefits. Plaintiffs endured numerous psychological and physical evaluations to apply for VA benefits, and were repeatedly subjected to a system that distributed benefits in a racially discriminatory manner.

214.    VA has an obligation under 38 U.S.C. § 303 to administer benefits in a way that is free from racial discrimination. In addition, VA leaders are subject to an ordinary duty of reasonable care. VA breached these obligations.

215.    The failure of VA officials and employees to maintain a racially neutral and non-discriminatory system of administering benefits led to psychological harm and emotional distress.

216.    It was foreseeable that Black veterans, including members of the proposed Class, would experience emotional distress from having to litigate claims and navigate a VA benefits system that administered benefits in a racially discriminatory way.

217.    VA officials caused Mr. Monk Jr., Mr. Monk Sr., members of NVCLR, and members of the proposed Class to be so severely emotionally distressed that it might result in illness or bodily harm.

218.    As a result of the actions of VA officials and employees, Mr. Monk Jr., Mr. Monk

Sr., members of NVCLR, and members of the proposed Class suffered severe emotional distress.

### THIRD CLAIM FOR RELIEF

### 28 U.S.C. § 1346(b) – FTCA – Negligent Supervision

219.     Plaintiffs Mr. Monk Jr., on behalf of himself and the estate of Mr. Monk Sr., and NVCLR, on behalf of its members who have or will have exhausted their administrative remedies, repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein. These allegations are also made on behalf of the proposed Class.

220.     In Connecticut, negligent supervision occurs when: (1) the plaintiff suffers an injury due to the defendant's failure to supervise an employee; and (2) the defendant had a duty to supervise the employee. *Roberts v. Circuit-Wise, Inc*., 142 F. Supp. 2d 211, 213 (D. Conn. 2001). The defendant has a duty of care where the defendant "knew or reasonably should have known of the employee's propensity to engage in that type of tortious conduct." *Id*.

221.     If the Court determines that District of Columbia law applies, a plaintiff must meet the following standard to establish a claim of negligent supervision. A plaintiff must show: (1) the employee behaved in a dangerous or otherwise incompetent manner, (2) the employer knew or should have known its employee's dangerous or incompetent behavior and (3) the employer, "armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Busby v. Cap. One, N.A.*, 772 F. Supp. 2d 268, 284 (D.D.C. 2011) (internal quotations omitted).

222.     VA is liable under the FTCA for negligent supervision when either Connecticut or District of Columbia law is applied.

223.    VA officials and employees failed to supervise or instruct VA staff on how to distribute benefits in a racially neutral way. Leadership failed to create a system in which data related to benefits decisions could be aggregated and potential bias could be identified. Mr. Monk Jr., Mr. Monk Sr., members of NVCLR, and members of the proposed Class thus had to file their claims in a system that was racially discriminatory, creating the danger of mental, emotional, and financial harm to Black veterans, including Plaintiffs and members of the proposed Class, and actually did cause such harm.

224.    VA officials and employees knew or should have known about these failures but failed to rectify them.

225.    VA leadership's negligent supervision of VA managers and adjudicators violated their statutory duty to ensure the proper execution of VA laws. In addition, VA leaders are subject to an ordinary duty of reasonable care. VA breached these obligations.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(1) Certify a class of Black applicants for veterans' benefits administered by VA at any time since January 1, 1945, and who have or will in the future have satisfied the exhaustion requirement imposed by 28 U.S.C. § 2675, and appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

(2) Award Plaintiffs compensatory damages in an amount to be determined at trial;

(3) Require Defendant to pay Plaintiffs' reasonable fees, costs, and expenses; and

(4) Grant such other relief as the Court deems just and equitable.

Dated: June 5, 2023
        New Haven, Connecticut

Respectfully Submitted,

By: /s/ Michael Wishnie
Hillary Browning, Law Student Intern*
Ethan Dilks, Law Student Intern*
Michelle Fraling, Law Graduate
Adam Henderson, Law Graduate
Beatrice Pollard, Law Graduate
Claire Sullivan, Law Student Intern
Meghan Brooks, ct31147
Natalia Friedlander **
Michael J. Wishnie, ct27221
Veterans Legal Services Clinic
Yale Law School
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

Yaman Salahi, *pro hac vice*
ysalahi@edelson.com
EDELSON PC
150 California St., 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

Jimmy Rock (*pro hac vice* forthcoming)
jrock@edelson.com
EDELSON PC
1255 Union Street NE, 7th Floor
Washington, D.C. 20002
Tel: 202.987.6303

Theo Benjamin (*pro hac vice* forthcoming)
tbenjamin@edelson.com
Zoë Seaman-Grant (*pro hac vice*
forthcoming)
zseaman-grant@edelson.com
EDELSON PC
350 North LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

---

[*] Motion for law student intern appearance forthcoming.
[**] Motion for admission forthcoming