```
 1                UNITED STATES DISTRICT COURT
                   DISTRICT OF CONNECTICUT
 2

 3   _____
                                   )
 4   CONLEY F. MONK, JR.,          )
                                   ) No. 3:22-cv-01503-SRU
 5                Plaintiff,       )
                                   ) November 2, 2023
 6   v.                            )
                                   ) 9:03 a.m.
 7   THE UNITED STATES OF          )
     AMERICA,                      ) 915 Lafayette Boulevard
 8                                 ) Bridgeport, Connecticut
                  Defendant.       )
 9   _____)

10

11                    MOTION HEARING

12

13   B E F O R E:

14        THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

15

     A P P E A R A N C E S:
16

     For the Plaintiff:
17

          YALE LAW SCHOOL, JEROME N. FRANK LEGAL SERVICES
18             127 Wall Street
               New Haven, CT  06511
19             (203) 432-4800
               E-mail:  Michael.wishnie@ylsclinics.org
20        BY:  MICHAEL J. WISHNIE, ESQ.
               NATALIA FRIEDLANDER, ESQ.
21             OLUWALANI OISAGHIE
               CLAIRE SULLIVAN
22             MICHAEL SULLIVAN

23   (Continued)

24
                    Official Court Reporter:
25             Melissa J. Cianciullo, RDR, CRR, CRC
               (203) 606-1794
```

```
 1    A P P E A R A N C E S:

 2
      For the Defendant:
 3
           DEPARTMENT OF JUSTICE
 4                157 Church Street, 25th Floor
                  New Haven, CT  06510
 5                (203) 821-3700
                  E-mail:  Natalie.elicker@usdoj.gov
 6           BY:  NATALIE NICOLE ELICKER, ESQ.

 7
           DEPARTMENT OF JUSTICE CIVIL DIVISION
 8                Benjamin Franklin Station
                  P.O. Box 888
 9                Washington, D.C.  20044
                  (202) 305-4145
10                Email: Emily.m.kelley@usdoj.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    (Call to Order, 9:03 a.m.)

2            THE COURT:  Good morning.  We here in the

3    matter of Monk v. United States.

4            Could I have appearance, please.

5            MR. WISHNIE:  Good morning, your Honor.  For

6    plaintiffs, Michael Wishnie, Veterans Legal Services

7    Clinic, Jerome N. Frank Legal Services Organization.

8            With me today are several law students whose

9    appearances the Court has approved and who will

10   address the motions this morning.  Claire Sullivan

11   and Oluwalani Oisaghie will address the motion to

12   dismiss.  Michael Sullivan will address the two

13   discovery motions.  Attorney Natalia Friedlander is

14   with me at counsel table as well.

15           MS. ELICKER:  Good morning, your Honor.  I'm

16   Assistant United States Attorney Natalie Elicker here

17   on behalf of the defendant, and with me is trial

18   attorney Emily Kelley.  I'll let her introduce

19   herself.

20           MS. KELLEY:  Thank you.  I'm trial attorney

21   from the civil division of the Department of Justice.

22           THE COURT:  I'm sorry.  I missed your name.

23           MS. KELLEY:  Emily Kelley.

24           THE COURT:  Kelley.  Thank you.

25           All right.  Well, let me perhaps disappoint
```

```
 1   some folks.  I don't know that it makes sense,
 2   although I'm happy to hear you on this issue, to take
 3   up discovery motions until there is a decision on the
 4   motion to dismiss.  I hope to get something issued
 5   fairly quickly, but I apologize for not making that
 6   view clearer in advance.  I'm sure there was a lot of
 7   preparation done.  If anybody wants to suggest
 8   otherwise, I'm happy to hear you.  But there is a lot
 9   to go over on the motion to dismiss.  I have a hard
10   stop at 10:45, and I think it may make sense to defer
11   the discovery motions.
12        MR. WISHNIE:  Of course, your Honor.  I had
13   mentioned the discovery motions because I think all
14   three were noted for argument.
15        THE COURT:  Yeah.  My bad.
16        MR. WISHNIE:  No problem, of course.  We're
17   prepared to answer any questions on discovery
18   motions; but if the Court would rather defer those,
19   we'll take those up if and when the Court wants
20   argument on those.
21        THE COURT:  Thank you.
22        MS. ELICKER:  And, your Honor, for the
23   government, we agree.
24        THE COURT:  Very good.  Okay.  Let's take up
25   the motion to dismiss.
```

1    MS. KELLEY:  May it please the Court, again,

2    my name is Emily Kelley, trial attorney for the Civil

3    Division of the Department of Justice.

4    This action is advanced by Mr. Monk on his

5    Veteran Service Organization.  Mr. Monk is a Vietnam

6    veteran who has applied for and received VA benefits

7    including by appealing benefits decisions through the

8    Veterans Judicial Review Act process.

9    Now, plaintiffs seek monetary damages under

10    the Federal Tort Claims Act for losses allegedly

11    suffered as a result of what plaintiffs describe as

12    interacting with the racially biased benefit system.

13    The Department of Veterans Affairs considers

14    the issue of equity and benefits to be of great

15    importance and is working to ensure fair and equal

16    treatment.

17    But the question here is whether plaintiffs

18    may bring a claim in tort against the United States

19    based on their theory regarding administration of

20    benefits.  And for the four reasons stated in our

21    motion, they cannot.  I will be addressing three of

22    these bases:  dismissal for lack of subject matter

23    jurisdiction under the Veterans Judicial Review Act,

24    for untimeliness under the FTCA, and on the basis

25    that the claim is precluded.  And my colleague

1    Ms. Elicker will address the remaining basis for

2    dismissal for lack of subject matter jurisdiction

3    under the FTCA.

4         First, the Court lacks subject matter

5    jurisdiction under the VJRA which provides that the

6    VA secretary shall decide all questions of law in

7    fact necessary to a decision by the secretary under a

8    law that affects the provision of benefits.  And that

9    decision shall be final and may not be reviewed by

10   any other Court, except that the VJRA does provide a

11   full process of judicial review for issues involving

12   decisions affecting benefits, first to the board of

13   veteran's appeals within the VA, on to the Court of

14   appeals for veteran's claims, then the Court of

15   appeals for the federal circuit, and finally cert to

16   the Supreme Court.

17        THE COURT:  Is this a claim for benefits?

18        MS. KELLEY:  Your Honor, it is.  Although

19   plaintiffs have presented this as an FTCA claim, this

20   is a claim that inherently and inextricably involves

21   decisions on law and fact that affect the provision

22   of benefits, including the benefit determinations

23   themselves.

24        The Second Circuit recognizes the district

25   courts are excluded from the process of reviewing

 1    such decisions because the VJRA provides meaningful

 2    remedies.

 3         THE COURT:  Right.  But where in the

 4    complaint are they claiming that I need to get more

 5    benefits?

 6         MS. KELLEY:  Well, your Honor, throughout the

 7    complaint the plaintiffs describe situations in which

 8    they have been what they describe is improperly

 9    denied benefits.  But it's not just a question of

10    claims for benefits or characterizing it as claim for

11    benefits.  It's whether this Court is being asked to

12    decide or review decisions by the secretary that

13    affect benefits provisions, and that is what the

14    claimant is asking this Court to do regardless of

15    whether they describe it as an FTCA claim.  And

16    numerous courts, including in the Second Circuit and

17    the Second Circuit itself, have stated that where

18    plaintiffs attempt to frame what is really a

19    benefits-related dispute as another type of action,

20    there is no subject matter jurisdiction.

21         So, for instance, the Second Circuit and

22    other courts have held that subject matter

23    jurisdiction was lacking where plaintiffs alleged

24    constitutional claims or discriminatory treatment

25    where those claims really amounted to a challenge to

```
1   decisions made in connection with and affecting the
2   provision of benefits.  And plaintiffs have --
3          THE COURT:  Here, as I understand it, they're
4   basically claiming emotional distress.  Are emotional
5   distress benefits available through the
6   administrative process?
7          MS. KELLEY:  Your Honor, emotional -- to my
8   knowledge, emotional distress benefits -- well, let
9   me back up.
10         FTCA claims cannot be brought in the VJRA
11  process; however, the VJRA process provides a full
12  and adequate mechanism, as acknowledged by the Second
13  Circuit, for review of issues relating to benefits,
14  and it specifically excludes district courts.  And
15  characterizing this claim as one for emotional
16  distress or other types of harm alleged here does not
17  change the fact that really all of the alleged
18  damages stem from decisions relating to benefits that
19  this Court is prohibited from hearing under the VJRA.
20         Plaintiffs rely on a case from the D.C.
21  circuit Broudy to try to limit the VJRA's effect, but
22  that case does not help them here.  It doesn't --
23  fist of all, it doesn't involve the FTCA.  But it's
24  also not followed by other circuits, including within
25  the Second Circuit, and it only stands at most for
```

1    the proposition that where a case deals with the

2    situation in which no decision of fact or law

3    affecting benefits has been made, the VJRA may not

4    apply.

5         But plaintiffs cannot avoid the VJRA by

6    saying the FTCA claim itself has not been decided by

7    the secretary because the issue is that VJRA applies

8    to all decisions of law in fact affecting the

9    provision of benefits, and that is what this case is

10   based on.  The test --

11        THE COURT:  Well, help me out, law in fact.

12   What issues of law in fact relating to benefits

13   decisions are being challenged here?

14        MS. KELLEY:  Well, your Honor, the plaintiffs

15   are alleging that this case is about a pattern of

16   discrimination or -- excuse me, a pattern of

17   disparity in benefits determinations and

18   determinations affecting benefits.

19        The alleged injury is interaction with a

20   racially biased benefit system.  But to show that,

21   plaintiff would first have to show that benefits have

22   been administered in a racially biased way, and that

23   would require looking at the propriety of at least

24   some amount of individual benefits-related

25   determinations.

1          And plaintiffs here are seeking individual

2   FTCA relief.  So even if they're alleging a system of

3   bias, in order to determine if an individual is

4   entitled to relief, the Court would need to assess

5   whether that individual was personally damaged by

6   biased administration of benefits.  So, for

7   example --

8          THE COURT:  That's one way of doing it.  Why

9   is there not basically a disparate treatment-type

10  approach here to, what is it, 22 percent disparity in

11  the results of benefits decisions based on race?

12         MS. KELLEY:  Well, your Honor, first -- and

13  Ms. Elicker will address why there is also not a tort

14  claim here under the FTCA.

15         But the issue under the VJRA is that

16  plaintiffs can avail themselves of the VJRA process

17  and multiple courts have held that even where it's a

18  constitutional -- characterized as a constitutional

19  claim or a disparate impact claim, that they can then

20  do that and that subject matter jurisdiction is

21  precluded in the district court.  And Mr. Monk has in

22  fact availed himself successfully of the VJRA

23  process.

24         But even if it's a disparate impact-type

25  claim, if you are asking the Court to decide whether

1    those disparities were actually caused by

2    discrimination or to decide whether the disparities

3    actually caused damages to an individual, you would

4    need to look at their interactions with the VA, their

5    benefits-related determinations, because the

6    interactions with the VA are for the purpose of

7    obtaining benefits.  And all of that is precluded by

8    the VJRA.

9            THE COURT:  Again, they're not claiming

10   benefits, lost benefits.  They're expressly

11   disclaiming lost benefits.  What they're saying is I

12   felt I was treated unfairly and -- on the basis of my

13   race, and in fact there is statistics to back that

14   up, so I get emotional distress damages among other

15   things.

16           But they're not claiming -- take Mr. Monk,

17   for example.  I think he's gotten all the benefits

18   that he claimed.  I mean, he's obviously not coming

19   here and saying give me more benefit.  He's saying I

20   have other types of damages, isn't he?

21           MS. KELLEY:  Well, your Honor, even if

22   plaintiffs characterize it as a different type of

23   damage, it's still stemming from benefits-related

24   decisions.  So, for example, in amended complaint, I

25   think it's paragraph 133, they allege that Mr. Monk

1  experienced reputational and dignatory harm

2  associated with his benefits denials.  In order to

3  determine whether that harm was caused by his

4  benefits denials, the Court would need to assess

5  whether those benefits denials were in fact improper

6  or influenced by bias.

7         THE COURT:  I don't think so.  If he's denied

8  benefits and as a result of that can't get a job, I

9  mean, that may be a bad example, but if that's --

10  it's a consequential impact of the benefits decision

11  or he's simply up set and unemployed for a period of

12  time because he can't -- he feels so discouraged that

13  he can't move forward with his life.  Those are not

14  related to the benefits decision, are they?

15         MS. KELLEY:  Well, I think they are, your

16  Honor.  In the FTCA context, the test is whether --

17  if a determination of whether the VA acted in bad

18  faith or negligently would require the district court

19  to determine first whether the VA acted properly in

20  handling the benefit claim, the claim is foreclosed.

21         Certainly there would not be damages if --

22  even if cognizable under the FTCA, which we do not

23  believe they are, if there was no actual impropriety

24  in how those benefits denials were handled.

25  Certainly veterans -- you know, all veterans interact

1  with the system in order to obtain benefits.  There

2  are situations where veterans are granted benefits in

3  full at the outset, and there are situations where

4  benefits are denied for entirely proper reasons.

5       THE COURT:  Sure.  But the claim here is not

6  really -- they're not claiming -- as I understand it,

7  they're not claiming that the benefits decision was

8  wrong.  They are focusing on supervision, right?

9  They're basically saying, look, we have this

10  statistical disparity and the VA knew what was

11  happening in terms of the racially disparate

12  treatment, and they had a duty to correct that and

13  they didn't correct that.  So they're not -- they're

14  focusing on supervision more than they are on

15  benefits decisions themselves.

16       MS. KELLEY:  Well, your Honor, the idea of

17  supervision versus line staff is a false premise

18  under the VJRA.  The role of the employee is not

19  relevant.  The test is whether the Court would be

20  required to examine the propriety of decisions of

21  fact or law, any decisions that affect benefits.

22       And as far as disparity, again, disparity can

23  reflect statistical deviations for many factors.  And

24  in order to show that the disparities here were the

25  result of discrimination and not innocuous or even

1    permissible factors, the plaintiff would need to show

2    that those disparities were the result of

3    discrimination.

4         But even accepting allegations as true, for

5    the Court to decide whether senior officials knew of

6    bias in the benefits decisions, the Court would first

7    have to decide that there was racial bias in benefits

8    decisions and have to decide if an individual

9    suffered harm as a result.  That is an example of one

10   of the things that the VJRA expressly excludes from

11   the district court process, although it does provide

12   processes within the system going all the way up to

13   the Supreme Court.  And the --

14         THE COURT:  They're not saying, Judge, go

15   look behind each of these benefits decisions for our

16   class, take each individual, figure out -- read the

17   transcript, figure out whether the adjudicator was

18   biased, look into their background, figure out if

19   they have any suspect posts on social media.  They're

20   not saying look behind the benefits decision, are

21   they?

22         MS. KELLEY:  Well, they are disclaiming that.

23   But that is in fact what would be necessary.  Cases

24   where plaintiffs have alleged systemic wrongs or

25   patterns still lack subject matter jurisdiction.

1          And the *Veterans for Common Sense* case from

2    the Ninth Circuit is helpful here.  There plaintiffs

3    were arguing that veterans were harmed by average

4    delays in processing times, and they claimed that the

5    constitutional defects were divorced from individual

6    benefits decisions.  But the Ninth Circuit

7    acknowledged that couching claims in terms of

8    averages, for example, or here statistical

9    disparities, doesn't change the fact that

10   fundamentally it's a challenge to thousands of

11   decisions relating and affecting provision of

12   benefits and because the Court lacked jurisdiction to

13   review the circumstances or decisions that created

14   delay in any one veteran's case, it also could not

15   determine whether there had been a systemic denial of

16   due process across the board.

17          Vietnam Veterans of America from the D.C.

18   circuit reached similar results, albeit on standing

19   grounds.

20          So here, regardless of how the plaintiffs

21   characterize it, the Court would have to decide if

22   there was harm by looking to individual interactions

23   with the VA benefit system because the plaintiffs are

24   bringing individual claims for damages in tort.  And

25   the plaintiffs spend the majority of the amended

1 complaint discussing and challenging questions of

2 fact in law relating to the provision of benefits on

3 an individual level.

4      Even the allegations regarding systemic

5 disparities rely on an analysis of benefits grant

6 rates across different demographics, and these

7 decisions are really at the heart of this matter and

8 cannot be extricated to avoid application of the VJRA

9 which provides a full and adequate process for

10 plaintiffs to bring claims relating to benefits.

11      Your Honor, the plaintiff's claims are also

12 untimely under the FCA statute of limitations which

13 is two years from claim accrual.  Given that

14 plaintiff's injuries do stem from adverse benefits

15 decisions of which plaintiffs were aware at the time,

16 the claims here are clearly untimely.  The most

17 recent denial for Mr. Monk was in 2015.

18      But even if the Court applies a diligence

19 discovery rule here, the claims are untimely.  That

20 is an objective and nonexacting standard that only

21 requires knowledge of or knowledge that could lead to

22 the basic facts of the injury's existence and its

23 cause or the person or entity that caused it.  It

24 doesn't require knowledge of every relevant fact.  It

25 does not require knowledge that the injury was

1  negligently inflicted, and it doesn't require

2  knowledge that the plaintiff may have a legal claim.

3       THE COURT:  So on a motion to dismiss based

4  on statute of limitations, you're limited, aren't

5  you, to the allegations of the complaint, and it has

6  to appear on the face of the complaint that the

7  statute of limitations bars the claims.  What

8  allegations of the complaint make that clear?

9       MS. KELLEY:  Well, your Honor, Amended

10  Complaint Paragraph 114 alleges that beginning around

11  1983, after a denied VA home loan application,

12  Mr. Monk stopped applying for benefits for over two

13  decades.  He believed VA's benefit system to be

14  plagued by racial bias.  Now, plaintiff has,

15  therefore, believed for decades that bias was present

16  not just for his benefits decisions but within the

17  system.

18       And since at least 2011, plaintiff was

19  sufficiently aware of the critical facts of his

20  alleged injury such that he sought and obtained legal

21  counsel.  And the same counsel that represents him

22  today has competently represented Mr. Monk in a

23  variety of actions over the years, some of which were

24  directly related to his benefits in which he was

25  successful.  That knowledge sufficient to seek legal

1   advice is all that is required to accrue under the

2   discovery rule, and that's under the *Kronisch* and

3   *A.Q.C.* cases.

4         THE COURT:  Did he seek legal advice to

5   examine whether there was racial bias in the VA?

6         MS. KELLEY:  Well, your Honor, he did bring a

7   challenge in -- I believe in 2014 that is described

8   relating to character of discharge determinations and

9   status of discharge that was based on racial bias.

10  And that was without, I believe, the statistical

11  analysis that he has here, has advanced here.

12        But more important, first, discover --

13  diligence discovery rule does not require knowledge

14  that the injury may have resulted from disparity or

15  discrimination.  It doesn't require knowledge that

16  there was even negligence.

17        But the *A.Q.C.* Second Circuit case is also

18  directly on point here.  A plaintiff cannot set the

19  statute of limitations based on when it chooses to

20  analyze data or develop legal theories.  That could

21  completely render the statute of limitations

22  meaningless because it could be ten months or ten

23  years until a plaintiff accomplishes that, and using

24  that as the marker for accrual would swallow the rule

25  whole.  And plaintiffs had months to address our

1    motion to dismiss but they -- not only do they not

2    address *A.Q.C.*, they don't even mention it.  And that

3    is -- that should be considered a concession of its

4    applicability.  And the case should be dismissed on

5    this separate basis, please.

6          THE COURT:  Let me press you a little bit.

7          MS. KELLEY:  Sure.

8          THE COURT:  The simple fact that they don't

9    address a decision means that they've conceded the

10   applicability of that case?  I think that's

11   stretching the doctrine a little bit, isn't it?

12         MS. KELLEY:  Well, your Honor, we believe

13   that if plaintiffs had a response to why *A.Q.C.* does

14   not negate the timeline that they wish to set, which

15   is from when they analyzed the data in 2021, that

16   they would have a response to it.

17         THE COURT:  Well, maybe they'll have a

18   response today.

19         MS. KELLEY:  One additional argument, your

20   Honor, before I turn this over to Ms. Elicker.

21         The plaintiff's claims are also precluded by

22   Mr. Monk's prior benefits requests in litigations.

23   Years ago Mr. Monk obtained the full disability

24   benefits that he sought running retroactively from

25   the date of application.  And he also received an

```
 1    upgrade to his discharge status and recognition that
 2    his discharge status should not have been a bar to
 3    obtaining benefits; and these victories obtained
 4    through using the VJRA review process are valid and
 5    final judgments.
 6            Yet, Mr. Monk, what he's really seeking to do
 7    here is to relitigate those final judgments.  And
 8    although this claim is characterized as an FTCA
 9    claim, the nucleus of operative fact here remains
10    decisions affecting grands or denials of benefits for
11    the reasons stated earlier and in our papers.  And
12    even new evidence or theories of the case do not
13    avoid preclusion, and so the case should be dismissed
14    for this separate basis as well.
15            THE COURT:  Who is going to arguing standing?
16            MS. KELLEY:  I'm sorry.  I could not hear
17    you.
18            THE COURT:  Are you arguing standing?
19            MS. KELLEY:  Your Honor, we haven't
20    separately advanced a standing argument, although we
21    do point to the D.C. Circuit Vietnam Veterans case
22    where standing was specifically raised as an issue,
23    and we do think there is potentially a standing issue
24    here for the same reasons as stated in that case.
25            THE COURT:  But you're not pressing it today?
```

```
 1          MS. KELLEY:  No, your Honor.

 2          THE COURT:  All right.  Thank you.

 3          MS. ELICKER:  Good morning, your Honor.

 4          THE COURT:  Good morning.

 5          MS. ELICKER:  The government moves to dismiss

 6  Mr. Monk's FTCA claim for lack of a private analogue.

 7  The FTCA does not -- is a limited waiver of the

 8  United States sovereign immunity.  It does not permit

 9  novel and unprecedented liabilities to be brought

10  against the United States.  In order to bring a

11  claim, a plaintiff must identify a private analogue.

12          And here plaintiff's claim fails because they

13  cannot identify such a private analogue in which a

14  person applies to an entity for benefits, the

15  benefits are paid and that entity is subject to tort

16  liability for a harm that the plaintiff believes they

17  suffered in that process.

18          The Court could initially look to case law

19  from the Second Circuit ruling that quasi

20  adjudicative decisions by the government are the type

21  of decisions that -- for which there is no private

22  analogue.  There is good case law from the Second

23  Circuit and more recent case law from various

24  district courts in the circuit acknowledging this

25  line of cases, and that would be our first basis.
```

1          THE COURT:  Is a statutory cause of action

2     considered a private analogue?

3          MS. ELICKER:  A statutory cause of action

4     that gives liability to a private entity could be.

5          THE COURT:  I'm thinking, for example, about

6     the employment laws against racial discrimination.

7     So you apply to an entity for employment, not a

8     benefit but employment, and you're racially

9     discriminated against.  There would be a cause of

10    action there, wouldn't there?

11         MS. ELICKER:  No, your Honor.  And the reason

12    is it doesn't hinge on that it came through statute.

13    It's that it is a -- like Title 7, for example,

14    doesn't arise in tort.  So in order for there to be

15    recovery under the Federal Tort Claims Act, there has

16    to be a tort.  A statute like that isn't conceived of

17    as arising in tort.  It's a statutory action that,

18    you know, the government, either the state or the

19    federal government, has created to give a right to

20    people but it's not a right in tort law.

21         THE COURT:  What about infliction of

22    emotional distress?

23         MS. ELICKER:  Negligent infliction of

24    emotional distress is a common law claim in

25    Connecticut.  But -- and in D.C.  But we're not aware

of any like circumstances where an entity that has a
relationship to a person that looks similar to the
relationship between the VA and Mr. Monk where a
negligent infliction  of emotional distress claim has
been given.

So the problem that plaintiff's claim
presents is that they have recited the elements of
these three torts that they claim they are bringing,
but they haven't identified any like circumstances.
They haven't given any comparison to a relationship
between two private parties that looks like this
relationship.  The relationship that Mr. Monk has
with the VA doesn't exist in the abstract.  It's a
very specific relationship.  He first served in the
military.  He was discharged.  He made an application
for benefits.  It was upon his application for
benefits that he went into a relationship with the
VA.  So that's the kind of relationship that we need
to look for in a private setting.

Plaintiff didn't identify any -- well,
plaintiff suggested a few relationships.  Their
briefing suggests that good Samaritan law is an
appropriate analogue.  But the specific relationships
that are captured in the cases they cite, one was the
government acting as a lighthouse operator, and

1     that's not analogous to this situation here.  Another

2     was the government performing mine inspections.  And,

3     again, there is no comparison to the relationship

4     here.

5             Plaintiff's briefing does suggest a

6     comparison to the state Department of Veterans

7     Affairs provision of benefits, but under *Olson* that's

8     not a qualifying private analogue because *Olson* says

9     it needs to be a comparison to a private entity, not

10    a state or municipal governmental entity.

11            THE COURT:  What about in the context of

12    applying for a mortgage and you're applying for a

13    mortgage from a redlined area and the banker says to

14    the applicant, we don't give mortgages to people like

15    you who live where you do.  Emotional distress

16    results.  Is there a claim?  Is that an analogue that

17    might be appropriate in this case?

18            MS. ELICKER:  Your Honor, I'm not familiar

19    with whether Connecticut has -- or D.C. has such a

20    law.  It's certainly not --

21            THE COURT:  There doesn't have to be a law.

22    I'm talking about common law.  Negligent infliction

23    of emotional distress.  You know, you should have

24    known that saying those kind of things to me would

25    have caused me emotional distress.  In fact, I

1    suffered some emotional distress and it was severe.

2        MS. ELICKER:  Your Honor, there is case law

3    recognizing that emotional distress injuries that

4    spring from an economic harm are not recoverable.

5    And so that line of cases, that doctrine would

6    preclude the recovery that you're suggesting.  So

7    where a person has suffered only an economic injury

8    rather than a physical injury, typically the law

9    doesn't recognize emotional distress cases.

10        THE COURT:  I'm not saying that the claim is

11    for getting a mortgage.  I'm saying the claim is for

12    the emotional distress of being denied a mortgage.

13    So the person leaves the bank, is very depressed,

14    checks into the hospital with depression and has

15    emotional distress.

16        MS. ELICKER:  So the emotional distress

17    though springs from the lack of an economic

18    opportunity.  There is no physical harm that's come

19    to the person.  In theory, there could be a physical

20    manifestation of the distress, but that's the kind of

21    injury that tort law generally doesn't allow recovery

22    for because it's too remote.  So we cited, your

23    Honor, *Waters*, a Connecticut Supreme Court decision

24    that says there can be no economic harm or no damages

25    for economic harm without a physical injury.

```
 1              So, again, here in the mortgage situation, I
 2     think you're describing the person goes into the
 3     mortgage company, they're not -- they haven't been
 4     physically assaulted.  They leave with, you know, a
 5     feeling of being denied something, but the denial is
 6     an economic denial.
 7              And that's actually where, you know, to touch
 8     briefly on the standing point that was raised
 9     earlier, if plaintiffs were not denied, then -- if
10     there is a wrongful denial of benefits, then how are
11     they injured, right?  And so to accept the
12     plaintiff's characterization of the harm as any
13     interaction with the VA means that people who applied
14     to the VA and were granted benefits, under their
15     conception, could still be harmed.  And under tort
16     law, that's -- it's again, it's -- there is no injury
17     if they weren't denied, right, if they're not denied
18     the benefit.  If they interact positively with the
19     system and they get what they were asking for, then
20     how can there be a harm that flows from that.
21              Your Honor, so the Waters decision, I think,
22     addresses the point about economic harms in the
23     absence of physical injury.
24              There was one --
25              THE COURT:  So your broader point then is
```

1   that there cannot be -- not only that there isn't but

2   there cannot be a private analogue because these

3   plaintiffs sought an economic benefit and no matter

4   what happened to them, there cannot be a private

5   analogue for that.

6        MS. ELICKER:  Your Honor, I'm not sure we

7   would characterize generally across economic

8   benefits.  But here where they applied for

9   governmental benefits, we think the

10  quasi-adjudicative case law is especially

11  appropriate.  So we would point your Honor to those

12  decisions.

13       Likewise, where plaintiffs point to federal

14  law to provide the duty that they believe was

15  breached, federal law can't provide the duty under

16  the FTCA.  It has to be the state law that provides a

17  duty.  So the failure to identify a state law duty is

18  fatal to their tort law claims.

19       One other comparison that is worth

20  considering is in plaintiff's ECF Number 28, it was

21  one of the responses to a discovery motion, they

22  briefly raised the idea that insurance could be an

23  appropriate analogue.  It's -- I'm not sure if I

24  mentioned, ECF 28 at page 9.  They said insurance --

25  an insurance relationship could be analogous, but

1    they did not raise that analogy in their response to

2    the motion to dismiss briefing and also in their --

3    although in Connecticut there is a claim for bad

4    faith denial of insurance benefits, they disclaimed

5    bad faith, that bad faith was any component of their

6    claim.  That's on ECF 61 at note 12.  They said we're

7    not making any claims for bad faith.

8          So to the extent that insurance -- an

9    insurance relationship provides a potential analogue,

10   they have disclaimed it and it would be inappropriate

11   for the same reason that a -- well, in D.C. this

12   claim is not allowed at all.  And in any event, the

13   bad faith denial of insurance benefits, there is

14   always a predicate that there was an insurance

15   contract, that there was a contract between the two

16   parties, and here there is no contract between

17   Mr. Monk and the VA.

18          Unless your Honor had any other questions

19   about the FTCA, thank you.

20          THE COURT:  Thank you.

21          MS. SULLIVAN:  Your Honor, Claire Sullivan

22   for the plaintiffs.  I will be addressing the

23   Veterans Judicial Review Act section of the briefing.

24   And with us today in the courtroom is Conley Monk,

25   Jr., Garry Monk who is the executive director of the

1    National Veterans Counsel For Legal Redress and

2    multiple children of Conley Monk, Sr.

3         Your Honor, for decades every black veteran

4    that applied for benefits through the VA was forced

5    to participate in a system that was rigged against

6    them, an experience that, wholly apart from the

7    outcome of any particular benefits application,

8    caused emotionally and dignatory harm.  And Conley

9    Monk, Jr. is one such veteran, and nothing in the

10   Veterans Judicial Review Act prevents him from

11   bringing these claims.

12        As your Honor correctly characterized, the

13   government misrepresents the nature of the harm that

14   he suffered by claiming that Section 511 precludes

15   this Court's review.  But these plaintiffs are not

16   seeking to relitigate their benefits or to recover

17   any damages associated with their benefits.  They are

18   merely asking the Court to hold VA officials

19   accountable for their failure to redress longstanding

20   racial disparities and VA benefits of which they knew

21   or should have known.

22        First, your Honor, this Court will have no

23   reason to look to the propriety of any individual

24   benefits adjudication in assigning liability on these

25   claims because the VA does not dispute that racial

1    disparities and benefits decisions have existed for

2    decades.  And moreover, VA has even conceded that

3    these disparities stemmed from racism.  In fact, the

4    VA press secretary, upon filing -- the filing of

5    these claims, said that disparities in VA benefits

6    decisions were due to racism which have wrongly left

7    black veterans without access to VA care and

8    benefits.

9         So the tortious conduct in this case stems

10    from VA official's negligent failure to redress

11    longstanding racial disparities of which they knew or

12    should have known.

13         So all the Court will need to assign

14    liability is whether VA officials knew or should have

15    known about this discrimination before Mr. Monk

16    brought this case and what steps, if any, they took

17    to address it.

18         THE COURT:  So how do you address the private

19    analogue issue?

20         MS. SULLIVAN:  I'm happy to defer to my

21    colleague on the private analogue question.  Does the

22    Court have any --

23         THE COURT:  That's fine.  That's all right.

24    I'm not sure, kind of, where you're --

25         MS. SULLIVAN:  Yes.  I'm happy to answer any

1    questions on the Veterans Judicial Review Act, and

2    I'll defer to my colleague on any of the FTCA

3    questions.

4         THE COURT:  Thank you.

5         MS. SULLIVAN:  Does the Court have any

6    further questions on the Veterans Judicial Review

7    Act?

8         THE COURT:  You know, I don't know that I do.

9    I -- well, maybe if you could address the argument

10   that these dignatory harms are nonetheless connected

11   to the benefits decisions, because I think sorting

12   out what is being sought and what is permissible is a

13   tricky issue here.

14        MS. SULLIVAN:  Your Honor, the harms here

15   stem from the experience of applying for benefits

16   through a system that one suspects is steeped with

17   racism, and that stems from applying for --

18   submitting form after form, interacting with VA

19   officials, effectively reliving the worst days of

20   one's life and subjecting one's self to

21   retraumatization through that process with the

22   suspicion that it might be rigged against you.  And

23   paragraphs 127 to 132 of the complaint really detail

24   those harms that Mr. Monk suffered as a result of

25   this system.

1          Similarly, paragraphs 177 to 178 detail the
2     harms that Ms. Barnett suffered as a result of this
3     system, who is one of the members of NVCLR before
4     this Court today.  She submitted extensive
5     documentation.  She filled out various VA forms.  She
6     was subjected to traumatic gynecological exams by
7     unprofessional examiners all while suspecting that
8     she may be doing it with the assumption that it might
9     be rigged against her.  And that in and of itself is
10    a unique emotional and dignatory harm separate and
11    apart from the outcome of any benefits adjudication.
12          THE COURT:  Are you addressing the statute of
13    limitations?
14          MS. SULLIVAN:  No, your Honor.  That's my
15    colleague.
16          THE COURT:  Okay.  Sorry.
17          MS. SULLIVAN:  No.  That is all right.  I'm
18    happy to pass it over to my colleague.
19          Thank you, your Honor.
20          THE COURT:  Thank you.
21          She pushing all the hard questions on to you.
22          MR. OISAGHIE:  Oh, boy.  Thank you, your
23    Honor.  Olu Oisaghie for the plaintiffs.
24          And the story of plaintiff's FTCA claims
25    fundamentally is quite simple.  The VA had a duty to

veterans like Mr. Conley Monk, Jr., Mr. Conley
Monk, Sr., Mrs. Michelle Barnett and other members of
NVCLR to prevent the administration of benefits in a
racially discriminatory manner.  The VA breached this
duty because (a) it either knew or should have known,
as any reasonable person would have, the benefits
were being administered in a racially discriminatory
manner; and (b) the VA failed to intervene in order
to prevent this outcome.  The VA's actions caused
emotional and dignatory harm to plaintiffs.
Plaintiffs timely brought action under the FTCA, and
as such, plaintiffs are entitled to damages.

        Now, plaintiffs state a valid FTCA claim for
two reasons.  The first is that under Connecticut
law, the VA violated its ordinary duty of reasonable
care that it owed to the plaintiffs.  By the
reasonable person standard, the VA either knew or
should have known the benefits were being
administered in a racially discriminatory manner.
And you can look to the VA's own public statements
which acknowledged that unacceptable disparities,
quote, in VA benefits decisions have been, quote, due
to racism, and that these racial disparities have
wrongly left black veterans without access to VA care
and benefits.  And that is detailed on page 1 of

1   plaintiff's opposition brief.

2        THE COURT:  Let me press you on that a little

3   bit.  If it was so obvious or a reasonable official

4   should have understood there was racial

5   discrimination going on and they were making public

6   statements about it, why doesn't that undercut your

7   statute of limitations argument?

8        MR. OISAGHIE:  Well, your Honor, because

9   while VA officials should have been on notice that

10  racial discrimination was occurring, plaintiffs would

11  not have had sufficient facts as to the cause of

12  their injury being racial discrimination for the

13  claim to accrue under the statute of limitations.

14       THE COURT:  But you just said they made

15  public statements that this was based on racism.

16       MR. OISAGHIE:  Oh, those public statements

17  were made after this claim was brought, your Honor.

18       THE COURT:  I see.  Okay.  Thank you.

19       MR. OISAGHIE:  Additionally, this Court can

20  look to statistical evidence released in September

21  2021 in response to FOIA litigation which revealed

22  statistically significant disparities in the

23  administration of benefits, the fact that the VA

24  chose not to disclose to the public the results of a

25  2017 report which showed significant disparities, and

1    additionally, on page 65 of the amended complaint,

2    plaintiffs raise that the VA Advisory Committee on

3    Minority Veterans raised concerns about disparities

4    in benefits in 2013, 2015, 2016, 2017 and 2018, and

5    that additional records held by the VA but not yet

6    publicly disclosed would confirm that this

7    discrimination goes back further.

8         Now, under common law negligence theories, a

9    similarly situated private entity could be held

10   liable in the state of Connecticut for the VA's

11   actions.

12        And as articulated by the Connecticut Supreme

13   Court in cases plaintiffs cite such as *Zamstein v.*

14   *Marvasti*, *Raspberry Junction Holdings*, Connecticut

15   courts consider whether a duty exists on a

16   case-by-case basis.  There is no exhaustive list of

17   duties recognized by the common law in Connecticut.

18   And in the absence of exactly on-point precedence,

19   Courts look to foreseeability and a four-factor

20   public policy oriented test; and those factors

21   include the normal expectations of the participants

22   in activity under review, the public policy of

23   encouraging participation in that activity, the

24   avoidance of increased litigation and the decisions

25   of other jurisdictions.

```
1          THE COURT:  I didn't really see a private
2    analogue identified in your papers.  I mean, can you
3    articulate what it is that you think is the private
4    analogue that gives rise to a legitimate claim under
5    the VJRA.
6          MR. OISAGHIE:  Yes, your Honor.  And in --
7    plaintiffs cite in the brief cases such as *Liranzo*,
8    *Olson* and *Indian Towing*.  And the takeaway that is
9    relevant from those cases is that the private
10   analogue need not be exactly analogous for the
11   purposes of the FTCA.  The private analogue only need
12   be sufficiently similar to effectuate Congress's
13   intent in passing the FTCA which was to allow claims
14   that would be traditionally cognizable under state
15   tort law to be brought against the federal
16   government.
17         And in terms of private analogues, a private
18   analogue raised in plaintiff's opposition brief would
19   be, for example, discrimination in the provision of
20   banking services.  Connecticut has -- Connecticut and
21   D.C. both have statutes on point which provide
22   private causes of action to individuals who face
23   discrimination in banking and housing, insurance and
24   in medical care.
25         And, you know, going back to the
```

1    public-policy-oriented test mentioned earlier, the

2    fact that these states have clearly expressed through

3    their state law a preference that residents not be

4    discriminated against in their interactions with

5    large well-funded institutions clearly demonstrates

6    what the public policy of Connecticut is and what the

7    public policy of D.C. is.

8            So, you know, in addition to those which this

9    Court might look for, look to for private analogues,

10   Connecticut has also adopted the adoption of

11   negligence per se which means that state and federal

12   statutes can give rise to tort duties under state

13   law.  And in particular, plaintiffs reference 38

14   U.S.C. Section 303 which charges the VA with properly

15   executing and administering all laws administered by

16   the department.  And this federal statutory duty is

17   incorporated as a state law tort duty in Connecticut

18   through the doctrine of negligence per se, and that

19   duty which charges the VA with properly executing and

20   administering all laws administered by the department

21   can't possibly be consistent with allowing benefits

22   to be administered in a racially discriminatory

23   manner.

24           And, your Honor, I would also like to address

25   a few points raised by the government.  So the

1  government points to *A.Q.C.* as to the statute of

2  limitations saying that when a plaintiff's lawyers

3  decide to take action can't be the relevant point for

4  starting the accrual of the statute of limitations.

5  But the government misses that fundamentally *A.Q.C.*

6  follows *Kronisch v. The United States* which

7  plaintiffs do cite in their briefing.  And the rule

8  under *Kronisch* is that for the statute of limitations

9  to accrue, plaintiffs must have sufficient facts to

10  form a belief both as to their injury and the cause

11  of their injury.

12      And in this case those facts were not

13  available to plaintiffs until September 2021 when the

14  VA released information in response to its FOIA

15  litigation.  And Mr. Monk filed -- Mr. Monk, Jr.

16  filed an administrative claim under the FTCA in

17  February '22 just a few months later.

18      THE COURT:  The government cited a paragraph

19  where Mr. Monk thought he had been discriminated

20  against.  I can't find it now.

21      Ms. Kelley, what was that paragraph?

22      MS. KELLEY:  Paragraph 114, your Honor.

23      THE COURT:  114.  He believed VA's benefit

24  system to be plagued by racial bias.  This was back

25  -- the date is unclear.  But the next paragraph says,

1   "In 2007."  So presumably it's before 2007.

2           Do you want to comment on that?

3           MR. OISAGHIE:  Yes, your Honor.  So *Kronisch*

4   *v. United States* very explicitly holds that mere

5   suspicion is not enough to trigger accrual of the

6   statute of limitations.  And frankly, your Honor, to

7   be a black person in the United States is to often

8   suspect racial discrimination, you know, in

9   interactions with a large number of institutions

10  throughout this country, but that suspicion alone

11  would not have been sufficient to trigger the statute

12  of limitations.  This Court must look to when

13  plaintiffs would have actually had sufficient facts

14  to form a reasonable belief that the VA, you know,

15  was discriminating against them in its administration

16  of benefits, and that date is September 2021 under

17  the diligence discovery rule.

18          THE COURT:  And why isn't it the date on

19  which the FOIA request was filed?  In other words,

20  there is reason to believe, sufficient to start

21  searching for, evidence, that this is what's going

22  on.

23          MR. OISAGHIE:  Well, your Honor, even if it

24  were the date the FOIA request was filed, that would

25  still have been early 2021.  So basically just a

1    couple months earlier than when the information was

2    released.  And ultimately whether --

3            THE COURT:  Is that when it was sought or

4    when it was received?

5            MR. OISAGHIE:  When the FOIA request was --

6    excuse me one second.

7            THE COURT:  I'm sure I have it here.  I can

8    look at it.

9            Let me shift gears for a second.  You talked

10   about there being any number of institutions that

11   people feel have discriminated against them.

12           What -- if a cause of action is recognized

13   here, what guardrails are there?  People would be

14   entitled to sue historic decisions of Social Security

15   Administration benefits, of housing relief, of

16   agricultural subsidies provided to farmers.  I mean,

17   in other words, are we basically opening the door to

18   damages for decades and decades of discrimination by

19   every agency in the federal government?

20           MR. OISAGHIE:  Well, not necessarily, your

21   Honor.  If plaintiffs in cases involving other

22   federal agencies and different fact patterns can

23   discriminate that the negligence of those agencies

24   resulted in their experience of racial discrimination

25   which caused them harm, then they may very well have

```
 1   valid claims under the FTCA.  But that's not the
 2   question presented to the Court ultimately today.
 3          The factual record in this particular case,
 4   even prediscovery, is compelling.  You can look to
 5   the VA's own public statements, the statistical
 6   evidence of disparities in the administration of
 7   benefits.  And, frankly, the VA doesn't even dispute
 8   that racial discrimination in benefits administration
 9   occurred.
10          But even setting aside the particularly
11   compelling facts of this case, there is a special
12   solicitude for veterans under federal law.  For
13   example, the veterans canon requires Courts to
14   construe ambiguities in statutes providing benefits
15   to veterans in favor of the beneficiaries, and
16   Congress very specifically created the VA system
17   separate and apart from other systems of social
18   welfare in recognition of the special solicitude for
19   veterans under federal law.  So this is a unique
20   case.
21          THE COURT:  And do you have an obligation, at
22   least if the case proceeds, to demonstrate that the
23   source of the discrimination in benefits
24   determinations was the VA as opposed to the various
25   branches of the military?  In other words, Mr. Monk,
```

1  Sr., was subject to discipline by the military that

2  ultimately resulted in his initial denial, at least,

3  of benefits.  So if the VA looks at his record and

4  says, well, we just don't give benefits to people who

5  are less than honorably discharged, hasn't the

6  discrimination taken place prior to the time that the

7  VA makes its decision?  And do you have to sort that

8  out, or would a jury have to sort that out?

9        MR. OISAGHIE:  Not necessarily, your Honor,

10  because the VA has an obligation to conduct its own

11  inquiry and not to just accept, you know, the status

12  of -- by default, the status of discharge given by

13  the military and --

14        THE COURT:  Well, they have a duty to make

15  sure that their adjudicators are not biased.  But do

16  they have a duty to look behind the reasoning of

17  those adjudicators?  In other words, again, if

18  they're just applying a bright-line rule, folks who

19  are less than honorably discharged don't get

20  benefits, what's discriminatory about that?  The

21  discrimination may have occurred at the disciplinary

22  stage in the military, but has the VA itself

23  discriminated?  And if not, what duty was there to

24  correct anything that the military did?

25        MR. OISAGHIE:  Well, whether the

1  discrimination was due to discriminatory inputs, so

2  to speak, from other agencies wouldn't mitigate the

3  VA's duty to prevent, you know, racial discrimination

4  as experienced by black veterans from occurring.

5          And ultimately plaintiffs allege, you know,

6  in various paragraphs of the complaint, that the VA

7  knew that this discrimination was occurring for

8  decades and that the VA did not act to rectify the

9  situation.  So whether the inputs came, you know,

10  from the VA initially or not, the VA still failed in

11  meeting its duty.

12          THE COURT:  Okay.  Let me ask another kind of

13  left field question.

14          You rely, at least in part, on the continuing

15  course of conduct doctrine to get around the statute

16  of limitations?

17          MR. OISAGHIE:  Yes, your Honor.

18          THE COURT:  Under that doctrine, doesn't

19  there have to be a wrongful act within the statute of

20  limitations that then can allow prior continuous acts

21  to be brought as part of the claim?  In other words,

22  don't you have to point to, for each plaintiff, a

23  wrongful act within the statute of limitations that

24  would allow that plaintiff's claims to be deemed

25  timely under the continuing course of conduct

```
 1   doctrine?

 2        MR. OISAGHIE:  That would be correct, your

 3   Honor, under the continuing course of conduct

 4   doctrine, though the primary argument that plaintiffs

 5   rely on is the diligences discovery rule.

 6        But even under the continuing course of

 7   conducts doctrine, Mr. Monk -- Mr. Monk, Jr.'s -- the

 8   statute of limitations on Mr. Monk, Jr.'s claims

 9   would not have accrued until December 2020 at the

10   earliest which was when the VA correctly backdated

11   Mr. Monk's application for benefits.  That would have

12   been the last discrete instance of his interaction

13   with --

14        THE COURT:  That was a beneficial act, not a

15   discriminatory act?  That's when things were

16   corrected.  So you can't rely on the date when things

17   were corrected to reach back to instances of

18   discrimination, can you?  In other words, they are

19   fixing what they did wrong.

20        MR. OISAGHIE:  Yes.  But the point is not

21   that -- the point is not the particular sort of

22   decision that was made in that discrete interaction.

23   The point is that the harm in this case is stemming

24   from the exposure to a racially discriminatory system

25   of benefits administration so --
```

1          THE COURT:  Right.  Right.  But when

2    corrections are made, that can't be deemed

3    discriminatory, can it?

4          MR. OISAGHIE:  Well, the --

5          THE COURT:  I understand the point.  I mean,

6    I think you're -- I don't want to say you're

7    conceding the point, but I think you see my point

8    which is plaintiff by plaintiff we're going to have

9    to find an act -- to use the continuing course of

10   conduct theory, we're going to have to find,

11   plaintiff by plaintiff, an act within the statute of

12   limitations in order for that plaintiff to bring a

13   timely claim.

14         MR. OISAGHIE:  Yes.  But the act itself would

15   not necessarily have to be discriminatory in and of

16   itself.  You know, the 2021 FOIA information covered

17   adjudications going all the way from 2001 to 2020.

18   So if we're discussing an interaction that occurred

19   in December of 2020, even if that interaction, you

20   know, resulted in Mr. Monk's claims being correctly

21   backdated, it would still be taking place within the

22   context of a larger system that was discriminating on

23   the basis of race and Mr. Monk continuing to be

24   subjected to interacting with that system.

25         THE COURT:  Okay.  Let me ask you a couple of

```
 1   other kind of off-point questions.

 2           First off -- and just to be clear, I haven't

 3   read the entire file.  It was transferred to me

 4   recently.  I have looked at what I think is pertinent

 5   to this motion, but I haven't looked back at all the

 6   prior pleadings so maybe it's answered somewhere.

 7   I'm just not sure.

 8           The class that's sought in this case, is that

 9   a nationwide class?  Is it a class of the members of

10   the plaintiff organization?  What's the scope here?

11   Is it all Connecticut veterans?  What are the

12   limitations of the class that sought to be certified

13   in this case?  Maybe you're not -- I don't know if

14   you guys have even thought about that yet, but I do

15   need to know that at some point.  It seems to me

16   choice of law, at minimum, is going to be affected by

17   whether it's a nationwide class, a Connecticut class

18   and so forth.

19           MR. OISAGHIE:  Yeah.  May I have just a

20   moment to confer with my colleagues?

21           THE COURT:  Sure, yeah.

22           MR. WISHNIE:  Your Honor, if I may briefly.

23           THE COURT:  Sure.

24           MR. WISHNIE:  There is no motion for a class

25   certification yet pending.
```

```
 1              THE COURT:  I know.  I know.

 2              MR. WISHNIE:  The proposed class in the face

 3    of the amended complaint is a nationwide class.

 4              THE COURT:  That's how I read it, yeah.

 5              MR. WISHNIE:  Of course the issues you're

 6    raising I think are likely to have to be vetted in a

 7    motion for class certification.

 8              THE COURT:  Right.

 9              MR. WISHNIE:  And we are -- would be prepared

10    to address I think what's underneath the Court's

11    questions at that time.

12              THE COURT:  Yeah.  So in terms of choice of

13    law, if it's a nationwide class, then it's D.C. law;

14    is that fair?

15              MR. WISHNIE:  It might well be, your Honor.

16    But here today on the motion to dismiss just the

17    claims of the individual plaintiffs, we don't think

18    that that all has to be resolved.  And we've briefed

19    it under both Connecticut and D.C. law, recognizing

20    that.

21              THE COURT:  Okay.  Thank you.

22              Sorry about that.

23              MR. OISAGHIE:  No problem.

24              THE COURT:  Okay.  Well, I've interrupted you

25    enough.  I don't know if you have further argument
```

1    you want to make on any of these points or other

2    points.

3            MR. OISAGHIE:  Yes, your Honor.  Just to

4    address two other points.

5            So the government raised earlier the lawsuits

6    by Mr. Monk, Jr. in 2014.  That lawsuit, just to

7    clarify for the Court, involved alleged racial

8    discrimination by the Department of Defense.  The VA

9    was not a party to that 2014 lawsuit, nor did it

10   involve any allegations of discrimination by the VA

11   specifically.  So for the purposes of the statute of

12   limitations, that 2014 lawsuit wouldn't be relevant.

13           The government also raised a point about

14   preclusion.  You know, the previous fora in which

15   Mr. Monk, Jr. pursued benefits claims and other

16   plaintiffs pursued benefits claims did issue valid

17   final decisions, yes, but those decisions were about

18   benefits.

19           This case is not about benefits.  This case

20   is about the emotional and dignatory harm suffered by

21   plaintiffs as a result of their interaction with a

22   discriminatory system.  And, in fact, Mr. Monk, Jr.,

23   Mr. Monk, Sr. and other plaintiffs who were harmed in

24   this case would not have been able to raise their

25   claims in any of the other fora that the government

```
 1    mentioned.
 2            So under traditional principles of res
 3    judicata, since the claims could not have been
 4    brought under other fora, they can't possibly have
 5    been precluded.
 6            THE COURT:  Right.  Yeah.  I understand the
 7    argument.
 8            And then I did have a thought about -- I'm
 9    not sure it was well briefed but discretionary
10    function exception.  Is the government relying on
11    that and if so, do you want to comment?
12            MR. OISAGHIE:  Yes, your Honor.
13            MS. ELICKER:  The government has not briefed
14    that issue yet, but we reserve the right to raise the
15    discretionary functioning exception.
16            THE COURT:  So it's not a basis for this
17    motion?
18            MS. ELICKER:  Correct.
19            THE COURT:  All right.  Gets you off the
20    hook.
21            MR. OISAGHIE:  Thank you, your Honor.  If the
22    Court doesn't have any further questions.
23            THE COURT:  I don't think I do.  If I do,
24    I'll let you know.
25            Does the government want to respond?
```

1          MS. KELLEY:  Yes, your Honor.

2          MR. WISHNIE:  Your Honor, if I may just

3   briefly, just to offer a cite or two that might help

4   in some of your earlier questions, the Court asked

5   when the FOIA request was submitted.  Not the

6   lawsuit, the request.  Paragraph 37 of the amended

7   complaint states that the FOIA requests were

8   submitted on February 22, 2001 -- I'm sorry, 2021, so

9   about one year before the FTCA claim in this case

10  which was February 25, '22, well within the two-year

11  period.

12          In addition, the last decision you were

13  asking about when Mr. Monk, Jr. finally was granted

14  his benefits was on -- this was on the continuing

15  violations, that was on December 15, 2020.  Up until

16  the day before that, December 14, 2020, VA was

17  continuing to deny benefits.  So the violation

18  continued at least until that decision.  We agree the

19  correction of the decision changed things.  But until

20  December 14, 2020, the VA continued to withhold

21  benefits.  So even from that date two years, he's

22  well within.

23          THE COURT:  Well, okay.  So that's the effect

24  of a decision.  But a wrongful decision did not occur

25  within the two years prior to bringing this case.

 1            MR. WISHNIE:  I was referring to paragraphs

 2   124 and 125 of the amended complaint which trace some

 3   of that back.  You may be right, that the last

 4   wrongful decision may not have been within the two

 5   years.

 6            THE COURT:  Okay.

 7            MR. WISHNIE:  But the continuing harm, of

 8   course, lasted until December 14, 2020.

 9            THE COURT:  Right.  I understand.  But let's

10   use an automobile negligence claim.  You know, if the

11   automobile accident occurs on June 1st of 2015 and

12   you're continuing to treat or continually affected,

13   the statute of limitations don't flow, continue to be

14   open.  It goes back to the last wrongful act, I

15   think.  And so the consequences of a wrongful act

16   don't necessarily hold open the statute of

17   limitations.

18            MR. WISHNIE:  That may be so, your Honor.  It

19   would be ironic if the delay in VA's correcting the

20   wrongful act pushed it beyond the time limit.

21            THE COURT:  Yes.  I get the point.  Okay.

22            MS. KELLEY:  Thank you, your Honor.  I'd like

23   to address a few points that were made.

24            First, on the VJRA, plaintiffs are arguing

25   that every black veteran forced to interact with the

1    system has experienced harm.  But here plaintiffs are

2    seeking individual damages in tort which requires

3    showing duty, breach, causation and damage at the

4    very least.  And the experience of having to apply

5    for benefits is something that all veterans must do.

6    The question here is whether, to the extent -- excuse

7    me, whether disparities necessarily applied to

8    plaintiff in this case and caused a harm in tort.

9          Again, as my colleague mentioned, there are

10   situations where benefits are granted in full or

11   where they're denied for proper reasons.  And the

12   paragraphs that the plaintiffs have pointed to as

13   examples of the harm all describe adverse benefits

14   decisions and discuss the concept of harms connected

15   to those benefits decisions.  And in order to

16   establish whether that results in a tort, the Court

17   would be required to look into whether the VA acted

18   improperly, which is what the case law about FTCA

19   claims dismissed under the VJRA says cannot be.

20         Further, the VJRA does provide meaningful

21   remedies, meaningful remedies that the plaintiff has

22   pursued successfully.  And, for example, the *Conyers*

23   and the *Beamon* case show that this is an adequate

24   process and even if the plaintiff is unable to bring

25   the claim in the format that they might prefer, that

```
1    doesn't mean that the process is inadequate or that

2    the remedies through that process are not exclusive.

3           THE COURT:  Could the claims for emotional

4    distress damages and the like be made in the

5    administrative process?  And if not, how does res

6    judicata apply here?

7           MS. KELLEY:  Your Honor, an FTCA claim cannot

8    be brought in the VJRA process.

9           THE COURT:  But can a request for emotional

10   distress damages be brought?  In other words, when

11   they were correcting the benefits decisions, could

12   they have said, oh, and by the way, we recognize that

13   you have suffered emotional distress and, therefore,

14   we're going to award you an extra $10,000.

15          MS. KELLEY:  Your Honor, I cannot speak to

16   that.  I can say that the FTCA is the mechanism for

17   bringing a tort claim against the United States, and

18   so that would not be available under the VJRA

19   process.

20          But, again, when the issue is really all --

21   stems from a situation in which the Court would be

22   required to look into or assess the propriety of

23   benefits determinations, those are excluded,

24   including when they're characterized as FTCA claims.

25          You know, there was a discussion about
```

1    character of discharge and whether, you know, it's on

2    the VA, which is the only government entity at issue

3    in this case, would -- had assessed character of

4    discharge correctly to make its character of

5    discharge determinations.  That -- again, that is a

6    benefits-related decision that the Court would be

7    required to look into if that became an element and

8    is discussed in detail in the amended complaint.

9         THE COURT:  I don't completely follow that.

10   So the U.S. Navy makes a discharge determination.

11        MS. KELLEY:  Uh-huh.  The U.S. Navy issues a

12   discharge.  The VA makes what's called a "character

13   of discharge determination" based on that discharge

14   to determine whether a veteran may be entitled to

15   benefits, and they make that character of discharge

16   determination when a veteran applies for benefits

17   because they're -- you know, depending on what type

18   of the discharge is, the veteran may or may not be

19   entitled to benefits.  That's something that, as you

20   mentioned, the VA is required to consider the

21   discharge status when it makes that COD.  But you're

22   correct, the discharge status itself is outside of

23   the VA's control.

24        But to the extent that plaintiffs are

25   criticizing benefits decisions based on allegedly

1    flawed character of discharge determination, that is

2    a decision affecting benefits that falls under the

3    VJRA.

4            Your honor, on the FTCA, first, with respect

5    to negligence per se, the Federal Tort Claims Act --

6    under the Federal Tort Claims Act, plaintiffs must

7    identify analogous state law duties that would impose

8    liability on private parties for similar conduct.

9    And federal statutes and policies cannot be basis for

10   a tort claim under the FTCA, and we describe that in

11   both our opening brief and on page 10 of our reply

12   brief.

13           THE COURT:  Can a federal statute be a source

14   of a duty?

15           MS. KELLEY:  Excuse me?

16           THE COURT:  Can a federal statute be a source

17   of a duty giving rise to a private cause of action?

18           MS. KELLEY:  No, not under the FTCA, it

19   cannot.  It has to be a situation -- it has to be

20   state law private analogue.  So it can't be --

21           THE COURT:  I understand that.

22           MS. KELLEY:  Yes.

23           THE COURT:  But if there is a -- well, you

24   haven't really responded to the per se negligence

25   arguments that the plaintiffs make.

1          MS. KELLEY:  Your Honor, as I understand the

2     per se argument, it is relying on a violation of a

3     federal policy or statute.  And that is what the FTCA

4     does not permit.

5          THE COURT:  So if there is a state of

6     Connecticut or a District of Columbia statute that

7     prohibits race discrimination in the provision of

8     banking services or insurance services, that's not

9     permissible private analogue?

10          MS. KELLEY:  Your Honor, it would need to

11     impose that obligation on private parties, and it

12     would need to create a right in tort, not just a

13     general statutory right to sue.  So, for example,

14     D.C. law does not permit tort claims that arise from

15     a contractual relationship.  And that's in the

16     *Gebretsadike* case.  And so -- and plaintiffs,

17     moreover, have not pointed to such a private

18     analogue.

19          THE COURT:  So can a state statute create a

20     tort cause of action?

21          MS. KELLEY:  Yes, your Honor, it can.

22          THE COURT:  Okay.  And so why are the state

23     statutes relied upon by the plaintiffs, why do they

24     not do that?

25          MS. KELLEY:  Well, your Honor I'm not aware

1    of the state statutes that they use that provide a

2    private analogue that creates a right in torts.  I

3    don't believe plaintiffs have pointed to that where

4    it would be analogous to this situation.

5            THE COURT:  Okay.  So let's try one that

6    should be familiar:  The Connecticut Unfair Trade

7    Practices Act.  All right?  If a company refuses to

8    do business with anyone who is black and a black

9    person brings a claim under CUTPA against the

10   company, that's a tort.  CUTPA is a tort cause of

11   action, I think.

12           MS. KELLEY:  Your Honor, I apologize.  I am

13   not aware of -- or familiar enough with that statute

14   to say that it is a tort cause of action.

15           But I believe that, first off, again, it

16   would have to be a private analogue; and it is not

17   analogous here where it's potentially arising out of

18   a contractual situation as well.

19           Your Honor, on -- further, your Honor, on the

20   FTCA issue, to the extent that the plaintiffs are

21   asking the Court to recognize a new duty, there can

22   be no novel and unprecedented liabilities under the

23   FTCA.  It has to be an established recognized tort by

24   the state law.

25           On the statute of limitations, plaintiffs

1  point to the *Kronisch* case and say, you know, it does

2  not require perfect knowledge, which we agree with.

3  But the belief that Mr. Monk had for decades was

4  sufficient to put him on notice to diligently

5  discover the source of his injury.  And, you know,

6  plaintiffs point to the date that the FOIA request

7  was filed but they don't explain why, for example,

8  the FOIA request could have been filed as early as

9  2011 when he had current counsel.  That's why *A.Q.C.*

10  says you can't pick that date.  And we only point to

11  the 2014 matter that we discussed as an example of

12  the fact that plaintiffs didn't need this statistical

13  analysis necessarily to either pursue more

14  information on their claim sooner or to bring their

15  claim.

16           And so for those reasons, *Kronisch* does not

17  change the fact that plaintiffs had enough

18  information years ago and, in fact, it supports that

19  fact.

20           THE COURT:  Well, the 2014 case was a case

21  against the Department of Defense, wasn't it?

22           MS. KELLEY:  Yes, your Honor.

23           THE COURT:  Right.  And so the -- Mr. Monk

24  would have had personal knowledge of how he was

25  treated by the Department of Defense.

```
 1              MS. KELLEY:  Yes, your Honor.

 2              THE COURT:  Right.  So he would have

 3    sufficient information to bring a claim against the

 4    Department of Defense.  If the adjudicator of his

 5    benefits claim wasn't openly hostile or

 6    discriminatory in manner or speech, then what reason

 7    would he have to have information about the potential

 8    of racial discriminatory treatment by the VA?

 9              MS. KELLEY:  Well, your Honor, the diligence

10    discovery rule doesn't require knowledge of

11    discriminatory treatment.  But if it did, the point

12    is that he had knowledge sufficient to act to

13    discover his claim.  So it only requires knowledge or

14    knowledge that could lead to the basic facts of the

15    injury's existence and its cause.  And *Kronisch* and

16    *A.Q.C.* say that that knowledge is there by the time

17    you have enough knowledge to seek legal advice, and

18    Mr. Monk did that no later than 2011.

19              THE COURT:  He sought legal advice, but do

20    you have reason to believe he sought legal advice

21    about this claim or about the potential of suing the

22    Veteran's Administration?

23              MS. KELLEY:  Your Honor, I believe from their

24    complaint it's clear that he sought legal advice

25    related to adverse benefits determinations, and one
```

1    of his beliefs, held since apparently the eighties,

2    is that the system was being administered in a

3    racially biased way.

4          Finally, your Honor, as far as the continuing

5    course of conduct doctrine, I believe it was -- is

6    fairly well addressed but -- by your Honor.  But

7    there is also no cases that plaintiffs cite to where

8    that's actually applied to an FTCA action.  There is

9    only one case that has cited to it, and the Court

10   there declined to apply it to an FTCA action.

11         THE COURT:  What does that turn on?  Does it

12   turn on federal law?  Does it turn on the law of the

13   state that applies?

14         MS. KELLEY:  Sorry, the --

15         THE COURT:  Federal law determines the

16   statute of limitations.

17         MS. KELLEY:  Yes, your Honor.

18         THE COURT:  And if that there is a state law

19   doctrine that would permit a private cause of action

20   to be continued, why wouldn't that be treated as a

21   doctrine applied under the FTCA?

22         MS. KELLEY:  Well, I believe, your Honor,

23   that just even if the concept exists under

24   Connecticut law, it does not mean it would apply to

25   this type of claim.

```
 1                And if your Honor has no further questions.

 2                THE COURT:  Okay.  Thank you.

 3                MS. ELICKER:  Your Honor, just a few points

 4     to add about CUTPA.

 5                THE COURT:  Sure.

 6                MS. ELICKER:  I'm not certain that it is a

 7     tort.  It's certainly not an analogue that plaintiffs

 8     identified in their briefing that they attempted to

 9     claim.  CUTPA does not allow emotional distress

10     damages, and that's probably the fatal comparison in

11     this circumstance.  CUTPA allows recovery for

12     economic damages and -- but the predicate question

13     too is does Mr. Monk's relationship to the VA look

14     like a consumer relationship, and we would

15     respectfully say that it does not.

16                THE COURT:  Well, again, how close does the

17     analogue have to be?  You know, you're not going to

18     have a private analogue where a private party is

19     denying benefits to -- I mean, so you're basically

20     saying there can't be a private analogue.  Maybe

21     state pension benefits, I don't know.  All that is

22     going to be --

23                MS. ELICKER:  The FTCA's private analogue

24     requirement works very well in circumstances where

25     the government engages in conduct that looks like the
```

1    things that private parties do.  So when doctors for

2    the VA provide medical care or when Postal Service

3    truck drivers drive around in cars, those are actions

4    that private people do and those are FTCA claims all

5    the time.

6         But in this type of context, respectfully, we

7    don't think it's a problem that the FTCA would not

8    recognize a private analogue because this type of

9    conduct where the government is giving a benefit is

10   quintessentially adjudicative government-type

11   conduct.

12        THE COURT:  And so the bottom line is there

13   is no potential cause of action of any kind that the

14   plaintiffs can bring for a redress for systemic

15   racial discrimination in the provision of VA

16   benefits?

17        MS. ELICKER:  Not through the FTCA, your

18   Honor, and not because of the VJRA.  But those are

19   the two questions that are in front of your Honor

20   today is are those available, and we would say

21   that --

22        THE COURT:  Well, sure.  But really what

23   we're saying is it can't be done.  There is no

24   constitutional right, obviously, to apply, no

25   statutory right.

1           MS. ELICKER:  Your Honor, in, I think it was

2     footnote 5 of our brief, we discuss the history of

3     the FTCA and how it was adopted.  And advocacies such

4     as what lead to the FTCA in the first place remains

5     available to the plaintiffs who feel that the

6     government's procedures are not serving them in the

7     way that they want.

8           Thank you.

9           THE COURT:  Thank you.  Anything further?

10          MS. SULLIVAN:  Your Honor, I would just like

11    to provide some clarity on the question regarding

12    whether courts within the VJRA appellate structure

13    can provide tort damages.  They cannot.  In 2021, in

14    *Watson v. McDonough* out of the Court of Appeals For

15    Veterans Claims, the Court there determined that it

16    could not award traditional tort damages.  So if

17    these claims can't be heard in this court, they can't

18    be heard in any court which is inconsistent with the

19    congressional intent in passing the Federal Tort

20    Claims Act.

21          THE COURT:  All right.  This is a tough one.

22    Very interesting.  I appreciate the argument, and I'm

23    going to issue a written decision, obviously.  And

24    we'll get that to you as quickly as I can.

25           Again, my apologies for not taking up the

1    discovery, but it seems appropriate, to me anyway, to

2    resolve this issue first and then move forward.

3        All right.  Thank you all.  We'll stand in

4    recess.

5        (Proceedings adjourned, 10:25 a.m.)

6            C E R T I F I C A T E

7

8

9

10        RE: CONLEY F. MONK, JR.
              v.
11        THE UNITED STATES OF AMERICA

12        No. 3:22-cv-01503-SRU

13

14        I hereby certify that the within and

15    foregoing is a true and accurate transcript taken in

16    the aforementioned matter to the best of my skill and

17    ability.

18

19        /s/ Melissa J. Cianciullo_____

20    MELISSA J. CIANCIULLO, RDR, CRR, CRC
              Official Court Reporter
21        United States District Court
              915 Lafayette Boulevard
22        Bridgeport, CT 06604
              (203) 606-1794

23

24

25