UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CONLEY F. MONK, JR., ET AL.,
Plaintiffs,
v.
UNITED STATES OF AMERICA,
Defendant.

No. 3:22-cv-01503-SRU
March 24, 2025
2:02 p.m.
915 Lafayette Boulevard
Bridgeport, Connecticut

# TELEPHONIC STATUS CONFERENCE AND MOTION HEARING

B E F O R E:

THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

A P P E A R A N C E S:

For the Plaintiffs:

JEROME N. FRANK LEGAL SERVICES - YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
E-mail: Michael.wishnie@ylsclinics.org
BY: MICHAEL J. WISHNIE, ESQ

(Appearances continue ...)

Official Court Reporter:
Melissa J. Cianciullo, RDR, CRR, CRC
(203) 606-1794

A P P E A R A N C E S C O N T ' D:

For the Plaintiffs:

JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
E-mail: Jcreelan@jenner.com
BY: JEREMY M. CREELAN, ESQ.

353 N. Clark Street
Chicago, IL 60654
E-mail: Ahenderson@jenner.com
BY: ADAM C. HENDERSON, ESQ.

For the Defendant:

DEPARTMENT OF JUSTICE CIVIL DIVISION
Benjamin Franklin Station
P.O. Box 888
Washington, DC 20044
E-mail: Emily.m.kelley@usdoj.gov
BY: EMILY M. KELLEY, ESQ.
IRINA MAJUMDAR, ESQ.

UNITED STATES ATTORNEY'S OFFICE
450 Main Street, Suite 328
Hartford, CT 06103
E-mail: Jillian.orticelli@usdoj.gov
BY: JILLIAN ROSE ORTICELLI, AUSA

(TELECONFERENCE COMMENCED, 2:02 p.m.)

THE COURT: Good afternoon. This is Stefan Underhill. We are on the record.

Could I please have the appearance of anyone who expects to speak today in the conference.

MR. WISHNIE: Good afternoon, Your Honor. Michael Wishnie, Jerome N. Frank Legal Services Organization. And with me is law school student Kindall Hayes whose appearance you have approved.

On the line are co-counsel at Jenner & Block who will also participate today. I'll invite them to introduce themselves.

MR. CREELAN: Good morning, Your Honor. This is Jeremy Creelan, partner at Jenner & Block. And with me is Adam Henderson who will be handling a portion of the argument along with the Yale clinic.

THE COURT: Thank you.

MS. KELLEY: Your Honor, good afternoon. This is Emily Kelley from the Department of Justice torts branch for the United States of America. We also have Irina Majumdar and Jill Orticelli on the line; however, I will be handling the discussions on behalf of the United States of America.

THE COURT: All right. Thank you.

Well, I think we have five issues to take up,

two raised by the plaintiff and three raised by the defense. Why don't with start with the plaintiff's issue. I think the first is the data sampling question.

MS. HAYES: Thank you, Your Honor.

We're seeking two things that go to the heart of the plaintiff's case: a random sample of benefits adjudication data and records of complaints of discrimination by veterans. If we were to pool that data, we would call it sampling of adjudications and then more targeted communications. I'll give a short preview of both issues.

First, on sampling, we're asking for a relatively small sample of data that we can use to demonstrate racial disparities of VA benefits adjudications. And, Your Honor, the government doesn't dispute the relevance of these documents. It's just their main concerns are privacy and burden, which I'll address now.

On privacy, we think this can be addressed by the entry of a Privacy Act order authorizing government disclosure of these records. And that, combined with the standing protective order, should be sufficient to protect the relevant privacy interests. It would also relieve the government of

the burden of having to redact personal information from the record.

On the government's concerns regarding burden, Your Honor, we've done our best to work this out with the defendants, but they haven't offered an alternative to our sampling proposal.

So one way or another, we need a sufficiently representative sample of data to make our case. And the burden is minimal for the structure data covering 2006 onwards; and it is a bit more involved for the paper files before 2006, and we acknowledge that. But I believe, and we believe, plaintiffs believe, that entering a Privacy Act order will reduce that burden significantly because the defendant won't need to redact PII.

Beyond that, Your Honor, any burden involved in producing the sample is relatively proportionate to the needs of the case.

So on our second issue, complaint, we are seeking an order compelling the government to search for correspondence from advocacy groups and other institutional actors complaining about discrimination of VA benefits and VA's response. Those advocates might include one of three organizations or one of three types: veteran services organizations, members

of Congress or civil rights organizations. What we're not seeking are complaints that might appear in individual benefits files.

We tried to work with defendants on the search by asking them to identify relevant liaisons for these inquiries during the time period, but they failed to agree with us on any search that we could do together.

So we need help from the Court in resolving these issues. Specifically, we would like the Court to enter an order to resolve this issue. And if we're not able to reach an agreement today, we're hoping that -- we request, respectfully, Your Honor, that the Court set an expedited briefing schedule.

Thank you so much, Your Honor. That's all for the plaintiff's side.

THE COURT: Ms. Hayes, let me just confirm one thing, and that is the parties have met and conferred on these issues; that is, actually spoken to each other out loud?

MS. HAYES: Yes, Your Honor.

THE COURT: Very good. Thank you.

Ms. Kelley, you want to be heard?

MS. KELLEY: Yes. Thank you, Your Honor.

I'll address the sampling proposal first.

And just to provide the Court a little bit of background, the parties have now met and conferred on this issue on several occasions. Essentially, plaintiffs are looking for anonymized randomized data for a large quantity of veterans who are not involved in the suit seeking specific data points, like demographic data points like race and gender and initial disability benefits claim information. And our understanding is that plaintiffs want to analyze these data points on a large scale for statistical purposes. And as plaintiffs briefly touched on, for the past, you know, 19 or 20 years or so, that information is stored in VA-maintained databases across which a code could be run to create what is essentially a database report.

And defendant had been awaiting answers from plaintiffs on the parameters of their request. And once that was received, the United States confirmed that it would work to provide that anonymized data sample for the years for which such data is maintained; and that would be, as plaintiff requested, for 5500 randomized anonymized veterans.

So our understanding is the only remaining dispute is for the years where such information does not exist in that format. And depending on the year,

that could be paper benefits filed where -- which are stored by National Archives or digitized files in the Veterans Benefits Management System operated by VA. They're often thousands of pages per veteran, and even where these files are digitized, they're essentially a collection of scanned documents. They are not maintained in a way on which a code could be run to pull the info plaintiffs request.

So, very importantly, these files contain the most sensitive personal and health information for thousands of veterans who, again, may be alive or dead, covering decades, are not involved in this case. And for good reason, there are numerous privacy statutes and regulations that prohibit VA from simply releasing such information on request; and the VA takes its privacy duties to veterans very seriously. And we understand that plaintiffs, generally speaking, do not have a need for most of the information in these benefits files.

So the United States' perspective is that the VA cannot simply hand over these documents. The United States would need to manually pull, scan and review thousands of documents for each of the 11,000 veterans requested and redact every page of every file except for the specific demographic info that

plaintiffs want. So not only would -- even if this could be done, not only would it take months just to do the pulling and scanning and even longer to do the review, you know, that which is separate from the expense itself, but this could significantly delay discovery.

And for the reasons stated, more importantly, the U.S. cannot simply agree to produce unredacted versions of claims files for veterans without their knowledge or consent to third parties in a litigation that does not involve them.

The United States does not believe that plaintiff's request is feasible or appropriate for the years where that data does not exist in the format that plaintiffs want. As mentioned, we are producing that anonymized data where we can which covers about a 20-year span. And so, you know, we cannot -- we don't agree that the protective order would be sufficient in this case, and we don't agree that it's appropriate for United States to produce that information unredacted.

I can move on to the complaints topic now, Your Honor, if you'd like, or if you have any questions on that topic first.

THE COURT: On the sampling, is the United

States willing to be bound by statistical analysis from -- I think it just said 2006 forward? In other words, if there was racial disparity in the period 2006 to the present, is the government willing to admit that there was a similar racial disparity prior to then?

MS. KELLEY: No, Your Honor. We are not prepared to admit any such statements for either period, certainly not at this time where --

THE COURT: I'm not asking you to give away the case. I'm asking whether you would be willing to be bound by the data analysis. In other words, if there was nothing that happened between 1945 and 2006 that would have affected the overall disparity, if you will, alleged disparity that they have on the claims.

So if -- in other words, if you're willing to be bound in the current period, at least the one that you can disclose, and have that reflect good or bad on the earlier period, there is no need for -- or at least potentially no need for further sampling of the paper file.

MS. KELLEY: I -- Your Honor, I don't think that we are in a position to agree to that. I think I understand that extrapolation that you're

suggesting. We certainly would need to talk with the VA. You know, that's not something that plaintiffs have proposed thus far, but I do not think we could say that at this time.

We also just don't know yet what the data will reflect for the time period that we do have. You know, I think -- you know, the plaintiffs have not proposed this, but it is possible to discuss more randomized sampling from the time period that we do have.

But as stated, you know, the data -- or, sorry, the information for that older time period, the pre-2006 or so time period, it just doesn't exist in that format.

THE COURT: Well, I understand that. The question is really how are we going to deal with that problem.

Let me hear from Ms. Hayes regarding what precisely plaintiffs think they need from the paper files. Is it -- do you need the entire claim file or do you need some summary? For example, numbers of visits, numbers of adjudications, ultimate determination. Is there some subset of data that might be contained in a summary sheet, if you will, of the contents of the file that might be sufficient?

MS. HAYES: Yes, Your Honor. We have provided defendants with a list of eleven variables that we hope to extract from each of these claims. We are requesting 5500 from each era, so that's 1945 to 1961, 1961 to '91, and then '91 to present. So we are looking for a total of about 15,500 claims. But on each of these claims, we are looking for a specific number of variables which we've already shared with defendants, and that's just eleven variables.

MS. KELLEY: This is Emily Kelley.

We are searching the variables that plaintiffs -- the parties have agreed upon for the period for which it's available.

To go back to your question, it's our understanding that there is no such summary sheet already in existence that you were mentioning for the files that are not within the databases already. So there is no easy way to provide plaintiffs those variables that they want for those older time periods without having to essentially hand over the entire veteran's benefits file.

You know, and one important point is the information plaintiffs are asking for may not even be in those files. It may be scattered throughout.

And, again, the VA cannot agree to handing over unredacted veterans' files. You know, we're talking thousands of pages too in which the variables could be on any given page.

So we've got the issue of the privacy protections for these veterans which is of utmost importance; and then we also have the issue of the burden of pulling, scanning and reviewing thousands of pages for thousands of veterans.

THE COURT: Well, okay. I've never seen a veteran's claim file so I don't know what's in there, but I assume that the bulk of the documents that are in that file are medical records. Is that a fair assumption?

MS. KELLEY: Yes, Your Honor. That's a fair assumption. There is medical records. There is personal health and identifying information. There is also likely to be some records potentially relating to service. So -- and we're talking, you know, anything connected to claims benefits applications and decisions. So there is a lot of highly sensitive information in these files.

THE COURT: Yes. But as I read these eleven or twelve, depending on whether one has agreed to be dropped, variables, I don't understand the plaintiffs

to be seeking medical records. In fact, I think they're disclaiming any effort to obtain, in effect, appeal or review or re-examine whether the decisions made were correct or incorrect medically or otherwise.

It doesn't strike me as especially difficult to take a file and scan the nonmedical records, pages. In other words, if there's a thousand pages, 850 pages are medical records, you know, you can get plaintiff what they need without disclosing the -- one, the bulk and, two, the most sensitive information in that file.

MS. KELLEY: Your Honor, so one point versus that. The variables they're seeking often may be in the medical files or in the medical documents in a veteran's benefits file.

So, for example, there isn't going to necessarily be a summary sheet of any sort that says all of the info plaintiffs want but doesn't have medical information. It's all -- it could be like on any given page. So, for example, it could be a medical examination that has the info about race. Or it could be --

THE COURT: Right.

MS. KELLEY: -- a medical document --

THE COURT: I think maybe we're talking past each other a little bit.

If the variables are employed in the following way, that is, documents sufficient to show these variables, the fact that the date of the initial disability claim may be repeated 500 times throughout the medical records doesn't matter. If you've got a document that shows the date of the initial disability claim, that variable has been satisfied. For the disability compensation claim, same thing, great. That may show up on every single medical record. But if it's elsewhere in the file, then the plaintiff has received documents sufficient to show race, what information they need. That's what I'm trying to figure out: Is there some way to minimize your burden? I mean, obviously, this is all very important stuff, and maybe we have to put that burden on you. I'm looking for a way around the burden.

MS. KELLEY: Uh-huh. So, Your Honor, I see what you're asking. The problem is that, you know, when you look at a veteran's benefits file, even a digitized version, it's kind of like having a document folder on your computer. So to figure out if we can get that information sufficient to show, we

have to go through manually all of the documents until we've gotten to the point where we've identified everything that we can. And if, for example, there is a variable we haven't been able to find, that would still require reviewing the entire file to make sure that we have really exhausted the process of locating it.

In addition, any pages we did produce would, again, have to be redacted of any information that's not the variables being sought.

So, you know, that to the United States does not alleviate any of the burden of individually pulling, scanning and reviewing these documents for this large size of veterans.

I hope that addresses your question about how it's maintained.

THE COURT: Okay. Well, what I'm hearing is there shouldn't be any discovery permitted. I know I'm overstating it, but that's essentially what you're saying: It's so burdensome that we can't really produce anything. That's not a --

MS. KELLEY: But -- Your Honor, I think what we're saying is that for the information where it is not maintained in the ordinary course in a way that can be reasonably produced, we object to the

discovery. We obviously have not objected for where it is in a database; we're working on that right now to produce the report that plaintiffs have asked for.

This is an issue of importance to the United States given the -- not just the burden but the privacy issues involved. So, you know, our -- if the Court is inclined to issue any sort of ruling on this dispute, we would request that the United States be given an opportunity to brief that issue for you so we may present the argument and factual background fully.

THE COURT: Well, I'm happy to let you brief it. I would also like that briefing to include a response to the suggestion that the Court can enter a Privacy Act order.

And I'd like to understand the difficulties in producing documents sufficient to show these variables. The -- this is a big case. We've all known from the beginning it's going to be requiring a lot of document review on both sides. And, you know, we've got to come up with a way to permit a reasonable amount of discovery within the nature of the claims.

So maybe you can grab 50 files that are paper files and in your briefing describe how difficult it

is to obtain documents sufficient to show these were variables. That would be helpful to me.

MS. KELLEY: Understood, Your Honor. And, you know, we would just request that a briefing schedule be set -- that a reasonable schedule be set so that we can do that and address these issues.

THE COURT: Well, when you say "reasonable," what do you mean?

MS. KELLEY: Well, Your Honor, if you were thinking, for example, a reference to grabbing 50 files and how much time it takes, we would just request enough time to indeed pursue that. As we said, 50 files could be 50,000 documents. That's not an exaggeration. So that's what we're dealing with.

THE COURT: Yeah. Okay. I don't know what's in these files, but I've got to believe that there is somewhere a written determination of a claim that will contain three-quarters of the variables: the date the claim was filed, the type of claim, maybe race and gender, whether their claim is granted or denied, the -- if granted, the disability rating, the VA office handling the claim, the types of service, what branch they were in. Virtually all of them. Not, maybe, combat zone but rank.

You know, I just -- I'm going to be a little

surprised if you have to look through a thousand pages in a particular file rather than finding some written order. Maybe it's a form that's filled out that summarizes the -- in effect, the findings or determination of the administrative panel. That's what I'm talking about in terms of a summary, a summary document. It may be quite simple.

MS. KELLEY: Understood, Your Honor. My understanding is, unfortunately -- it would be nice if it was that idea but that -- or if it was maintained in that way but -- it would be simpler, but that's not our understanding how they're maintained.

The records aren't necessarily even in order; and they don't have every variable, to our understanding on, you know, any given page. So we can certainly provide more information about how the records are maintained.

THE COURT: All right. Do these files maintain a written determination of the disability claim?

MS. KELLEY: They should, Your Honor, yes. There should be a determination contained within the file.

THE COURT: And so presumably the file is

well-maintained, that's the top document or it's maybe stapled on the left-hand side of the file as a paper document. In other words, when somebody wants to pull this file to quickly understand what's going on, the written determination is the first thing they would like to see. I've got to believe it's segregated in a way that permits easy access to it by somebody who's never picked the file up before. I could well be wrong. Maybe these are -- maybe they got dropped on the floor and shuffled back into the file. I don't know. But if this is the military, I expect there is going to be some very careful records.

MS. KELLEY: My understanding is plaintiffs are only interested in the initial benefits claims, but this is just another example of, you know, this is a collection of files that would have to be really hunted through to find the information.

THE COURT: Okay. Well, again, if applications are made five times, presumably there are -- there is a portion of the file that has benefits determinations that are separately maintained. I'm going to be very surprised if that's not the case.

It does not make sense for anybody who wants

to pick up the file to figure out what's going on, that they would have to search through a thousand pages to find the four or five determinations made on the disability. When the second application is filed, whosever deciding that application wants to know what happened the first time around. So it's going to be placed in a place that is easily accessible, and it's going to have most of the variables that the plaintiff is seeking. So that's my hope. Obviously, that's my presumption, but you can let me know if I'm right or wrong.

Ms. Hayes, do you want to comment on anything? Do you want to comment on seeking an expedited briefing?

MS. HAYES: Yes, Your Honor. Just -- I just wanted to underscore what you were saying. Just out of the tens of millions of claims that veterans have filed with VA since 1945, we're only asking for the government to pull 16,500, which is an average, about 200 claims per year. This is a fraction of responsive claims data; and this is not a meaningful burden, especially for historical cases this important, Your Honor.

THE COURT: All right. So, Ms. Kelley, can you get me your brief two weeks from today?

MS. KELLEY: Your Honor, if we could, we would request -- we would request four weeks.

THE COURT: Well, I think the rules say three weeks, and this issue has been bubbling around for a while.

MS. KELLEY: Okay. If three weeks would be possible, we would appreciate that, Your Honor.

THE COURT: All right. Twenty-one days.

How much time, Ms. Hayes, do you need for an objection?

MS. HAYES: We were hoping for a week, Your Honor. But 21 days is --

MR. WISHNIE: Your Honor, this is Mike Wishnie.

We would take 14 days for the response.

THE COURT: Yeah, that's fine.

MS. KELLEY: Your Honor, this is Emily Kelley. I'm just asking for a clarification.

Is Your Honor asking United States to file the initial briefing on this issue or for plaintiffs to file their motion to compel?

MR. WISHNIE: Your Honor, if I may, Mike Wishnie.

THE COURT: We can do simultaneous briefs if that works for everybody.

MR. WISHNIE: Simultaneous would be okay for plaintiffs. Given the facts that are in the control of the government and some of the details that Attorney Kelley was just sharing, it strikes me that essentially the government moving for a protective order is going first and putting forward the details about the recordkeeping systems and the scope of these files and so forth might be more productive than us telling you what our understanding is and then the government in response saying, well, here is the details.

But if the Court would prefer simultaneous, we're glad to do that as well.

MS. KELLEY: Your Honor, the United States believes that it would be more appropriate for the plaintiffs to file a protective order. We've discussed this many times and given the plaintiffs a lot of detail on this issue already. We believe that it's fair discovery that they are pushing. Obviously, we will defer to what the Court orders.

THE COURT: Well, yeah. Let's do it as a protective order. I'll tell you, this discovery seems perfectly appropriate to me. And so as a practical matter, it makes sense for the government to come in and tell me why I'm wrong about that. And

I think by having the details of how the files were organized or maintained and so forth will be very helpful.

So I'd like the government to file the initial brief on the motion for protective order and give plaintiffs 14 days to object to that motion.

MR. WISHNIE: Thank you.

MS. KELLEY: Your Honor, just to confirm, you would be requesting that defendant file a motion for a protective order by April 14th; is that correct?

THE COURT: That sounds right. I don't have my calendar in front of me, but 21 days from today.

MS. KELLEY: Okay.

THE COURT: All right. Do you want to take up, Ms. Kelley, the question of --

MS. KELLEY: Of the complaint, yes, Your Honor. Thank you.

So I just want to address plaintiff's statement that defendant has failed to agree on any search regarding this complaints issue which we believe is definitely an accurate statement.

The background is that plaintiffs are seeking what they call formal or informal complaints received by VA from any source regarding actual or suspected racial disparities in benefits for a period of 80

years. We've had multiple discussions with plaintiffs about what they mean by "complaint." And we -- the defendant a month ago had identified 30 custodians, both current and former, from various VA components for which it would collect electronic records, including some that plaintiff specifically be included. And this includes searching their records for things such as these formal and informal complaints. It also includes the VA's external complaints program which handles things like complaints of discrimination and which we've specifically seen the United States specifically identified as potentially having responsive materials.

In meet and confers, plaintiff has stated that they will narrow the request by saying they only seek institutional actor complaints for what plaintiffs have referred to as complaint intake units. And plaintiffs provided a list of potentially dozens of offices and locations that they view as complaint intake units.

But they, frankly, caused a little bit of further confusion, first, because plaintiff has stated that they do still want individual-level complaints received by the external complaints

program, which defendant is already in the process of collecting and will produce.

And, second, because -- with the exception of this external complaints program, the list of components that plaintiffs provided as complaint intake units are units which actually do not have any sort of mandate to receive or respond to complaints.

And the United States explained that to plaintiff, that we did not have reason to believe that such units serve to receive this kind of amorphous concept of complaints, and plaintiffs were also clear that their list was not exhaustive. So in our perspective, it didn't narrow the request.

So what defendant has been doing and what we think is the best way to proceed is that defendant has been actively working to try to get refined search terms finalized so we can move forward with custodial document production.

At this point, using agreed-upon search terms, defendant collected millions of documents from these 30 custodians, which we've been working with plaintiffs to try to narrow down to a reasonable review set. And, again, those custodians include in the units that plaintiffs seek documents from such as the Legislative Affairs Office, the Center for

Minority Veterans, Equity Assurance Office and so on, as well as current and former under secretaries for Veterans Benefits Administration. We plan to identify responsive documents and produce them through that review, including with respect to this request.

So in our perspective, the parties are already doing a fulsome approach to discovery. We'd like to be able to get that moving so we can get those documents to defendant. And if issues are identified or as more potential sources of information are identified, we could discuss that.

But what plaintiff seems to be asking for right now is that the United States preemptively do a search of hundreds of custodians and components that we currently have no reason to believe would have such complaints, let alone think that their function is to receive them.

We will also look into certain 1940s era NAACP correspondence that plaintiffs only recently brought to our attention. The United States will look into whether that kind of correspondence might be stored by the VA.

But plaintiffs haven't provided any other specific examples of what they think, and at this

point we think it's the most effective use of the parties' discovery time to proceed with this custodial collection that's already underway.

THE COURT: And just to be clear, these are electronic files that you're looking at, it seems, 2006 forward?

MS. KELLEY: Your Honor, these are electronic files across the course of a custodian's tenure with the VA. Many of these custodians go back 20 and 30 years. So we have not time-limited them to the extent electronic files exist and hit them with search terms. We've collected them.

We also are, you know, collecting any other custodial files to the extent they exist in paper form. So this is separate and apart from that 2006 time period that we were talking about for the sampling issue.

THE COURT: Right. But the files -- you're doing an electronic search at this point?

MS. KELLEY: That is correct.

THE COURT: So that is only documents that were created in electronic form or saved in electronic form or that have been scanned in somehow?

MS. KELLEY: That's correct, Your Honor. Except to the extent that we are also looking into,

for example, for these 1940s materials, whether there might be a paper file format.

THE COURT: Okay. Ms. Hayes.

MS. HAYES: Your Honor, just to repeat, the time frame we're looking at is from 1945 to present date. Just to recall, the organizations we're looking for are civil rights organizations, veteran services organizations or members of Congress. Again, we're talking about large institutional actors.

We understand that VA will have superior knowledge of how VA was structured and what different functions would have had which role. So we did propose legislative affairs, community engagement, maybe a veteran services liaison, in addition to the office of the secretary which would have been the office of the administrator before 1989.

So we've made our proposals, Your Honor; but I think it's really important that we talk about the full period which, again, would include the '40s through the '50s all the way into the early 2000s, some of which wouldn't have been captured in the electronic files.

THE COURT: All right. It sounds like the parties are closer on this one than on the sampling

issue.

Is there going to be some optimism that if you continue your discussions, you can resolve this?

MR. WISHNIE: Your Honor, this is Michael Wishnie again.

We brought it to you because I believe that the parties have exhausted their conversations. We have asked where the functions reside over time, such as legislative affairs, and that the VA search for communications, for instance, from members of Congress regarding racial disparities in VA benefits. And while we can look on the website today and see there is an office of legislative affairs, we recognize that that function will have existed in the administrator's office or in other offices over the years.

The government, however, has refused to search pre-electronic records of communications from members of Congress to whatever legislative affairs unit or staff handled that, for instance. Except that when we managed to locate some affirmative communications from the NAACP in the NAACP's archives and shared those with the government, they said, Okay, we'll look for those.

So we tried to identify the kinds of

communications and the functions, legislative affairs, community engagement and what's currently called a liaison function to the veteran's organizations.

But the government has declined, as I understand it, to perform any searches in nonelectronic records, so anything before 20 to 30 years back, except for responses to the NAACP letters that we managed to pull from their archives and share with the government.

MS. KELLEY: Your Honor, I do not believe it's accurate to say that the United States has refused to do any such searches.

What we have done repeatedly is asked for clarity about what plaintiffs are seeking because, again -- Mr. Wishnie mentioned legislative affairs offices -- we do not understand these offices to be what plaintiff characterizes as complaint intake units.

And with the exception of the NAACP files, plaintiff has not specifically or identified with any specificity what they seek, which they are obligated to do under the discovery rules.

And so what we understand plaintiff to be asking us to do is to essentially search every

electronic or paper file for hundreds of custodians in dozens of locations that we do not necessarily have any reason to believe would host or hold these informal or formal complaints. And we believe that this is an example of plaintiff casting a wide net to see what might be out there and that that's not the appropriate goal of discovery. We are doing targeted searches and we continue these discussions, but we have asked for plaintiff for specificity and they have been unable to provide it.

THE COURT: Let me suggest this: With respect to legislative affairs offices, it sounds like there are more than one, but whatever is in headquarters is the likely place that a congressperson, for example, during the civil rights era, might have written a letter to the VA.

Is there -- again, is my assumption about a legislative affairs office being maintained in headquarters accurate?

MS. KELLEY: Your Honor, there is a legislative affairs offices, yes. And we do have, I believe, at least one, maybe two custodians that we're already collecting materials from from that office.

THE COURT: Okay. Both paper and electronic?

MS. KELLEY: For that custodian.

THE COURT: All right. What about for the office? In other words, the official files of the office? You know, a congressperson writes to the VA and says, you know, if you don't shape up, we're going to pass legislation to fix this racial discrimination problem. Somebody is going to maintain that. Not necessarily the custodian, although they might maintain a copy. There is going to be an official record, I'll assume, at the legislative affairs office.

Can we start there and see what we come up with?

MS. KELLEY: Your Honor, I am -- I will not sit here and say that we can assume that. I think it is highly possible that these things come in and are filtered through custodians. But we can certainly look into that issue with the Veterans Affairs and see if there is a way to start there.

THE COURT: Let's do that. This is a form of sampling, I think; but the value of these documents, as I understand the claim, is principally to show knowledge on the part of higher-ups. The documents coming into headquarters are going to be more relevant to that issue, and presumably there is a

more limited universe of documents you're happy to search through to find them.

So if you could search the -- as an initial matter, search the headquarters' files regarding the focused complaint, focused request by the plaintiffs, that is, documents from major advocacy organizations or members of congress, we'll see what we get and we can talk about whether it's sufficient or whether we need to go further.

MS. KELLEY: Your Honor, and I understand you to be referring to the Office of Congressional and Legislative Affairs as we were just discussing a moment ago.

I'll note, again, that we are already searching files from, for example, VA under secretaries for benefits and other numerous custodians at headquarters.

So we will, in addition to those custodians, look into the Office of Congressional and Legislative Affairs.

THE COURT: All right. Good. And what about the administrator? You know, if I'm a member of Congress, I'm going to go right to the top. I'm going to send a letter to the administrator. Is that one of the custodians --

MS. KELLEY: Your Honor --

THE COURT: We have all the custodians -- administrators from '45 forward as custodians that we're searching.

MS. KELLEY: So, Your Honor, I believe I understand you to be referring to the positions before the secretary.

We actually do not believe that plaintiffs have previously asked us to search secretary files, although they stated that in the motion. We believe that that would need to be presented in a request and -- so we would have the opportunity to assess and respond to. We are currently not searching those files.

MR. WISHNIE: Your Honor, this is Mike Wishnie.

I'm sorry. It's just I've been on this. We have repeatedly raised meet and confers with the office of the administrator and now the secretary.

My understanding of the 30 custodians being searched are all relatively recent or in fact contemporary via employees who have e-mail. So I think the custodians go back no further than 20 to 25 years, and I don't believe that the government has agreed to do searches of paper files before that,

which is why we appreciate your time on this issue.

THE COURT: Well, has it been requested? I guess let's start there.

MR. WISHNIE: Yes, Your Honor. I believe that's -- I can certainly -- without going into all of the meet and confers, I recall talking about how in 1945, surely the VA was a much smaller operation, and just as you put it, whether it was from the NAACP or member of Congress or the American Legion, communication probably was addressed to the administrator. And a response, if it came, probably came under the signature of the administrator. I think that's what some of the NAACP correspondence suggests.

Today there is this distinct office of legislative affairs, and we're not sure exactly when that emerged. But, again, it's the function, not the formal names that we're interested in.

MS. KELLEY: Your Honor, I may have misunderstood. But I don't believe they have requested the secretary files.

But to the extent they are requesting administrator files, the United States is not currently searching those paper files to the extent they exist in part for all of the reasons we have

stated, which is that we don't have specificity on what is being looked for. And it would require a manual review of any paper files that are out there, all of the paper files, because we can't do a search, and to try to locate what plaintiffs refer to as these informal or formal complaints but have not been defined.

THE COURT: Well, all right. I've told you what I think is reasonable. If that can't be agreed to, then let's add this to the briefing. Let's take it up formally.

MS. KELLEY: Your Honor, I would like clarification. Again, we are checking the Office of Legislative Affairs, so I don't believe right now that that -- there is a ripe dispute on that case.

Are you referring to simply looking into further whether there are paper files of the administrator?

THE COURT: Yes. The administrator is a good place to start.

MS. KELLEY: Your Honor, we can -- we can try to get a better handle on what that would involve, which I think would be useful for the parties to have that conversation further.

THE COURT: Okay. Good luck. If you can't

resolve that, again, include it in your briefing.

All right. Then the defense has -- I think -- I've got another call a 3 o'clock.

The defense has raised three issues. First is whether the statistician is a consulting expert, if any privilege has been waived. I'll tell you my inclination there and you can shoot at that.

I think the statistician is clearly a consulting expert. There is no indication that the plaintiffs intend to call that expert as a witness at trial. The court -- the analysis was conducted in anticipation of litigation. They wanted to figure out whether they had a claim or didn't have a claim; that's anticipating litigation. And I don't believe there has been a waiver by mentioning the analysis in the complaint or producing the final report. That document, of course, can no longer be kind of treated as a work product document.

But the subject of the statistician's work, in my view, is probably not even relevant to the case because that analysis is what -- a preliminary analysis to figure out whether there was a Rule 11 basis for filing the complaint. And the analysis that's going to matter at trial, and the only analysis that will be introduced at trial will be the

analysis of a testifying expert or experts.

So I don't think that the defense gets any further discovery of the statistician, but I'm happy to hear from you if you want to take that on.

MS. KELLEY: Yes, Your Honor. Thank you.

First, this statistician analysis was not just mentioned in the complaint. It forms the basis for the factual and legal allegations. There are statements of specific statistical conclusions drawn by the statistician in the complaint, and there is even a graph that appears to be an excerpt from his analysis. And plaintiffs have referenced analysis elsewhere; and, in fact, the administrative claims for Mr. Monk, Jr. and other purported class members, which are signed and certified by those individuals, state that their claims are based on the analysis and incorporate the specific details of the analysis. And so defendant naturally sought discovery regarding these allegations.

And just to clarify for Your Honor, the final report has not been produced to the United States. Their report -- plaintiffs originally represented that they would collect and produce documents created by or for Mr. Jakubow including final reports, and then they've since walked that back and said that all

of it is privileged, including the reports that they have detailed selectively in the complaint. And so --

THE COURT: Just -- just to be clear, the complaint will not be shown to the jury. Okay? So it's -- there is no prejudice here by the concern that the jury is going to see a report that's a preliminary report based on four-year data that the defendant has access to and can run a -- if you wanted to, you're able to run a complete analysis and refute the irrelevant analysis of the statistician. But I wouldn't admit it at trial because I'm not going to admit his report at trial. The analysis has got to be of actual discovery in the case, not the FOIA preliminary information.

MS. KELLEY: Your Honor, plaintiff has utilized this analysis ostensibly as a sword repeatedly throughout their complaint and their filings and witnesses have relied on it. We think it has -- to the extent it ever was privileged, has clearly been waived. We do think it's relevant. We'd ask the opportunity to brief this issue before Your Honor rules.

THE COURT: Yeah. I don't think this is a close one, so I'm simply going to deny the request

and deny the request to brief it. I don't think this one is close.

I think you have a stronger claim of some discovery of Michele Barnett. She is an absent class member. The scope of the discovery that you get from counsel should not include any information that has been discovered as a result of the administrative claim but -- and because her claims are going to be limited to garden variety emotional distress, you're not going to get her medical or psychiatric file, if any.

So let me hear from plaintiff if there is any reason why --

MS. KELLEY: Your Honor -- sorry.

THE COURT: If there is any reason why there shouldn't be some limited discovery on this point.

MR. CREELAN: Your Honor, I think Mr. Henderson will address this.

Adam, do you want to address this very briefly?

MR. HENDERSON: Yeah. I'm here.

Very briefly. So like you mentioned, Your Honor, Ms. Barnett is an absent class member. We'll note that we have done preliminary searches of what we have in our control regarding Ms. Barnett and will

produce that to the government in due course.

But the additional discovery regarding her, you know, medical and psychiatric reports, because we're only seeking garden variety damages, that's outside the scope of what we're going to be looking for at trial so we don't need to be searching for that or conducting additional searches for that at this point, especially because she's an absent class member.

THE COURT: All right. Ms. Kelley.

MS. KELLEY: Your Honor, we would like a little bit of clarification here.

I think, as you acknowledge, plaintiff has informed us that plaintiff's counsel does not represent Ms. Barnett with respect to this litigation even though they are her attorneys for the administrative claims.

Setting aside the medical records for a second, defendants want to speak to Ms. Barnett and to depose her. And we need some clarification on, you know, if we were to reach out to her on the issues of the amended complaint specifically, what plaintiff's position is, and also for plaintiffs just to confirm whether they will be producing discussions that they've had with her regarding the complaint

since they state that they do not represent her with respect to the complaint.

MR. CREELAN: Your Honor, if I may, this is Jeremy Creelan. If I could just jump in, Your Honor.

I think this may be premature, and I'm not sure we need to burden the Court with this question. We haven't -- we have not received, you know, a request to accept service on the subpoena or whether, you know, or a deposition notice of any kind.

So I think that we could talk with the government and Attorney Kelley about that and try to, you know, work -- that question of representation, all the implications of that, work that out and if we're unable to do so, bring that to the Court. But that's -- I don't think really that's -- that's not the subject of the motion here, and it's not really ripe for any decision by the Court, if you will.

MS. KELLEY: Your Honor, I think the --

THE COURT: All right.

MS. KELLEY: If I may just say, the plaintiff has stated in no uncertain terms that they cannot accept a subpoena on her behalf, or at least they have no ability to do so yet. We did ask that at the last meet and confer.

And, again, that doesn't address our concern

about production of communications or whether we may reach out to her separate and apart from noticing the deposition.

MR. CREELAN: Well, we're happy to address that with Attorney Kelley offline and work that out; and if we're unable to, we can reach out to the Court. That's what I would suggest.

THE COURT: Yeah. That's fine. So we'll leave that one open.

The third issue is whether Mr. Monk, Jr.'s medical and psychiatric records are discoverable. We need a formal limitation on the scope of emotional distress damages that are being sought either by way of an amended complaint, by a stipulation or by an authorized statement on the record today that the class will only be seeking garden variety emotional distress damages.

If that happens, then that's the limitation. The psychiatric and medical records, which the medical records have already been produced, that the psychiatric records are not relevant and not admissible and, therefore, not discoverable. Do we --

MR. HENDERSON: Yes. This is Adam Henderson again, Your Honor.

We will make that statement today that the class is only going to seek garden variety damages in this case.

THE COURT: Very well.

MS. KELLEY: So, Your Honor, I think that if I may slightly address one of the questions we had asked plaintiffs last time which was whether they were representing that they would not affirmatively attempt to use medical information going forward, and we'd appreciate hearing from counsel on the record on that.

THE COURT: I don't understand.

MS. KELLEY: Well, Your Honor, we had asked -- we had asked plaintiff's counsel if they would amend the complaint to reflect this more limited theory of damages or if they could confirm that plaintiffs will not later attempt to incorporate medical or clinical information in their case in chief affirmatively in pursuit of their claims, and plaintiffs have refused to agree to that.

So we are just trying to get clarification on whether plaintiffs can confirm that they will not attempt to use such information affirmatively in pursuit of their claim.

THE COURT: I don't understand how they would

use it affirmatively. They've indicated that they're limiting emotional distress damages to garden variety damages. If there is a psychiatric record out there, it's simply not relevant at this point. What am I missing?

MS. KELLEY: Your Honor, the reason for our confusion is that to date plaintiff has produced information and discovery on this topic and has stated, you know, these things in the complaint. So, you know, even in response to an interrogatory that sought information as to whether plaintiffs had received any clinical treatment for the specific alleged harm here of interacting with an allegedly racist VA benefits system.

So the source of our confusion is that plaintiffs have partially responded while also maintaining that it's not relevant, and we just want to confirm whether they plan to use that partial response moving forward.

MR. CREELAN: Your Honor, this is Jeremy Creelan. I think I can try to address this.

I think the confusion may simply be -- and I think the Court has properly clarified this on the record today -- that, you know, at this point as we sit here today, the plaintiffs are not going to seek

anything other than garden variety damages.

Prior to -- you know, at an earlier point, that was not -- that decision hadn't been fully made and there was, you know, fulsome discovery and production of some -- you know, some records. So that may be the source of the confusion.

But inherent in not seeking anything other than garden variety damages is, we believe, that the reliance on the plaintiff's testimony will be -- that will be the evidence provided rather than medical, you know, reports or information.

THE COURT: All right. I think that resolves it.

All right. Anything else we can usefully take up today?

MR. WISHNIE: Nothing for plaintiffs, Your Honor.

MS. KELLEY: Not from defendants, Your Honor. Thank you.

THE COURT: All right. I look forward to hearing the outcome of your subsequent meet and confers and to receiving your briefs.

Take care. Bye-bye.

(PROCEEDINGS ADJOURNED, 3:04 p.m.)

C E R T I F I C A T E

RE: CONLEY F. MONK, JR. V. UNITED STATES OF AMERICA
No. 3:22-cv-01503-SRU

I hereby certify that the within and foregoing is a true and accurate transcript taken in the aforementioned matter to the best of my skill and ability.

/s/_Melissa J. Cianciullo______

MELISSA J. CIANCIULLO, RDR, CRR, CRC
Official Court Reporter
United States District Court
915 Lafayette Boulevard
Bridgeport, CT 06604
(203) 606-1794