**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CONLEY F. MONK, Jr. et al., | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | No. 3:22-cv-1503 (SRU) |
| | : | |
| THE UNITED STATES OF AMERICA, | : | April 14, 2025 |
| *Defendant*. | : | |

<u>**DEFENDANT THE UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**</u>

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

I.    PLAINTIFFS' PROPOSAL FOR "SAMPLING" DEMOGRAPHIC AND BENEFITS-RELATED INFORMATION ACROSS THOUSANDS OF VETERANS .................. 2

II.    PLAINTIFFS' REQUEST FOR "COMPLAINTS" ....................................... 8

LEGAL STANDARD.......................................................................................................... 13

ARGUMENT ...................................................................................................................... 14

III.    SEVERAL STATUTES PROHIBIT DISCLOSURE OF UNREDACTED VETERANS' BENEFITS FILES ABSENT COURT ORDER.................................. 14

    A.    The Privacy Act and 38 U.S.C. § 5701 limit disclosure absent a Court order. .... 16

    B.    38 U.S.C. § 7332 limits disclosure of certain medical information absent Court order finding good cause following applications and hearings. .......................... 20

IV.    PRODUCTION OF REDACTED BENEFITS FILE DOCUMENTS WOULD BE UNDULY BURDENSOME, IMPROPERLY REQUIRE CREATION OF WORK PRODUCT, AND BE DISPROPORTIONAL TO THE NEEDS OF THE CASE...... 24

    A.    Anonymization, redaction, and production of benefits file materials would cause undue burden, even if the United States was only required to produce redacted materials "sufficient" to satisfy Plaintiffs' request. ................................................ 24

    B.    Ordering the United States to anonymize, redact, and produce only excerpted pages from benefits files "sufficient to" satisfy Plaintiffs' request would improperly require one party to create work product for its party opponent........ 28

    C.    Both of these approaches are disproportional to the needs of the case................ 32

V.    COURT INTERVENTION ON PLAINTIFFS' VAGUE, OVERBROAD, AND UNDULY BURDENSOME REQUESTS FOR "COMPLAINTS" IS PREMATURE. ........................................................................................................................ 35

CONCLUSION.................................................................................................................... 39

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A & R Body Specialty v. Progressive Cas. Ins. Co.*,
  2008 WL 2229888 (D. Conn. May 27, 2008) .................................................. 30
*A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*,
  2014 WL 4437684 ........................................................................................ 30
*A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*,
  2014 WL 5859024 (D. Conn. Nov. 10, 2014) ................................... 29, 30, 31, 32
*Apple Inc. v. Samsung Elecs. Co. Ltd.*,
  2013 WL 4426512 (N.D. Cal. Aug. 14, 2013) .................................................. 30, 32
*Burgess v. Town of Wallingford*,
  2012 WL 4344194 (D. Conn. Sept. 21, 2012) .................................................. 14
*Conservation L. Found., Inc. v. Shell Oil Co.*,
  2023 WL 5434760 (D. Conn. Aug. 22, 2023) ........................................... passim
*DiPippa v. Edible Brands, LLC*,
  2021 WL 2201194 (D. Conn. June 1, 2021) ...................................................... 13
*Doe v. Wesleyan Univ.*,
  2021 WL 4704852 (D. Conn. Oct. 8, 2021) ...................................................... 13
*Ello v. Singh*,
  531 F. Supp. 2d 552 (S.D.N.Y. 2007) .............................................................. 14
*Gonzales v. Google, Inc.*,
  234 F.R.D. 674 (N.D. Cal. 2006) ..................................................................... 30
*Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.*,
  222 F.R.D. 594 (E.D. Wis. 2004) .................................................................... 29
*Hallmark v. Cohen & Slamowitz, Midland Funding LLC*,
  2014 WL 5017859 (W.D.N.Y. Oct. 8, 2014) ..................................................... 29
*Hedgeye Risk Mgmt. LLC v. Dale*,
  2023 WL 4353076 (S.D.N.Y. July 5, 2023) ...................................................... 38
*Humphrey v. LeBlanc*,
  2021 WL 3560842 (M.D. La. Aug. 11, 2021) .................................................... 31
*In re PE Corp. Secs. Litig.*,
  221 F.R.D. 20 (D. Conn. 2003) ........................................................................ 38
*In re Terrorist Attacks on Sept. 11, 2011*,
  454 F. Supp. 2d 220 (S.D.N.Y. 2006) .............................................................. 14
*Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*,
  2023 WL 8804257 (S.D.N.Y. Dec. 20, 2023) ................................................... 31
*Lugosch v. Pyramid Co. of Onondaga*,
  435 F.3d 11 (2d Cir. 2006) ............................................................................. 14
*North Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*,
  325 F.R.D. 36 (E.D.N.Y. 2018) ....................................................................... 32
*Shingara v. Skiles*,
  420 F.3d 301 (3d Cir. 2005) ........................................................................... 14
*Sibley v. Choice Hotels Int'l*,
  2015 WL 9413101 (E.D.N.Y. Dec. 22, 2015) ................................................... 38

*United States v. Amodeo*,
    44 F.3d 141 (2d Cir. 1995) ............................................................................................ 14
*Vera v. Alstom Power, Inc.*,
    189 F. Supp. 3d 360 (D. Conn. 2016) ..................................................................... 32, 33
*Walsh v. Top Notch Home Designs Corp.*,
    2022 WL 3300190 (E.D.N.Y. Aug. 11, 2022) .............................................................. 38
*Zeitler v. Nationwide Prop. & Cas. Ins. Co.*,
    2022 WL 1125397 (D. Conn. Apr. 15, 2022) ......................................................... 13, 14

## Statutes

5 U.S.C. § 522a ................................................................................................................. 15
5 U.S.C. § 522a(a)(4)-(5) .................................................................................................. 16
5 U.S.C. § 522a(b) ............................................................................................................. 17
5 U.S.C. § 522a(b)(11) ...................................................................................................... 17
5 U.S.C. § 522a(i) .............................................................................................................. 17
38 U.S.C. § 5701 ......................................................................................................... passim
38 U.S.C. § 5701(b)(2) ...................................................................................................... 17
38 U.S.C. § 5701(f) ........................................................................................................... 17
38 U.S.C. § 7332 ......................................................................................................... passim
38 U.S.C. § 7332(a)(1) ...................................................................................................... 20
38 U.S.C. § 7332(b)(2)(D) ................................................................................................ 20
38 U.S.C. § 7332(g) ........................................................................................................... 21

## Rules

Fed. R. Civ. P. 1 ................................................................................................................ 14
Fed. R. Civ. P. 26(b)(1) ........................................................................................... 13, 32, 34
Fed. R. Civ. P. 26(b)(2)(B) ............................................................................................... 14
Fed. R. Civ. P. 26(b)(2)(C)(iii) ........................................................................................ 13
Fed. R. Civ. P. 26(c)(1) .................................................................................................... 14
Fed. R. Civ. P. 34 ......................................................................................................... 28, 29
Fed. R. Civ. P. 34(b)(2)(E)(i)-(ii) .................................................................................... 29

## Regulations

38 C.F.R. § 1.460-1.496 ............................................................................................... 15, 20
38 C.F.R. § 1.465 .............................................................................................................. 24
38 C.F.R. § 1.490 .............................................................................................................. 20
38 C.F.R. § 1.491 .............................................................................................................. 21
38 C.F.R. § 1.493(a)-(e) .................................................................................................... 21
38 C.F.R. § 1.500-1.527 .................................................................................................... 15
38 C.F.R. § 1.511(b) .......................................................................................................... 17
38 C.F.R. § 1.511(d) ..................................................................................................... 18, 19
38 C.F.R. § 1.575-1.582 .................................................................................................... 15
38 C.F.R. § 1.576(a) .......................................................................................................... 16
38 C.F.R. § 1.576(a)(4) ...................................................................................................... 16

38 C.F.R. § 1.576(a)(5) ........................................................................................................... 16

38 C.F.R. § 1.576(b) ............................................................................................................... 17

38 C.F.R. § 1.576(b)(11) ......................................................................................................... 17

38 C.F.R. § 1.576(c) ............................................................................................................... 19

38 C.F.R. § 1.576(c)(1) ........................................................................................................... 17

38 C.F.R. § 1.576(c)(2)-(3) ..................................................................................................... 17

38 C.F.R. § 1.576(e) ............................................................................................................... 17

## INTRODUCTION

On March 24, 2025, this Court held a Status Conference (the "Status Conference") regarding certain discovery disputes. The Court thereafter ordered Defendant, the United States of America, to file a motion for protective order on two issues: (1) Plaintiffs' demand for a "sampling" of demographic and benefits-related information (referred to as "variables") for a period of 80 years from thousands of veterans who are not parties to this case; and (2) Plaintiffs' demand that the United States conduct exhaustive searches for "formal and informal complaints" received by any of numerous entities or custodians within the Department of Veterans Affairs ("VA"), from any of various sources, over the past 80 years.

First, the United States is providing Plaintiffs a "sampling" of "variables" data for the time period for which that information exists in a database that can be queried (2006-present). However, Plaintiffs also demand that the United States either turn over unredacted or review and redact thousands of disability benefits files for the time periods for which such information does not exist in "data" format. Requiring such a production would violate several privacy statutes, would be unduly burdensome, would require the United States to create new documents in discovery for a party opponent, and is disproportionate to the needs of the case. Plaintiffs' demand should be denied and the Court should enter an order that the United States need not produce these materials.

Second, the United States is conducting extensive discovery that includes Plaintiffs' vague request for "complaints" of racial disparities. And the United States has taken numerous additional steps to attempt to locate potentially responsive materials. However, this process is ongoing, fact discovery is ongoing, and Plaintiffs' request for Court intervention is, at best, premature. The Court should decline to intervene until after further productions have been made and only if Plaintiffs then demonstrate that the searches and productions the United States has undertaken are allegedly

1

unreasonable. But should the Court decide to rule on this issue now, Plaintiffs' requests are vague, overbroad, and unduly burdensome, and the United States is already satisfying its discovery obligations in nonetheless attempting to respond to them. The Court should therefore grant a protective order against Plaintiffs' attempts to unduly expand the scope of this discovery.

## BACKGROUND

I.    **PLAINTIFFS' PROPOSAL FOR "SAMPLING" DEMOGRAPHIC AND BENEFITS-RELATED INFORMATION ACROSS THOUSANDS OF VETERANS**

Plaintiffs' First and Second Requests for Production #3, #5, and #8 seek, from January 1, 1945 to the present,[1]

> All documents or records regarding racial disparities in the administration of VA housing, education, or disability compensation benefits for the time period….
> …
> All documents, or records that analyze, describe, discuss, mention, or relate to the racial composition of applicants for housing, education, and/or disability benefits received or processed by VA for the time period….
> …
> All documents or records that analyze, describe, discuss, mention, or relate to the relationship between claims outcomes and the following: amount of income, source of income, employment status, education level, character of discharge, rank on date of discharge, and/or VA facilities through which the application was processed for the time period….

Declaration of Irina Majumdar ("Majumdar Decl.") ¶ 4–7, Exhibits 1 and 2.

The United States properly objected to these requests on the basis of, among other grounds, vagueness, overbreadth, and burden, including that, as drafted, the requests demand "production of any document, no matter the context, author, or form, that relates in any way to" or "mention[s]" "actual, perceived, or alleged 'racial disparities' in VA housing, education, or disability compensation benefits," " the 'racial composition' of applicants" for benefits, or  the "benefits

---

[1] Plaintiffs' First Request for Production requested these materials from 1965 to the present. Plaintiffs' Second Request for Production expanded the time period by adding a request for such documents from January 1, 1945-1964.

claims determinations of applicants" for VA benefits, with numerous categories of information, for a period of 80 years. *Id.* ¶ 6–7, Exhibits 1 and 2. Among other things, as drafted these requests could conceivably require review of *every benefits file for every veteran to ever file a claim* to attempt to locate responsive information. Despite these proper objections, the United States was willing to conduct reasonable searches and productions[2] and to meet and confer on these issues.

During party discussions in August and September 2024, Plaintiffs expressed that they sought through these requests an aggregation of "structured data" relating to benefits determinations, "exported and produced in an appropriate and usable format" from a database. Plaintiffs thereafter indicated that they planned to put forth a "sampling proposal" to address the United States' concerns that, among other things, the information Plaintiffs sought did "not [] exist in aggregated form, [and] that not all information may be available for less recent time periods." The United States "asked multiple times" about the proposal for "sampling," but Plaintiffs did not provide any proposal for months. *Id.* ¶ 8–10; Exhibit 3.

On November 18, 2024, for the first time, Plaintiffs provided details regarding what they meant by a possible "sampling." Specifically, Plaintiffs stated that

> Plaintiffs seek *data* on veterans' initial applications to VA for disability compensation since 1945. Plaintiffs' basic proposal is that VA use a random number generator to identify a small sample of initial disability claims from each of three time periods, as set forth below. Plaintiffs can provide an example program for accomplishing this random number generation procedure, coded in STATA, R, or SAS. *If VA were instead to construct its own program, Plaintiffs request that VA document the process and provide a copy of the statistical program used and the seed for the random number generator to help us replicate the sample.*
> …
> Plaintiffs propose stratifying this sample by splitting initial disability claims into three eras: (1) initial disability claims submitted to VA from 1945 to 1960; (2) from 1961 to 1990; and (3) from 1991 to the present. Plaintiffs

---

[2] For instance, the United States has produced and is in the process of producing additional documents and information regarding studies and reports relating to racial composition of benefits applicants or potential disparities in benefits outcomes.

> propose VA pulls 5500 initial disability claims from each era, using the
> random number generation procedure above, for a total of 16,500 initial
> disability claims. We are limiting the sample size accordingly for purposes
> of preparing a motion for class certification, … However, we reserve the
> right to request a larger sample or to modify the stratification parameters….

ECF 119-1 (Plaintiffs' sampling proposal) (emphasis added); Majumdar Decl. ¶ 15; Exhibit 5.[3] As

demonstrated by the language of this proposal, Plaintiffs sought a sampling of information where

it existed as *data* that could be randomized and provided by using computer code. Although

Plaintiffs characterized this as a method to narrow their discovery requests, they expressly

"reserved the right" to seek more information beyond their own proposed sample set.

Plaintiffs also provided a list of what they referred to as 12 "variables" sought:

For each initial disability claim pulled, Plaintiffs propose including the following
variables associated with the claim:

1.  The date of the initial disability claim.
2.  The type of disability compensation claim.
3.  The race, ethnicity, and gender of the claimant.
4.  Whether the claim was granted or denied.
5.  If the claim was granted, the disability rating (0% - 100%) assigned by VA.
6.  The VA regional office handling the claim.
7.  The claimant's dates of service, as of the filing of the initial disability claim.
8.  The claimant's branch(es) of service, as of the filing of the initial disability claim.
9.  Whether the claimant was deployed to a combat zone.
10. The claimant's last rank, as of the filing of the initial disability claim.
11. The claimant's military occupational specialty (MOS), as of the filing of the initial disability claim.
12. The claimant's character of discharge, as of the filing of the initial disability claim.

*See id.*

Upon receiving this request, the United States began diligently investigating whether this

"proposal" could reasonably be accomplished. On December 19, 2024, the United States requested

---

[3] It is unclear to the United States whether Plaintiffs view this information as relevant *only* for the purposes of class certification, as opposed to the claims of the named Plaintiffs.

additional information from Plaintiffs relating to their proposal, including whether Plaintiffs were requesting veteran names and addresses, given the protected nature of such information; clarification on what details Plaintiffs sought for some of their variables; and clarification on the request for combat zone deployment, given difficulties inherent in tracking such information. Plaintiffs indicated they would follow up with the United States with answers to their questions about veteran names and addresses and "combat zone" information. Majumdar Decl. ¶ 20; Exhibit 7.

Plaintiffs did not respond to the United States' questions for two months, despite repeated requests for the information. Finally, on February 20, 2024, approximately three weeks after the United States again inquired into the status of these issues, Plaintiffs confirmed their proposal did not seek veteran names or addresses and dropped their request for the "combat zone" variable. *Id.* ¶ 24–25; Exhibit 10. The resulting list consists of Plaintiffs' current 11 requested "variables."

To the United States' surprise, *before* communicating again in any way on the "sampling" proposal, on March 4, 2025, Plaintiffs filed their Motion for Status Conference with the Court, alleging that the issue was at an impasse requiring Court intervention. ECF No. 119. Plaintiffs did this despite a meet and confer between the parties scheduled to be held the following week.

Throughout discussions, the United States has been transparent with Plaintiffs regarding how pre-2006 benefits-related information is stored and the associated limitations, the logical conclusion being that, for those years, it is not possible to generate the data sampling Plaintiffs seek. On March 13, 2025, the United States confirmed to Plaintiffs that the only time period for which all of the requested "variables" existed as "data"—that is, information that exists in a form that can be processed by a computer—and thus were available to be pulled into a report through the use of computer code was approximately 2006 to the present. The United States informed

Plaintiffs that it would do this work, which involves drafting the code, to generate a report containing variables for the requested randomized and anonymized sample of 5,500 for the relevant "era." It would also provide the total number of initial claims received, by year, for the years for which that information was available. Majumdar Decl. ¶ 27; Exhibit 11.

However, the United States explained to Plaintiffs that such information for pre-2006 veterans' benefits claims is not stored in this manner. Instead, such information is located in benefits files themselves, either in hard copy format stored at Federal Records Center ("FRC") locations administered by the National Archives and Records Administration ("NARA"), or in benefits claims files on the Veterans Benefits Management System ("VBMS"), an internal VA platform used to view disability benefits claims records. Disability benefits files only consistently began to be digitized and stored in VBMS in 2012. Declaration of Derek Herbert ("Herbert Decl.") ¶¶ 21, 36. Whether a pre-2012 claim file is on VBMS depends, in part, on whether it has ever previously been copied and digitized for any reason, including if a veteran has filed additional claims after 2012. *Id.* ¶¶ 30, 41. For either paper files or VBMS, the "variables" do not exist as data that a computerized program could process and pull into a report; instead, the information exists in the documents themselves, which would require a manual review to identify. There is also no guarantee that all the "variables" would be located in any given veteran's file. *Id.* ¶¶ 19, 33; *see also* Declaration of Stephen Fegard ("Fegard Decl.") ¶¶ 3, 13.

The United States also explained that the "eras" that Plaintiffs requested were not units of division that VA utilizes for its disability benefits files. Such files are assigned file numbers sequentially based on when an initial disability benefits claim is filed, but they are not otherwise organized or tracked by date. Herbert Decl. ¶ 23. Thus, although one could try to use file numbers to approximate the date of a veteran's initial disability benefits claim—the smaller the number, the

older the claim—for the pre-2006 period, there is no way to know the year an initial disability benefits claim was filed until the file is reviewed. *Id.* ¶ 28. This would complicate Plaintiffs' desire to artificially categorize claims information into different "eras." Finally, the United States explained that it was still unclear whether a "randomized" pull from VBMS would even be possible, as that system is designed to locate specific veterans' benefits files—one at a time—by searching identifiers such as a veteran's name or Social Security number, and a search by randomized file number may not work because not all file numbers are on VBMS. *Id.* ¶ 42.

Plaintiffs indicated no willingness to narrow their demand based on the information provided by the United States. Instead, they insisted that the United States could provide a random sampling of veterans' benefits files, either unredacted, redacted, or by having the United States compile the information for Plaintiffs. The United States stated that various statutes and regulations prohibited VA from simply producing these files unredacted.[4] Further, the process of pulling and copying such benefits files alone would take months. And any requirement that the United States fully review, redact, and produce documents from files would be unduly burdensome, inconsistent with discovery obligations, and disproportional to the needs of the case.

At no point have Plaintiffs attempted to refute the United States' statements regarding the time, burden, and cost involved in such a process, or explained why their claimed need for such information allegedly outweighs these concerns. Plaintiffs also have not explained how their demand would in any way comport with the intention behind their "sampling" proposal, which was to obtain an "aggregation" of *structured data*—which the benefits files are not.

---

[4] Among other things, Plaintiffs argued that the most sensitive information for thousands of non-party veterans could be handed over to them wholesale, either pursuant to the Protective Order (ECF 99) in this matter, or by essentially waiving those same privacy protections by "consenting" to the entry of a Court order requiring disclosure. The United States stated that this would be neither appropriate nor sufficient. This was especially true given VA's obligations to safeguard such information, as described further herein. However, by that time, Plaintiffs had sought Court intervention on this issue, effectively ending the parties' discussions.

On March 24, 2025, the Court held the Status Conference, and thereafter instructed the United States to file a Motion for Protective Order explaining (1) the privacy considerations related to Plaintiffs' requests, and (2) why production of redacted and/or excerpted documents sufficient to show the variables for thousands of randomized and anonymized veterans for the pre-2006 time period would be unduly burdensome.

Of note, it is unclear to the United States exactly how many thousands of benefits files are now at issue. The Court characterized the request as one for 16,500 files. ECF 139. However, as Plaintiffs know, the United States *is already* providing 5,500 randomized samples from 2006 to the present time. This is a major portion of their third "era" request, characterized as 1991 to the present. In theory, then, the remaining "sample" set at issue is the 11,000 samples requested from the two "eras" prior to 1991. For current purposes, the United States assumes the request is for *an additional* 16,500 files. But the statutory restrictions on disclosure and the undue burden involved are the same whether 11,000 or 16,500 disability benefits files are at issue.

## II.    PLAINTIFFS' REQUEST FOR "COMPLAINTS"

Plaintiffs' First and Second Requests for Production #1 seek, for 80 years, [5]

> All documents or records, including formal and informal complaints or other communications, received by the VA from any source (including veterans, veterans organizations, civil rights groups, elected officials and their staff, or otherwise), regarding actual or suspected racial disparities in VA housing, education, or disability compensation benefits."

Majumdar Decl. ¶ 4–7; Exhibits 1-2.

Additionally, in their Second Requests for Production 23 and 25, Plaintiffs asked for 80 years' worth of even more vague and broad productions of:

---

[5] Plaintiffs' First Request for Production requested these materials from 1965 to the present. Plaintiffs' Second Request for Production expanded the time period by adding a request for such documents from January 1, 1945-1964.

> All documents or records, including formal and informal complaints or other communications received by the VA from any source, including veterans, veterans organizations, civil rights groups, elected officials and their staff, relating to stress, emotional distress, trauma, and/or anxiety experienced by veterans as a result of applying for benefits, being denied benefits, and appealing denials of benefits.
>
> …
>
> All documents or records, including formal and informal complaints or other communications received by the VA from any source, including veterans, veterans organizations, civil rights groups, elected officials and their staff, relating to the experiences of Black veterans applying for VA housing, education, or disability compensation benefits for the time period from January 1, 1945 through present.

*Id.* ¶ 7; Exhibit 2.[6]

The United States properly objected to these Requests as vague and unduly burdensome, among other valid objections, and the parties conferred on multiple occasions. Specifically, the United States asserted that (1) the request for "formal and informal complaints" is vague, in that "complaints" is undefined and subject to multiple interpretations; (2) the requests improperly seek any document related in any way to not only alleged racial disparities, but also the amorphous contexts of "experiences" or "stress" or "anxiety" relating to the benefits process of any veteran, regardless of context or cause, since 1945; and (3) would require searching immeasurable volumes of data from an *unlimited* number of sources. For instance, it is theoretically possible that any VA employee could have, at some point, received a "complaint"—to the extent that term is broadly intended to mean any expression of dissatisfaction—or other communication in any way relating to any veteran's experience of "applying for benefits, being denied benefits, and appealing denials of benefits." Further, determining whether responsive documents exist would require a document-

---

[6] Plaintiffs have never sufficiently addressed the vagueness of their requests for information relating to "experiences" or "stress" in connection with benefits applications, denials, or appeals, or explained why documents that are not "complaints" or that *have nothing to do with alleged racial disparities* would be relevant for production.

by-document review of all veterans' benefits file since 1945, since such a theoretical "complaint" or depiction of an "experience" could have been raised in connection with a benefits claim.[7]

On November 22, 2024, Plaintiffs indicated that their interest lies in "complaints submitted by large institutional actors to units of VA dedicated to receiving such complaints." *Id.* ¶ 17; Exhibit 6. Plaintiffs then proposed what they repeatedly described as a "non-exhaustive list" of VA "complaint-intake units" to be searched, *in addition to* other offices that may have existed within the relevant time period.[8] *Id.* ¶ 17; Exhibit 6. But as the United States explained to Plaintiffs in a letter dated January 31, 2025, and again at the March 13, 2025 conference, only one of the entities included on Plaintiffs' list exists with the purpose of "intaking complaints." Plaintiffs' underlying assumption that all such entities were likely to have "complaints" was therefore flawed, and it did not make sense to require collection from potentially hundreds of such locations or custodians as a "narrowing" or a "starting point" for these requests.

The United States also repeatedly pointed out that the documents from the unit that *does* have such a purview were already being collected for production, as Plaintiffs were aware.[9] Further, the United States reminded Plaintiffs that it is in the process of collecting and reviewing electronically stored documents for *30* custodians, across almost all of these "units," as well as

---

[7] The United States informed Plaintiffs that there was no way to reasonably search benefits files for such complaints and that it would not undertake such an unreasonable search. Plaintiffs eventually conceded that they would not seek a review of every document of every veterans' benefits files for such "complaints." This was their only concession.

[8] This list included the following entities: "legislative affairs offices; VSO liaisons; public affairs offices; community engagement offices; Minority Veterans Outreach Program; Property Appraisal and Valuation Equity ("PAVE") Task Force; Minority Veterans Program Coordinator; Center for Minority Veterans; Advisory Committee on Minority Veterans; Equity Assurance Office; External Civil Rights Complaints Program; Veteran Experience Office; Office of Enterprise Integration; Office of Field Operations; Office of Performance Analysis and Integrity, and *all other* specific units within VA designed to handle complaints." Exhibit 6. (emphasis added).

[9] That unit, the External Complaints Program, exists for the purpose of receiving communications from individuals. Despite claiming that they now only sought "complaints" from "institutional actors," Plaintiffs confirmed they also wanted these materials, thus further confusing the parameters of their purported "narrowing" of their requests. *See* Exhibits 9 and 10.

electronic records of Under Secretaries for Benefits and others.[10] These documents are being collected and reviewed based on mutually agreed upon search terms, and as the United States reminded Plaintiffs, nonprivileged materials located through this process that are responsive to these requests will be produced. *Id.* ¶ 17; Exhibit 7.

Plaintiffs remained unmoved on their demands. Thus, what Plaintiffs appear to be demanding with these requests is a search of hundreds of custodians and locations, including electronic and archival paper documents (to the extent they exist), for a period of 80 years, based on the mere possibility that such records may somewhere contain one or more "complaints" of racial disparities or description of any benefits-related experiences of any Black veteran or stress or anxiety of any veteran. Although Plaintiffs claim to narrow their request to communications from "institutional actors," this phrase remains undefined and appears to include individual Congresspeople as well as individual-level complaints.

On March 4, 2024, despite the ongoing work by the United States to produce documents and a meet and confer scheduled for the following week, Plaintiffs filed their Motion for Status Conference and asserted that the parties "reached an impasse ripe for the Court's involvement."[11] ECF No. 119. The United States again sought clarity on these requests at the March 13, 2025 meet and confer. Plaintiffs provided none, and insisted that the issue could only be resolved by this Court.

---

[10] Plaintiffs also complain that these custodial records pulls "only" cover a period of the past 20 to 30 years, which they characterize as merely "recent." Even if such extensive time periods were only "recent," standard document retention policies within federal agencies and the invention of e-mail limit the likelihood of finding older electronic custodial records through the application of search terms.

[11] As was the case for the "sampling" proposal, Plaintiffs did not submit their Requests for Production with their motion for status conference. The actual requests were therefore not in front of the Court when it held the Status Conference and are submitted herewith. Majumdar Decl. ¶ 4–7, Exhibits 1 and 2.

To date, Plaintiffs have provided no clear definition of "complaints" or "institutional actors," other than to identify a few non-exclusive "examples." Nor have they agreed to any reasonable limitations on the number of "units" or custodians to be searched, despite the United States' concerns regarding the unlikelihood of finding responsive materials through an exhaustive search of units or custodians that the United States *has no reason to believe would have such materials*.[12]

At the March 24, 2025 Status Conference, the Court heard from both parties and "suggested the Government search for complaints received by VA headquarters, administrators, under secretaries, and the office of congressional and legislative affairs for the full liability period, including those complaints that are not electronically stored." ECF. 138 at 2 (Memorandum of Status Conference). During the Status Conference, the Court described Administrator files and the Office of Congressional and Legislative Affairs ("OCLA") as starting points and requested that the parties brief these issues as necessary.[13]

---

[12] The only "example" Plaintiffs have given of what they are looking for are documents obtained from non-government entities, containing communications from the National Association for the Advancement of Colored People to VA in the 1940s and 1950s. Plaintiffs referenced these conversations obliquely in a December 23, 2024 letter to the United States, stating that they "know that there was ongoing public conversation regarding racial discrimination at VA in the late 1940s and thereafter" and that they sought "files relating to that conversation." *See* Exhibit 8. That letter did not clarify to what "conversation" it referred, and the United States requested clarity so that it could investigate whether it possessed such files. *Id.* ¶ 27; Exhibit 11. The United States did not receive any information on this until Plaintiffs produced certain e-discovery on March 3, 2025, over two months later and one day before filing their First Motion for a Status Conference.

[13] Contrary to their statements to the Court, Plaintiffs have not previously articulated requests for "Administrator" files. Such a demand is *not* included in Plaintiffs' Requests for Production. At most, Plaintiffs referenced "Administrator" files in a single email sent on September 27, 2024 stating that Plaintiffs "propose that Defendant identify the units and administrators of VA that are most likely to have received and responded to communications expressing concerns or raising questions regarding broader racial disparities in VA benefits adjudications since 1945, and search through those units' or administrators' records to produce communications and responses that relate to racial disparities in VA benefits decisions." *Id.* ¶ 13; Exhibit 4. But when the United States *did* attempt to explain what relevant "units" may exist "that are most likely to have received" such communications, Plaintiffs have insisted the response is insufficient.

**LEGAL STANDARD**

A party may only discover relevant, non-privileged information in the other party's possession "'[s]ubject to the proportionality requirement and other limitations set forth in [Federal Rule [of Civil Procedure] 26." *See Zeitler v. Nationwide Prop. & Cas. Ins. Co.*, No. 3:21-cv-519, 2022 WL 1125397, at *1 (D. Conn. Apr. 15, 2022) (quoting *Doe v. Wesleyan Univ.*, No. 3:19-cv-1519, 2021 WL 4704852, at *3 (D. Conn. Oct. 8, 2021)). Rule 26(b)(1) provides that the scope of discovery encompasses "any nonprivileged matter that is relevant to any party's claim or defense *and proportional to the needs of the case*, *considering* the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1) (emphasis added). "The burden of demonstrating relevance initially rests with the party seeking discovery." *Zeitler*, 2022 WL 1125397, at *1. However, "the broad standard of relevance ... is not a license for unrestricted discovery." *Conservation L. Found., Inc. v. Shell Oil Co.*, No. 3:21-cv-00933 (JAM), 2023 WL 5434760, at *11 (D. Conn. Aug. 22, 2023) (quoting *DiPippa v. Edible Brands, LLC*, No. 3:20-cv-1434 (MPS) (SALM), 2021 WL 2201194, at *3 (D. Conn. June 1, 2021)) (cleaned up). "'Once the requesting party has made a *prima facie* showing of relevance … it is up to the responding party to justify curtailing discovery.'" *Id.*

On a motion, the Court must limit the extent of discovery if it finds that the proposed discovery is outside the scope provided under Rule 26. Fed. R. Civ. P. 26(b)(2)(C)(iii). A "party … may move for a protective order … to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" and a "court may, for good cause, issue an order … forbidding the disclosure or discovery" or "prescribing a discovery method other than the one

selected by the party seeking discovery." Fed. R. Civ. P. 26(c)(1).[14] Further, a party need not

provide discovery of electronically stored information from sources that the party identifies as not

reasonably accessible because of undue burden or cost. Fed. R. Civ. P. 26(b)(2)(B). These rules

help serve the goal of "secur[ing] the just, speedy, and inexpensive determination of every action

and proceeding." Fed. R. Civ. P. 1.

When the requested materials are non-judicial,[15] "'the movant need only make a baseline

showing of good cause in order to justify the imposition of a protective order.'" *See Burgess v.

Town of Wallingford*, No. 3:11-cv-1129 (CSH), 2012 WL 4344194, at *9 (D. Conn. Sept. 21,

2012) (quoting *Ello v. Singh*, 531 F. Supp. 2d 552, 583 (S.D.N.Y. 2007)). Good cause exists

"'when a party shows that disclosure will result in a clearly defined, specific and serious injury.'"

*See In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (quoting

*Shingara v. Skiles*, 420 F.3d 301, 306 (3d Cir. 2005)). "While an affidavit is ordinarily required to

demonstrate undue burden or lack of proportionality, a court can sustain those objections without

an affidavit when the request is plainly disproportionate and unduly burdensome on its face."

*Conservation L. Foundation, Inc.*, 2023 WL 5434760, at *12; *Zeitler*, 2022 WL 1125397, at *1.

## ARGUMENT

## III.    SEVERAL    STATUTES    PROHIBIT    DISCLOSURE    OF    UNREDACTED VETERANS' BENEFITS FILES ABSENT COURT ORDER.

Several statutes and regulations limit the ability of the VA to disclose randomly selected

veterans' disability benefits files to Plaintiffs without those veterans' consent. Those statutes and

regulations provide specific limited exceptions for disclosure as well as the need for procedural

---

[14] The United States files this Motion pursuant to the Court's instruction that it do so, rather than directing Plaintiffs to file a motion to compel on their discovery requests.

[15] A judicial document is one that is "'relevant to the performance of the judicial function and useful in the judicial process.'" *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 11, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)).

safeguards. Although some of the statutory bases for disclosure may be satisfied in this case through entry of a Court order, other statutory protections for certain types of information require heightened findings by the Court that are unlikely to be met in this case. As a result, the United States believes that the parties will be unable to demonstrate a sufficient basis for entry of order(s) requiring disclosure of randomly selected, unredacted disability benefits files for thousands of veterans whose personal and sensitive information has no connection to this matter.

First, the Privacy Act of 1974, 5 U.S.C. § 522a (the "Privacy Act") governs the collection, maintenance, use, and dissemination of "individually identifiable information." *See also* 38 C.F.R. § 1.575-1.582 (implementing regulations). The Privacy Act provides that an individual's information subject to the Act may only be disclosed to third parties in certain limited situations. Similarly, the VA has specific statutory requirements relating to the confidentiality of files, records, reports, and other papers that pertain to any claim for benefits administered by the VA. 38 U.S.C. § 5701; *see also* 38 C.F.R. § 1.500-1.527 (implementing regulations).

Second, 38 U.S.C. § 7332 enacts even more stringent restrictions on the disclosure of medical records relating to drug abuse, alcoholism or alcohol abuse, infection with the human immunodeficiency virus, or sickle cell anemia, maintained in connection with the performance of any program or activity (including education, training, treatment, rehabilitation, or research). 38 U.S.C. § 7332; *see also* 38 C.F.R. § 1.460-1.496 (implementing regulations). Because of the nature of these conditions, at least some veteran benefits files containing such information are *highly likely* to be pulled into any randomized collection of thousands of benefits files. But it is *highly unlikely* that Plaintiffs would be able to meet the statutory threshold for disclosure.

The existing Protective Order in this matter, ECF No. 99, is not sufficient to authorize disclosure of these protected categories of information in a matter such as this, where the

information itself is not at issue. That stipulated Protective Order provides methods for protecting the confidentiality of material *after* it is produced in discovery; it does not provide the initial disclosure authority pursuant to the Privacy Act, 38 U.S.C. § 5701, or 38 U.S.C. § 7332.

## A.     The Privacy Act and 38 U.S.C. § 5701 limit disclosure absent a Court order.

There is no dispute that veterans' disability benefits files contain extensive "individually identifiable information." Information typically contained in a benefits file includes a veteran's name, birth date, address, social security number, service records, dependents' information, and medical records relevant to disability benefits applications. Such individually identifiable information is protected by the Privacy Act. *See* 5 U.S.C. § 522a(a)(4)-(5) (covering, among other things, systems of records maintaining information about "education, financial transactions, medical history, and criminal or employment history and that contains [an individual's] name, or the identifying number, symbol, or other identifying particular assigned to the individual"). Further, statutory requirements specific to the provision of benefits by the VA state that "[a]ll files, records, reports, and other papers and documents pertaining to any [benefits] claim" are considered confidential and privileged. 38 U.S.C. § 5701; *see also* 38 C.F.R. § 1.500 *et seq.*

The VA takes the protection of this information seriously and has a stated goal of "safeguard[ing] an individual against an invasion of personal privacy." 38 C.F.R. § 1.576(a). Generally, VA employees will only disseminate a record of identifiable personal information "in a manner that assures that such action is for a necessary and lawful purpose, that the information is correct and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information." 38 C.F.R. § 1.576(a)(4). Deviations from the Privacy Act's confidentiality requirements should only be permitted "where an important public policy need for such exemption has been determined pursuant to specific statutory authority." 38 C.F.R.

16

§ 1.576(a)(5). Failure to abide by these provisions carries criminal penalties. 5 U.S.C. § 522a(i); *see also* 38 C.F.R. § 1.576(e); 38 U.S.C. § 5701(f).

There are certain limited scenarios in which records containing individually identifiable information may be disclosed to third parties. The Privacy Act generally provides that this protected information may only be disclosed with the written consent of the individual to whom the record pertains; however, there are some enumerated exceptions. 5 U.S.C. § 522a(b); *see also* 38 C.F.R. § 1.576(b). One exception in which records may be disclosed without a veteran's written permission is if the disclosure would be "pursuant to the order of a court of competent jurisdiction." 5 U.S.C. § 522a(b)(11); *see also* 38 C.F.R. § 1.576(b)(11). Statutory provisions governing benefits files contain a similar exception. 38 U.S.C. § 5701(b)(2), (j) (permitting disclosure of benefits files "[w]hen required by process of a United States court to be produced in any suit or proceeding therein pending" and as consistent with the Privacy Act); *see also* 38 C.F.R. § 1.511(b).

VA implementing regulations also require additional steps to record and retain the nature of any disclosure, the identities of the recipient(s) of protected information, and to inform veterans of such disclosure. Specifically, for each disclosure made pursuant to the order of a court, regulations state that the VA will "maintain information consisting of the date, nature, and purpose of each disclosure, and the name and address of the person or agency to whom the disclosure is made." 38 C.F.R. § 1.576(c)(1). Such accounting is to be retained for at least five years, or the life of the record, whichever is longer, and made available to the individual named in the record upon request. 38 C.F.R. § 1.576(c)(2)–(3). Additionally, for records related to benefits claims, the custodian of records "will make reasonable efforts to notify the subject of such records that such subject's records were disclosed to another person under compulsory legal process. Such notice

17

should be accomplished when the process compelling disclosure becomes a matter of public record." 38 C.F.R. § 1.511(d).

Thus, in order for thousands of randomly selected veterans' disability benefits files to be released to Plaintiffs in unredacted form in a manner consistent with both the Privacy Act, 38 U.S.C. § 5701, and implementing regulations, the Court would need to find that disclosure is necessary and appropriate in this matter and enter an order instructing the VA to disclose the records. This would not be sufficient for disclosure of information covered by 38 U.S.C. § 7332, as discussed below.

Assuming the Court is inclined to enter such an order, the order should also "ensure adequate safeguards" are in place. At a minimum, the records would need to be considered "Attorney's Eyes Only" pursuant to the Protective Order. ECF 99. Such a designation limits disclosure to counsel for the parties, "law student interns working under the supervision of counsel of record and assigned to and necessary to assist in the litigation," Government employees, the Court and Court personnel, "retained expert witnesses," and any others that are agreed upon by the parties in writing. *See id.* at (E)(5). However, for such extensive and sensitive materials, additional safeguards should be implemented.

First, the United States understands that law students who are not counsel of record in this matter assist in the representation of Plaintiffs and would have access to "Attorney's Eyes Only" materials under routine Protective Order procedures. It is unclear to the United States how many students this could or would include at any time, and their identities are not known to the United States. Given the number of students who have at one point served or will serve on this matter through the Yale Law School Clinic and who would therefore have access to highly confidential

materials, any ordered disclosure of *these* files should limit student access to only those students who have actually entered appearances and had their representation approved by the Court.

Second, to ensure that the records are used for their intended purpose, any order should also instruct Plaintiffs that the records may not be used for any improper purpose, including attempting to identify or contact potential purported class members.

Third, because the regulations describe the need for an accounting of every "person" to whom disclosure is made, Plaintiffs' counsel would also need to provide a complete list of every individual who reviews any of the records, together with that person's address and a list of every benefits file that individual accessed. The VA would maintain this accounting and, upon request, produce it to any individual whose record was reviewed. 38 C.F.R. § 1.576(c). Notably, the custodian of records would presumably have to take reasonable steps to inform thousands of veterans that their claims benefits records were being produced to a third party pursuant to a Court order of disclosure. 38 C.F.R. § 1.511(d).

Fourth, all veteran information would need to be maintained by Plaintiffs' counsel in a separate database, not to be comingled in any way with any other information, with adequate protections to be provided in detail by Plaintiffs. All such files should be destroyed immediately upon the final determination of the litigation, and the ultimate destruction of these files should be confirmed by Plaintiffs' counsel.

In sum, in order to comply with only the Privacy Act, implementing regulations, and 38 U.S.C. § 5701, a Court order is required to instruct the United States to produce the requested set of thousands of randomly selected veterans' benefits files to Plaintiffs. Assuming the Court is inclined to enter such an order directing disclosure, the United States requests that it include the limiting safeguards discussed herein. The nature and scale of the materials requested merits such

heightened protection. However, as addressed in the next section, such an order would *not* be sufficient disclosure authority to require disclosure of information subject to 38 U.S.C. § 7332.

**B.    38 U.S.C. § 7332 limits disclosure of certain medical information absent Court order finding good cause following applications and hearings.**

Separate from the provisions of the Privacy Act and 38 U.S.C. § 5701, disclosure by the VA of certain types of medical records is also strictly limited by 38 U.S.C. § 7332. This statute pertains to "the identity, diagnosis, prognosis, or treatment of any patient or subject which are maintained in connection with the performance of any program or activity (including education, training, treatment, rehabilitation, or research) relating to drug abuse, alcoholism or alcohol abuse, infection with the human immunodeficiency virus, or sickle cell anemia." 38 U.S.C. § 7332(a)(1); *see also* 38 C.F.R. § 1.460–1.496. This important privacy protection is relevant to Plaintiffs' requests for disability benefits files because such information is highly likely to be contained in such files for veterans who suffer from or sought treatment at any time for any of these illnesses.

Although disclosure of such records may be made without patient consent pursuant to an appropriate court order, the requirements for entering such an order are significantly heightened as compared to the statutes described above. Specifically, disclosure may only be made:

> If authorized by an appropriate order of a court of competent jurisdiction granted after application showing good cause therefor. In assessing good cause the court shall weigh the public interest and the need for disclosure against the injury to the patient or subject, to the physician-patient relationship, and to the treatment services. Upon the granting of such order, the court, in determining the extent to which any disclosure of all or any part of any record is necessary, shall impose appropriate safeguards against unauthorized disclosure.

38 U.S.C. § 7332(b)(2)(D); *see also* 38 C.F.R. § 1.490 (implementing regulation further providing that "[a]n order of a court of competent jurisdiction to produce records subject to [38 U.S.C. § 7332] will not be sufficient unless the order reflects that the court has complied with the requirements of 38 U.S.C. 7332(b)(2)(D)."). Violation of 38 U.S.C. § 7332 carries criminal

penalties, and the statutory limitations on disclosure continue to apply after a veteran's death. 38 U.S.C. § 7332(g); 38 C.F.R. § 1.465.

Furthermore, in order for such records to be disclosed to Plaintiffs or their counsel without patient consent, the following would need to occur: (1) Plaintiffs would need to establish a "legally recognized interest in the disclosure which is sought" and file an application consistent with 38 C.F.R. § 1.493(a); (2) notice would need to be provided to the patient consistent with 38 C.F.R. § 1.493(b); (3) this Court would need to conduct an *in camera* hearing on the application consistent with 38 C.F.R. § 1.493(c); (4) this Court would need to determine that good cause exists consistent with 38 C.F.R. § 1.493(d); and (5) the content of the order would need to limit disclosure consistent with 38 C.F.R. § 1.493(e). This process cannot be done on a generalized level—it would need to be undertaken *individually for each patient* whose relevant records are subject to the request for disclosure. Additionally, the regulations provide even more limited exceptions where a court may authorize disclosure of "confidential communications made by a patient to a treatment program in the course of diagnosis, treatment, or referral for treatment" without patient consent, none of which apply here. *See* 38 C.F.R. § 1.491 (stating that such order may be entered *only if* necessary to protect against a threat to life, the disclosure is necessary in the course of investigating or prosecuting a serious crime, or the disclosure is in connection with a litigation in which the patient offers testimony or other evidence pertaining to the communications).

The information covered by 38 U.S.C. § 7332 can exist in many forms and in many locations within a veteran's disability benefits file. The file could include communications from a veteran to a treatment provider relating to drug or alcohol use; records or recommendations of treatment providers for any of the subject illnesses; test results; records relating to prescription of or use of medications commonly associated with these illnesses, such as for withdrawal symptoms

due to substance abuse; requests for benefits related to these disabilities; information submitted by a veteran in support of a claim in which the veteran describes in-service related trauma; requests for accommodations in an educational or vocational setting; and more.

The United States does not believe that Plaintiffs would be able to demonstrate—or indeed, that they even claim to have—a "legally recognized interest" in the records of veterans who are non-parties to this case sufficient to meet the stringent statutory requirements for disclosure without consent. Even if Plaintiffs applied for disclosure consistent with the regulatory requirements, such a process would be incredibly lengthy and time-consuming for all involved, including the Court, given the volume of veterans' records sought by Plaintiffs.

Thus, Plaintiffs' proposal that the United States could simply provide unredacted copies of thousands of veterans' benefits files pursuant to a Court order, even if sufficient to satisfy the Privacy Act and 38 U.S.C. § 5701 disclosure requirements, would not comply with the heightened protections for records covered by 38 U.S.C. § 7332.

If unredacted production of the "sample" is the goal, the United States would therefore have to review every document within every randomly selected file to ensure that not even a single reference to such information is produced. As described above, that information could take many forms, risking inadvertent production even with extreme diligence. Such a process alone would be unduly time-consuming and disproportionate to the needs of the case.

Then, if such information is located, the United States cannot simply redact it so that the remainder of a veterans' file may be produced. This is because the act of redaction would itself indicate that information covered by 38 U.S.C. § 7332 is in that veteran's file. Thus, if the Court requires that unredacted, randomly selected files be produced, the only option would be for VA to first review *all of the files in full* and exclude *entirely* any file containing any such information.

22

This, too, is impractical and inappropriate for several reasons. As discussed above, it would require extensive and unduly burdensome review of every page of every randomly selected file for thousands of veterans. And for every file that contains any such information and therefore must be excluded from the randomized sample set, at least one additional randomly selected file must be pulled to take its place. This process would have to continue until VA is able to identify a full set of the 11,000 or 16,500 files requested by Plaintiffs. Such a process could result in the United States having to pull and review an even greater number of veterans' benefits files, increasing the burden, time, and cost exponentially. Finally, such a process is unlikely to be consistent with Plaintiffs' stated goal of a "randomized" sample. For instance, veterans who suffer from psychological trauma or disabilities such as PTSD or depression are more likely to also report drug and alcohol use. If such files had to be excluded from the production in order to comply with statutory requirements, the sample set Plaintiffs request would not be randomized. Instead, it would, in effect, be limited through exclusion of certain types of disabilities.

For all of the above reasons, production of unredacted veterans' disability benefits files for thousands of veterans unconnected to this matter would be inappropriate and potentially contrary to law. Even if the Court were to enter an order for disclosure of such records sufficient to satisfy the disclosure exceptions enumerated in the Privacy Act and 38 U.S.C. § 5701, this would not be a sufficient basis for disclosure of information subject to 38 U.S.C. § 7332—information that at least a subset of the randomly selected veterans benefits' files are likely to include but which could not be confirmed to exist or excluded without an unduly burdensome full-scale review.[16]

---

[16] As discussed further herein, it is also no answer to say that VA need only produce a "summary" sheet from a given veteran's file. There is no single, easily identifiable and universal "summary" sheet across all veterans from all time periods that is known to contain all 11 variables that Plaintiffs seek. And there is no guarantee that any such sheet, if it existed, would not also contain information covered by 38 U.S.C. § 7332.

IV.    **PRODUCTION OF REDACTED BENEFITS FILE DOCUMENTS WOULD BE UNDULY BURDENSOME, IMPROPERLY REQUIRE CREATION OF WORK PRODUCT, AND BE DISPROPORTIONAL TO THE NEEDS OF THE CASE.**

Plaintiffs' request for a "sample" set of certain "variables," from thousands of randomly selected veterans' benefits files, *where those variables do not already exist in data format,* is disproportional to the needs of this case when considering relevant factors including burden, expense, and likely benefit. The request would require the United States to develop a method for randomly selecting as many as 16,500 veterans' disability benefits files existing in either or both paper and digitized format, artificially separated across three eras from 1945-2006; assign an anonymized number to each such file; search those files for Plaintiffs' "variables"; and either produce the entire files in nearly entirely redacted format *or* selectively produce only excerpted and redacted pages,[17] sufficient to show the variables. This would not only be unduly burdensome and expensive out of all proportion to the needs of the case, but would also require the United States to create new product for Plaintiffs in contravention of discovery obligations. The demand that the United States undertake such a process should be denied.

A.    **Anonymization, redaction, and production of benefits file materials would cause undue burden, even if the United States was only required to produce redacted materials "sufficient" to satisfy Plaintiffs' request.**

Plaintiffs' demand for review, redaction, and production of documents reflecting their "variables," for as many as 16,500 veterans' disability benefits files from the years of 1945-2006, where a data query is not an available option to provide such information, is unduly burdensome on its face. The Court can and should deny these discovery requests on this basis alone. *See Conservation L. Foundation, Inc.*, 2023 WL 5434760 at *12. Here, however, the United States has

---

[17] Even if only excerpted pages were produced, and even if an order is entered pursuant to the Privacy Act and 38 U.S.C. § 5701, the United States believes at least some redaction would still be necessary under 38 U.S.C. § 7332. Because, again, the United States cannot redact *only* 38 U.S.C. § 7332 information without thereby indicating that such information is in the file, the United States would have to redact *all* identifying information as well.

provided declaration support, detailing the extensive process that would be involved in meeting these overly burdensome demands. Among other things:

- Pre-2006 benefits information sufficient to identify the "variables" does not exist in a "data" format upon which a query could be run, and there is no single "summary" sheet known to contain all the variables in one place, let alone consistent forms that were used across all decades; Herbert Decl. ¶¶ 8, 16-17;[18]

- A person would therefore need to manually review benefits files, many of which are thousands of pages each, to identify the information, *Id.* ¶¶ 31, 44;

- Such files contain extensive sensitive and protected information, *Id.* ¶¶ 13-15;

- Millions of paper files that have never been digitized are located at storage facilities, filed by veteran "C-number," are not organized within the file in any specific manner, cannot be identified by "era," would require extensive work to scan, would need to be reviewed page-by-page until the "variables" are identified, and may require judgment calls, all before redaction, and all of which would divert resources currently devoted to addressing active benefits claims, *Id.* ¶¶ 26-35; *see also* Rodgers Declaration ("Rodgers Decl.") ¶¶ 21-22; and

- Files on VBMS would similarly require sifting through documents within a file, some of which are listed as the same "document type," to review individual documents until the "variables" are located, would require extensive time to download for redaction and production, would again divert resources away from active claims, and, moreover, it is not clear that a random number generator could even be used to randomly "pull" thousands of files in the first instance, since VBMS is not designed with such a purpose in mind, *Herbert Decl.* ¶¶ 40-45, 47.

Thus, even the process of "randomly" collecting and copying the materials would take months at least and would necessarily divert the time of employees who would otherwise be assisting in crucial work related to veterans' benefits applications. This is true even if the files could be produced entirely unredacted and without need for any pre-production review, which, as discussed above, they cannot.[19] It also would divert resources that would otherwise be spent addressing Plaintiffs' many other discovery requests, which also span decades.

---

[18] Although "data" does exist for some variables for the four-year period of 2001-2006, it does not exist in linked databases in a manner that would allow a query to combine the "data" and create an output. Herbert Decl. ¶ 9.

[19] At the Status Conference, the Court suggested that Defendant provide a small sample set of 50 or so benefits

*(Continued)*

But it does not stop there. Plaintiffs appear to argue that if unredacted production is not possible, the United States must search the randomly selected files for the requested "variables" and produce either (1) redacted versions of the entire file, or (2) redacted versions of only selected, excerpted pages or documents from the file, "sufficient to show" the unredacted variables.[20] Either approach is unduly burdensome.

Even if the second approach was used, there is no single, summary form in every veteran's file, across eight decades, that handily tracks, in one place, the exact "variables" on which Plaintiffs have chosen to focus. Herbert Decl. ¶ 17; Fegard Decl. ¶ 3. Even where the "variable" information may be contained in only a few documents within a file, those documents first have to be located and reviewed. In the case of paper files, this could mean reviewing the entire file of unsorted documents until they are found. Herbert Decl. ¶ 31. In the case of VBMS, this could mean the reviewer has to know which documents to look for first—as those most likely to contain one or more variables—locate those documents out of a list of hundreds, review the selected documents individually to confirm the variables exist, and then *individually* download each document that is "sufficient to show" the variables—and this process would have to be undertaken for every single

---

files, so that the Court could gain a better understanding of how they are maintained. However, for the reasons discussed above, the United States cannot disclose such files absent first having an appropriate Court order or veteran consent. Further, even pulling together and copying such files for 50 veterans is a time-consuming process that would take weeks. In efforts to nonetheless provide the Court with information that would aid it in considering these issues, on April 8, 2025, the United States contacted Plaintiffs' counsel to request that it ask a subset of 50 of their client-claimants alleging the same claims brought by Mr. Monk, Jr. to sign consent forms so that their files could be marked highly confidential and provided to the Court as a supplement to the briefings for *in camera* review. Majumdar Decl. ¶ 28–29; Exhibit 12. On April 10, Plaintiffs' counsel stated that counsel was "not in a position to consent to production of their records" because they "represent these fifty veterans only for FTCA administrative-claim purposes." The United States clarified that it was not asking for Counsel to consent *on behalf of* its clients, but rather to ask their clients if they would sign consent forms. The United States also asked whether the named Plaintiffs in this manner would consent to in camera review of their records. *See* Exhibit 12. Plaintiffs' counsel responded that they would seek consent from Mr. Monk, Jr., but again refused to even ask their other clients to consent to such disclosure. *Id.*; Majumdar Decl. at ¶ 29.

[20] This second approach was suggested by the Court at the Status Conference. Plaintiffs' actual Requests for Production seek "all" documents and records and are not limited to those "sufficient to show" the requested information.

one of the up to 16,500 veterans' benefits files. *Id.* ¶ 44; Fegard Decl. ¶¶ 5-16. [21] In doing this, the reviewer would need to keep track of whether they have, in fact, identified sufficient documents to reflect all 11 "variables" for each file. If not all of the "variables" can be located through a limited review of only specific documents, then the remainder of the file would have to be reviewed until the reviewer can find all of the "variables" or confirms that some "variables" are simply unavailable for that veteran.[22] *See id.*

To put this in terms of quantifiable work, VA counsel who has VBMS access and who is experienced with the system and with the types of records found in veterans' benefits files attempted to identify Plaintiffs' requested 11 "variables" in a single veteran's file, by looking at as few records as possible. For a veteran with 161 documents in their file—a relatively small number—it took *55* minutes to identify all of the variables[23] requested as efficiently as possible. Fegard Decl. ¶¶ 5-14. Multiplied by as few as 11,000 veterans and as many as 16,500 veterans, a single reviewer, working 40 hours a week solely on this project and never taking leave, would need anywhere from approximately 252 weeks, or four years and 10 months, to 378 weeks, or seven years and three months. Even a team of five reviewers devoted to this specific task, working full time with no leave and without performing any other duties or any other discovery in this matter, would take anywhere from over 11 months to one year and five months to complete. And

---

[21] Because of technical limitations, the only other option to downloading documents one at a time would be to download the entire file at once. This would be inconsistent with the goal of a "sufficient to show" production. Further, when a VBMS file is downloaded in its entirety, it is downloaded as a .zip file that does not retain the "document type" conventions in VBMS. A reviewer would therefore have to relocate the relevant documents within the .zip file by opening the documents until the reviewer locates the ones containing the variables. *See* Fegard Decl. ¶ 16.

[22] This process in turn raises other issues. For instance, if a reviewer sees conflicting information within a single veteran's file, the reviewer would need to decide whether to produce all of the conflicting information or a subset thereof. That could involve subjective judgment; it is not the same as using a computer program to produce structured data as it exists in a database.

[23] The review did not uncover the veteran's ethnicity. *See* Fegard Decl. ¶ 13.

this assumes reviewers are experienced with the system and with the materials therein and it does not account for the likelihood that some files require a more complicated review or that not all files have the same forms or other documents.

This also does not include the time it takes to download the requisite documents. *Then* the United States would need to assign an anonymized identifier to each file, redact the documents or pages as necessary, and render them for production in a newly created manner that organizes the excerpts by such anonymized identifier. The United States would also need to create an internal log that tracks which veteran corresponds with which identifier, to ensure the "sampling" is done correctly and can be traced back if needed.

None of the above is consistent with an appropriate balancing of discovery scope. Nor is it even consistent with what *Plaintiffs claimed to want*—which was a search of a dynamic database, through the running of a computer code, to produce an output that is consistent with how that data is stored (as the United States is already doing, where possible). That Plaintiffs want "unrestricted discovery" based on non-established relevance is not a sufficient basis to require the United States to undertake such an unduly burdensome and expensive process. *See Conservation L. Foundation, Inc.*, 2023 WL 5434760 at *11.

> **B.    Ordering the United States to anonymize, redact, and produce only excerpted pages from benefits files "sufficient to" satisfy Plaintiffs' request would improperly require one party to create work product for its party opponent.**

Such a process is also improper in that compliance would require the United States to create new documents in violation of Fed. R. Civ. P. 34. Far from the obligation to produce documents as they exist in the ordinary course, an order requiring the United States to produce only excerpted and redacted pages or documents from benefits files sufficient to supply Plaintiffs their "variables" for each randomized veteran, organized by an assigned anonymized identifier, would effectively require the United States to create new work product in litigation specifically for a party opponent.

Generally, a party must produce electronically stored documents as they are kept in the usual course of business. If a request does not specify a form for producing electronically stored information,[24] a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms. Fed. R. Civ. P. 34(b)(2)(E)(i)-(ii). The law is clear that Rule 34 "cannot be used to compel a party to produce a document that does not exist." *See A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, No. 3:07cv929 (WWE), 2014 WL 5859024, at *3 (D. Conn. Nov. 10, 2014) (citing *Hallmark v. Cohen & Slamowitz, Midland Funding LLC*, No. 11-cv-842S(F), 2014 WL 5017859, at *5 (W.D.N.Y. Oct. 8, 2014)). Further, under Rule 34, "a responding party has no duty to organize and label the documents if it has produced them as they are kept in the usual course of business." *See Hagemeyer N. Am., Inc. v. Gateway Data Scis. Corp.*, 222 F.R.D. 594, 598 (E.D. Wis. 2004).

Under the plain language of Rule 34, assuming *arguendo* that privacy considerations and burden were no issue, Plaintiffs would at most have a right to production of the benefits files in their original format. That is, in full and unredacted, as they are contained in either paper file form or VBMS. Plaintiffs could then identify the "variables" in these files themselves. But these files *cannot* be produced unredacted, pursuant to the privacy laws discussed above. And production in redacted format would not only be unduly burdensome, but would also require the United States to create new materials—*especially* if, as the Court suggested at the Status Conference, the United States was required to review the files and then disclose only selected excerpts of pages or documents within a file sufficient to reflect the "variables."

---

[24] Plaintiffs' Requests for Production do not specify a form for production, and their "sampling" proposal was by its terms intended to apply to data located in query-able databases.

In *A & R Body Specialty & Collision Works, Inc. v. Progressive Cas. Ins. Co.*, the plaintiffs, who alleged the defendants engaged in unfair and deceptive trade practices,[25] sought from the defendant "repair channel" data and "estimating" data to help demonstrate, in part, that the defendants steered business away from their repair shops. 2014 WL 5859024, at *3, *6. The plaintiffs sought this data for over 11,000 insurance claims. *See id.* at *3. In response, the defendants produced claims data for over 11,000 claims with 157 columns of data.[26] The plaintiffs thereafter claimed that the defendants' production was insufficient, in that the data produced did not include certain variables such as "the name of the repair shop, whether the shop was in [defendants'] network and whether the repair was ultimately performed." *Id*. at *3, n.4. The defendants argued in response that filling in that data would require a file-by-file review of each claim, an examination of tens of thousands of claims, the creation of a new data set based on that review, and that such review would not fully satisfy plaintiffs' request in any event. *Id.* at *4.

The court found that requiring the defendants to produce this information was akin to "the creation of a document for the purposes of production." *Id*. The court noted that, in contrast to other cases[27] wherein courts ordered disclosure based on a responding party's ability to query dynamic databases for the information, the "defendants would have to conduct a file-by-file review of claims information beyond the data itself " in order to extract the information requested by the plaintiffs. *Id*. at *6. Further, there was "no evidence" that the defendants could query the information sought, through the use of data extraction programs or otherwise. *Id.* Rather, "they

---

[25] *See A & R Body Specialty v. Progressive Cas. Ins. Co.*, No. 3:07-cv-0929 (WWE), 2008 WL 2229888 (D. Conn. May 27, 2008).

[26] *See A & R Body Specialty and Collision Works, Inc. v. Progressive Cas. Ins. Co*, 2014 WL 4437684, at *2, *adhered to on reconsideration*, No. 3:07-cv-929, 2014 WL 5859024 (D. Conn. Nov. 10, 2024).

[27] *See Apple Inc. v. Samsung Elecs. Co. Ltd.*, Case No. 12-cv-0630-LHK(PSG), 2013 WL 4426512 (N.D. Cal. Aug. 14, 2013); *see also Gonzales v. Google, Inc.*, 234 F.R.D. 674 (N.D. Cal. 2006).

would have to manually create the data sought." *Id*. As a result the court ruled, upon the plaintiffs'
motion for reconsideration, that it would "not require [the] defendants to produce the information
plaintiffs seek." *Id*. at *7 (motion granted on other grounds).

Plaintiffs' request is on all fours with that which was denied in *A & R Body Specialty &
Collision Works, Inc*. Here, Plaintiffs' request would require manual, file-by-file review of
veterans' benefits files to locate the requested variables. Whether in the form of a newly created,
single document containing the variables or through submission of extracted pages from benefits
files, organized by anonymized veteran and likely containing redactions, what Plaintiffs seek is a
manual analysis and creation of new material for the purposes of litigation, conveniently compiled
for them through the extensive work of the opposing party.[28]

As stated above, this pre-2006 information cannot be queried, for either paper files or in
VBMS, through the use of code or data extraction programs. Moreover, there is no guarantee that
a particular claims file will contain all the variables Plaintiffs seek. *See, e.g., id.* at *4 (denying
burdensome discovery requiring manual review for specific data where, among other things,
defendant argued that "even a file-by-file review would still not provide [p]laintiffs with the
'complete and accurate' data they request").

By contrast, a reasonable search via query of a dynamic database and provision of the
results through a report "'does not require creation of a new document beyond the scope of Rule
34.'" *See Local 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, No.
18-cv-4476 (LJL) (JW), 2023 WL 8804257, at *12 (S.D.N.Y. Dec. 20, 2023) (citing *Humphrey v.*

---

[28] This would be even more egregious if Plaintiffs are indeed demanding that the United States create a single
document, such as a spreadsheet, summarizing only the information they want for their "variables" based on a
laborious manual review of thousands of veterans' files. There should be no doubt that requiring creation of such a
document, where the information does not already exist in a database upon which a computer program could be run
to extract the data, would be procedurally improper.

*LeBlanc*, No. CV 20-233-JWD-SDJ, 2021 WL 3560842, at *3 (M.D. La. Aug. 11, 2021)); *see also*

*North Shore-Long Island Jewish Health Sys., Inc. v. MultiPlan, Inc.*, 325 F.R.D. 36, 51 (E.D.N.Y.

2018) (citing *Apple Inc. v. Samsung Elecs. Co.*, No. 12-cv-0630, 2013 WL 4426512, at *3 (N.D.

Cal. Aug. 14, 2013)) ("While 'a party should not be required to create completely new documents,

that is not the same as requiring a party to query an existing dynamic database for relevant

information'"). In these cases, disclosure was ordered where the production required was

reasonably attainable through running a computer data extraction program or algorithm, thanks to

the data already existing in dynamic databases. *See id.* And indeed, *the United States has been*

*doing this for the data that does so exist*. However, that undertaking is the opposite of what

Plaintiffs now seek for the pre-2006 time period. Plaintiffs' request is not only unreasonably

burdensome, but also contrary to case law. No query, code, or data extraction program could

currently be run across the files to pull the variables Plaintiffs seek for these time periods; only a

manual review and an improper "creation of [] document[s] for the purposes of production" would

satisfy their demands. *A & R Body Specialty & Collision Works,* 2014 WL 5859024, at *3 n.4.

## C.     Both of these approaches are disproportional to the needs of the case.

The VA takes its responsibilities to veterans seriously. It also takes Plaintiffs' allegations

seriously. The issue of providing benefits to all veterans entitled to them is the core of the VA's

mission and the reason for its existence. However, this action is, at heart, brought as an alleged

tort claim by one individual, on behalf of himself and his deceased father's estate, seeking

individual monetary damages. Further, because Plaintiffs now state that they seek only "garden

variety emotional distress" claims, Plaintiffs' potential damages should be substantially limited.

*See, e.g., Vera v. Alstom Power, Inc.*, 189 F. Supp. 3d 360, 376-79 (D. Conn. 2016); *see also* Fed.

R. Civ. P. 26(b)(1) (one consideration for determining discovery's proportionality to the needs of

the case is "the amount in controversy").[29] And although Plaintiffs purport to represent a class, no certification motion has yet been filed and no class has yet been certified.[30]

Plaintiffs allege that their claims are for emotional distress as a result of interacting with the VA, not a challenge to individual benefits determinations. And this Court has held that "[d]issecting each individual benefits adjudication is unlikely to accurately measure systemic racism within VA benefits administration, even if one aggregates the results. … Dissecting what occurred in each Black veteran's benefits adjudication would be unhelpful and unnecessary." ECF No. 115 at 12, 14 (Order Denying Leave to Appeal). But such individual-level "dissection" of benefits files is what Plaintiffs are now demanding the United States to do, in order to selectively excerpt only the certain pieces of information that Plaintiffs deem useful. This is substantively an entirely different process than the original "sampling" discussion, which was to run *computer queries across a database that can produce a "summary" style report,* and which the United States has already agreed to do for information that is stored in that manner.

This information is, further, requested as only one piece of the extensive discovery Plaintiffs seek across a period of 80 years. It is related only to their desire to conduct another statistical analysis based on their choice of veteran demographic and disability benefits

---

[29] At this time, Mr. Monk, Sr., through his estate, is the only named Plaintiff who allegedly interacted with the VA at any point between 1945 and the 1970s. However, Mr. Monk, Sr. passed away in 1989, decades before this suit was filed. It is unclear how Plaintiffs (1) intend to establish a timely claim for Mr. Monk, Sr., even under their continuing tort theory, given that such a theory would require "the last violation" to have occurred *to him* within the two year statutory period and Mr. Monk, Sr. could not have interacted with the VA more recently than 1989, *see* ECF No. 83 at 23 (Order on Motion to Dismiss); or (2) intend to establish "garden variety emotional distress" damages for Mr. Monk, Sr., given he is unavailable to testify as to his own alleged emotional distress, *see Vera*, 189 F. Supp. 3d at 375. Regardless, and despite its stated objections to the overbroad time period applied to practically all of Plaintiffs' discovery requests, the United States has been endeavoring to reasonably search for and produce materials without time limitation. But Plaintiffs' insistence on extensive discovery from 1945-1970s is especially disproportional to the needs of the case when considering the allegations that actually relate to that time period.

[30] Notably, Plaintiffs have themselves refused to search for or produce materials relating to the purported class on the basis that no class has yet been certified and the requests are therefore allegedly premature. To the extent Plaintiffs rely on a purported class as the basis for their own unduly burdensome discovery requests, that reliance is improper.

"variables."[31] Plaintiffs are being provided an anonymized sample of the requested variables for the years for which the information is available to be queried within dynamic databases (2006-present). This time period covers a significant portion of Mr. Monk, Jr.'s alleged interactions with the VA benefits process. And the VA is willing to discuss with Plaintiffs a possible expansion of the post-2006 sample set, beyond the 5,500 claims requested for that "era."

When placed in the context of this litigation, "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). It would be unduly burdensome, time-consuming, grossly disproportional to the needs of the case, and injurious to other veterans to require the United States to either (1) review, redact any identifying information or protected medical information wherever they appear, and otherwise produce in full veterans' benefits files for thousands of veterans who have no connection to this case, or (2) create new work product for opposing counsel's litigation purposes through review, selective excerption, redaction, and organization of only certain pages containing the "variables." Both approaches would involve a laborious process and take years to complete—time during which vital resources would be diverted away from the VA's primary duties, and which would significantly delay resolution of Plaintiffs' claims. Nor should Plaintiffs' desire for unfettered discovery over 80 years in pursuit of their individual damages claims outweigh the rights of thousands of other veterans—including some of the very veterans on whose behalf Plaintiffs purport to act—to protection of their sensitive records from third party disclosure and to a VA whose resources are focused on its mission.

---

[31] Plaintiffs already conducted at least one similar such analysis for a period of approximately 20 years and relied on that analysis and incorporated its alleged findings into their administrative claims and the Amended Complaint. Although the Court has previously referred to this unproduced analysis as "evidence of systemic racism," ECF 115 at 14, at the Status Conference the Court held that the United States was not entitled to see that analysis in discovery.

## V.    COURT INTERVENTION ON PLAINTIFFS' VAGUE, OVERBROAD, AND UNDULY BURDENSOME REQUESTS FOR "COMPLAINTS" IS PREMATURE.

Contrary to Plaintiffs' assertion at the Status Conference, the issue of what Plaintiffs characterize as "requests for complaints" is not ripe for Court intervention. Setting aside the United States' valid objections to these overbroad and vague requests, extensive collections and review are already underway. To the extent nonprivileged, responsive materials are identified through such review, they will be produced. Additionally, consistent with the Court's instructions, the United States has undertaken efforts to identify historical files belonging to former VA "Administrators" and to identify additional potential sources of information within VA OCLA. Because these processes are time-consuming and not yet complete, and because fact discovery is ongoing, the parties should be allowed to proceed with document production and continue to discuss this topic as appropriate. If Plaintiffs later believe that the United States' efforts are insufficient, *after they have actually received such productions and after fulfilling their meet and confer obligations*, only at that point should additional judicial resources be taken up on this issue.

As discussed above, the United States has already been actively engaged in searching for responsive materials, including for 30 identified potential custodians. These custodians include current and former Under Secretaries for VA Benefits as well as individuals from: the External Civil Rights Discrimination Complaints Program within the Office of Resolution Management; the Center for Minority Veterans; Office of the Chief of Staff; Office of Field Operations; Office of Performance Analysis and Integrity; Compensation Services; Office of Equity Assurance; Office of Congressional and Legislative Affairs; and Special Assistants to the Secretary for Veterans Service Organizations Liaison, among others. These searches—which were underway before the Status Conference, as Plaintiffs are aware—are entirely consistent with the Court's

suggestion of searching "headquarters, administrators, under secretaries, and the office of congressional and legislative affairs" for the "formal or informal complaints." ECF. 138 at 2.

The United States has also been investigating the location of potentially responsive VA "administrator" files, whether electronic or paper. Because such files would be decades old at a minimum, to the extent they still exist they would be in the possession of NARA rather than the VA. Rodgers Decl., ¶¶ 24-25. However, archived agency records are generally not organized by subject matter or topic. This means there is not known to be any file conveniently organized as, for instance, "complaints of disparities received by an Administrator." Instead, files are organized by the generating organization and may be saved in various facilities, as a "series." *See id.*, ¶¶ 5-6. Nor are they likely to be digitized. *Id.* ¶ 14. Therefore, any search of such files for *responsive* materials relating to "informal or formal complaints" would require a manual page-by-page review of every identified "series" in its entirety—which, depending on the series, could be thousands of pages. *Id.* ¶¶ 30-31. Further, even paper files maintained by NARA are not kept indefinitely if the records retention policy relevant to that "series" indicates that the files should be destroyed after a certain period of time. *Id.* ¶¶ 3, 26.

Despite these obstacles to a reasonable search and review, the United States has been endeavoring to identify the existence and location of potential VA Administrator files, to determine the process and time involved in locating, reviewing, and digitizing. At this stage, the United States has identified several file "series," at multiple physical locations, that are from or related to the Office of the VA "Administrator" and which could *theoretically* contain documents responsive to Plaintiffs' requests. *Id.* ¶ 30. However, these identified series are not digitized, are in some cases not "processed," and consist of thousands of pages of records not organized by subject matter. *Id.* The parties have not yet discussed this, and this process is ongoing. Of note, the

36

NARA online Archives Catalog is publicly available to be searched and contains information regarding where such "series" are located, their estimated size, and how they are stored. *Id.* Plaintiffs could themselves access this Catalog to identify series in which they are interested. Similarly, records themselves are, with some exceptions, available to any member of the public to review in person, subject to completing orientation requirements. *Id.* ¶ 13, 16, 17, 32. Given the United States' efforts to date, including the associated burdens of undertaking such a process as described herein, the parties should continue to confer on this issue.

The United States is also assessing whether additional file locations within OCLA—besides the custodial material already being searched—can or should be searched for responsive material. For instance, the United States is working to determine whether there is a reasonable method for identifying "inquiries" to OCLA that would touch on the subject of racial disparities, so that documents associated with those inquiries alone could be pulled, to the extent they exist, rather than conducting an exhaustive custodial pull across all OCLA employees regardless of whether the parties have any reason to believe those custodians would have responsive documents. This process is similarly ongoing. Given these reasonable efforts, the fact that discovery is ongoing, that Plaintiffs have not yet received intended custodial productions that they are preemptively claiming are insufficient, and that this issue is therefore not ripe for motion practice, the parties should be permitted sufficient time to further discuss these issues. The United States therefore requests that the Court decline from issuing a ruling at this juncture.

Should the Court nonetheless decide that the issue is ripe for a ruling, Plaintiffs' requests are vague, overbroad, and unduly burdensome. Plaintiffs seek "*[a]ll* documents or records, including formal and informal complaints or other communications, received by the VA from *any* source…regarding actual or suspected racial disparities" in VA benefits from January 1, 1945, to

the present (emphasis added). Plaintiffs further seek all documentation, from any source, for 80 years, regarding such vague concepts as "experiences of Black veterans" or "stress, emotional distress, trauma, and/or anxiety" of any veteran in relation to benefits applications, appeals, or denials. The language of the requests themselves supports the notion that they are overbroad and unduly burdensome. *See, e.g.*, *Conservation L. Found., Inc.* 2023 WL 5434760, at *20-21 (requests for "all documents" relating to interactions between defendants or their parent companies over a period of twelve years were facially overbroad, unduly burdensome, and disproportionate to the needs of the case; discovery request that begins with the phrase "'all documents' 'related to' broad subject areas … 'often is a red flag for overbreadth and undue burden.'") (quoting *Hedgeye Risk Mgmt. LLC v. Dale*, No. 21-cv-3687, 2023 WL 4353076, at *2 (S.D.N.Y. July 5, 2023)). These requests are, on their face, patently improper, and the efforts the United States is *already undertaking* are both reasonable and appropriately narrowed to address these requests.

Civil discovery's scope is not unbounded. It is not proportional to the needs of the case for Plaintiffs to require the United States to search hundreds of custodians or locations for documents that neither party has a reason to believe exist. Rather, Plaintiffs are required to state their requests with sufficient specificity for the United States to reasonably respond. *See In re PE Corp. Secs. Litig.*, 221 F.R.D. 20, 23 (D. Conn. 2003) ("[D]iscovery requests 'based on pure speculation and conjecture' are not permissible"); *Walsh v. Top Notch Home Designs Corp.*, No. CV 20-05087, 2022 WL 3300190, at *6 (E.D.N.Y. Aug. 11, 2022) (when requesting party "is not entirely sure of what they are seeking or what will be produced, it's merely casting the net for a 'gotcha'"); *Sibley v. Choice Hotels Int'l*, No. CV 14-634, 2015 WL 9413101, at *7 (E.D.N.Y. Dec. 22, 2015) (requesting party should ask "clear questions aimed at getting clear and simple responses").

Here, in contrast to these governing principles, Plaintiffs have failed to adequately define "formal or informal complaints," "experiences," or "institutional actors," among other terms. Their proposal for searches from a list of what they called "complaint intake units" as an alleged "narrowing" of their requests neither clarified nor narrowed the requests, since the listed VA entities do *not*, for the most part, exist to "intake complaints," and the already extensive list was described as "non-exhaustive." Despite the United States reminding Plaintiffs that custodians in most of these units were already having documents collected, Plaintiffs maintain that this is insufficient—*before even having reviewed such documents*. Yet a review of documents produced from the current custodial list may be further confirmation of the fact that a given custodian's unit is *unlikely* to have these requested materials and that further searches in such a unit would be inappropriate and unnecessary. Plaintiffs have put the cart before the horse.

As a practical matter, satisfying even the "narrowed" version of Plaintiffs' request would require the United States to pull records from hundreds of custodians and locations, both electronic and physical, to find the proverbial "needle in a haystack," even where the United States has no reason to believe the subject custodians would have such records.[32] This is not consistent with the scope of discovery contemplated by Rules 26 and 34.

## **CONCLUSION**

The United States respectfully requests that this Court enter an Order protecting benefits files for thousands of veterans unrelated to this case from unnecessary and possibly illegal

---

[32] As discussed above, Plaintiffs argue that searches being conducted for electronic custodial records from the past 20 or 30 years is insufficient. But standard document retention policies within federal agencies may render older electronic and paper records nonexistent. For instance, when attempting to pull custodial materials for its list of 30 custodians, the United States only recently determined that electronic custodial records for two former Under Secretaries for VA Benefits, who held the role over 15 years ago, no longer exist. Although the belief that materials are not likely to exist is not by itself a basis to refuse to conduct a *reasonable* search, it does weigh against the reasonableness of excessively expending resources searching for custodial records—let alone *responsive* records—that are unlikely to exist.

disclosure.  The United States specifically requests an order denying Plaintiffs' discovery requests for "sampling" for the time periods for which such "sampling" is not available through database queries and thus would be unduly burdensome (pre-2006). The United States further requests that the parties be permitted to proceed with other fact discovery that is ongoing and not yet ripe for judicial intervention.

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

MARK H. SILVERMAN
Acting United States Attorney

KIRSTEN L. WILKERSON
Director, Torts Branch

DEBRA R. COLETTI
Acting Deputy Director, Torts Branch

*/s/ Irina M. Majumdar*
Irina Majumdar (phv207971)
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 598-5403
Email: irina.m.majumdar@usdoj.gov

Emily M. Kelley (phv207548)
Trial Attorney
United States Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4400
Email: Emily.m.kelley@usdoj.gov

Jillian Rose Orticelli (ct28591)
Assistant United States Attorney
450 Main Street, Rm. 328
Hartford, CT 06103
Tel.: (860) 947-1101
Fax: (860) 760-7979
Email: Jillian.Orticelli@usdoj.gov

ATTORNEYS FOR DEFENDANT
UNITED STATES OF AMERICA

41