# EXHIBIT 1

**Edelson PC**

150 California Street, 18th Floor, San Francisco, California 94111
t 415.212.9300 | www.edelson.com

August 20, 2024

**<u>VIA EMAIL</u>**

Jillian Orticelli
Jillian.Orticelli@usdoj.gov

Irina M. Majumdar
Irina.M.Majumdar@usdoj.gov

Emily M. Kelley
Emily.M.Kelley@usdoj.gov

***Re:*** ***Monk, et al. v. United States of America***
Letter Memorializing August 20, 2024 Meet and Confer re: Defendant's Responses and Objections to Plaintiffs' Requests for Production and Interrogatories

Counsel,

Thank you for the call today. I'm writing to memorialize our conversation and follow-up on a few issues.

**<u>Updates re ESI: Collection</u>**

- You stated that Defendant has begun the process of collecting custodial files. To do that, Defendant has selected custodians that it believes are likely to have relevant materials. You will be sending that list to us, including their names and job titles. You described this as an "initial set" of custodians, stated that some have worked at VA for many years (some for decades), and that your pull is not limited in time period but will cover the entire period for which the custodians worked at VA. You said this group will include the individuals identified in Defendant's interrogatory responses as well as in Plaintiff's Second Set of RFPs. We stated that we would review your list and we would let you know if we propose additional custodians or have other questions.

- With respect to the process for pulling these custodial files, you stated that the volume of each custodian's files is too large to gather the full file, so Defendant has chosen a set of broad search terms to attempt to narrow what is pulled for migration to a document review platform. You agreed to provide those search terms to us, which you described as simple OR searches. You stated that you expect to devise further search terms that will be run across these collections for purposes of identifying a review set. We will review your collection search terms and let you know if we have any questions or additional suggestions, and we ask that—to the extent possible—you provide information about the

volume of documents collected per custodian through those search terms (you explained a hit count may not be useful because it would double count hits within a single document). We do anticipate developing any search terms that are used for identifying a review set with you in a collaborative process.

- As far as what is included in this individual custodial collection, you stated that the collection method above can only be applied to "online Office360 data," which you represented encompasses the vast majority of any custodian's e-mails and files. However, there are other files that custodians may have against which search terms cannot be run, so Defendant will pull those in their entirety for migration to a document review platform. Once on the platform, it may be possible to refine a review set.

**Updates re Specific Discovery Requests**

RFP No. 1

You shared some updates about how Defendant intends to search for responsive documents, mentioning the VA's external complaints manager would be included as a custodian (we think you mean Sterling Atkins, External Complaints Program Manager, VA Office of Resolution Management Diversity & Inclusion (ORMDI), but please let us know if that is not the case). We noted that this position may have changed over the years and asked what ability there is to search for whatever offices held that function before the Deborah Sampson Act. You confirmed that you intend to look into predecessor systems and will provide us with an update.

We also noted that, for a long time, potential discrimination complaints (other than employment discrimination) may have been kept in a decentralized fashion by local VA offices. You agreed to look into whether there were older systems in place to cover certain types of discrimination complaints and, if so, what types of opportunities might exist to search those and to let us know.

We also requested that you look into whatever offices or personnel may have had responsibility for legislative affairs, as elected officials in Congress may communicate complaints to the VA about discrimination (either on policy issues or constituent services), and responsibility for liaising with Veterans Services Organizations (VSOs), which have a long history of raising various issues to VA. We also suggested that in earlier eras, for instance, a letter from the NAACP expressing concern about VA discrimination might have been sent directly to the Administrator or Secretary, before modern offices of public engagement were established. You agreed to look into this and let us know.

You also noted that you are aware of a Spreadsheet Tracker that kept track of discrimination complaints, and that you are aware of it and will be producing it.

Finally, you mentioned that another place complaints may exist is within individual benefits files, such as if a vet alleged that their benefits claim was wrongly denied for that reason, it could come up in the form of a challenge or appeal. You stated that such files are accessible through VBMS (the Veterans Benefits Management System), and that it has limited search parameters that may not allow keyword searches similar to those we are using for ESI.

When we asked technical questions about the VBMS infrastructure and database systems, you referred us to the Cunningham Declaration produced in connection with the FOIA litigation. The declaration confirms that, as we suspected, VBMS is built on top of one or more databases that can be directly queried to pull and combine different types of data relevant to benefits decisions. *See*, *e.g.*, Cunningham Decl. ¶¶ 23-24 (discussing the development of a custom SQL script that merged data from multiple databases to produce spreadsheet in question).

To help us determine what information may be available in the various data sources within Defendant's possession, custody, and/or control, please provide us with the database schemas (i.e., list of table names and available data fields), in the databases described in the Cunningham Declaration (BIRLS, USVETS, VADIR, PIF, VACOLS, CPMR, and the Corporate Database), any other databases that underly the VBMS system, and any other databases that exist and may house relevant information about veterans' demographic information (e.g., race, gender) or housing, education, and disability benefits adjudications. Please also confirm the time periods that are covered by each respective data source so that we can determine what information may only be available in paper archives. These preliminary steps will help the parties streamline the search process and determine whether sampling would be appropriate, and if so, how to pursue it. Please let us know if you have any questions.

<u>RFP No. 2</u>: You stated that you understood our email response and have no further questions at this time.

<u>RFP No. 3</u>: We discussed this issue at length, and it overlaps with the conversation above regarding the Cunningham Declaration. We agreed to continue discussing this issue, and expect to do so once we receive the information above regarding the various database sources and data fields that are available, the time periods they cover, and what information may be available only in a paper archive.

<u>RFP No. 7</u>: We asked you if you had any updates about agency decisionmakers for each sub-category of materials distributed to training attendees, as you stated you would do in your July 26 e-mail. You stated that you do not have that information yet but that you will follow-up on it for us.

<u>RFP No. 8</u>: You confirmed you received our explanation about the term "racially correlated characteristics," and understood what we were looking for.

<u>Rog No. 1</u>: Following up on Emily Penkowski Perez's August 7 email, we asked you to supplement your responses to cover the entire timeframe at issue in this case, provide the the predecessors and successors of the individuals previously identified, and provide more specific summaries about the nature and extent of each individual's area(s) of knowledge. You confirmed that Defendant will be supplementing these responses to provide more specific information about each individual's area of knowledge. With respect to the remaining two issues, you stated that Defendant has undertaken a reasonable investigation to identify people who currently or recently worked for VA who have knowledge of the relevant facts, and that you did not do so by relying solely on their job titles. We emphasized that it seems unlikely that

current VA employees would be the only people with knowledge of relevant information, particularly given that the complaint alleges ongoing failure to address discrimination since the 1940s, and asked what Defendant is doing to identify individuals with knowledge related to earlier times. While we appreciate your promise to supplement these responses to identify any additional individuals you may later learn about, Defendant has an affirmative obligation to conduct a reasonable investigation to identify people with knowledge as to all time periods relevant to the allegations. We have suggested that one way to do that may be to start by investigating whether individuals who previously held the same job titles or had similar job responsibilities to the individuals you have already identified also have relevant knowledge. We request that, at the very minimum, you undertake that investigation and then supplement your responses if you determine such individuals in fact possess relevant knowledge. Please confirm that you will do so.

Rog No. 11: You confirmed that you will be supplementing these responses to provide the title and time period of tenure for each person listed in your responses.

Please let us know promptly if you disagree with anything we have memorialized above. We request that you get back to us on the outstanding issues by next Friday, Aug. 30, 2024. If you would like to schedule a follow-up call, please let us know.

Thank you,

Yaman Salahi
EDELSON PC

cc: Michael Wishnie and Natalia Friedlander, Jerome N. Frank Legal Services Organization

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| CONLEY F. MONK JR., et al.,<br>*Plaintiffs*,<br>v.<br>UNITED STATES OF AMERICA,<br>*Defendant*. | Civil Action No. 3:22-cv-1503-SRU<br><br>June 12, 2024 |

**PLAINTIFFS' SECOND REQUEST FOR PRODUCTION**
**TO DEFENDANT UNITED STATES OF AMERICA**

To: The United States of America, by and through its attorney of record, Jillian Orticelli, United States Attorney, 157 Church Street, New Haven, CT 06510

Pursuant to Rule 34 of the Federal Rules of Civil Procedure (FRCP), Plaintiffs submit the following request for production of documents from Defendant United States of America. Plaintiffs requests that Defendant produce for inspection, copying, and use all responsive documents requested herein within thirty (30) days of service of these discovery requests.

## I. INSTRUCTIONS

1. When an objection is made to any document request, state with specificity all grounds for the objection.

2. When information is withheld because of an objection, describe the nature of the information withheld and identify each objection asserted to justify the withholding.

3. If certain requests are duplicative of previous requests to which documents have already been produced, Defendant need not reproduce such documents. Plaintiff requests that the Defendant provide notice that such documents are among those already produced.

4. Pursuant to FRCP Rule 34(b)(2)(E), Plaintiffs request that when Defendant produces the requested documents, including electronically stored information (ESI), Defendant will produce such documents or ESI as they are kept in the usual course of business or will organize and label them to correspond to the categories in the request.

5. Defendant must make a good faith effort to produce any and all requested documents that are readily ascertainable from Defendant United States of America.

6. If, in responding to a document request, Defendant claims that there is any ambiguity in either a particular document request or in a definition or an instruction applicable thereto, such claim shall not be used as a basis for refusing to respond, but rather Defendant shall set forth as part of the response the language deemed to be ambiguous and the interpretation Defendant chose or used in responding to the particular document request.

7. All requests are for the time period from January 1, 1945 through December 31, 1964, unless otherwise specified.

## II. DEFINITIONS

The terms used in these Requests for Production have the meanings set forth in D. Conn. Local Rule 26(c). In addition, as used in these Requests for Production:

A. "Agreement" means a contract, arrangement, or understanding, formal or informal, oral or written, between two or more persons.

B. "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

C. "Document" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a). A draft or nonidentical copy is a separate document within the meaning of this term.

D. "Discussion," "discussions," "discuss," "mention," "mentions," "describe," "describes," "analyze," or "analyzes" mean any and all inquiries, conferences, conversations, negotiations, agreements or other forms or methods of oral communication or such dialogue sent via e-mail, facsimile, letter, telegram, or other written communication.

E. "Record" and "records" mean all data; papers; documents; books; transcriptions; records; reports; contracts; agreements; video, audio and other electronic recordings; memoranda (including written memoranda of telephone conversations, other conversations, discussions, agreements, acts and activities); minutes; diaries; calendars; desk pads; scrapbooks; notes; notebooks; correspondence; drafts; bulletins; electronic files; electronic mail (e-mail); text (SMS) messages; messages sent via messaging applications including but not limited to WhatsApp, Facebook Messenger, Signal, Teams, and Skype; all data stored on social media sites and services such as X (formerly Twitter), Facebook, TikTok, and Instagram; facsimiles; circulars; forms; pamphlets; notice; statements; journals; postcards; letters; telegrams; publications; inter- and intra-office communications; photocopies; microfilm; maps; drawings; diagrams; sketches; analyses; transcripts; spreadsheets; electronically stored information (ESI) and any other documents within defendant's possession, custody or control from which information can be obtained or translated, if necessary, by detection devices into reasonably usable form, i.e. typed in English, and including

all originals, file copies, and all other copies, no matter how prepared, and all drafts prepared in connection with such records, whether used or not.

F. “Electronically stored information” and ”ESI” mean any information on operational systems including accounting, financial, distribution, or manufacturing systems; email; instant messages (IM) and text messages; web pages; text messages; cell phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (e.g., Access); erased, fragmented or damaged data; Blackberry data; cloud storage systems (e.g. SharePoint, OneDrive, Google Drive); social media; third-party websites and services; and anything stored on computer or other electronic means located on or in, but not limited to cache memory; optical disks; magnetic tapes/back-up tapes; magnetic disks (hard drive, floppy disks, etc.); proprietary data systems; smart phones; cell phones; IM tools; USB drives; or cloud storage systems.

G. “VA” means the U.S. Department of Veterans Affairs and its predecessor the Veterans’ Administration.

H. “VA facility” means any location where the VA offers services to veterans, including but not limited to regional offices, intake centers, hospitals, medical centers, clinics, or cemeteries.

I. “Defendant,” the “United States,” “you,” or “your” means the United States of America, and any of your respective departments, agencies, agents, employees, officers, or representatives acting on your behalf or under your control, including but not limited to the VA and its respective agents, employees, and officers

J. The use of a verb in any tense shall be construed as the use of the verb in all other tenses, and the singular form shall be deemed to include the plural, and vice versa.

K. “Request” and “Requests” mean and are limited to the numerical requests set forth in this motion for production of documents.

L. “Copies of” means authentic duplicates of the originals as noted, kept, maintained, and organized by the Defendant.

M. “Complaints” means emails, messages, or formal filings alleging disparate or discriminatory treatment.

## III. DOCUMENT REQUESTS

1. All documents or records, including formal and informal complaints or other communications, received by the VA from any source (including veterans, veterans organizations, civil rights groups, elected officials and their staff, or otherwise), regarding actual or suspected racial disparities in VA housing, education, or disability compensation benefits for the time period from January 1, 1945 through December 31, 1964.

2. All documents or records related to any internal investigations, audits, or reviews of racial disparities in VA housing, education, or disability compensation benefits for the time period from January 1, 1945 through December 31, 1964.

3. All documents or records regarding racial disparities in the administration of VA housing, education, or disability compensation benefits for the time period from January 1, 1945 through December 31, 1964.

4. All records identified in, referenced, or relied upon by Defendant in its responses to Plaintiffs' First and Second Set of Interrogatories to Defendant United States of America, regardless of the document's date.

5. All documents, or records that analyze, describe, discuss, mention, or relate to the racial composition of applicants for housing, education, and/or disability benefits received or processed by VA for the time period from January 1, 1945 through December 31, 1964.

6. All documents or records regarding or related to required training and/or supervision of individuals responsible for processing and/or adjudicating claims for VA housing, education or disability compensation benefits for the time period from January 1, 1945 through December 31, 1964, in the following areas:

a. Discrimination, unconscious bias, implicit bias, cultural competence, and/or diversity;
b. Whether or how to weigh, consider, or interpret the following characteristics of applicants for housing, education, and/or disability benefits: race, ethnicity, amount of income, source of income, employment status, education level, and/or rank on date of discharge; and

7. All documents or records prepared for, provided during, or used in national or agency-wide initial trainings for VA adjudicators or VA employees in equivalent predecessor positions, regarding or related to the following areas for the time period from January 1, 1945 through December 31, 1964:

a. Housing, education, and/or disability compensation benefits entitlement determinations;
b. Character of discharge determinations;
c. Disability rating determinations.

8. All documents or records that analyze, describe, discuss, mention, or relate to the relationship between claims outcomes and the following: amount of income, source of income, employment status, education level, character of discharge, rank on date of discharge, and/or VA facilities through which the application was processed for the time period from January 1, 1945 through December 31, 1964.

9. All documents or records that describe, discuss, mention, or relate to data collection and retention policies or practices in VA's housing, education, and disability compensation benefits programs for the time period from January 1, 1945 through December 31, 1964.

10. All documents or records that describe or define the role and responsibilities of the Center for Minority Veterans ("Center"), detail its interaction and integration with other departments or units within the Department of Veterans Affairs, discuss or refer to its data collection practices, and/or include complete lists of all individuals who have held the position of Director at the Center for the time period from January 1, 1994 through the present.

11. All documents or records, including but not limited to emails, memos, letters, notes, text messages, and electronic documents, created, sent, received, copied, or maintained by the following persons, or in which the following persons are a participant, for the following periods, concerning (i) racial disparities, (ii) research regarding potential racial disparities, (iii) data collection and retention policies or practices, and (iv) the 2017-18 VA analysis regarding racial disparities in PTSD claims, in VA's housing, education, and disability compensation benefits programs:

a. Mark Seastrum from June 1, 2012 to the present;
b. Margarita Devlin from May 1, 2018 to January 1, 2021;
c. Beth Murphy from July 1, 2016 to the present;
d. Willie C. Clark Sr. from December 1, 2016 to the present;
e. Paul Lawrence from April 1, 2018 to January 1, 2021;
f. Dennis May from October 1, 2017 to the present;
g. Tim Goliver from April 1, 2012 to the present;
h. Elaine Saiz from April 1, 2022 to the present.

12. All documents or records that describe, discuss, mention, or relate to the procedures, protocols, training materials, guidelines, audits, assessments, trends, patterns, and statistical data concerning the processing of claims under the Federal Tort Claims Act by the Department of Veterans Affairs from January 1, 1945 through the present.

13. All documents or records sent from or to the Government Accountability Office (GAO) or any GAO investigators by VA entities, including but not limited to the Office of Performance, Analysis and Integrity (PA&I), the Office of Congressional and Legislative Affairs (OCLA), the Office of Public and Intergovernmental Affairs (OPIA), and all components of the Office of the Secretary, concerning (i) racial disparities, (ii) research regarding potential racial disparities, and (iii) racial data collection.

14. All documents or records that describe, discuss, mention, or relate to an organizational chart outlining the geographical allocation of claims within the Veterans Benefits Administration's National Work Queue.

15. All documents or records that describe, discuss, mention, or relate to the reasons that the Advisory Committee on Minority Veterans (ACMV) requested the VA to study racial data in the administration of veterans benefits, including any communications between ACMV and VA and those commutations internal to ACMV and VA about this matter from January 1, 1994 to the present.

16. All agendas for and minutes of meetings of the ACMV from January 1, 1994 to the present.

17. All documents or records, including but not limited to directives or memos, issued in response to concerns about racial disparities within the VA, specifically documents or communications that describe, discuss, mention, or relate to any restrictions, such as prohibiting discussion of the results of studies or surveys indicating racial disparities, from January 1, 1945 to the present.

18. All communications from ACMV to VA officials or components that describe, discuss, mention, or relate to requests to analyze disability compensation, housing, and education benefits applicants, outcomes, and awards by race from January 1, 1994 to the present.

19. All documents or records that describe, discuss, mention, or relate to ACMV requests for data analysis and data collection by race from January 1, 1994 to the present.

20. Documents or records sufficient to show and explain VA's "capability through data matching to identify Veterans by race and ethnicity," as stated in the ACMV 2018 Annual Report at 10. A copy is attached.

21. The "VBA White Paper" that "was presented to the senior leaders by the Acting VBA Under Secretary, Tom Murphy" as stated in the ACMV 2018 Annual Report at 10.

22. All documents or records that describe, discuss, mention, or relate to the inception, establishment, and implementation of VA's 2024 Agency Equity Action Plan.

23. All documents or records, including formal and informal complaints or other communications received by the VA from any source, including veterans, veterans organizations, civil rights groups, elected officials and their staff, relating to stress, emotional distress, trauma, and/or anxiety experienced by veterans as a result of applying for benefits, being denied benefits, and appealing denials of benefits.

24. All documents or records that describe, discuss, mention, or relate to corrective actions taken against employees alleged to have contributed to racial disparities within the VA to include but not limited to any reports, memos, disciplinary records, emails, and meeting notes discussing the identification, investigation, and resolution of incidents or behaviors that contributed to racial disparities, as well as any follow-up actions and evaluations of such corrective measures, from January 1, 1945 to the present.

25. All documents or records, including formal and informal complaints or other communications received by the VA from any source, including veterans, veterans organizations, civil rights groups, elected officials and their staff, relating to the experiences of Black veterans applying for VA housing, education, or disability compensation benefits for the time period from January 1, 1945 through present.

Dated: June 12, 2024

Respectfully yours,

/s/ Michael J. Wishnie
Jessica Angel, Law Student Intern
Raillan Brooks, Law Student Intern
Claire Sullivan, Law Student Intern
Shelby Niehus, Law Student Intern
Natalia Friedlander, ct31510
Michael J. Wishnie, ct27221
Veterans Legal Services Clinic
Jerome N. Frank Legal Svcs. Org.
P.O. Box 209090
New Haven, CT 06520
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

Yaman Salahi, *pro hac vice*
EDELSON PC
150 California St., 18th Floor
San Francisco, California 94111
Tel: (415) 212-9300
Fax: (415) 373-9435

Jimmy Rock, *pro hac vice*
jrock@edelson.com
EDELSON PC
1255 Union Street NE, 7th Floor
Washington, D.C. 20002
Tel: (202) 987-6303

Theo Benjamin, *pro hac vice*
tbenjamin@edelson.com
Zoë Seaman-Grant, *pro hac vice*
zseaman-grant@edelson.com
EDELSON PC
350 North LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378

*Counsel for Plaintiffs*

# EXHIBIT 3

The Jerome N. Frank Legal Services Organization
YALE LAW SCHOOL

March 21, 2025

Emily Kelley
United States Department of Justice
Civil Division
175 N Street NE
Washington, DC 20530

Dear Counsel,

Thank you for speaking with us last week. We have included below a response to your March 13th email and a summary of our conversations regarding Plaintiffs' and Defendant's discovery requests. Action items are in bold.

/s/ Michael Wishnie

Emily Elledge, Law Student Intern
Kindall Hayes, Law Student Intern
Gabriella Hill, Law Student Intern
Jared Hirschfield, Law Student Intern
Ryan Kellner, Law Student Intern
Claire Sullivan, Law Student Intern
Briana Thompson, Law Student Intern
Braden Worthington, Law Student Intern
Natalia Friedlander, Supervising Attorney
Michael Wishnie, Supervising Attorney
VETERANS LEGAL SERVICES CLINIC
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

Jeremy M. Creelan
JENNER & BLOCK LLP
1155 Avenue of the Americas
New York, NY 10036
Tel: (212) 891-1600
jcreelan@jenner.com

Adam C. Henderson
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Tel: (312) 222-9350
ahenderson@jenner.com

Yaman Salahi
SALAHI PC
505 Montgomery St., 11th Floor
San Francisco, CA 94111
Tel: (415) 236-2352
yaman@salahilaw.com

## I. Summary of Plaintiffs' Discovery Requests

### *A. Plaintiffs' Sampling Proposal*

Defendant agreed to begin sampling electronic records from 2006 forward.

With regard to a sample of electronic records from 2006 onward, thank you for confirming that "[t]he United States will produce such data in accordance with the parties' agreement as soon as it is available [and] will likewise produce aggregate claims data by year when it is available." We also confirmed that Plaintiffs dropped from their list of variables the following: veterans' deployment to a combat zone, veterans' names, and veterans' addresses.

Defendant will follow up about randomized sample of electronic records from VBMS.

At the meet and confer, you clarified Defendant's access to electronic data. You explained that, since 2012, Defendant has used VBMS as its main electronic repository for veteran information. You explained that during the pandemic, a portion of older claims files were scanned into VBMS. You noted that Defendant is working to determine which files those are and what years they came from. **Please let Plaintiffs know as soon as possible what years those files cover.**

You then explained that Defendant needs specific veterans' information in order to search for veterans' data in VBMS. You asserted that Defendant cannot perform a randomized search of veterans' files in VBMS. We asked you to clarify what unique identifiers Defendant can use to find veterans' files in VBMS. You explained that it was not yet clear to you whether VBMS contains all veterans' C-File numbers. You asserted that Defendant is, regardless, unable to do a mass, randomized search of veterans' files in VBMS. You did explain, however, that you would "double check" whether there is a way for Defendant to perform such a search. As part of this investigation, we request that you consult Daniel Cunningham or another knowledgeable person to determine whether a method similar to the SQL queries and procedure Mr. Cunningham described in his February 25, 2022 declaration can be utilized to select data from a random set of claims files. **Please let Plaintiffs know whether mass, randomized searches of VBMS are possible, and if not, why SQL code could not be written to accomplish this. Please also clarify the relationship between VBMS and the various databases described in Mr. Cunningham's February 2022 declaration by that date. If you determine that you are unable to create a random sample through VBMS, please provide us a list of the data fields associated with VBMS and with the databases discussed in Mr. Cunningham's declaration.**

Defendant answered some of Plaintiffs' questions regarding sampling records before 2006.

On December 23, 2024, Plaintiffs sent Defendant questions regarding its storage of physical disability claims files. During our meeting, you provided the following answers:



P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • PHONE 203 432-4800 • FAX 203 432-1426

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511

- Plaintiffs asked how Defendant assigns C-File numbers to paper files from 1945 to the 1970s. You explained that C-File numbers were assigned to veterans sequentially based on the date of receipt of their initial claim. You explained that a larger C-File number indicates that the veteran was assigned a C-File number at a later date.
- Plaintiffs asked when in the 1970s VA shifted from using C-File numbers to identify veterans' disability claims to using veterans' Social Security Numbers as identifiers. You explained that you were not able to determine a precise date on which VA began using Social Security Numbers as identifiers. You explained that the military migrated to using Social Security Numbers to identify service members in the late 1960s or early 1970s. You noted that VA began using Social Security Numbers to identify veterans in their medical records around the same time.
- Plaintiffs asked Defendant to identify the proportion of physical VA files that do not have an associated Social Security Number. You explained that there was no way to answer this question within pulling physical files. However, you explained that if a veteran's file is maintained in the electronic Veterans Benefits Management System (VBMS), then VBMS should contain that veteran's Social Security Number.
- Plaintiffs asked Defendant to identify the proportion of VA's paper files that are stored at Defendant's storage site at Lee's Summit. You explained that a large proportion of physical files are stored at the Lee's Summit location, but regional offices still maintain some physical files of their own. You did not offer a precise breakdown of the proportion of physical files stored at Lee's Summit. You did note, however, that these physical files, whether stored at Lee's Summit or elsewhere, were likely associated with a C-File number that could be used to find and pull that file.

Defendant objected to a random sample of records before 2006 (paper records) on privacy and burden grounds.

In light of Defendant's clarification that C-file numbers are assigned sequentially based on a veteran's date of initial application, Plaintiffs stated that one could identify the C-File number associated with a veteran who applied for disability benefits in or around January 1945 and the number for a veteran who applied in or around January 1961. Using those C-File numbers, Plaintiffs could propose a random sample of 5,500 C-File numbers assigned between January 1945 and January 1961, which Defendant could pull. This process could be repeated for the other time periods detailed in Plaintiffs' sampling proposal. You again noted that even if Defendant adhered to this proposal, it would not be able to determine the year in which the veteran associated with each C-File number applied for benefits until Defendant actually pulled the file. Plaintiffs explained that they understood this limitation.

You then objected to producing a random sample of pre-2006 files on privacy and burden grounds. First, you asserted that staff at the National Archives and Records Administration (NARA) would be responsible for pulling these files and that this process would likely take months. You also stated that the time required for attorney review and extensive redaction of sample files would be unduly burdensome. We stated that there was no need for extensive redaction in light of the protective order entered in this case, and thus review time was not burdensome.



P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • PHONE 203 432-4800 • FAX 203 432-1426

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511

Second, at the meet and confer, you stated that the existing protective order was inadequate and that privacy statutes and regulations prevented you from disclosing individual veterans' benefits files. We asked you to identify the statutes and regulations. You pointed us to the Privacy Act and its implementing regulations. We responded that the Privacy Act, as well as most other privacy statutes, contain a judicial-exception provision that would allow Defendant to turn over unredacted files pursuant to a court order and that, for the sake of time and efficiency, both parties could file a consent motion with the Court asking for such an order. *See, e.g.*, 5 U.S.C. § 552a(b)(12) (records subject to Privacy Act may be disclosed "pursuant to the order of a court of competent jurisdiction"). You responded that you would object to such an order.

You asserted that these files contain thousands of pages and that there would be no guarantee that each file would have any of the variables Plaintiffs requested, including veterans' races. We have previously explained that if a VA file lacked race data on a particular veteran in the samples, that such race data could be obtained for that veteran from Defense Department records. We asked whether, given Defendant's concerns, Defendant has a proposal of its own to achieve sampling of these physical files; you responded that it does not. We asked whether Defendant had now provided all of the information it has on how and where paper files are stored. You said Defendant is still working to determine how many veterans' files were scanned during the COVID-19 pandemic. Otherwise, you explained that Defendant had provided all of the information it had on the location and nature of Defendant's storage of physical files.

Defendant agreed to provide Plaintiffs with data regarding the total number of initial-claim adjudications Defendant conducts annually.

On November 18, 2024, Plaintiffs requested that Defendant also provide yearly totals of VA's annual adjudications of initial disability claims, overall and by regional office. During our meeting, you explained that you are still working to obtain these totals.

Plaintiffs ultimately noted that they have identified a plan to identify and pull physical files in accordance with Plaintiffs' original sampling proposal. Defendant refused to commit to this proposal, stated its plan to object to any motion to seek a court order that would obviate Defendant's privacy and burden objections, and refused to supply its own proposal that would allow Plaintiffs to obtain the information Defendant is obligated to supply. The parties ultimately agreed that the Court's involvement is necessary to resolve the parties' impasse.

*B. Plaintiffs' Requests for Complaints*

On March 3, 2025, Plaintiffs produced records containing complaints of the kind they seek.

As you noted in your March 13 letter, Plaintiffs produced documentation of some complaints of racial discrimination on March 3, 2025 (MONK_00011910 to MONK_00015285). We explained that we obtained these records from publicly available NAACP archives, which do



P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • PHONE 203 432-4800 • FAX 203 432-1426

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511

not identify which VA units these complaints were submitted to or which VA units may have prepared an official response.

At the meet and confer, you asked whether there are any other time periods we can identify wherein individuals or organizations submitted complaints to VA that we think are relevant to Plaintiffs claims. We explained that we believe complaints and inquiries similar to those identified in Plaintiffs' latest production of records have been submitted to VA since 1945, but that we do not currently have other records to produce to Defendant. We explained that we have not withheld any such documents, and that we will produce any responsive documents we find.

Defendant refused to conduct a search for or to produce records of complaints, despite Plaintiffs' repeated attempts to clarify and narrow their request.

You explained that Defendant is working to pull complaints submitted to the External Civil Rights Program, an office established relatively recently, as well as custodial documents related to the parties' identified custodians, all of whom are current or recent VA employees. We responded first that while Plaintiffs appreciate Defendants' efforts thus far, documents pulled from the External Civil Rights Program and documents pulled from the parties' identified custodians only concern events at VA in the last two decades or so. Plaintiffs' claims date back to 1945. As a result, Plaintiffs have repeatedly proposed (1) identifying units of VA that have served a complaint-intake function and (2) searching for complaints submitted to those units by large institutional actors like Veterans Service Organizations, Congress, and advocacy groups like the NAACP.

You explained that Defendant does not understand what Plaintiffs mean when they seek, in their Requests for Production, "complaints." You also explained that Defendant does not understand what Plaintiffs mean when they have identified, on several occasions, "complaint-intake units" within VA, a term not contained in the relevant RFP. We responded that we have explained what Plaintiffs mean by "complaint" and "complaint-intake unit" several times, both in writing and during the parties' meetings. Moreover, Plaintiffs explained that their recent production of records from the NAACP archives demonstrate the type of complaints Plaintiffs seek, in that the records in these archives (1) are dated back to the 1940s and 1950s, (2) were submitted by large institutional actors, and (3) contain complaints concerning systemic disparities in VA benefits. *See Monk v. United States*, No. 3:22-cv-1503 (SRU), 2025 WL 473590, at *5-6 (D. Conn. Feb. 12, 2025) (elaborating on Plaintiffs' allegations of "systemic racism"). You insisted that you still do not understand our definitions of these terms. We asserted that this topic deserves the Court's involvement. You agreed.

Finally, you limited your March 13 letter to "fifteen potential units within the VA that Plaintiffs understood to carry out a 'complaint-intake' function," as shared in Plaintiffs' November 22, 2024 meet and confer summary and our February 20, 2025 letter. Plaintiffs reiterate, as they have repeatedly noted, that this list of fifteen units is non-exhaustive.



P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • PHONE 203 432-4800 • FAX 203 432-1426

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511

*C. Second-Level Search Terms for Custodial Documents*

Plaintiffs sent Defendant a revised proposal for search terms and timelines for custodians on March 14, 2025, by email. Per Defendant's March 13 letter, Plaintiffs will provide Defendant with information regarding which custodians Plaintiffs would like to prioritize.

**II. Summary of Defendant's Discovery Requests**

*A. Documents Relating to Dr. Jakubow*

In their February 20, 2025 letter, Plaintiffs identified Dr. Alexander Jakubow as the Yale University statistician cited in the Complaint. Plaintiffs agreed in that letter to produce *nonprivileged* documents created by or for, reviewed by, or relied upon by Dr. Jakubow. At the meet and confer, you asked whether Plaintiffs still intended to produce this information. Consistent with the February 20 letter, we stated that we would provide the nonprivileged, underlying data that Dr. Jakubow relied upon. We further asserted that other work product, including Dr. Jakubow's final report, is privileged because Dr. Jakubow is a consulting expert, and the privilege afforded to consulting experts' work product was never waived. You stated that you disagreed with this contention and would potentially seek intervention from the Court to resolve the disagreement.

*B. Documents Obtainable from Other Sources*

We agreed to conduct reasonable searches for Plaintiffs' social media sites and other documents Defendants might have access to. We agreed to produce any nonprivileged documents and to note any asserted privilege in a log. We also stated that we would not produce every future filing in Mr. Monk's VBA portal, and you agreed to this limitation on discovery.

*C. Time Period Objections and Objections to Communications with Non-Parties*

We agreed to conduct reasonable searches for the entire period covered by the complaint and for communications with non-parties. We confirmed that we would note any asserted privileges in a privilege log.

*D. Mr. Monk Jr.'s Medical Records*

You inquired whether we would conduct additional searches for Mr. Monk Jr.'s medical and psychiatric records. We stated that because Plaintiffs were asserting garden variety damages, there was no need to search for additional records. Plaintiffs explained that seeking garden variety damages obviates the need for medical documentation because such damages are proved by Plaintiffs' testimony. You asked whether we would amend the complaint or interrogatory responses. We stated that such amendments were unnecessary. We also mentioned that Mr. Monk



P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • PHONE 203 432-4800 • FAX 203 432-1426

COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511

has already searched for and produced all records of his medical care and treatment in his possession.

*E. Discovery Related to Michele Barnett*

You asked what searches Plaintiffs were undertaking with regard to Michele Barnett. You asserted that Ms. Barnett is differently situated from other absent class members because her experience is detailed in the complaint, and you asked whether we would make her available for a deposition. We responded that Ms. Barnett is not a party to this case and that we only represent her for her administrative FTCA claim. We also stated that to depose Ms. Barnett you would need to subpoena her and that we are not authorized to accept service on her behalf.

*F. Discovery on Absent Class Members*

You expressed that you needed to receive discovery on the alleged injuries and damages of other members of the class. We reiterated our position that asserting garden variety emotional damages obviates the need for discovery of medical records and, regardless, that we do not represent the NVCLR members in this case. We also stated that we will be producing some documents related to these individuals and logging any asserted privileges, so we can revisit the issue after that production. Finally, damages discovery of absent class members is premature before a class has been certified.

*G. Requests for Personal Private Information*

We confirmed that Plaintiffs have not withheld any information based on the definition of "identify," but will not include the phone numbers and employment information of individuals on "The List." We stated that this information is nonresponsive and irrelevant to Defendant's discovery requests.

*H. Issues of Pure Law*

You inquired regarding our objection to Interrogatory 20, which asks Plaintiffs to disclose what state law applies to their claims. We responded that this interrogatory was inappropriate because it asked for a statement of pure law. You stated that you disagreed because the interrogatory is a mixed question of fact and law, but that you understood our position.


P.O. BOX 209090, NEW HAVEN, CONNECTICUT 06520-9090 • PHONE 203 432-4800 • FAX 203 432-1426
COURIER ADDRESS 127 WALL STREET, NEW HAVEN, CONNECTICUT 06511

EXHIBIT 4

ARLES C. DIGGS, JR.
3TH DISTRICT, MICHIGAN

DETROIT OFFICES:
E: 1201 E. GRAND BLVD. 48211
AREA CODE 313, 925-8300
IDE: 6523 GRAND RIVER 48208
AREA CODE 313, 896-8900

S DOROTHY QUARKER
ADMINISTRATIVE ASSISTANT

# Congress of the United States
## House of Representatives
### Washington, D.C. 20515

COMMITTEES:
FOREIGN AFFAIRS

SUBCOMMITTEES:
AFRICA, CHAIRMAN
ASIAN AND PACIFIC AFFAIRS
DISTRICT OF COLUMBIA
SUBCOMMITTEE # 2, CHAIRMAN

WASHINGTON OFFICE:
2464 RAYBURN BUILDING
AREA CODE 202, 225-2261

March 25, 1971

Dear Friend:

The Congressional Black Caucus is meeting with President Nixon today at 5:00 p.m. The other 12 Black Congressmen have asked me to tell you that they are sending you copies of their Opening Statement and Recommendations. They are recommending action by this Administration to improve the conditions of Black and poor Americans in the general areas of Economic Security and Economic Opportunity, Community and Human Development, Justice and Civil Rights, and Foreign Affairs.

The Caucus would appreciate your comments, both to us and to your local press. Any inquiries should be directed to me at the Rayburn address listed above.

Sincerely,

CHARLES C. DIGGS, JR.
Chairman
Congressional Black Caucus

P. S. Please pardon the unpersonalized form I am forced to use, but we are terribly rushed and I wanted you to have a copy of our document as soon as it came from the printer.

CCD

5-612074

— o —

Reproduced and distributed as a public service by:

April 9, 1971

The Action Library
Afram Associates, Inc.
68-72 East 131st Street
Harlem, New York 10037
212/690-7010

P.S. Write to your Congressman for additional copies.

# STATEMENT TO THE PRESIDENT OF THE UNITED STATES

BY

U.S. Congress. House.

THE CONGRESSIONAL BLACK CAUCUS.

U. S. HOUSE OF REPRESENTATIVES

March 25, 1971

MBW3 21 of 71

## Table of Contents


| | | |
|---|---|---|
| PART I. | OPENING STATEMENT | 1 |
| PART II. | RECOMMENDATIONS | 8 |
| A. | ECONOMIC SECURITY AND ECONOMIC DEVELOPMENT | 8 |
| | 1. Manpower and Employment Rights | 8 |
| | 2. Welfare Reform | 10 |
| | 3. Federal Assistance to State and Local Government | 11 |
| | 4. Minority Economic Development | 14 |
| | 5. Poverty Programming | 15 |
| B. | COMMUNITY AND URBAN DEVELOPMENT | 16 |
| | 1. Education | 16 |
| | 2. Housing and Urban Development | 21 |
| | 3. The Drug Crisis | 22 |
| C. | JUSTICE AND CIVIL RIGHTS | 24 |
| | 1. Criminal Justice | 24 |
| | 2. Civil Rights | 25 |
| | 3. Veterans' Affairs | 26 |
| | 4. District of Columbia | 27 |
| D. | FOREIGN POLICY | 28 |
| Closing Letter to the President | | 32 |

## PART I. OPENING STATEMENT

We sought this meeting, Mr. President, out of a deep conviction that large numbers of citizens are being subjected to intense hardship, are denied their basic rights, and are suffering irreparable harm as a result of current policies.

As you may know, all of us were elected by substantial majorities. We were given clear and unmistakable mandates to articulate the problems of our constituents and to work for prompt and effective solutions to them. Most of the districts that we represent are predominantly black, though our constituencies also include whites, Spanish-speaking, Indians, Japanese-Americans, and Chinese-Americans, some suburbanites as well as residents of the central cities, poor, middle income, and even some well-to-do Americans.

But our concerns and obligations as Members of Congress do not stop at the boundaries of our districts; our concerns are national and international in scope. We are petitioned daily by citizens living hundreds of miles from our districts who look on us as Congressmen-at-large for black people and poor people in the United States. Even though we think first of those we were directly elected to serve, we cannot, in good conscience think only of them -- for what affects one black

community, one poor community, one urban community, affects all.

We think it of singular significance that the leaders of national and local civil rights and human rights organizations, and hundreds of private citizens from all walks of life, have asked us to express their general and specific concerns. They share our hope that this is no pro forma, one-time exchange.

Like us, they believe this must be only the beginning of a continuing exchange aimed at permanently changing, through persistent and far-reaching action, the harsh conditions under which all too many poor, black, and other oppressed Americans are forced to live.

We recommend that by the end of this meeting we agree on a mechanism for insuring continued productive liaison between the President and this Caucus.

Since you assumed office, we have spent billions on war, while over 2 million Americans have been added to the ranks of unemployed, and 2.5 million more are now on ever-mounting relief rolls. Inflation is reducing our standard of living, and most cities face bankruptcy. The racist policies of public and private U. S. institutions insure that blacks and other oppressed peoples suffer much more than others, whether in good times or bad. Economic recovery -- not now in sight -- cannot possibly

secure rights and opportunities that millions of citizens never had. In our view, the quest for economic stability cannot be separated from the basic need for a redistribution of wealth and income, so that there is no longer destitution amid opulence. Nor can we easily repair the damage done to our children by inferior schools, hunger, and ill-health.

We would be less than honest, Mr. President, if we did not reflect a view widely shared among a majority of the citizens we represent. That view is that the representatives of this Administration, by word and deed, have at crucial points retreated from the national commitment to make Americans of all races and cultures equal in the eyes of their government -- to make equal the poor as well as the rich, urban and rural dwellers as well as those who live in the suburbs.

Our people are no longer asking for equality as a rhetorical promise. They are demanding from the national Administration, and from elected officials without regard to party affiliation, the only kind of equality that ultimately has any real meaning -- equality of results.

If we are in fact to be equal in this country, then the government must help us achieve these results:

-- the eradication of racism within the United States and in its dealings with other nations;

-- the earning of a decent living, or the means to survive in dignity when work is not available;

-- decent housing for our families and equal access to the total housing market;

-- fair and impartial justice and adequate protection against drug abuse and crime;

-- the enforcement of civil rights and other constitutional guarantees through vigorous affirmative action by the government;

-- a fair share of the public funds used to support business and community development and full participation in determining how tax dollars are spent in our communities;

-- the guarantee by the federal government of ample health care for all citizens;

-- the protection of federal standards and guarantees in programs financed by federal funds; and

-- the full participation by the members of our communities in the executive, judicial, and legislative branches of our government at every level.

The results we pursue as achievable goals are those whose affirmation we have often missed in the words and deeds of many who represent this Administration. And be assured that those for whom we speak cannot afford the luxury of criticism

as a mere expression of partisanship. Indeed, when you have proposed long-needed, if inadequate, welfare reforms, or when Secretary Romney has argued against restricting low and moderate income housing to the inner cities, our people felt a momentary quickening of hope that perhaps the federal government was prepared to respond to their desperate needs.

But all too often we have heard discomforting references to "forced integration," or to the need to "broaden" the Voting Rights Act in ways which would have rendered it less effective. "Voluntarism" has been proposed as a means of achieving compliance with federal law by those with a history of callously flouting such laws. The principle of equal justice under law has been clouded over by ambiguous pronouncements on "law and order" and "crime in the streets."

Though the Office of Economic Opportunity is to be extended, it seems clear that current plans for reorganization and revenue sharing will result in the dismantling and eventual destruction of the one agency whose primary mission is to give an effective voice to the poor, the near poor, and minorities.

But we are not here merely to recite the disappointments of the past. We are here to present the first of a series of constructive proposals for the immediate relief of our communities, and for making America in the 1970's a whole and healthy nation.

We do not underestimate the power of the presidency in achieving progressive change. Every sector of our society tends to look to the White House for cues to the direction that the society is taking. When those cues seem negative, contradictory or half-hearted, then citizens take that as evidence of a lack of national commitment to their well-being. If equality for all Americans is to be a reality, it must have the unequivocal commitment of the Chief Executive. Every official in each federal department in Washington and the regional offices, every governor, mayor, county official, and local school board member must understand the clear direction in which the Administration is headed. If equal job opportunity in the private sector is to be real, then equal job opportunity in the federal system -- from initial entry to upgrading -- must provide a clearcut example for others to emulate. If the vast federal bureaucracy is to administer the laws of the land so that the poor, the black and the Mexican-American, the Puerto Rican and the Indian, the Japanese-American and the Chinese-American do not suffer inequities, then it must be clearly evident that the President of the United States demands it.

In fact, as you well know, having served in Congress, the success or failure of progressive legislation often depends on whether or not the Chief Executive is willing to make a

sufficiently strong fight for it.

Lastly, black Americans and many of our constituents, without regard to income or color, would want us to make plain our alarm at the devastation to four Indochinese nations. We say this out of deep concern for the untold misery suffered by the people of Indochina, for American families which should not have to suffer further, and for the continued draining away in this futile conflict of the human and financial resources needed to rebuild this society. All U. S. military forces, and related civilian personnel should be withdrawn from all nations of Indochina promptly.

The recommendations which follow represent our own deep concerns and the expressed concerns of organizations and individuals from all over the country. We have not attempted to rank them in any order of priority. We feel that they are all essential to the long overdue task of making America one nation. We do not claim that they represent a comprehensive agenda of needs and remedial actions. We do believe that they represent more than merely a good beginning. In the days, weeks and months that lie ahead, we hope to remain in touch with you and the members of your Administration on this agenda.

In discussing these recommendations with you, we will be focusing on executive action that can be taken immediately,

as well as legislative programs whose success may depend on the nature and intensity of the support they receive from the White House.

## PART II. RECOMMENDATIONS

### A. Economic Security and Economic Development

#### 1. Manpower and Employment Rights

RECOMMENDATION 1: Within the framework of a comprehensive manpower planning program, this Administration should provide permanent job creation programs -- with jobs in the public sector targeted to the areas of persistent unemployment and underemployment without regard to national employment rates. These jobs must be useful and desirable and have adequate wages and supportive services. Present manpower programs fail to deal adequately with the gaps between national rates and the critically higher jobless rates for blacks and other minorities in urban and rural ghettos.

RECOMMENDATION 2: A federal job creation program in the public service fields must be adopted. Such a program should initially provide a minimum of 500,000 productive jobs during the first six months of operation, and 600,000 in the second six months in this one program alone, with additional jobs in other programs to meet the unemployment crisis.

RECOMMENDATION 3: A minimum of 1 million NYC jobs should be provided for in-school youth during the summer. Present planning in this area is totally inadequate. The jobs should be provided by the federal government with no local matching fund requirement and should be for 10-32 hour weeks at not less than $1.60 an hour. This program must be understood to be no substitute for the needs addressed in Recommendation 1.

RECOMMENDATION 4: Basic changes must be made in federal recruitment, testing, and promotion policies and day-to-day Administration to insure blacks and other oppressed minority peoples equal results to whites in the middle and upper levels of federal employment.

RECOMMENDATION 5: Executive Order 11246 must be enforced, requiring affirmative action by government contractors and subcontractors to provide equal employment opportunities and to extend the requirement of goals and timetables for achievement to all government contractors and subcontractors.

RECOMMENDATION 6: We call for vigorous support for expansion of the Civil Rights Act of 1964 to provide cease and desist power to the Equal Employment Opportunity Commission, coverage of employers of eight or more persons, and to eliminate the present exemption of state and local governments,

and educational institutions.

RECOMMENDATION 7: At a time when blacks are fighting and dying in disproportionate numbers in Indochina, we urge the White House to initiate a thorough investigation of the status of blacks and other minorities in the Veterans Administration -- 90 per cent of whose black classified employees are in grades GS-8 or below. The investigation and the remedial action which must follow should include not only equal employment opportunity within the Veterans Administration, but should focus on closing the critically wide gap between the needs of black veterans and the inadequate and uncoordinated existing programs of the Veterans Administration, the Department of Labor, Housing and Urban Development, and other federal agencies.

2. Welfare Reform

RECOMMENDATION 1: We recommend that the present welfare system be replaced by a guaranteed adequate income system. We oppose any welfare reform which fails to establish a satisfactory timetable for reaching a guaranteed adequate income system of a minimum of $6,500 a year for a family of four from cash assistance, wages or both.

RECOMMENDATION 2: Any federalization of existing welfare programs must have as an ultimate objective the realization of individual economic self-sufficiency. The federalized

programs should guarantee the standardization of eligibility requirements, the establishment of adequate payment standards, the elimination of abusive and degrading administrative practices, and the provision of suitable work opportunities which maximize individual freedom of choice and self-respect.

RECOMMENDATION 3: Until a fully operational cash assistance program is established, we urge you, Mr. President, to direct the appropriate federal agencies to overhaul the food assistance delivery system, so that the minimum standards and goals of existing legislation can be guaranteed. Further, the necessary budgetary revisions (or supplemental budget requests) should be made so that the needs of all children eligible for free or reduced-price school breakfast or lunch programs by 1972 are met.

3. Federal Assistance to State and Local Government

The Caucus recognizes that the concept of revenue sharing is already operative and that the issue is really one of block grants versus categorical grants. The federal government has been sharing federally-collected tax money revenue with states, cities, counties, and individuals for the past forty years. The Caucus would, however, support a form of federal assistance to state and local governments with the following provisions:

(1) Assurance that the funds will be spent in ways or

in the amounts that will benefit the poor and the minorities who are least able to prevail in the inevitable contests at the local level that are bound to be waged over such expenditures.

(2) Allowance for the participation of neighborhood and other community units in planning and in the decisions about how funds will be spent.

(3) Enforcement of civil rights laws with respect to the expenditure of federal funds.

(4) Incentives for states to shift from forms of taxation that fall most heavily on low-income families to more progressive income taxes.

RECOMMENDATION 1: Immediate, short-term financial assistance should be afforded local communities by releasing frozen funds for development projects, closing the growing authorization/appropriations gap, and by expeditiously proposing and strongly supporting an emergency public service employment bill.

RECOMMENDATION 2: We strongly recommend that the program of welfare nationalization and reform called for in Recommendations 1 and 2 under Welfare Reform should not be considered as an alternative to the Administration's general "revenue-sharing" proposal.

RECOMMENDATION 3: The population-based distribution

formula in the Administration's "revenue-sharing" bill must be altered to more accurately target the funds to places of maximum need. Specifically, we would recommend that one per cent (1%) of the individual tax base be distributed to all categorized welfare disbursing units on a basis reflecting the proportion of national welfare costs paid by that unit during 1970, providing that the unit maintains its 1970 welfare effort.

<u>RECOMMENDATION 4</u>: The distribution apparatus of the present proposal for "revenue-sharing" must be changed to funnel more funds to major urban centers, i.e., .5% of the individual tax base be distributed to all local units not sharing in Recommendation 3 above and which have a population of 50,000 or more.

<u>RECOMMENDATION 5</u>: The civil rights guidelines set forth in the Administration's "revenue-sharing" package must be greatly strengthened, particularly in regard to equal employment hiring, and an effective compliance program.

<u>RECOMMENDATION 6</u>: Although we support general "revenue-sharing" to states and localities, under the conditions set forth above, to assist in the provision of basic services, we are opposed to the apparent abandonment of national leadership in such areas as education, housing, etc. that would result from proposed program "revenue-sharing." While states and localities

can be given more flexibility in administering federal grants, national priorities requiring accountability for delivering services to those most in need of them must be maintained.

4. Minority Economic Development

RECOMMENDATION 1: An independent agency should be organized as a non-profit quasi-public, publicly-funded development bank for consolidation of present programs intended to assist minority business, and should receive an initial annual appropriation of 1 billion dollars. This agency should be under the direction of a board with broadly representative minority membership.

RECOMMENDATION 2: A federally-financed guarantee organization similar to the Government National Mortgage Association should be created to insure securities and obligations of community development corporations -- firms providing employment for and owned by residents of low-income areas.

RECOMMENDATION 3: In addition to increased federal support and employment of direct set-aside programs for all procurement, we urge you to support the enactment of legislation requiring that contractors working on federally-assisted and financed projects, set aside a specified percentage of their subcontract work for minority firms.

RECOMMENDATION 4: Federal management and technical

assistance should be increased and made more broadly available to minority trade associations, development corporations, and other organizations of minority businessmen, with assistance provided more as an aid than as an audit.

RECOMMENDATION 5: Funding for Community Development Corporations should be increased to at least 50 million dollars for the development of community-based minority business ownership.

RECOMMENDATION 6: The Federal Deposit Insurance Corporation should be authorized and directed, by specific legislation, to use some of its assets to provide technical assistance to minority banks. No federal or quasi-federal agency presently provides technical assistance to these institutions, with the result that other kinds of programs (such as the $100 million deposit program) are less effective than they would be otherwise.

5. Poverty Programming

RECOMMENDATION 1: We urge the Administration to abandon any plans -- now or two years hence -- which will weaken the programs now under the aegis of the Office of Economic Opportunity and submerge them in existing agencies or in a broader plan for government reorganization. We believe that converting the Office of Economic Opportunity to a research

and evaluation organization will deprive the poor of an advocate agency in Washington. Further, we recommend the restoration of the $116 million by which the Economic Opportunity Act was reduced in the fiscal year 1972, and a substantial increase in anti-poverty funds for the following fiscal year, and the elimination of the matching requirement which makes it impossible for some communities to participate in the program.

RECOMMENDATION 2: We support the continued existence and expansion of the OEO legal services. We urge that new guidelines be drawn and new legislation be proposed which would limit the power of state and local authorities to intervene politically in the operation of these programs. Should this prove infeasible, we recommend that every low income American citizen be guaranteed access to free, quality legal assistance through the establishment of a National Legal Services Corporation.

B. Community and Human Development

1. Education

RECOMMENDATION 1: We urge you, Mr. President, to initiate (and/or support) such child development legislation and to require the promulgations of such administrative regulations for existing child development programs, which incorporate the following principles: a) significant expansion of

child development services; b) developmental rather than custodial programming; c) child development services provided as a right rather than as mandatory eligibility requirements; d) encouragement of educational innovation and reform; e) the validity of programs designed by and in accordance with the special needs of minority groups; and f) consumer control.

In conjunction with the support of minority business enterprises, special assistance should be provided to minorities for the development of day care and other child development programs. The grant system should be adopted, as opposed to the voucher system. Further, the federal government should issue grant and/or funds directly to day care institutions.

RECOMMENDATION 2: We recommend a strong program which enforces the priorities established by Congress under Title I of the Elementary and Secondary Education Act of 1965. In addition we recommend that this title be fully funded in advance so that educational systems may plan a continuing program of high quality as was true during the time of the Morrill Land Grant Act of 100 years ago.

RECOMMENDATION 3: We specifically urge that the Administration abandon its plans to consolidate federal education legislation into a program of block grants.

RECOMMENDATION 4: We urge this Administration to support pending legislation that is designed to provide quality integration education so that the concept of equal educational opportunity will become a reality for blacks and others among the oppressed in the country.

RECOMMENDATION 5: We support and call on the Administration to make real its own announced commitment to universal literacy for every American in this decade.

Because illiteracy will be even more crippling for our citizens in the 1970's and 1980's than at any previous time in our history, we urge that the Administration revive and strongly fund and support a national "Right to Read" program like that originally proposed by your own first Commissioner of Education.

RECOMMENDATION 6: We specifically urge that the federal government increase substantially its financial support for predominantly black institutions of higher education in order to insure their growth and expansion. For immediate relief of black colleges we recommend the full funding of $91 million authorized in the Developing Institutions Program of Title III of the Higher Education Act of 1965, and the elimination of the matching fund requirement.

RECOMMENDATION 7: We recommend, Mr. President, that you arrange to convene a meeting of the officials of black institutions of higher education with the heads of major federal agencies and departments such as the National Science Foundation, Department of Labor, Department of Agriculture, HUD, and HEW, to consider how black colleges may have greater access to the funds, programs and technical assistance of those agencies.

RECOMMENDATION 8: While we would support a request for 70 percent increase in student aids in grant and work study over the previous fiscal year, we would strongly request reconsideration of the change in formula which reduces from approximately $1,800 to $1,000, the amount of grant and work study funds. A high proportion of black students now attending or hoping to enter our colleges, would not be able to sustain the financial burden of the loans now being proposed. We would support the proposed increase in the availability of subsidized grants to students whose family incomes are less than $10,000 per annum. We would recommend, however, (1) that existing grant and loan programs for student financial assistance be continued at least at current levels until the proposed programs become operational; (2) the ceiling in terms of family incomes be raised to $15,000

per annum; and (3) that interest rates on the available loans be stabilized.

Student financial aid for most black students must assume little or no family financial aid. They need money for almost all their costs. We therefore believe that the major emphasis should be placed on grants rather than loans in supporting their education.

RECOMMENDATION 9: We recommend that the Administration give strong support to the establishment and maintenance of community colleges. We ask you to direct the Department of Health, Education and Welfare, the Department of Labor, and the Office of Economic Opportunity to work with the appropriate public officials and private citizens to restructure vocational, technical, and post-secondary education for the 70's and 80's. A critical aspect of this mission must be making certain that community colleges do not become dumping grounds for the children of the poor and near-poor. We are concerned that community colleges develop into one of the strongest and most flexible links in the continuing education in which millions of our people must be involved at various stages in their lives if they are not to be crippled by dead-end or unmarketable skills, or by undeveloped capacities as citizens and human beings.

2. Housing and Urban Development

RECOMMENDATION 1: We call for the immediate release of supplemental FY 1971 funds of $150 million for public housing. This can be accomplished immediately by Presidential action.

RECOMMENDATION 2: We recommend the implementation of the Uniform Relocation Act to insure an adequate stock of low and moderate income housing for displaced persons. Immediate action by the President could achieve the implementation.

RECOMMENDATION 3: We urge you to support legislation to amend the Housing Act so that urban renewal money may be used for housing development projects other than new construction.

RECOMMENDATION 4: The Department of Housing and Urban Development should institute and enforce a uniform policy of site selection applicable to all of its departmental programs. The current regulations of the Department of Housing and Urban Development affecting site selections apply only to low rent housing. All other Housing and Urban Development programs, including Sections 235 and 236, should be brought under this policy to insure that they expand opportunities for black citizens and avoid reinforcement of segregation.

Immediate executive action in this area is possible.

RECOMMENDATION 5: We strongly urge the amendment of Executive Order 11512 (1970) concerning the selection of sites for federal installations, in accordance with the U.S. Commission on Civil Rights' recommendation on "Federal Installations and Equal Housing Opportunity" to assure that communities are, in fact, open to all economic and racial groups as a condition of eligibility for location of federal installations.

RECOMMENDATION 6: Tax legislation providing favorable treatment of investment in new and rehabilitated housing should be broadened to provide identical preference to investment in any inner-city real property development, sponsored or substantially-owned by a community development corporation or other organization of minority or low-income citizens.

3. The Drug Crisis

RECOMMENDATION 1: We strongly urge that drug abuse and addiction be declared a major national crisis. We call upon this Administration to use all existing resources to stop the illegal entry of drugs into the United States, including suspension of economic and military assistance to any country which fails to take appropriate steps to prevent narcotic drugs produced or processed in that country from entering the

United States unlawfully.

RECOMMENDATION 2: We recommend that funds be made available to every major city for the establishment of ambulatory detoxification and rehabilitation centers. Federal financial support should likewise be extended to reinforce the local initiatives developed in many communities to address this problem.

RECOMMENDATION 3: Amphetamine abuse programs, beginning with Food and Drug Administration restraints on present overproduction and overuse, should be upgraded substantially. Special emphasis should be given cooperatively by the FDA and the Office of Education to restraint of the application of amphetamine drugs to control school children. We are concerned about the danger that such drugs might be given to children not adequately diagnosed as hyperkinetic.

RECOMMENDATION 4: Substantial federal funds should be made available to study the long-range social and physiological effects of the broad use of methadone as an alternative to heroin addiction. The Food and Drug Administration of the Department of Health, Education and Welfare should take the initiative in establishing safeguards which will eliminate the careless, and often unsupervised, dispensing of methadone.

RECOMMENDATION 5: Since organized crime is the principal distributive mechanism of hard narcotics, we urge that Justice Department manpower for investigation and prosecution in that area be substantially increased.

RECOMMENDATION 6: A cabinet level federal task force on drug abuse should be appointed, with broad representation, including the Justice Department, the Department of State, HEW and other federal agencies relevant to this problem. This task force should be mandated to design a government-wide action strategy for eliminating drug abuse. A task force report should be made public, and implementation begun within six months.

C. Justice and Civil Rights

1. Criminal Justice

RECOMMENDATION 1: We urge that the President and the Attorney General direct the Law Enforcement Assistance Administration (LEAA) to do the following: (1) support law reform and basic changes in the present system rather than the excessive purchase of weapons and equipment; (2) insure adequate minority, urban and community-level representation on planning boards at all levels; (3) guarantee vigorous Title VI enforcement in regard to grantees; and (4) make certain that urban areas, particularly inner-city communities, are

assisted in developing effective and fair criminal justice systems.

RECOMMENDATION 2: We urge you, Mr. President, to appoint black federal judges and other legal officials, including U.S. Attorneys, U.S. Marshals, federal correctional officers, and other Justice Department employees in every region of the country. We note with considerable concern that you have appointed only one black judge outside the District of Columbia. We feel it is especially important that black federal judges be appointed in the South.

RECOMMENDATION 3: We are disturbed that the D.C. Court Reform and Criminal Procedure Act of 1970 has been advertised as a model for the nation, inasmuch as we feel that some of its provisions clearly impinge on the constitutional rights of suspects and defendants. Such other laws with similarly constitutionally odious provisions are the Organized Crime Control Act of 1970. None of these ought to be so advertised as models, and we strongly urge that the Administration sponsor legislation to repeal such sections of those acts as the "no-knock" and preventive detention provisions as inimical to the interests of a free society.

2. Civil Rights

RECOMMENDATION 1: We call for the full implementation of the 1970 Report of the U.S. Commision on Civil Rights,

and request that the findings derived from the White House inquiries of the 26 federal agencies be shared with the Black Caucus as well as with the U.S. Commission on Civil Rights.

RECOMMENDATION 2: We urge you, Mr. President, to instruct the Attorney General to move promptly to investigate and take corrective action on efforts to disenfranchise blacks and other minorities in the South and Southwest -- especially in thirty-three counties in Mississippi. In addition, we urge that you instruct the Attorney General to take prompt and decisive action to investigate and take remedial action concerning allegations of attempted vote fraud in Gary, Indiana, and that similar action be taken wherever attempts are made to disadvantage and disenfranchise minority voters.

RECOMMENDATION 3: We recommend that you instruct the Office of Management and Budget to establish an adequately staffed division on civil rights with properly trained persons, which would monitor every department and agency to insure that all civil rights legislation and executive policies are implemented. Further, this agency should issue periodic public reports of its findings.

RECOMMENDATION 4: We recommend that the regulations now being formulated by the Justice Department to implement Section 5 of the Voting Rights Act require the Attorney General

to object to submitted voting law changes unless he makes a finding that the change has no discriminatory purpose or effect.

3. Veterans' Affairs

RECOMMENDATION 1: We recommend, Mr. President, that you direct the Departments of Defense, Justice, and State -- assisted by selected members of the bar, including minority representatives--to investigate the quality of justice meted out to black and other minority servicemen. The investigation should also examine the conditions under which blacks and other minority servicemen are incarcerated in military prisons here and abroad. The resulting report and recommendations for action should be submitted to you, the appropriate committees of Congress, and the public.

RECOMMENDATION 2: We urge the Administration to recommend and support legislation to establish a Civil Rights Division within the Department of Defense and to prescribe by law the personnel, funding, and procedure for handling complaints of racial discrimination against military personnel, both on and off base, in the United States and abroad.

4. District of Columbia

RECOMMENDATION 1: We urge you, Mr. President, to lend the vigorous support of your Administration to legislation

providing for:

(1) full Congressional voting representation for the District of Columbia;

(2) Home Rule for the District, including an elected Mayor and City Council; and

(3) a just and adequate automatic federal payment formula to provide revenues necessary to make the District of Columbia a model for the nation.

D. Foreign Policy

<u>RECOMMENDATION 1</u>: We call upon you to effect disengagement from Southeast Asia as soon as possible, preferably by the end of 1971, and definitely within the life of the 92nd Congress.

<u>RECOMMENDATION 2</u>: We call for drastic reduction in our military expenditures, and the redirection of these funds to finance much needed domestic programs -- such as economic security and economic development, community and urban development, justice and civil rights, and many other unfulfilled interests of the black community.

<u>RECOMMENDATION 3</u>: Mr. President, following World War II Europe was the recipient of massive aid through the Marshall Plan and Japan was rebuilt essentially through American assistance. In the sixties the Alliance for Progress

was conceived and funded for the benefit of Latin America, and the Middle East continues to receive a significant input of our resources. We feel strongly that Africa's turn is overdue. Africa must be given priority and attention on an equal basis with other parts of the world. Over the past few years, Africa has received only 8.5% of American aid; we believe this percentage should be increased significantly -- to at least 15%.

We recommend that a special Task Force be created in the Executive Branch, composed of ranking members of the Departments of State, Commerce, Defense, and other pertinent agencies, where the variety of American policies dealing with Africa can be reviewed in a comprehensive manner and whose recommendations would be effectively implemented. In addition, several recognized experts of long time interest in this continent should be included, (e.g., Members of Congress, academicians, journalists, and businessmen.)

U.S. representatives to the World Bank, the International Monetary Fund and the International Development Association should request those organizations to allocate increasing shares of multi-lateral resources for Africa.

We support broader U.S. participation in the African Development Bank and we urge that our government provide soft funds with other donors for the Bank.

RECOMMENDATION 4: United States relations with Southern Africa are in need of a major overhaul. This country should take the lead in isolating the Republic of South Africa, the world's most racist nation. Disincentives should be developed to discourage the expansion of further private American investment there. On the other hand, private American enterprise should be encouraged to seriously examine the potential for profitable investment in other parts of Africa.

We urge the Administration to actively support legislation proposing the withdrawal of the United States sugar quota for the Republic of South Africa, and its reallocation to other African countries. We further urge the Administration to implement the United States pronouncements in the United Nations to help liberate the remaining areas under colonial rule in Africa.

The House Subcommittee on Africa submitted a comprehensive report on Southern Africa to the Administration as a result of its extensive travels and hearings. The recommendations of this report and others it has rendered should be seriously considered.

RECOMMENDATION 5: Of all major industrial nations, the United States has for years allocated less proportionately for international development efforts. We propose that the

United States direct at least 1% of its annual gross national product for international aid, with priority attention to Africa. (It must be noted that about 75% of all United States foreign aid funds have been spent for U. S. goods and services.)

RECOMMENDATION 6: We urge that blacks and other minorities be given a greater role in the making of foreign policy We also ask the Administration to increase its recruitment of minority Americans for foreign policy positions, as well as to improve the upgrading procedures regarding minorities within the State Department and related agencies.

March 25, 1971

Mr. President:

As we indicated earlier, we have not at this time placed before you the full range of concerns which we and those we represent believe to be subject to amelioration by the federal government of which you are the duly elected head. We look forward to the opportunity to work cooperatively with you and with other representatives of your Administration on the issues we have laid before you today, and on others which we hope to consider with you in the future.

Respectfully submitted,

THE CONGRESSIONAL BLACK CAUCUS

Charles C. Diggs, Jr.,
CHAIRMAN
Michigan

Augustus F. Hawkins,
VICE-CHAIRMAN
California

Charles B. Rangel,
SECRETARY
New York

Shirley Chisholm
New York

William L. Clay
Missouri

Louis Stokes
Ohio

George W. Collins
Illinois

John Conyers, Jr.
Michigan

Ronald V. Dellums
California

Ralph H. Metcalfe
Illinois

Parren Mitchell
Maryland

Robert N. C. Nix
Pennsylvania

# EXHIBIT 5

WDOSW - Ext. 2431
TKG/mjb

August 24, 1944

MEMORANDUM FOR: Mr. John J. McCloy, Assistant Secretary of War.

Subject: War Department Board of Review.

1. Title I, Chapter III, Section 301 of the Servicemen's Readjustment Act of 1944 directs that the Secretary of War, after conference with the Administrator of Veterans' Affairs, establish in the War Department a Board of Review of five members which shall review, on motion of the members or "upon the request of a former officer or enlisted man or woman or, if deceased, by the surviving spouse, next of kin, or legal representative, the type and nature of his discharge or dismissal, except a discharge or dismissal by reason of the sentence of a general court martial". It is further provided that requests for review must be filed within fifteen years from the date of discharge or the effective date of the act, whichever takes place later.

2. War Department records show the following separations of Negro soldiers for physical and mental causes for the months January - May, 1944:

| | |
|---|---|
| January | 5,236 |
| February | 4,190 |
| March | 3,980 |
| April | 3,416 |
| May | 3,402 |

Most of the men included in the above tabulation have received a blue discharge under AR 615-360, Section 8.

3. Most of the Veterans' re-employment benefits are provided under the provisions of the Selective Service and Training Act of 1940, which directs assistance to those men who have "satisfactorily completed" a term of service in the Army. It has been determined by the Selective Service System that holders of blue discharges are not entitled to any of the benefits of this Act. This is of course not the situation under the Servicemen's Readjustment Act of 1944, which specifically provides benefits for all men who have been discharged and released under conditions other than dishonorable.

Readjustment Act

4. It can be reasonably anticipated that large numbers of discharged Negro Veterans will apply for relief under Section 301 of the Servicemen's Readjustment Act of 1944, both because of the large number that have received blue discharges and also because of the fact that these men are now running into serious employment difficulties. The charge, with which you are familiar, that many of these men have been discharged because of protests against alleged acts of racial discrimination, is being widely circulated. A considerable portion of the many cases involving Negroes that will be presented to the Board will therefore involve the issue of racial discrimination.

5. In these circumstances, it seems to be highly important that the War Department Board of Review include in its membership a qualified Negro, preferably with a legal background. Such an appointment made before outside pressure is generated would be of great value to the War Department.

6. It is suggested that the provisions of the Selective Service and Training Act of 1940, with respect to re-employment benefits, be re-examined in light of the Servicemen's Readjustment Act of 1944. It would appear from the language used in the latter Act that it is the intent of Congress that all Veterans, except those dishonorably discharged be extended all statutory benefits. A re-examination should, therefore, be requested either from the Judge Advocate General or the Legal Section of the Selective Service System.

Truman K. Gibson, Jr.,
Civilian Aide to the Secretary
of War.

COL. CHARLES YOUNG POST NO. 57
AMERICAN LEGION
1008 Washington Street, East
Charleston, W. Va.

November 20, 1944

Mr. James C. Evans
Assistant Civilian Aide
to the Secretary of War
Washington, D. C.

Dear Mr. Evans:

We are much concerned about the Veterans Administration carrying out the provisions of Public Law 16 and Public Law 346 in an equitable manner. We know that a relatively small group of the total army enlisted personnel will qualify for educational services and we know that a very small group of those already discharged and eligible for educational services have been reached with complete information relative to privileges for them with federal aid. In the light of this concern our American Legion post believes that a Negro veteran should be a part of the Veterans Administration in Washington and in a position to act on policy and procedures.

I have requested and received from Mr. Hooks, Manager, Veterans Facilities in Huntington, application forms for veterans' participation in the G. I. Bill of Rights and I am supplying these to discharged veterans in the Charleston area. I have suggested to other posts this system of reaching and informing veterans. To my knowledge there are only two veterans information services set up in the state, one recently opened at the Kanawha County Court House and one at the Memorial Building in Kimball. However, the American Legion posts and these newly established veterans service centers will not give a complete service to Negroes.

I have spoken to a local executive department committeeman with the aim to have this problem presented at the next department executive committee meeting. The new department adjutant takes office in January and I expect consideration of this problem from the new executive committee at that time.

We firmly believe with the placing of executive officers in the Washington Bureau and the employment of qualified, understanding Negro Legionnaires as counselors in the several state facilities, the Negro veterans of this war will receive adequate guidance in training and aid in profitable readjustment to peacetime pursuits.

Our experience here in this local situation is that the ex-soldier with disabilities is qualifying under Public Law 16 for educational services with only minor difficulties with the Facilities. There are, nevertheless, many with disabilities who are timid, backward or just don't know, and for these counseling is an immediate need.

The expanded provisions of the G. I. Bill of Rights seem to provide the bottle neck. The counseling in this connection is at best clumsy. The information to ex-service men relative to the G. I. Bill seems to have small coverage where Negro veterans are concerned. This condition must be attacked with a background of experience in race relationship and especially a sympathetic understanding for the problems of that colored American segment in order for the G. I. Bill to have full meaning to our boys.

Sincerely yours,

T. C. Gregory

T. C. Gregory, Commander
Colonel Charles Young Post No. 57

C
O
P
Y

Hall-Whitlow Post #53
The American Legion
Cedar Grove, West Virginia
November 13, 1944

General Frank T. Hines,
Veterans Administrator
Washington, D. C.

Dear Sir:

The program for the rehabilitation of returning veterans of World War II as outlined by the G. I. Bill of Rights will entail certain additional responsibilities upon the Veterans' Administration. Among these returning veterans, there will be approximately one million Negroes. This number, in addition to the number of veterans of World War I places the number of Negroes involved well above one million.

Realizing the necessary additions to the staff of the Veterans' Administration to carry on this program of rehabilitation, the Hall-Whitlow Post #53 of the American Legion, Department of West Virginia, respectfully requests that you give consideration to the placement of Negroes on the administrative staff of the Veterans' Administration at the various levels.

This seems not only a matter of simple justice for employment purposes, but also a guarantee that the Negro veteran will receive more sympathetic consideration in matters involving his welfare.

Very respectfully yours,

P. J. Jackson,
Commander

PJJ:c

DOUGLAS ANDERSON
DISTRICT 31-C
HINDS COUNTY
3013 RANDOLPH STREET
JACKSON, MISSISSIPPI 39213

MISSISSIPPI
HOUSE OF REPRESENTATIVES
JACKSON

COMMITTEE ASSIGNMENTS:
EXECUTIVE CONTINGENT FUND
HIGHWAYS AND HIGHWAY FINANCING
PENSIONS, SOCIAL WELFARE AND
PUBLIC HEALTH
UNIVERSITIES AND COLLEGES

February 14, 1979

Mr. Louis Martin
Special Assistant to the President
The White House
Washington, D. C. 20500

Dear Mr. Martin:

I am writing this letter in an effort to obtain your help for the many Black veterans living in the Jackson area. These men, all of whom have honorably served this country during war and peace, now face financial ruin and irreparable damage to their careers and character if a decision made by the Veterans Administration is allowed to stand.

The problem is simple: Not being able to find records at the Mississippi Baptist Seminary suitable for acceptance for attendance records of certain veterans, the Veterans Administration has decided that at least 475 veterans who attended the Mississippi Baptist Seminary be required to pay back all monies received for the period of time 1969-1976, at least.

This decision appears unjust. I state several reasons why:

1. The Mississippi Baptist Seminary is a full-time institution preparing persons for ministerial study and professions. This institution was on the approved list of the Veterans Administration from 1969-1976, for veterans to enter, matriculate therein and receive G.I. benefits for academic attendance and education. As such, it must be agreed that the Mississippi Baptist Seminary must have met the requirements of the Veterans Administration for such acceptance and academic offerings, reporting and justification of studies. That is, the bookkeeping policies, attendance-keeping policies, and quality of studies program had to meet the requirements of the Veterans Administration prior to the institution's being approved and certified for these men to enter and receive benefits under the Veterans Administration program.

2. The Veterans Administration staff in a meeting with Mr. Nehemiah Flowers, Assistant to now Senator Cochran, Mr. J. B. Love, Assistant to Senator Stennis, and myself, repeatedly admitted that the records kept by the Seminary were extremely poor and in some cases nonexistent. What then is acceptable to show that these men and women attended the Mississippi Baptist Seminary? Seemingly, now the Veterans Administration will not accept transcripts, monthly cosigned attendance cards or diplomas issued from the Mississippi Baptist Seminary as evidence of veterans' attendance and participation. A dean of the Seminary has claimed the authorship of some 284 written communications to the Veterans Administration to witness the attendance of persons at the institution, but this seemingly is not acceptable.

3. By law and procedure, the Veterans Administration or some agency must inspect and monitor an institution approved by it at least once every year to guarantee the correctness of procedure. If this were done in 1969, 1972, 1973, 1974, 1975, and 1976, seemingly the Veterans Administration found no fault or grievance serious enough to deny the continuation of the program as acceptable for such veterans, because the program and benefits to the veterans continued.

4. Many who refused to serve in the Armed Forces of this nation, some deserting on the battlefield, others fleeing to foreign countries to avoid the draft, were granted full pardons by the President of this great nation, while these fighting men who bravely risked their limbs and lives in defense of this country find their freedom and their entire future jeopardized by the faulty system utilized by the very government for which they fought.

Senator Eastland, Senator Stennis, Representative Cochran and Representative Montgomery have all aided in getting the repayments somewhat reduced, but now plans are in operation to garnishee the veterans' wages and serve attachment on their salaries in an effort to recover the remaining funds.

I urge your serious reflection in this case and that this matter be brought to the attention of the President. I further recommend that all action now being planned or in force by the Veterans Administration to retrieve monies be halted, and that a blanket pardon be granted to all veterans involved.

Mr. Martin, you are our last hope. Your help is urgently needed and requested.

Sincerely yours,

Douglas Anderson

Douglas Anderson

DA:cd

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS


September 14, 1945

MEMORANDUM TO MR. WHITE FROM MR. DEDMON

I would like to make the following suggestions so that you might be turning them over in your mind prior to our conference with General Bradley on Monday.

1. The employment of a Negro on a policy making level by the Veterans Administrator.

2. The general employment of Negroes in the Veterans Administration.

3. The elimination of discrimination in all Veteran Facilities.

4. The change of policy in Veterans Hospitals.

I know you are very familiar with all of the aforementioned suggestions but I thought it might be wise to have these things so that you might be turning them over in your mind prior to coming to Washington.

mb

COPY

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

September 17, 1945

MEMORANDUM TO General Omar N. Bradley from Walter White, Secretary of National Association for the Advancement of Colored People, 69 Fifth Avenue, New York 3, New York or 100 Massachusetts Avenue, N.W., Washington, D. C.

Permit us to make the following recommendations to insure equality of opportunity and benefits from the Veterans Administration for veterans irrespective of race or color:

1. We urge that no segregated hospitals for veterans be established. Especially in this war in every theatre of operation it has been demonstrated that veterans, irrespective of place of birth or of race, can be integrated without friction or difficulty in hospitals where all receive the same quality and quantity of treatment.

2. We recommend and urge the use of qualified Negro doctors, nurses, specialists and administrative personnel in all veterans hospitals and facilities.

3. If necessity causes the establishment of an investigatory force we respectfully urge use of qualified Negroes in all branches of such a department.

4. We recommend that on the basis of ability qualified Negroes be used in all divisions of the Veterans Administration, including administrative and clerical departments.

5. To implement the above and to assist in maximum efficiency of the Veterans Administration we respectfully urge again the appointment of a qualified Negro at the policy making, policy executing level in the Veterans Administration. In this connection may we repeat what we have said to the late President Roosevelt, to President Truman, and to your predecessor General Hines, that in making this recommendation we do not contemplate the appointment of an "Advisor on Negro Affairs." While the appointee we recommend would, of course, have a particular interest in assisting to assure Negro veterans equality of opportunity, we strongly recommend that his duties should not be confined purely to racial matters. If the proper selection is made this individual can be of very considerable value in formulating over-all policy and helping to administer it.

Respectfully,

Secretary

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

September 17, 1945

**Memorandum on Conference with General Omar N. Bradley by Walter White, Secretary and Jesse O. Dedmon, Jr., Secretary, Veterans' Affairs**

The points enumerated in a Memorandum to General Bradley from Mr. White, Secretary, making certain recommendations were taken up ad seriatim. My impression of General Bradley as ascertained from this conference is that he is going to in some way try to change some of the old policies adhered to by the Veterans Administration. He remarked, " that any employee in the Veterans Administration could by faithful and competent service rise to the chair of Administrator regardless of race, creed or color." I feel that this statement by General Bradley was very farreaching but as far as it affects Negroes, it is a foregone conclusion that he could not reach the peak. I do believe that in the administration of Veterans Affairs that due notice will be given to the points raised by the Secretary in his conversation with General Bradley. However, I think it will be necessary for us to keep a watchful eye on the administration and keep pounding away on the points ennumerated in the Memorandum.

mb

J. O. Dedmon, Jr.

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

December 20, 1945

MEMORANDUM ON CONFERENCE WITH GENERAL BRADLEY AT VETERANS ADMINISTRATION BY COORDINATING NATIONAL NEGRO ORGANIZATIONS.

Subject: Techniques and Procedures for the complete integration of Negroes on a non segregated basis in all phases of the Veterans Administration program.

Introductory remarks were made by Miss Thomasina Johnson of the AKA National Non-Partisan Council on Public Affairs. Miss Johnson indicated that the organizations represented felt the need of such a conference to clarify many statements by the Press regarding the policy of the Veterans Administration, which has been misinterpreted. The attached statement, signed by representatives of the organizations represented was read to General Bradley by Miss Johnson who suggested to him that this overall statement embodied the wishes of the organizations represented.

At the conclusion of the reading of the statement General Bradley stated that he was not going to issue a blanket order now to provide all of the things asked for in the Memorandum because it would cause a lot of trouble but that he is trying to solve each problem as it arises. There are so many things to be done and it will take a lot of time. "I'm not saying that we are not going to make changes but rather say that we will effect integration through individual problems." "We could try it in one hospital now and then later integrate in another until the whole situation is taken care of but to get out a blanket order that we shall integrate veterans hospitals throughout the country would cause too much trouble." "I shall make an effort to have integration wherever it can be done." General Bradley also stated that through conferences and certain educational discussions that he thought that gradual integration can take place in all of the 13 Branch offices of the Veterans Administration. He indicated that what he needed to effect such a program as presented in the conference this morning, was good leadership in his Branch offices and once he could establish the kind of policy he wished with the leaders in the various Administration facilities we could have an effective, integrated administration.

The question arose as to how the General felt about the appointment of a qualified Negro on the policy making level as an Executive Assistant. To this the General made the following statement:

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

"I had made up my mind to appoint a qualified Negro as an
Executive Assistant but I have had so much adverse publicity
concerning that and other policies of the Veterans Adminis-
tration that I didn't think it wise to make such an appoint-
ment until some of this had died down. It is still under
consideration. As I understand it, you don't want an Advisor
on Negro Affairs, or someone to handle, say, just discrimination
and racial problems you want someone on a policy making level.
Yes, it is still under consideration but during the past couple
of weeks, the publicity has been so adverse and the press has
misinterpreted my policy so that I thought it would be wise
to hold it for a while."

Another question arose as to what kind of machinery
would he set up to handle democratically the complaints or
problems received by him so that he could institute a non-discrimin-
ation policy and particularly in Medicine and Surgery. The
General indicated that he had not given any consideration as to
just how these complaints would be handled as yet, but that he
would endeavor to handle them effectively and well.

Speaking on segregated hospitals, General Bradley
stated that some Negroes looked to Tuskegee as a monument and
that he can't change it, he only inherited it through the
administration and that he would study it first and then see what
can be done. Miss Johnson indicated that we, the organizations,
would like to see Tuskegee integrated and made open to all veterans,
not just Negro veterans and certainly no more segregated veterans
hospitals established. To this General Bradley replied, that he
could make no radical changes in any hospitals at present and that
when he took office he found plans for the construction of another
all-Negro veterans hospital but that they had been held because
complaints were received by organizations that they wanted no
more all-Negro hospitals.

One of the representatives suggested to General Bradley
that a statement by him would help tremendously in the upgrading
and integration of Negroes within the Veterans Administration
right here in Washington. Negroes are not being given enough opportuni-
ties to obtain jobs as adjudicators and other fields for which
they are qualified.

Rev. Jernagan of the Fraternal Council of Negro Churches
mentioned that he had just returned from the South Pacific and that
in Honolulu he interviewed a Negro who was Commanding Officer with
several white officers under him and that this officer indicated
that he had not had a minutes trouble because he was respected
by these men and that races got along very well. He indicated that
he saw no reason ~~by~~ why the Veterans Administration could not
through policy operate on just such an integrated basis.

General Bradley stated that of course in the Army you
have military dicipline which governs the operation of any
organization. In hospitals, for instance, in the army, the
patients know that they are subject to military dicipline if they
start anything and therefore their facilities are more effective
on integration.

The conference closed, with a few remarks by Miss Johnson thanking General Bradley on behalf of the organizations represented for permitting us to hold such a conference with him. The conference was held from 10:30 A.M. to 11:15 A.M. at the Central Office of the Veterans Administration. The following organizations were represented: (and endorsed the Memo submitted)

American Federation of Teachers
National Association of College Women
National Association of Colored Graduate Nurses
Fraternal Council of Negro Churches
National Bar Association
National Alliance of Postal Employees
Kappa Alpha Psi Fraternity
National Association for the Advancement of Colored People
Phi Delta Kappa Sorority
Alpha Phi Alpha Fraternity
National Council of Negro Women
Delta Sigma Theta Sorority
Omega Psi Phi Fraternity
Young Womens Christian Association
Young Mens Christian Association
National Negro Business and Professional Womens Assoc.
Phi Beta Sigma Fraternity
Washington Federationof Churches
Gay Northeasterners
International Brotherhood of Sleeping Car Porters
James E. Walker Post #26 - American Legion
James Reese Eurpoe Post #4 - American Legion
National Non-Partison Council on Public Affairs of AKA
National Association of Secondary Schools.

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS


December 20, 1945

General Bradley and your Associates --

The signatories to this statement have requested this conference with you because we are vitally concerned with the policies of the Veterans Administration with regard to minorities in general and Negroes in particular.

The practices of the Veterans Administration to date have not been acceptable to the majority of Negroes. These organizations here represented are gravely concerned over the alleged statement of policy by General Paul C. Hawley and reportedly concurred in by you that "the policy of the Veterans Administration is to hospitalize all veterans without discrimination in the same institution segregating only by sex and type of disability, the only exceptions made to this policy are dictated by local customs of the community in which the hospital is located and from which it draws the larger part of its patients. Whenever such local customs change so as to permit the application of the general policy without undue friction, no further exception is made."

We do not know the authenticity of such a report, but we do know that Mr. Austin Woolford, Asst. Director of Public Relations for the Veterans Administration, recently stated to a news reporter that the policy of the Veterans Administration is one of non-discrimination, but that Managers of Veterans facilities had the right to operate such facilities in conformity with local community patterns -- that Veterans Administration cannot crusade for social reforms in a given community. Practice seems to indicate however, that this is the policy not only in hospitalization but in the majority of the services and facilities under the jurisdiction of the Veterans Administration.

Because there has been equality of sacrifice, according to the capabilities, qualifications and limits to which each person has been allowed to serve in this and all other wars we should like to go on record as requesting the following:

1. That there be a firm policy established immediately abolishing segregation and discrimination because of race, creed or color, in all services, facilities and benefits under the administration of the Veterans Administration.

2. That there be established immediately within the Veterans Administration, the necessary administrative procedures for the rigid enforcement of such an overall policy.

3. That a Negro be appointed immediately, on a non-segregated basis, to serve as Executive Assistant to the Administrator whose duty it shall be to assist at this level in policy making, directed at a democratically administered Veterans Administration. We believe that in order to assure the kind of assistance that you will need in prosecuting a non-racial policy that this appointment should not be a token appointment nor made from the ranks of persons who will accept appeasement on the fundamental issues of segregation and discrimination.

4. That a Negro be appointed immediately as an Assistant to the Assistant Administrator for Vocational Training, Rehabilitation and Education.

5. That a Negro be appointed immediately as an Assistant to the Assistant Administrator for Medicine and Surgery.

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

6. That a Negro be appointed immediately as an Assistant to the Asst. Administrator for Personnel.

7. That the entire administration of the Department of Medicine and Surgery be reviewed with a view toward executing a policy of non segregation and non-discrimination with regard to personnel, services and patients.

8. That a complete and thorough investigation be made of the extent to which Negroes are sharing in the benefits provided under the G.I. Bill of Rights, with positive recommendations to follow whereby Negroes might achieve the benefits of this legislation where the customs of the community militate against them in the matter of loans for homes, businesses, etc.

9. That the personnel practices of the Veterans Administration be changed to conform with a policy non-discrimination and non-segregation here as well as in the regions, and to apply to all veterans personnel wherever they are.

We make these requests for we believe that on this basis and under these terms will be the only way by which the majority of Negroes will support the program of the Veterans Administration. We are unalterably opposed to segregation in any form-in any activity but particularly in the Veterans Administration, the Agency designed to care for the men and women who have offered their last full measure of devotion and have become mentally or physically ill. Or who, because of their service to their country, are in need of economic assistance, or other services available through the Veterans Administration.

We should like to point out that an increasing number of Negroes are no longer willing to accept plans involving segregation as a "step in the right direction" with promise of integration at some future time.

We should like to go on record also as being unable to understand the point of view of any official of the Federal government who espouses the philosophy that his agency cannot be an instrument of "social reform" which is used as the big red herring that is thrown on the scene to justify the practice of segregation and other non-democratic practies. We are quite familiar with this expression and wish to state that we do not expect any Federal agency to go on a crusade for "social reform" without its own jurisdiction. We do, however, expect that each Federal official and each agency under the jurisdiction of the Federal government to carry out the United States Constitution and the principles of the Declaration of Independence within the agency.

We believe that the principles of the Declaration of Independence which declares that "all men are created equal, endowed by their Creator with certain inalienable rights; that among them are life, liberty and the pursuit of happiness", should be the principle by which any Federal official administers his office. We believe that upholding that part of the Constitution of the United States which says in the 14th Amendment that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States" should or could logically be interpreted as being a crusade for "social reform" or"social measures" which some particular agency is not designed to execute. We believe that the Veterans Administration is an instrumentality of the United States government and as such cannot constitutionally

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

"abridge the privileges or immunities of citizens of the United States". In fact, it is sworn to uphold the Constitution. This particular section does not qualify the word "citizen" in any manner by making it majority of citizens or white citizens or male citizens. It is unmistakably clear when it says "citizens."

We believe that when one group of citizens is relegated to the use of certain facilities, or to the use of certain public properties, refused the use of others or provided certain privileges different to those provided to other citizens because of race, color or creed or religion, that this is indedd an abridgement of the Constitution of the United States.

We firmly believe that any program by the Veterans Administration based on anything less than complete integration in all phases, on all levels, will prove disappointing to all concerned.

Negro citizens look to the Federal government for leadership in democratic policies and practices. We are firm in our conviction that the creation of segregated units of any kind will be considered a step backward by thinking Negroes and the basis for further questioning of our war aims both by the persons who are being served by this agency and by our Allies, many of whom are of the darker races of the world.

Neither unity nor peace can be achieved as long as one-tenth of our population is separated from the others.

We firmly believe that the manner in which the Veterans Administration sets up its policies with regard to minorities in general and Negroes in particular will be a critical test of whether or not our war aims were sincere. Setting these policies up on a democratic basis will constitute proof to the world that the Negro is no longer the dilemma of America but a complete vindication of our war aims. This will offer concrete proof of the fact that American life is based on our beautiful ideals set forth in the Declaration of Independence; that our Constitution is not just a scrap of paper; and that justice and fair play are still the basic principles of our country.

The Army has found that it is not only morally wrong to segregate, but that it is militarily unsound. According to reports, it is in the process of abandoning its policy of partial segregation, which began as absolute segregation. Further, the Army has found that wherever integration has been the policy, it has worked. It is understood that the mixed platoons, some of which were in the Army under your command, were effective and the fears that they would not be proved unfounded. Integration works in Army hospitals--there is integration at Fort Devens, in the Crile General Hospital in Cleveland; the use of Negro nurses in Army hospitals has been most effective and has caused no problem based on race; Officer Training Schools have had integrated training with excellent results; the use of Negro women in the WAVES on a completely integrated basis has worked well; integration in OPA has been most effective, as has been the use of mixed Selective Service Boards where they have been set up. It has worked in many civilian enterprises of one kind or another, such as the St. Monica's Hospital in Phoenix, Ariz., in industry, in fact in many places that might be mentioned. As a matter of fact, where integration has been the practiced policy, there is no record of failure.

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

The Practices and Policies of the Hospitals under your jurisdiction, we are concerned that the policy and practice of all-Negro veterans hospitals be abandoned and that all hospitals be opened to any and all patients who are veterans and to any and all persons as far as personnel is concerned.

The practice of segregation in hospitals has been found by the military to be militarily unsound and that it does violence to the individual and is unsound from the point of view of the cure of the patient. Further, it is physically impossible to adequately staff all-Negro hospitals, even if there were no other considerations. The Army nor Navy segregate their sick, so that a veteran is discharged on a non-segregated basis and is segregated by the Veterans Administration.

The Veterans Administration claims that it does not segregate where it is not the local custom. This, too, is not in keeping with practices. Negro professionals practice on the hospitals staffs in most of the large northern cities except in the Veterans Administration hospitals. This is also true for Negro nurses. Another practice that we should like to specifically call to your attention is the unblemished record of the Negro nurse in the Armed Forces. They served on an integrated basis in many hospitals and have proved highly satisfactory. We should like to go on record as urging that Negro nurses be used whenever and wherever nurses are needed. Another practice that we urge be stopped immediately is the alleged practice of marking in red the fact-sheet of all Negro applicants for nursing positions by the Veterans Administration in referring Negro nurses for employment. We should like to go on record as requesting that Negro nurses be used in all capacities including psychiatric work and that the Veterans Administration cooperate with the National Association of Colored Graduate Nurses in recruiting nurses as it does with similar white nursing organizations.

Perhaps volumes could be written on the mental effect that segregation has on the persons who are the victims of segregation. Perhaps no more cruel act could be perpetrated on a human being who is sound and healthy who goes to do his patriotic duty for God and country and in the process becomes maimed, crippled and chronically ill for life, fighting for democracy, the four freedoms and all our idealistic war aims, to be segregated from his fellow man for no reason which he can see. This in itself is adequate cause to make a man go beserk.

We are also concerned with the personnel practices of the Veterans Administration from top to bottom. The number of Negroes holding jobs that are above a clerical and stenographic level are inconsequential. The matter of upgrading them has been almost negligible. The practice of segregating units of Negroes here in this building should be abolished and the Negroes involved placed on an integrated basis throughout the building. Sound integrated personnel practices must be carried through the whole realm of the Veterans Administration.

Much of the benefits that might be obtained from the Veterans GI Bill of Rights depend upon the community cooperation, particularly the section pertaining to loans. We urge that an investigation be made to determine to what extent Negro veterans are unable to qualify and legislative or administrative provisions be made to rectify this situation.

We should like to point out that the alleged suggestion that the Veterans Administration could not go against local customs is not in keeping with the facts. The Veterans Administration is part of the

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

Federal government, the jurisdiction of which is covered under Article 6 of the Constitution, Section 2, which states that "This Constitution and the laws of the United States which shall be made in pursuance thereof and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land, and the judges in every state shall be bound thereby, anything in the constitution or laws of any state to the contrary notwithstanding." We do not believe that it is within either the jurisdiction or the dignity of the United States government or any instrumentality thereof to stoop to the level of any state that is not upholding the Constitution.

We should like to say that as far as we can determine, we are pleased to say that an excellent job is being done by the Claims Divisions and also the Insurance Division. We should like to go on record as complimenting them for the fine job they have done.

We are also desirous of going on record as being willing to cooperate in any way possible in carrying out the requests that we have made today, not being unmindful of the difficulties involved in the execution of such a program. We are also aware that these problems must be faced with the same courage and grim determination that the war was fought and with the same determination that other organizations have faced and solved them. America is accustomed to solving problems and we have always had men who had the courage to solve them. We believe that you are such a man to understand the absolute need for such policies; to be a gentleman and a soldier and who believes in justice and fair play for all men without regard to his color, his creed or his religion.

The above is respectfully submitted by the undersigned organizations and individuals:

National Non-Partisan Council on Public Affairs of Alpha Kappa Alpha Sorority
Thomasina Walker Johnson, Legislative Representative

National Bar Association
Richard Atkinson

Gay Northeasterners
Mrs. Catherine Hurley

Y.M.C.A.
James C. Arnold

Phi Delta Kappa Sorority
Mrs. Irma Cornish

N.A.A.C.P.
Jesse O. Dedmon, Jr.

Phi Beta Sigma Fraternity
Atty. George A. Parker
and
Dr. Martin Jenkins

Omega Psi Phi Fraternity
W. S. Burke

Jas. E. Walker Post #26
American Legion
J. D. Martin

National Alliance of Postal Employees
William Jason

Jas. Reese Europe Post #5
Walter Jackson

Fraternal Council of Negro Churches
Rev. Wm. H. Jernagan

Alpha Phi Alpha Fraternity
Joseph H. B. Evans

American Federation of Teachers
Mrs. Mary Mason Jones

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

Kappa Alpha Psi Fraternity
John R. Young III

National Assoc. of College Women
Mrs. Esther Popel Shaw

National Negro Business and
Professional Womens' Assoc.
Mrs. Geneva K. Valentine

Delta Sigma Theta Sorority
Mrs. Myrtle R. Phillips
Mrs. Alice Bell

National Assoc. of Colored
Graduate Nurses
Mrs. Marian Seymour

International Brotherhood of
Sleeping Car Porters
W. S. Anderson

National Medical Association
Dr. Montague Cobb

National Council of Negro Women
Mrs. Mayme Mason Higgins

Washington Federation of Churches
Mrs. Josephine Kyle

Dec. 20, 1945

**MEMORANDUM**

To:

General Omar P. Bradley, Administrator of Veterans Affairs
Veterans Administration

From:

Coordinating National Negro Organizations

Re:

Suggested techniques and procedures for the complete integration of Negroes on a non segregated basis in all phases of the Veterans Administration program

We do not presume to advise the Veterans Administration on how its resources should be organized to achieve the abolition of segregation and discrimination from top to bottom. We do however accept the responsibility for presenting with our requests, a suggested procedure for accomplishing this end, recognizing that the success of plans which we suggest depends upon the application of sound principles of administration.

Before reaching a decision on these suggestions we have conferred with persons experienced in administration, with special reference to race relations; and who have had recent and continuing experience in the development of constructive programs for integrating Negroes into various phases of government, industry, war activity and American community life. We present this memorandum as the considered opinion of these persons as to how the Veterans Administration might initiate its program of abolishing segregation and discrimination based on color, creed or religion based on principles they have found to be effective.

I. All of the experiences and literature in this field point to the following:

a. Generally satisfactory integration of Negroes on all levels is reported by a majority of naval, military, industrial and community enterprises, establishments and programs where Negroes have been allowed to participate on an integrated basis. There is a growing recognition that Negroes succeed in much the same manner as other persons.

b. In all places where sound administrative practices have been followed in the integration of Negroes, good results have been obtained.

c. That the first step - the decision to integrate Negroes - must be initiated at the topmost level with firmness.

d. That the training, education and indoctrination of the supervisory staff is the second step. Enthusiastic supervisors being allowed to execute this project first.

e. That the integration of Negroes at a high level first is effective. The right of Negroes to integration should be discussed in routine speeches to the staff, along with other problems - never separate and apart. Racial epithets must be stringently prohibited.

f. That segragation of Negroes is to be studiously avoided.

g. That in relation with Negroes after integration, individual counseling is advisable.

h. That in matters dealing with Negro-white relations, where either is at fault individual counseling of the white is advisable.

i. In the initiation of this project, the Negroes to be integrated first, must be carefully chosen.

j. That in combatting the resistance of whites to the integration of Negroes, counseling in small groups is advisable and effective. The need for democracy, equality of sacrifice, justice and fair play for those persons who have offered their all for their country, may be used as a basis for requesting their acceptance of Negroes. However, do not look for resistance among whites. Emphasizing the purposes for which the Veterans Administration exists - with concentration on the cure, aid and help of all kinds to every veteran who is a veteran because of certain sacrifices, will help.

II. The detailed job referred to, of integrating Negroes in the Veterans Administration, can be done in an effective manner only from within the Veterans Administration by persons who have had broad experience in race relations and administration, including experience in the process of integrating Negroes and who are also equipped with a knowledge of the administrative organization of the Veterans Administration. We would therefore, recommend that the first step be the establishment of a firm decision on policy by you, as director that all Negro and other minority veterans be permitted the same privileges, on the same basis and in the same manner as now prevails for all other veterans. The second step would be that of obtaining several well qualified Negroes who have had this type of experience, who [illegible] a [illegible] of whites who have had [illegible] able training as a mixed staff, to work on this problem.

BEST AVAILABLE COPY

III. This procedure would only initiate the process of integration of Negroes. At the end of a reasonable time of training this mixed staff would further assist the Veterans Administration in the formulation of specific and practical plans for the next steps in the successful integration of large numbers of Negroes in all phases of the Veterans Administration programs.

IV. The approach as outlined above has the advantage of recognizing the established fact, that the important factor in the integration of Negroes, rests upon the attitude of persons in authority. The very presence of this selected mixed group of persons on the top level of the Veterans Administration will serve as a concrete and realistic experience for the persons in the Veterans Administration. The basis for the extension of the integration of larger numbers of Negroes therefore, will have been established and the principles by which it can be extended will have evolved within the Veterans Administration.

Through the organizations here represented, we are prepared to put at your service a group of some of the best personnel administrators and public relations experts available to discuss this further and in more detail, if we may. We are also prepared to furnish a bibliography on this matter.

There are other matters in connection with this that we believe will be helped by further discussion, such as the timing of your decision; the manner of presentation to the public, etc.

Inasmuch as this situation has been in process of consideration and negotiation for such a long period of time, we would appreciate your personal and immediate attention to effect a sound and satisfactory (and constitutional) solution.

We offer our wholehearted cooperation by assisting with the program in lending our moral support and in mobilizing public support for the execution of the requests that we have made. Coordinating National Negro Organizations including the following:

American Federation of Teachers
National Association of College Women
National Association of Colored Graduate Nurses
Fraternal Council of Negro Churches
National Bar Association
National Alliance of Postal Employees
Kappa Alpha Psi Fraternity
National Association for the Advancement of Colored People
Phi Delta Kappa Sorority
Alpha Phi Alpha Fraternity
National Council of Negro Women
Delta Sigma Theta Sorority
Omega Psi Phi Fraternity
Young Womens Christian Association
Young Mens Christian Association
National Negro Business and Professional Women's Association
Phi Beta Sigma Fraternity
Washington Federation of Churches
Gay Northeasterners
International Brotherhood of Sleeping Car Porters
James E. Walker Post #26 - American Legion
James Reese Eurpoe Post #4 - American Legion
National Non-Partisan Council on Public Affairs of Alpha Kappa Alpha Sororit
National Association of Secondary Schools

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

VETERANS ADMINISTRATION

WASHINGTON 25, D. C.

FOR VICTORY BUY UNITED STATES WAR BONDS AND STAMPS

January 9, 1947

61-4
XK. N1-2

YOUR FILE REFERENCE:

IN REPLY REFER TO: 5DC

JAN 10 1947
31

Mr. Jesse O. Dedmon, Jr.
Secretary, Veterans' Affairs
National Association for the
Advancement of Colored People
Washington Bureau
100 Massachusetts Avenue, N. W.
Washington 1, D. C.

Dear Mr. Dedmon:

Your letter of December 13 requesting the number of Negroes employed in the Veterans Administration has had careful attention and consideration.

As you are no doubt aware, records are not maintained with reference to race, creed, or national origin of employees, and to obtain the data you seek, it would be necessary to conduct a physical count of all employees throughout the Veterans Administration. The volume of work before the Veterans Administration at this time is of such magnitude as to prohibit the expenditure of the time and effort required to compile this information.

Therefore, it is regretted to advise you that it will not be possible to comply with your request.

Very truly yours,

G. H. SWEET
Assistant Administrator
for Personnel

An inquiry by or concerning an ex-service man or woman should, if possible, give veteran's name and file number, whether C, XC, K, N, or V. If such file number is unknown, service or serial number should be given.

VETERANS ADMINISTRATION
Central Office, Room 118
WASHINGTON 25, D. C.

OFFICE OF
THE ADMINISTRATOR OF
VETERANS AFFAIRS

August 10, 1955

Mr. Madison S. Jones
Special Assistant for Housing
NAACP
20 West 40th Street
New York 18, N. Y.

Dear Madison:

This is in quick reply to your letter asking for information on VA Home Loans.

From the passage of the G. I. Bill, June, 1944 through June 30, 1955, VA has guaranteed 3,914,535 home loans. Of that number, 22,285 have resulted in the Government paying claims. In other words, only 22,285 guaranteed loans have cost the taxpayers money as of June 30, 1955.

Although you did not ask, I did make an effort to secure some indication of the racial percentages involved in these totals, but due to the efforts of you know who (smile) I got the stock answer - "We do not maintain racial figures." Apropos of that remark, may I again suggest there is absolutely no way to determine the effectiveness of any program administered by a civil body unless you have racial statistics.

It is my educated guess that less than 30,000 colored veterans have benefited from the provisions of the G. I. loan program. However, there is no way that I know of, short of enlisting the aid of the NAACP local branches, to support that guess. My guess is simply a figure picked out of the sky based on very limited observation.

Would be very happy to suggest ways and means of the Association's pinpointing this unfavorably disproportionate participation by colored veterans if there is any continuing interest on your part.

Hope this information is what you wanted. Let me hear from you if it isn't.

REPRODUCED FROM THE MANUSCRIPT DIVISION, LIBRARY OF CONGRESS

# EXHIBIT 6

# The Jerome N. Frank Legal Services Organization

YALE LAW SCHOOL

*Via email*

February 20, 2025

Emily M. Kelley
United States Department of Justice
Civil Division
175 N Street NE
Washington, D.C. 20530

Dear Counsel,

Enclosed please find Plaintiffs' responses to Defendant's objections to Plaintiffs' Second Set of Interrogatories. Plaintiffs remain available to meet and confer with Defendant regarding any of the enclosed responses.

/s/ Michael Wishnie
Emily Elledge, Law Student Intern
Kindall Hayes, Law Student Intern
Gabriella Hill, Law Student Intern
Jared Hirschfield, Law Student Intern
Ryan Kellner, Law Student Intern
Claire Sullivan, Law Student Intern
Briana Thompson, Law Student Intern
Braden Worthington, Law Student Intern
Natalia Friedlander, Supervising Attorney
Michael Wishnie, Supervising Attorney
VETERANS LEGAL SERVICES CLINIC
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

/s/ Yaman Salahi
Yaman Salahi
SALAHI PC
505 Montgomery St., 11th Floor
San Francisco, CA 94111
Tel: 415-236-2352
yaman@salahilaw.com

Jimmy Rock
EDELSON PC
1255 Union Street NE, 7th Floor
Washington, D.C. 20002
Tel: 202.987.6303
jrock@edelson.com

Theo Benjamin
EDELSON PC
350 North LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
tbenjamin@edelson.com

Emily Penkowski Perez
EDELSON PC
350 North LaSalle St., 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378
epenkowski@edelson.com

**INTERROGATORY 1**

*Identify and describe in detail all ways in which the VA, from January 1, 1945 to present, has collected or aggregated data regarding the demographic characteristics of applicants for VA housing, education, and disability compensation benefits programs, including but not limited to applicants' race, ethnicity, amount of income, source of income, employment status, education level, character of discharge, rank on date of discharge, outcome of the benefit application, and/or the reason for the outcome.*

**Defendant's Objection:**

Defendant objects to Interrogatory No. 1 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines.

**Plaintiffs' Response:**

Plaintiffs do not seek confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation. Plaintiffs seek information responsive to Interrogatory No. 1 that is not protected from disclosure by the attorney-client privilege and/or the work product doctrines. Plaintiffs request that Defendant include in Privilege Logs any documents and/or records withheld pursuant to attorney-client privilege, work product doctrines, or deliberative process privileges that are not otherwise excluded under parties' standing ESI agreement.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 1 in that it contains subparts and is compound, conjunctive, and/or disjunctive.

**Plaintiffs' Response:**

Interrogatory No. 1 is not compound, conjunctive, or disjunctive, nor does the Interrogatory contain discrete, independent subparts. Defendant's letter on October 22, 2024, characterizes Interrogatory No. 1 as "seek[ing] information regarding both collection and aggregation of ten separate 'demographic characteristics' across three categories of benefits." But the Interrogatory seeks a description related to a common theme: how Defendant "has collected or aggregated data regarding the demographic characteristics" of applicants. The Interrogatory's enumeration of specific kinds of benefits or demographic characteristics is not "logically or factually independent of the question posed by the basic interrogatory." *Sec. Ins. Co. of Hartford v. Trustmark Ins. Co.*, No. Civ. 3:01CV2198(PCD), 2003 WL 22326563, at *1 (D. Conn. Mar. 7, 2003).

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 1 as more properly the subject of witness testimony and/or document production that is currently in process.

**Plaintiffs' Response:**

Interrogatory No. 1 seeks factual information regarding the process by which Defendant collects and aggregates data, which is properly the subject of written discovery: "Numerous courts have held that a party may not incorporate deposition testimony or otherwise rely on future deposition testimony in lieu of offering a complete and separate response to each interrogatory. . . . Documents and testimony are often subject to interpretation and they do not serve the same purposes as interrogatories. Only a full response to the interrogatories comports with the requirements of the Federal Rules." *Pouliot v. Paul Arpin Van Lines, Inc.*, No. 3:02 CV 1302(DJS), 2004 WL 1368869, at *2 (D. Conn. June 14, 2004).

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 1 as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. Plaintiffs' demand for "all ways" the VA has "collected or aggregated data" regarding unlimited "demographic characteristics" of applicants for multiple types of benefits, from 1945 to present, seeks untoward volumes of information, from a myriad of sources, for a period of over 80 years; Interrogatory No. 1 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

**Plaintiffs' Response:**

Interrogatory No. 1 is not overbroad, unduly burdensome, or vague and ambiguous. It seeks information dating to the earliest date of Plaintiffs' injuries and is limited in scope to a description of the processes by which Defendant collects or aggregates benefits applicants' demographic data. Interrogatory No. 1 does not seek information beyond the scope of Rule 26, as the information sought is relevant to Plaintiffs' claims and proportional to the needs of the case. The claims of Plaintiffs and the proposed class involve injuries dating to 1945, so the Interrogatory is proportional to the needs of the case to seek discovery dating to that year. Additionally, Interrogatory No. 1 is proportional to the needs of the case because of the "serious nature of the claims presented," namely sixty years of racial discrimination by a large federal agency, "[even though] the amount in controversy has not yet been specifically determined." *Walls v. City of New York*, 502 F. Sup. 3d 686, 696 (E.D.N.Y. 2020). Finally, because Interrogatory No. 1 seeks non-public information, Plaintiffs will be unable to access this information through other means.

The claims of Plaintiffs and the proposed class involve injuries resulting from the administration of VA benefits since 1945. As a result, Plaintiffs are entitled to foundational information describing how VA leadership is and has been made aware of the demographic

characteristics of its benefits applicants. "[E]ven when the party resisting discovery objects that the requests are 'burdensome, vexatious, and oppressive . . . [i]f the interrogatories are relevant, the fact that they involve work, research and expense is not sufficient to render them objectionable.'" *Mercer v. Rovella*, No. 3:16-CV-329 (CSH), 2022 WL 1540447, at *2 (D. Conn. May 16, 2022).

Plaintiffs are *not* seeking a line-by-line description of every form Defendant has ever issued to benefits applicants on which an applicant might mark their demographic characteristics. To the extent that a partial or full list of forms is available after a reasonable investigation, Plaintiffs are entitled to that information. For the time periods or programs for which information on forms is unavailable, Plaintiffs seek a description at a higher level of generality. For example, Plaintiffs seek a description of whether Defendant has relied on paper forms to collect data on applicants' demographic characteristics, and if not, at what point Defendant began using electronic or other methods of collecting such data. Plaintiffs seek an understanding of what processes Defendant uses to collect the relevant data over time. As a result, Interrogatory No. 1 does not seek information beyond the scope of Rule 26.

**Defendant's Objection from October 22, 2024 Letter:**

Defendant provided an extensive response identifying various ways in which it "collects" or "aggregates" categories of demographic data for applicants of multiple types of benefits. This response incorporated links to publicly available documents or references to documents in Plaintiffs' possession. Plaintiffs repeatedly mischaracterize and understate the nature and extent of the information provided in Defendant's response.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 1.

As Plaintiffs noted in their letter dated October 9, 2024, Interrogatory No. 1 seeks a description of "all ways" in which Defendant collects the demographic data of applicants for VA housing, education, and disability compensation benefits. However, other than for home loans, Defendant's response merely lists some current forms that collect some demographic information. Moreover, Defendant's response ignores that the Interrogatory seeks information starting in 1945; other than a reference to home loan practices "prior to 1995" (with no start date), Defendant fails to describe the time periods during which information was collected and the different methods through which it was collected and aggregated. These substantive concerns, as well as the others raised in Plaintiffs' letter dated October 9, 2024, remain unaddressed. Defendant has not supplemented its initial response to the Interrogatory. If Interrogatory No. 1 constitutes an exhaustive response regarding the time period prior to 1995, Plaintiffs seek confirmation as to that fact. Otherwise, Defendant has not responded in sufficient detail to the issues Plaintiffs raised in their letter, and the Interrogatory response remains deficient.

**Defendant's Objection:**

For instance, in arguing that Defendant has not provided sufficient detail for the subpart request for "demographic data aggregation," Plaintiffs contradictorily acknowledge that a lengthy list of material was provided. See Letter at 3 ("The only newly responsive information provided to this component of the Interrogatory identifies and provides links to VBA Annual Benefits Reports; Historical Annual Reports, a 2017 Minority Veteran Report and a 2020 update; indicates that VA is working with the Center for Minority Veterans to develop a demographic dashboard; and refers Plaintiffs to previously-produced records"). And as Plaintiffs state, this list contains only the items Plaintiffs deem "newly responsive." That some of the other provided information is not "new" to Plaintiffs is irrelevant. If anything, the fact that Plaintiffs admittedly already have this information in their possession is demonstrative of the improper nature of these requests.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 1.

Defendant's inclusion in its response to Interrogatory No. 1 of several VA reports issued in the last decade does not answer Plaintiffs' substantive concerns raised in their letter. Most importantly, Plaintiffs noted repeatedly in their letter dated October 9, 2024, that Defendant's response to Interrogatory No. 1 failed to provide sufficient information concerning its demographic data collection and aggregation procedures over the appropriate time period. Interrogatory No. 1 seeks information from 1945 to the present. Recently issued VA reports are not sufficiently responsive to the Interrogatory.

Furthermore, Defendant's assertion "[t]hat some of the other provided information is not 'new' to Plaintiffs is irrelevant," is misplaced. Plaintiffs' letter dated October 9, 2024, emphasized that Interrogatory No. 1 seeks information commensurate with Plaintiffs' claims, particularly information dating from 1945 to the present. Plaintiffs' objection that Defendant's response to Interrogatory No. 1 lacked newly responsive information was merely a restatement of Plaintiffs' larger concern: Defendant's response does not provide sufficiently detailed information over a sufficiently responsive period of time.

Finally, Defendant's assertion that Plaintiffs already have this information in their possession is impermissible grounds for objection. It is "irrelevant that the party seeking discovery already knows the facts as to which he seeks discovery." *S.E.C. v. Cymaticolor Corp.*, 106 F.R.D. 545, 549 (S.D.N.Y. 1985). The purpose of discovery "is not only for the ascertainment of facts, but also to determine what the adverse party contends they are, and what purpose they will serve, so that the issues may be narrowed, the trial simplified, and time and expense conserved." *Baim & Blank, Inc v. Philco Distributors, Inc*, 25 F.R.D. 86, 87 (E.D.N.Y. 1957). Therefore, Plaintiffs' prior possession of particular information does not render this Interrogatory impermissible.

Defendant has not responded in sufficient detail to the issues Plaintiffs raised in their letter, and the Interrogatory response remains deficient.

**Defendant's Objection:**

Your letter also takes issue with Defendant's reference to the Declaration of Daniel Cunningham, stating that "the Cunningham Declaration is not sufficiently responsive, on its own, to this Interrogatory." Letter at 4. First, Defendant did not refer to the Declaration "on its own." Rather, reference to the Cunningham Declaration was one piece of an extensive response made subject to Defendant's Objections. Second, the Cunningham Declaration does not merely recite "how one individual … used specific databases to gather [] information," as Plaintiffs claim. Letter at 4. It also provides detailed information regarding those databases, including demographic information contained therein for veterans and compensation benefits applicants.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 1.

Moreover, reference to other documents is an inadequate response to an Interrogatory. *Pouliot*, 2004 WL 1368869, at *2 ("Documents and testimony are often subject to interpretation and they do not serve the same purposes as interrogatories. Only a full response to the interrogatories comports with the requirements of the Federal Rules.").

Plaintiffs further emphasize that Defendant's response to Interrogatory No. 1 does not describe in sufficient detail how, if at all, the Cunningham Declaration captures information responsive to the Interrogatory. In their letter dated October 9, 2024, Plaintiffs noted that the Cunningham Declaration described Mr. Cunningham's process of gathering the information disclosed in a s*eparate proceeding under a separate statute.* If it is the case that Defendant follows Mr. Cunningham's procedures for collecting benefits applicants' demographic data at all times and in all contexts, Plaintiffs seek a confirmation of that fact.

Moreover, Plaintiffs' letter noted that the FOIA request and lawsuit addressed by the Cunningham Declaration sought records related to disability compensation claims; by contrast, Interrogatory No. 1 seeks information regarding data collection and aggregation for VA disability compensation, housing, and education claims. The Cunningham Declaration does not attempt to describe data collection and aggregation practices as to VA housing and education benefits. Again, if it is the case that Defendant follows Mr. Cunningham's procedures in collecting and aggregating demographic data related to VA housing and education benefits, Plaintiffs seek confirmation of that fact.

Defendant has not responded in sufficient detail to the issues Plaintiffs raised in their letter, and the Interrogatory response remains deficient.

**Defendant's Objection:**

Third, Defendant does not understand your statement that the declaration is insufficiently responsive because it was "based on a FOIA request by two organizations not party to this lawsuit." Letter at 4. Even if true, this would be irrelevant. Plaintiffs acknowledge that they have the

Cunningham Declaration, which is also publicly available. Moreover, NVCLR, an entity for which Mr. Monk Jr. is a Director, was a party to that FOIA litigation and is a named Plaintiff in this action. If NVCLR no longer intends to be a party to this action, please inform us immediately.

**Plaintiffs' Response:**

Plaintiffs repeat their above contention that reference to publicly available documents does not comport with the Requirements of the federal rules. "Documents and testimony are often subject to interpretation and they do not serve the same purposes as interrogatories. Only a full response to the interrogatories comports with the requirements of the Federal Rules." *Pouliot*, 2004 WL 1368869, at *2.

Plaintiffs correct their misstatement that NVCLR is not a party to this action.

**Defendant's Objection:**

Furthermore, as Plaintiffs are aware, the VA manages benefits for millions of veterans. Assuming a database can be considered an "aggregation" of demographic data, various databases exist, may be used for different purposes, and maintain different and sometimes overlapping categories of data. As discussed above, Defendant has repeatedly asked Plaintiffs to clarify what information you are seeking so that we may identify relevant databases and determine whether and how requested information can be reasonably produced. Instead of providing this, your letter demands that Defendant identify and "describe in detail" each and every electronic or physical location, that does or did exist over the last 80 years, that "collects" or "aggregates" any of ten different "demographic characteristics" for individuals who were applicants of any of three types of benefits, with a description of data contained and explanations for how these processes have changed over 80 years, including "oral self-reports, medical exams, data obtained from other agencies, and so on." Letter at 3-4. This demand is patently unreasonable. In demanding this information while at the same time refusing to acknowledge Defendant's Objections and Responses or to provide the guidance Defendant has requested, Plaintiffs have made clear that this Interrogatory would require the production of irrelevant information through an unduly burdensome search that is not proportional to the needs of the case.

**Plaintiffs' Response:**

During a meet and confer on December 19, 2024, Plaintiffs and Defendant engaged in a lengthy discussion regarding the types of data that Plaintiffs seek regarding demographic characteristics. As was made clear in that discussion, Plaintiffs lack the necessary information regarding Defendant's data collection and storage methods over the relevant time period to adequately assess how Plaintiffs' discovery requests regarding demographic data can be limited or cabined. This Interrogatory therefore seeks detailed descriptions of VA's data collection and aggregation mechanisms to better inform the Requests for Production. This Interrogatory is therefore proportional to the needs of the case.

Defendant's objection that this "demand is patently unreasonable" is insufficient. "To assert a proper objection on [the basis of overly broad or unduly burdensome] one must do more

than 'simply intone [the] familiar litany that the interrogatories are burdensome, oppressive or overly broad.' Instead, the objecting party bears the burden of demonstrating 'how each question is overly broad, burdensome or oppressive by submitting affidavits or offering evidence revealing the nature of the burden.'" *Culkin v. Pitney Bowes, Inc.*, 225 F.R.D. 69, 70-71 (D. Conn. 2004).

**INTERROGATORY 2**

*Identify and describe in detail all measures VA has taken (e.g., training, supervision, auditing, data analysis, record-keeping, or any other preventative or corrective measure), if any, to identify, assess, measure, address, and/or mitigate racial disparities in VBA claims adjudication in VA housing, education, and disability compensation benefits programs, from January 1, 1945 to present.*

**Defendant's Objection:**

Defendant objects to Interrogatory No. 2 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines.

**Plaintiffs' Response:**

Plaintiffs do not seek confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation. Plaintiffs seek information responsive to Interrogatory No. 2 that is not protected from disclosure by the attorney-client privilege and/or the work product doctrines. Plaintiffs request that Defendant include in Privilege Logs any documents and/or records withheld pursuant to attorney-client privilege, work product doctrines, or deliberative process privileges that are not otherwise excluded under parties' standing ESI agreement.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 2 in that it contains subparts and is compound, conjunctive, and/or disjunctive.

**Plaintiffs' Response:**

Interrogatory No. 2 is not compound, conjunctive, or disjunctive. Nor does the Interrogatory contain discrete, independent subparts. The Interrogatory seeks a description of how Defendant has identified and addressed racial disparities in its claims adjudication. The Interrogatory's clarification that it seeks information on how Defendant has "measur[ed]," "assess[ed]," or "mitigat[ed]" these disparities is consistent with this question posed. That is, no part of the Interrogatory is "logically or factually independent of the question posed by the basic interrogatory." *Sec. Ins. Co.*, 2003 WL 22326563, at *1.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 2 as more properly the subject of witness testimony and/or document production that is currently in process.

**Plaintiffs' Response:**

Interrogatory No. 2 seeks factual information regarding the steps Defendant takes and has taken to identify and address racial disparities in its benefits adjudications processes. Additionally, Defendant's objection fails to comport with the requirements of the Federal Rules. Interrogatory No. 2 seeks factual information regarding the process by which Defendant collects and aggregates data, which is properly the subject of written discovery. "Numerous courts have held that a party may not incorporate deposition testimony or otherwise rely on future deposition testimony in lieu of offering a complete and separate response to each interrogatory. . . . Documents and testimony are often subject to interpretation and they do not serve the same purposes as interrogatories. Only a full response to the interrogatories comports with the requirements of the Federal Rules." *Pouliot*, 2004 WL 1368869, at *2.

**Defendant's Objection:**

Defendant further objects to Interrogatory No. 2 as argumentative in that it improperly relies on an assumption of racial disparities in VBA claims adjudication.

**Plaintiffs' Response:**

Interrogatory No. 2 is not argumentative. It does not rely on an assumption of racial disparities in VBA claims adjudication, but instead "seeks factual information" without requiring the advancement of Defendant's legal argument. *See Dot Com Entm't Grp., Inc. v. Cyberbingo Corp.*, 237 F.R.D. 43, 44-45 (W.D.N.Y. 2006). Instead, the Interrogatory merely requests that the United States provide information regarding steps that VA has taken to identify *whether there are* racial disparities in VA claims adjudication, and if so, steps that VA has taken to assess, measure, address, and/or mitigate those disparities. If VA has not taken steps to identify whether there are disparities in VA claims adjudication, Plaintiffs seek confirmation of that fact.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 2 as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. Plaintiffs' demand for "all measures" the VA has taken "to identify, assess, measure, address, and/or mitigate racial disparities" in adjudication of multiple types of benefits, from 1945 to present, seeks untoward volumes of information, from a myriad of sources, for a period of over 80 years. "Racial disparities" is not defined and is susceptible to multiple conflicting interpretations. Interrogatory No. 2 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

**Plaintiffs' Response:**

Interrogatory No. 2 is not overbroad, unduly burdensome, or vague and ambiguous. It seeks information dating back to the earliest date of Plaintiffs' injuries and is limited in scope to a description of the processes by which Defendant identifies and addresses racial disparities in its claims adjudication. Defendant's statement that this Interrogatory "seeks untoward volumes of information" is conclusory and insufficient. "[T]he Court is not bound to accept 'conclusory allegations . . . masquerading as factual conclusions." *Cadet v. All. Nursing Staffing of N.Y., Inc.*, 632 F. Supp. 3d 202, 219 (S.D.N.Y. 2022) (internal quotation omitted).

For the purposes of this Interrogatory, "disparities" has the same definition as the thirty-five uses of the term in the 2023 Department of Veterans Affairs Equity Action Plan.[1] "Racial disparities" refers to disparities based on race. Plaintiffs previously defined the term "racial disparities" in a July 15, 2024 email with Defendant.

Plaintiffs' Amended Complaint emphasizes the failure of VA leadership to properly supervise its benefits adjudication processes since 1945. Specifically, Plaintiffs allege that Defendant failed to redress racial disparities in its benefits adjudications. As a result, Plaintiffs' request for a description of Defendant's procedures for identifying and addressing such disparities is plainly relevant to Plaintiffs' claims and within the scope of Rule 26. That is, Interrogatory No. 2 seeks information directly related to Plaintiffs' claims. Furthermore, Plaintiffs are entitled to such information from 1945 to the present, given Plaintiffs' allegation that racial disparities have existed in Defendant's benefits adjudication processes over the same period.

**Defendant's Objection from October 22, 2024 Letter:**

Defendant provided an extensive response identifying various measures it takes and has taken to ensure that all veterans are treated fairly and equally so that they may receive benefits, including steps taken to identify and eliminate racial disparities. Again, Plaintiffs repeatedly mischaracterize the information provided by Defendant. For instance, Plaintiffs complain that "Defendant's response primarily focuses on its current outreach programs," but do not acknowledge that Defendant provided information dating back 30 years. Letter at 6. And as stated above and in the Objections and Responses, Defendant reserves the right to supplement.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 2.

The information Defendant provided in response to Interrogatory No. 2 "dating back 30 years" consists primarily of a general description of the creation of the Center for Minority Veterans under Public Law 103-446, enacted in 1994. But, as Plaintiffs noted in their letter dated October 9, 2024, Defendant's response does not describe in sufficient detail the steps Defendant has taken to identify and address racial disparities in VA claims adjudications.

---

[1] U.S. Dep't of Veterans Affs., *Equity Action Plan*, Executive Order 13985 Implementation (2023), https://assets.performance.gov/cx/equity-action-plans/2023/EO_14091_VA_EAP_2023.pdf.

Furthermore, even if Defendant had adequately described its processes for identifying and addressing such racial disparities "dating back 30 years," Defendant's response still fails to acknowledge that Plaintiffs seek such information dating back *eighty* years. Defendant has not responded in sufficient detail to the issues Plaintiffs raised in their letter, and the Interrogatory response remains deficient.

**Defendant's Objection:**

Plaintiffs' argumentative demands unreasonably expand what is called for by the already overbroad Interrogatory. The insistence that Defendant explain, for a period of 80 years, "how Defendant monitors claims processors' benefits decisions, whether Defendant undertakes audits of benefits decisions, whether Defendant has ever taken any steps to rectify processors' decisions when processors fail to abide by their training, and so on" ignores the Objections and Responses and is facially improper.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 2.

Plaintiffs' response to Defendant's answer does not constitute an expansion of the interrogatory. In clarifying that Plaintiffs seek information regarding "how Defendant monitors claims processors' benefits decisions, whether Defendant undertakes audits of benefits decisions, whether Defendant has ever taken any steps to rectify processors' decisions when processors fail to abide by their training, and so on," Plaintiffs are merely clarifying the types of activities taken by Defendant that they understand to be responsive to this Interrogatory.

**INTERROGATORY 3**

*Identify and describe in detail all measures VA has taken, if any, to ensure that racial bias in the military discharge and military justice systems did not and do not cause racial disparities in VBA claims adjudications, from January 1, 1945 to present.*

**Defendant's Objection:**

Defendant objects to Interrogatory No. 3 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines.

**Plaintiffs' Response:**

Plaintiffs do not seek confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation. Plaintiffs seek information responsive to Interrogatory No. 3 that is not protected from disclosure by the attorney-

client privilege and/or the work product doctrines. Plaintiffs request that Defendant include in Privilege Logs any documents and/or records withheld pursuant to attorney-client privilege, work product doctrines, or deliberative process privileges that are not otherwise excluded under parties' standing ESI agreement.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 3 as more properly the subject of witness testimony and/or document production that is currently in process.

**Plaintiffs' Response:**

Interrogatory No. 3 seeks factual information regarding the steps Defendant takes and has taken to prevent racial bias in the military discharge and justice systems from causing racial disparities in Defendant's VA claims adjudications. If this Interrogatory will be comprehensively answered through document production, Plaintiffs seek confirmation as to that fact and further seek specificity regarding which Bates ranges are responsive to this Interrogatory.

Additionally, Interrogatory No. 3 seeks factual information regarding the process by which Defendant collects and aggregates data, which is properly the subject of written discovery. "Numerous courts have held that a party may not incorporate deposition testimony or otherwise rely on future deposition testimony in lieu of offering a complete and separate response to each interrogatory. . . . Documents and testimony are often subject to interpretation and they do not serve the same purposes as interrogatories. Only a full response to the interrogatories comports with the requirements of the Federal Rules." *Pouliot*, 2004 WL 1368869, at *2.

**Defendant's Objection:**

Defendant further objects to Interrogatory No. 3 as argumentative in that it improperly relies on an assumption of racial bias in military discharge and military justice systems.

**Plaintiffs' Response:**

Interrogatory No. 3 does not rely on an assumption that racial biases exist in the military discharge and justice systems. Rather, "if [Defendant has taken] any [measures] to ensure that racial bias in the military discharge and military justice systems did not and do not cause racial disparities in VBA claims adjudications," the Interrogatory asks about such measures. *See also* Amended Complaint, ECF No. 36, at ¶¶ 76-77 (citing 1972, 1975, and 2017 analyses by Defense Department finding racial disparities in its military discharge and military justice systems).

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 3, which seeks "all measures" the VA has taken "to ensure that racial bias" in discharges or military justice systems "do not cause racial disparities" in adjudication of benefits, for a period of over 80 years, as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26.

**Plaintiffs' Response:**

Interrogatory No. 3 is not overbroad, unduly burdensome, or vague and ambiguous, nor does it seek information beyond the scope of Rule 26. Plaintiffs' Amended Complaint emphasizes VA leadership's failure to properly supervise its benefits adjudication processes since 1945. Specifically, Plaintiffs allege that Defendant failed to redress racial disparities in its benefits adjudications. As a result, Plaintiffs' request for a description of Defendant's procedures for preventing such disparities is relevant to the claims of Plaintiffs and the proposed class and within the scope of Rule 26. That is, Interrogatory No. 3 seeks information directly related to Plaintiffs' claims. Furthermore, Plaintiffs are entitled to such information from 1945 to the present, given Plaintiffs' allegation that racial disparities have existed in Defendant's benefits adjudication processes over the same period.

Defendant's statement that this Interrogatory seeks measures that are "overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26" is conclusory and insufficient. "[T]he Court is not bound to accept conclusory allegations . . . masquerading as factual conclusions." *Cadet*, 632 F. Supp. 3d at 219 (internal quotation omitted).

**Defendant's Objection:**

"Racial disparities" is not defined and is susceptible to multiple conflicting interpretations. Interrogatory No. 3 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

**Plaintiffs' Response:**

For the purposes of this Interrogatory, "disparities" has the same definition as the thirty-five uses of the term in the 2023 Department of Veterans Affairs Equity Action Plan.[2] "Racial disparities" refers to disparities based on race. Plaintiffs have previously defined the term "racial disparities" in a July 15, 2024 email to Defendant.

**Defendant's Objection from October 22, 2024 Letter:**

Defendant provided a detailed response to this Interrogatory. Plaintiffs mischaracterize the Response and have not identified any genuine dispute. As stated above and in the Objections and Responses, Defendant reserves the right to supplement this or any of its Responses.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 3.

---

[2] *Equity Action Plan*, *supra* note 1.

Plaintiffs' letter did not "mischaracterize" Defendant's response to Interrogatory No. 3. Rather, Plaintiffs asked that Defendant confirm whether its response contains the complete set of actions Defendant has taken that are responsive to Interrogatory No. 3. Defendant has not responded, and the Interrogatory response remains deficient.

**INTERROGATORY 4**

*Identify and describe in detail all formal or informal VBA investigations, if any, conducted following or in response to complaints regarding racial disparities in VA housing, education, and disability compensations benefits programs, from January 1, 1945 to present, including but not limited to the response to complaints received by Willie Clark and Mike Frueh via email on December 5, 2017 at 5:27 PM. A copy of the email is attached as Exhibit A.*

**Defendant's Objection:**

Defendant objects to Interrogatory No. 4 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines.

**Plaintiffs' Response:**

Plaintiffs do not seek confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation. Plaintiffs seek information responsive to Interrogatory No. 4 that is not protected from disclosure by the attorney-client privilege and/or the work product doctrines. Plaintiffs request that Defendant include in Privilege Logs any documents and/or records withheld pursuant to attorney-client privilege, work product doctrines, or deliberative process privileges that are not otherwise excluded under parties' standing ESI agreement.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 4 in that it contains subparts and is compound, conjunctive, and/or disjunctive.

**Plaintiffs' Response:**

Interrogatory No. 4 is not compound, conjunctive, or disjunctive. To the contrary, Interrogatory No. 4 seeks a description of a common theme: all VA investigations conducted in response to complaints regarding racial disparities in benefits adjudications. That is, no part of the Interrogatory is "logically or factually independent of the question posed by the basic interrogatory." *Sec. Ins. Co.*, 2003 WL 22326563, at *1.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 4 as more properly the subject of witness testimony and/or document production that is currently in process.

**Plaintiffs' Response:**

Interrogatory No. 4 seeks factual information regarding formal and informal VBA investigations, which is properly the subject of written discovery. If this Interrogatory will be comprehensively answered through document production, Plaintiffs seek confirmation as to that fact and further seek specificity regarding which Bates ranges are responsive to this Interrogatory.

**Defendant's Objection:**

Defendant further objects to Interrogatory No. 4 as argumentative in that it improperly relies on assumptions and characterizations regarding the subject matter and context of the communications contained in the referenced Exhibit A.

**Plaintiffs' Response:**

Interrogatory No. 4 is not argumentative. It does not rely on assumptions or characterizations regarding the subject matter and context of the communications contained in the referenced Exhibit A. In referring to the subject matter of the communications contained in the referenced Exhibit A as "complaints," Interrogatory No. 4 merely provides context for Defendant regarding the type of communications that are responsive to this Interrogatory.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 4, which demands "all formal and informal VBA investigations" in response to "complaints" regarding "racial disparities" in multiple types of benefits programs, for a period of over 80 years, as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. "Racial disparities," "complaints," and "investigations" are not defined and are susceptible to multiple conflicting interpretations.

**Plaintiffs' Response:**

Interrogatory No. 4 is not overbroad, unduly burdensome, or vague and ambiguous. It seeks information dating to the earliest date of Plaintiffs' injuries and covering the three types of benefits programs that are relevant to the claims of Plaintiffs and the proposed class. Interrogatory No. 4 does not seek information beyond the scope of Rule 26, as the information sought regarding the investigations is directly relevant to Plaintiffs' claims and proportional to the needs of the case. Specifically, Plaintiffs lack the requisite knowledge regarding the structure of VA dating back to the earliest date of their injuries. Therefore, should Defendant provide an organizational chart to Plaintiffs, as Plaintiffs have requested of Defendant in multiple communications, Plaintiffs may be able to further cabin the breadth of this Interrogatory.

For the purposes of this Interrogatory, "disparities" has the same definition as the thirty-five uses of the term in the 2023 Department of Veterans Affairs Equity Action Plan.[3] "Racial disparities" refers to disparities based on race. For the purposes of this Interrogatory, "complaint" is understood to mean an "expression of grief, pain, or dissatisfaction," consistent with the Merriam-Webster definition.[4] For the purposes of this Interrogatory, "investigations" carries its ordinary meaning.[5] Plaintiffs have previously defined the terms "racial disparities" and "investigation" in a July 15, 2024 email with Defendant.

**Defendant's Objection:**

Interrogatory No. 4 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

**Plaintiffs' Response:**

Interrogatory No. 4 is proportional to the needs of the case. Plaintiffs' claims involve injuries dating to 1945, so it is proportional to the needs of the case to seek discovery dating back to that year. Additionally, Interrogatory No. 4 is proportional to the needs of the case because widespread racial disparities in veterans' benefits are an important issue, there is a significant amount in controversy, and the response to Interrogatory No. 4 will be important to resolving the issues. Finally, because Interrogatory No. 4 seeks non-public information, Plaintiffs will be unable to access this information through other means. Defendant's statement that this Interrogatory is "nor proportional to the needs of the case" is conclusory and insufficient. "[T]he Court is not bound to accept conclusory allegations . . . masquerading as factual conclusions." *Cadet*, 632 F. Supp. 3d at 219 (internal quotation omitted).

**Defendant's Objection from October 22, 2024 Letter:**

"Complaint" and "formal and informal investigations" are broad and vague terms. Regardless, Defendant provided a detailed response regarding the forms a "complaint ... regarding racial disparities" could take, the ways it could reach the VA, and the correspondingly varied ways in which a theoretical complaint is reviewed or "investigated." As Plaintiffs know, at this time, Defendant is unaware of any search mechanism that would allow us to conduct a reasonable, not unduly burdensome search for "complaints...regarding racial disparities" within individual benefits files. It follows that, if such a complaint exists in a benefits file, a search for any "formal or informal" review of such a complaint within the context of benefits determinations would have similar limitations. Plaintiffs' demand that Defendant search for and list in detail "any and all" instances of any alleged "formal or informal" investigation, or attest to the non-existence of the

---

[3] *Equity Action Plan*, *supra* note 1.
[4] *Complaint*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/complaint.
[5] *See* VA Office of Inspector General, 2022-2026 Strategic Plan, https://www.vaoig.gov/sites/default/files/document/2025-01/VA%20OIG%20Strategic%20Plan_1.pdf (conduct "audits, inspections, reviews, and investigations").

same, is unreasonable. Defendant is under no obligation to extensively compile "a description of individual investigations," including "a description of the complaint, any steps taken by Defendant upon receiving the complaint, and the associated records." Moreover, if such documents do exist, they are also highly likely to contain sensitive personal information of non-parties. It is unclear how such information is relevant or proportional. Finally, Defendant explained that the document at Exhibit A reflected a grievance by an individual VA employee, and that review of that grievance was handled pursuant to the VA Office of Resolution Management, Diversity & Inclusion's EEO Discrimination Complaint Process. It is Defendant's understanding, based on prior communications, that Plaintiffs are not seeking discovery into VA employment-related disputes. Regardless, Defendant responded to Plaintiff's request regarding this document, subject to our Objections.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 4.

The parties discussed Defendant's objections to Interrogatory No. 4 during a meet and confer on December 19, 2024. As memorialized in Plaintiffs' letter dated December 20, 2024:

> "You asked whether we were only interested in complaints from institutional actors, or whether we are also interested in complaints filed with Sterling Akin's office. We responded that Plaintiffs seek both. We stated, as we have said previously, that Plaintiffs do not seek individual disability compensation files that may have a stray comment regarding racial disparities or discrimination, but Plaintiffs do seek complaints submitted to Mr. Akins' office and letters or other communications to VA leadership since 1945 regarding racial disparities. These latter communications may include such materials as correspondence from the NAACP, veterans service organizations (VSOs), or the Congressional Black Caucus, and any records made in response."

Plaintiffs' request therefore would not require Defendant to search individual benefit files to identify such complaints.

Defendant's objections regarding the documents containing sensitive information concerning non-parties are unavailing, as Defendant can withhold sensitive information as needed.

## INTERROGATORY 5

*Identify the names and positions of the senior-most members of the Senior Executive Service, federally appointed VA staff, and VBA personnel who, in each year from and inclusive of 1945 to present, were responsible for (a) developing, approving, or implementing VA diversity initiatives related to veteran benefits; (b) creating, modifying, reviewing, and/or approving data collection and retention policies and practices for VA housing, education, and/or disability compensation benefits programs; and/or (c) creating, modifying, reviewing, and/or approving reports, presentations, or any other material summarizing and/or analyzing data arising from or related to VA housing, education, and disability compensation benefits programs.*

**Defendant's Objection:**

Defendant objects to Interrogatory No. 5 in that it contains subparts and is compound, conjunctive, and/or disjunctive.

**Plaintiffs' Response:**

This Interrogatory's enumeration of specific kinds of benefits programs is not "logically or factually independent of the question posed by the basic interrogatory." *Sec. Ins. Co.*, 2003 WL 22326563, at *1. Interrogatory No. 5 sees information regarding particular employees responsible for particular tasks associated with VA benefits programs, and all parts of Interrogatory No. 5 are factually and logically linked to that basic question. As a result, the Interrogatory is not compound, conjunctive, or disjunctive, nor does the Interrogatory contain discrete, independent subparts.

**Defendant's Objection:**

Defendant further objects to Interrogatory No. 5 as argumentative in that it improperly relies on assumptions regarding employee roles and responsibilities.

**Plaintiffs' Response:**

Interrogatory No. 5 is not argumentative. It does not rely on assumptions or characterizations regarding data analyses regarding employee roles and responsibilities. In identifying the relevant roles and responsibilities, Interrogatory No. 5 merely identifies the precise types of activities in which an employee might have engaged that would render their identification responsive to the Interrogatory.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 5 as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. Plaintiffs' demand for the identities and positions of multitudinous federal workers, holding numerous roles or titles, "responsible for" various broad and vague duties, from 1945 to present, seeks untoward volumes of information, from a myriad of sources, for a period of over 80 years. "Senior-most members," "federally appointed VA staff," "responsible for," "implementing," "reviewing," and "diversity initiatives" are not defined and are susceptible to multiple conflicting interpretations.

**Plaintiffs' Response:**

Interrogatory No. 5 is not overbroad, unduly burdensome, or vague and ambiguous. It seeks information dating to the earliest date of Plaintiffs' injuries and is limited in scope to identifying the names and positions of individuals, responsible for three cabined categories of activities that are directly relevant to Plaintiffs' claims. Interrogatory No. 5 does not seek information beyond the scope of Rule 26, as the identities and positions of individuals responsible for the identified activities are directly relevant to Plaintiffs' claims and proportional to the needs of the case. Defendant's statement that this Interrogatory "seeks untoward volumes of information" is

conclusory and insufficient. "[T]he Court is not bound to accept conclusory allegations . . . masquerading as factual conclusions." *Cadet*, 632 F. Supp. 3d at 219 (internal quotation omitted).

For the purposes of this Interrogatory, "senior-most member" concerns the person with the highest rank or seniority who was responsible for the identified activities. For the purposes of this Interrogatory, "federally appointed VA staff" includes any VA employee appointed by the President or appointed pursuant to Title 38 or Title 5 of the U.S. Code. For the purposes of this Interrogatory, "responsible for," "implementing," and "reviewing" carry their ordinary meanings. For the purposes of this Interrogatory, "diversity initiatives" is consistent with VA's understanding of the phrase: formal efforts or programs to "address the specific needs that affect Veterans from minority and disadvantaged backgrounds."[6]

**Defendant's Objection:**

Interrogatory No. 5 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

**Plaintiffs' Response:**

Interrogatory No. 5 is proportional to the needs of the case. Plaintiffs' claims involve injuries dating back to 1945, so it is proportional to the needs of the case to seek discovery dating back to that year. Additionally, Interrogatory No. 5 is proportional to the needs of the case because widespread racial disparities in veterans' benefits are an important issue, there is a significant amount in controversy, and the response to Interrogatory No. 5 will be important to resolving the issues. Finally, because Interrogatory No. 5 seeks non-public information, Plaintiffs will be unable to access this information through other means.

Defendant's statement that this Interrogatory "is not proportional to the needs of the case" is conclusory and insufficient. "[T]he Court is not bound to accept conclusory allegations . . . masquerading as factual conclusions." *Cadet*, 632 F. Supp. 3d at 219 (internal quotation omitted).

**Defendant's Objection from October 22, 2024 Letter:**

Defendant provided responsive information identifying numerous employees, for each category of information sought, covering periods of approximately 20-30 years. Defendant will supplement its answer if more information becomes available through the course of discovery.

[6] *Diversity, Equity, and Inclusion Initiative*, Off. of Rsch. & Dev., U.S. Dep't of Veterans Affs. (Oct. 23, 2024), https://www.research.va.gov/programs/dei/default.cfm.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 5.

Plaintiffs appreciate Defendant's efforts to provide responsive information to Interrogatory No. 5 and commitment to supplementing its answer as needed. Plaintiffs continue to seek responsive information to Interrogatory No. 5 from years prior to the twenty- to thirty-year period provided in the September 10, 2024 Response. Plaintiffs also seek confirmation regarding the precise period covered by Response No. 5 and confirmation regarding whether the Response is full and complete as to the time period identified.

**INTERROGATORY 6**

*Identify all of Your employees or contractors who conducted data analysis regarding the relationship between race and outcomes of VA benefits adjudication from January 1, 1945 to the present, including those responsible for the 2017 analysis of PTSD outcome claims by race.*

**Defendant's Objection:**

Defendant objects to Interrogatory No. 6 as argumentative in that it improperly relies on assumptions or characterizations regarding data analyses relating to benefits adjudication outcomes.

**Plaintiffs' Response:**

Interrogatory No. 6 is not argumentative. It does not rely on assumptions or characterizations regarding data analyses relating to benefits adjudication. In referring to the relevant data analyses as those "regarding the relationship between race and outcomes of VA benefits adjudication," Interrogatory No. 6 merely describes the subject matter of any data analyses that would be relevant to the Interrogatory.

**Defendant's Objection:**

Defendant objects further to Interrogatory No. 6 as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. "Conducted" is not defined and is susceptible to multiple conflicting interpretations.

**Plaintiffs' Response:**

Interrogatory No. 6 is not overbroad, unduly burdensome, or vague and ambiguous. It seeks information dating to the earliest date of Plaintiffs' injuries and is limited in scope to identifying the names of individuals involved in data analyses that are directly relevant to Plaintiffs' claims. Interrogatory No. 6 does not seek information beyond the scope of Rule 26, as the identity of individuals involved in the identified data analysis is relevant to Plaintiffs' claims and proportional to the needs of the case. Defendant's statement that this Interrogatory "unduly burdensome" is

conclusory and insufficient. "[T]he Court is not bound to accept conclusory allegations . . . masquerading as factual conclusions." *Cadet*, 632 F. Supp. 3d at 219 (internal quotation omitted).

For purposes of responding to this Interrogatory, Plaintiffs understand "conducted" consistent with its ordinary meaning.[7]

**Defendant's Objection:**

Interrogatory No. 6, which seeks the identities and positions of potentially numerous employees and contractors "who conducted data analysis" regarding the "relationship" between race and benefits outcomes for a period of over 80 years, is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

**Plaintiffs' Response:**

Interrogatory No. 6 is proportional to the needs of the case. The claims of Plaintiffs and the proposed class involve injuries dating to 1945, so it is proportional to the needs of the case to seek discovery dating back to that year. Additionally, Interrogatory No. 6 is proportional to the needs of the case because widespread racial disparities in veterans' benefits are an important issue, there is a significant amount in controversy, and the response to Interrogatory No. 6 will be important to resolving the issues. Finally, because Interrogatory No. 6 seeks non-public information, Plaintiffs will be unable to access this information through other means. Defendant's objection that the Interrogatory is "not proportional to the needs of the case" is conclusory and insufficient. "[T]he Court is not bound to accept conclusory allegations . . . masquerading as factual conclusions." *Cadet*, 632 F. Supp. 3d at 219 (internal quotation omitted).

**Defendant's Objection from October 22, 2024 Letter:**

Defendant provided responsive information identifying numerous employees and contractors, for multiple studies, covering a period of approximately 20 years. Defendant will supplement its answer if more information becomes available through the course of discovery.

**Plaintiffs' Response:**

Plaintiffs reincorporate the substantive concerns they raised in their letter dated October 9, 2024, regarding Defendant's response to Interrogatory No. 6.

Plaintiffs appreciate Defendant's efforts to provide responsive information to Interrogatory No. 6 and commitment to supplementing its answer as needed. Plaintiffs continue to seek

[7] *See, e.g.*, *Department of Veterans Affairs Fiscal Years 2022-28 Strategic Plan*, U.S. Dep't of Veterans Affs. (2022), https://department.va.gov/wp-content/uploads/2022/09/va-strategic-plan-2022-2028.pdf ("The Center for Minority Veterans (CMV) conducts and sponsors appropriate social and demographic research to understand the needs of minority Veterans and publicizes results of medical research of significance to minority Veterans.").

responsive information to Interrogatory No. 6 from years prior to the twenty-year period provided in the September 10, 2024 Response and seek confirmation regarding whether the response is full and complete as to the time period 2005 through the present.

* * *