UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONLEY F. MONK, JR., ET AL., Plaintiffs, | No. 3:22-cv-01503-SRU |
| | December 4, 2025 |
| v. | 1:33 p.m. |
| UNITED STATES OF AMERICA, Defendant. | 915 Lafayette Boulevard Bridgeport, Connecticut |

TELEPHONIC MOTION HEARING

B E F O R E:

THE HONORABLE STEFAN R. UNDERHILL, U.S.D.J.

A P P E A R A N C E S:

For the Plaintiffs:

JEROME N. FRANK LEGAL SERVICES - YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
E-mail: Rose.goldberg@ylsclinics.org
BY: ROSE CARMEN GOLDBERG, ESQ.
BESSIE BAUMAN, Law student intern

(Appearances continue ...)

Official Court Reporter:
Melissa J. Cianciullo, RDR, CRR, CRC
(203) 606-1794

A P P E A R A N C E S C O N T ' D:

For the Defendant:

DEPARTMENT OF JUSTICE CIVIL DIVISION
Benjamin Franklin Station
P.O. Box 888
Washington, DC 20044
E-mail: Emily.m.kelley@usdoj.gov
BY: EMILY M. KELLEY, ESQ.
IRINA MAJUMDAR, ESQ.

UNITED STATES ATTORNEY'S OFFICE
450 Main Street, Suite 328
Hartford, CT 06103
E-mail: Jillian.orticelli@usdoj.gov
BY: JILLIAN ROSE ORTICELLI, AUSA
SARAH ROCCO, AUSA

THE COURT: Good afternoon. This is Stefan Underhill. We are on the record.

Who is on the call, please?

MS. GOLDBERG: Good afternoon, Your Honor. This is Rose Carmen Goldberg. I'm a supervising attorney with the Yale Law School, Jerome N. Frank Legal Services Organization, here on behalf of plaintiffs.

And I'm joined by Bessie Bauman, law student intern, whose appearance you have approved, who will handle arguments today.

THE COURT: Very good. Thank you.

MS. KELLEY: Your Honor, good afternoon. This is Emily Kelley with the Department of Justice Civil Division.

I'm joined by fellow counsel of record Irina Majumdar and Jillian Orticelli of the U.S. Attorney's Office for the District of Connecticut.

Also joining us are counsel from the VA, as well as Sarah Rocco from the U.S. Attorney's Office for the District of Connecticut.

And I will be handling the discussion on behalf of the United States.

THE COURT: All right. Very well. If each of you could identify yourselves when you start

speaking, that would be helpful to my court reporter.

Ms. Kelley, it's your motion. Why don't we hear from you first.

MS. KELLEY: Thank you, Your Honor.

So as Your Honor is aware, there are two main discovery issues in front of the Court on this motion. One deals with what is referred to as the sampling requested benefits information and another is for what plaintiffs call a request for complaints.

And now, since the briefing, we do have some updates for the Court and a bit of clarity that we received from plaintiffs pursuant to a September meet and confer that was held at the government's request.

The primary issue here is, really, plaintiffs' request for the production of thousands of highly protected and highly sensitive veterans' benefits files or, in the alternative, the spending of a massive amount of government resources and time to collate and produce either redacted or compiled information from those files as just one piece of their expansive discovery that covers 80 years. We believe these requests would not only violate the rights of other veterans but are disproportional to the needs of the case.

On that sampling proposal, as we discussed in

our briefing, the United States promised to produce an anonymized data-based reports for at least 5500 anonymized claims from the period of 2006 to the present. And we have since done that. And back in July, the United States produced that. It constituted 44,000 rows of data, over 60 columns.

And we also produced a data dictionary, a summary of the query process and a spreadsheet with total claims filed by regional office by year where available. So that has now been done for the periods for which that information does exist in a database across which a data query could be run.

Having heard nothing further from plaintiffs after the filing, we did request a meet and confer to discuss whether the plaintiffs were seeking an additional 11,000 or an additional 16,500, since they had originally requested 16,500 total. They've now confirmed they seek 11,000 more claims. So those are the updates on that issue.

So the remaining issue is the pre-2006 time period. For that time period, the request the plaintiffs ask for cannot be satisfied through a computer query run across structured data because the information does not exist in that format. This is supported by uncontradicted and detailed declarations

filed in support of the motion.

Also, as laid out in our motion, there are multiple statutes and regulations that protect against the release of this information without veteran's consent. And plaintiffs cannot meet the high bars --

THE COURT: Or a Court order. Or a Court order.

MS. KELLEY: I'm sorry, Your Honor. I couldn't hear you clearly.

THE COURT: You said "without consent" and I said "or a court order." And I want to determine whether you agree that a Court order would satisfy -- a court order to produce the files would satisfy the statutes.

MS. KELLEY: Your Honor, we believe that a very specific type of court order, in theory, in a hypothetical, could satisfy it. However, we do not believe that the process that is required in this case could be done or that plaintiffs could show the good cause that they have to show to obtain this information.

And, you know, in addition to the Privacy Act, for instance, which we did put forward a list of what we thought were safeguards that would be

necessary to satisfy the Privacy Act, you also have Section 7332 protection, and that protects the most sensitive types of personal health information for specific categories of health information. And it's inevitable that some or maybe many thousand of these thousands of randomly selected files would contain that, and there is no way to know for sure until the files are scoured.

So a requirement to produce these files would be in violation of the statutes. The order process for that would require a good cause application, notice to the patients, all of them, who might have this information, a review of evidence and a hearing process for each individual patient or veteran that cannot be held in an open hearing, it has to be in-camera, it has to be confidential, and then specific criteria for an entry of order has to be entered. That is pursuant to a regulation that is enacted pursuant to specific statutory authority.

So if we're talking about unredacted claims materials, there is just not sufficient good cause. It would be an unheard of intrusion into these veterans' privacy rights to say that a plaintiff in a personal claim for damages has a right to this information on a massive scale. Regardless of how

important one might view the issues implicated in this case, that does not outweigh the rights of all of these other veterans to have their sensitive information protected.

And plaintiffs admit they don't really want all of the files. They want to essentially go through and cherry-pick information that they think will then be helpful for their claims, and the Court has already acknowledged that dissecting individual benefits files is not helpful here.

You know, the other proposed options are equally inappropriate as we examined in detail in our briefing. You know, we put forward, again, uncontradicted declarations explaining how these benefits filed exist and how difficult it would be to either pull, anonymize and redact and produce the selected files or to review and compile information into a spreadsheet. The only real --

THE COURT: Let me interrupt.

So Section 7332 concerns records regarding the identity, diagnosis, prognosis or treatment of any patient or subject relating to drug abuse, alcoholism, AIDS, sickle cell anemia, et cetera.

So what reason is there to believe that a benefits file is going to include that information?

MS. KELLEY: Sure, Your Honor. So we discuss this in our briefing. There is very good reason to think that a benefits file could include this information. If, for example, a veteran applied for a certain disability that could be related to any of these illnesses, they would have that kind of information in there. They could have -- this could come in all sorts of forms. It could be the application itself for benefits. It could be treatment records. It could be medical records that are submitted in support of it. It could even be in the form of, you know, listing a prescription that is tied to one of these specific treatments.

So it is almost absolutely certain that at least some of these files will contain such information, and there is literally no way to know unless you review all of the files in full which would also defeat the purpose of plaintiffs' suggestion that unredacted production is simpler because we could not do an unredacted production without reviewing in full all of these files to make sure that none of that gets through.

We also couldn't simply redact it because the very act of redacting it and only it would indicate that that kind of information is contained in a given

file.

THE COURT: But it wouldn't indicate who the patient was. But let me go back.

Are veterans' benefits available based upon drug abuse, alcoholism, human immunodeficiency virus or sickle cell anemia?

MS. KELLEY: Your Honor, if any of those things are deemed connected to their service, absolutely. Not to mention that there can be other times or other types of disabilities that could indicate that.

So, for example, a veteran that sought mental health counseling or, as we mention in our brief, a veteran who receives benefits for PTSD may be more likely to also suffer from drug or alcohol abuse. And so absolutely --

THE COURT: Right. But the benefits claim would not be for alcohol abuse, it would be for PTSD, right?

MS. KELLEY: I can't say that, Your Honor. I do believe that if it's a disability that can be approved as connected to benefits or connected to service, that the claim could be for that.

But regardless, 7332 isn't just about what the claim is for. It's about the information itself.

If that information is in the record, it is protected under 7332.

THE COURT: I understand. But presumably the veteran has more than one subfile. There might be a medical subfile. There might be an employment subfile. There might be a service subfile and there might be a disability benefits subfile.

What reason is there to believe that the disability benefits portion of the total record would include anything that is the subject of 7332?

MS. KELLEY: Your Honor, there are no subfiles within these disability benefits files. The disability benefits file is everything that was ever submitted in connection with those disability benefits. There is --

THE COURT: Correct. Correct.

MS. KELLEY: Yes.

THE COURT: Correct. The disability benefits file is what I'm focusing on. The medical treatment file --

MS. KELLEY: Yes, Your Honor.

THE COURT: -- should not be included as part of the disability benefits file unless the medical treatment was for a gunshot wound, you know, during combat or PTSD as a result of, you know, combat

memories, whatever.

The point is that the information that is prohibited from disclosure under 7332 would not likely -- I don't see how it's likely that that's going to appear in a disability benefits file as opposed to another subfile that the veteran has. If the veteran is at the -- goes to the veterans hospital and is treated for appendicitis, it's not going to show up in their disability benefits file, is it?

MS. KELLEY: Your Honor, the entire medical record of that veteran is likely not in the disability benefits file; however, by the very nature of the disability benefits, they have to produce medical records in support of their claims.

THE COURT: Right.

MS. KELLEY: And absolutely, that can involve and does at some time involve these types of records in the disability benefits file, which is what plaintiffs are asking for and which is where this disability benefit information is contained.

So while you are correct that not all medical records are necessarily in there, yes, absolutely these types of records can be in there. We can produce a declaration, likely, if you need one in

further support. I mean, I think you've -- you know, we've produced samples of benefits files with the plaintiffs' consent from them, although they refuse to ask their other clients if they would consent so that we could show you a sample of what those files can look like.

And there can be all sorts of information. If a veteran submits information in support of their benefits claim, even if it's not relevant, that is going in the benefits file. So if they submit it in support of their claim, even if it turns out, you know, that's not the type of disability they're supporting, it's in there. So, yes, that is --

THE COURT: Right. But you're giving me hypotheticals. You're not giving me facts. You're saying somebody who has a terrible back injury might have sickle cell anemia and they might have mentioned that somewhere when they were talking about their back injury. That's possible. Of course, it's possible.

What I am asking you is: The various records that are set forth in 7332 all relate to types of conditions that I don't believe are available as a basis for disability. So the appearance of a stray record shouldn't prevent the disclosure of the

disability benefits file.

MS. KELLEY: Your Honor, we cannot provide you specific examples without literally examining the entirety of the files. But what we can say is, yes, they can be connected to specific disability claims. Things like alcoholism, alcohol abuse, they can be connected. Even HIV, potentially, could be connected.

Disability benefits cover many more things than just being hurt in -- while during service through, you know, a bullet wound, as you said. And, yes, they are in there. And actually, a stray disclosure is incredibly serious. This is the most protected type of information. And plaintiffs haven't demonstrated a need for it. They don't even claim to need it. I mean, there are legal ramifications. There are criminal ramifications for disclosure of this information without consent and without following the proper procedures, you know.

THE COURT: Or without a court order.

MS. KELLEY: The court order that would be required here would require the specific process outlined in Regulation 38 CFR 1.493 which we do not believe could possibly be satisfied on this massive scale because it would require notice to thousands of

veterans and then in-camera review for each individual veteran. And that is all before -- or sorry, that is all after plaintiffs first make an application and a good showing.

THE COURT: Let me take you back to first principles. The reason we're even talking about sampling here is to minimize the burden on the VA. And if you're arguing that it's impossible to follow that burden-minimizing approach, it doesn't mean that the discovery is not available. There is a serious claim that has been made. In order to sustain that claim or even have it come to trial, the plaintiffs need discovery from the government regarding other veterans' disability claims.

So we can do this the hard way or we can do this the easy way. These plaintiffs are trying to make it easy on the government, and they're willing to do the work. But what you're arguing for, in effect, is prohibiting discovery in support of the claim.

MS. KELLEY: Your Honor, respectfully, as you can see, you know, yes, perhaps unredacted production would be an easier way. The fact that we're arguing against that is because of veterans' rights, not because of what would be easiest for the VA. And the

fact that plaintiffs are so willing to be dismissive of those veterans' rights and say the Court should ignore those requirements is frankly surprising and concerning. It doesn't mean that their rights outweigh these other veterans' rights.

As far as the easy way, there isn't an easy way. We would prefer it if there was an easy way and we would have done it already, as we did for the 20-year period where it is available by running a query across the database, which is what plaintiffs proposed in the first instance and what we agreed to do where we could.

As far as their other proposals, just because they in theory could be done does not mean they're appropriate and proportional discovery here. I mean, again, our declarations are uncontradicted. We clearly examined these from numerous angles. We thought about this. We tried to figure out if there was a way to do it. But we are talking about weeks -- or excuse me, months or years worth of effort that would be required, also taking away those resources from people who would otherwise be working on active benefits requests.

And even if we accepted plaintiffs' description of how long they thought the process

should take to review files on VBMS and pull that information, it's still months. And that doesn't even include the time it would take to anonymize and redact specific documents or input that information into a spreadsheet, not to mention that that kind of creation of a document is nothing like the production of a database report through an automated process that gives you information as it exists in the normal course.

What plaintiffs are essentially asking for here is the creation of work product by an opposing party specifically for their use in litigation. We don't think anything about that is appropriate. We are certainly not being dismissive of plaintiffs' request. We've offered to produce even more data from the 20-year time period in which it is available. But what we are saying is there is no easy way. And plaintiffs, frankly, do not refute that. They say there should be an easy way. They cite to nothing in support. They admit that they are not as familiar with these programs as VA is, who have submitted multiple declarations to show and to explain what this is. They're not even willing to ask their own clients to share their records which we think is rather telling.

So no, Your Honor, we don't believe that those are appropriate or proportional solutions to what plaintiffs want.

THE COURT: Do you want to be heard on the second issue; that is, the complaint issue?

MS. KELLEY: Yes. Thank you, Your Honor. Yes. So we also have an update on this one, as I mentioned.

So on the complaints issue, you know, this one, we think, is -- mostly should still be left to the parties as it is ongoing and we think progress has been made.

As far as an update, as I mentioned, we hadn't heard anything further from plaintiffs after the briefing, so we reached out to them for a meet and confer in September. We had identified specific National Archives files that are publicly available for review in our briefing. We asked, you know, plaintiff, "Can you confirm whether you're even interested in those files potentially being reviewed?" And they have now confirmed that they do.

But the parties continue to dispute who should bear that burden given the materials are already accessible to plaintiffs and have been for these many months.

We also asked plaintiffs if they had identified other files through the online National Archives catalog that they can peruse. They said they were looking but although it's been months, we haven't heard anything further on that. To our knowledge, plaintiffs have not searched any of these publicly available physical files themselves since the motion was granted.

One other issue on the complaints piece has to do with the Office of Congressional and Legislative Affairs files. We did provide plaintiffs an update on our search of those. So far the only things that have been identified are individual-level veteran complaints, which we understand plaintiffs are not interested in, but we are continuing to look for what plaintiffs describe as institutional level. So that process is very much ongoing. And, again, we don't think that's ripe for Court intervention at this point.

Going back to the piece that we think is at a bit of an impasse between the parties, it's about who should bear the burden of reviewing the physical files that we identified in our briefing. They amount to 11,000 or so pages of administrator files. The files are not organized by subject matter, so we

cannot say with any certainty that there would be anything responsive in them unless and until those files are examined.

You know, these -- again, because these files are available, we believe that should satisfy Rule 34's requirement to make materials available for inspection, and we think it's an instance where the burden should appropriately -- the burden of review should appropriately be placed on the requesting party. We expect that plaintiffs are also going to ask for additional National Archives materials to be reviewed, although we haven't heard.

And plaintiffs are best positioned to identify what they want. The defendant would have to go through essentially the same steps to review and copy them. Plaintiffs' categories that they are asking for are extremely broad, like things like anything describing the experience of veterans when applying for benefits. And based on the documents they've produced to us that they say reflects complaints about discrimination in veterans' benefits, we don't even think those are correct as described. Most didn't go to the VA or don't discuss alleged disparities in benefits adjudication or are on the individual level. So all we're really asking

here is that plaintiffs review these available files themselves.

THE COURT: All right. Ms. Bauman.

MS. BAUMAN: Your Honor, this is Bessie Bauman for plaintiffs' counsel.

On the complaints issue, we'll begin just with what Emily Kelley has mentioned. First, there is an impasse on this issue and it is ripe for intervention. While we understand that parties have agreed and discussed about NARA, the National Archive, the government has now maintained that it is not the one or should not be the one to review these documents even though these documents are in the VA's legal possession as evidenced by VA archivist Robyn Rodgers' own declaration that even the documents at the National Archives remain in the VA's legal possession.

Further, it's important to go back to the discussion that this Court had with the parties in March 2025 where the Court instructed the government to search preelectronic records. At this point since the September 2025 meet and confer, the government has not provided any evidence that it has searched any preelectronic records. It identified or potentially responsive NARA series which plaintiffs

then responded with a prioritized list, but it has not made any commitment to review them, nor has it done any work to identify the breadth of those documents. And so this indicates that the government is not actually fulfilling its duties to complete a reasonable inquiry into the documents in its own possession.

And so at this point, we have nothing else. If there is no NARA records, there is no other document from the Office of Congressional and Legislative Affairs, effectively the search for preelectronic records has resulted in nothing. And we think that this is not possible or, I think, expeditious to this case going forward.

Furthermore, that's exactly why we asked this Court to intervene. At this, point we ask this Court to request that the government at least start with the prioritized list of NARA records that plaintiffs have provided and begin the search and continue to search that way and report status updates moving forward from that point.

THE COURT: All right. Let me find out, Ms. Kelley, has the government undertaken any search of preelectronic documents?

MS. KELLEY: Your Honor, we have not

specifically reviewed the preelectronic documents. We identified them in our papers.

And also, I just want to clarify something. Plaintiff is characterizing this as if they have received nothing. They have received at least seven productions of material since we briefed these documents. They were receiving productions on a rolling basis every few weeks up until the shutdown. So it's just -- it's disingenuous to characterize it as discovery has stalled. This is just one piece of discovery.

Further, that prioritized list had to come at our request after we reached out to them in September, and we heard nothing about whether they even wanted a review of the four files we identified in our papers. So from our perspective, identifying these things in our papers was part of the process of bringing it to plaintiffs' attention so those discussions could continue.

Further, on the OCLA files, again, we updated plaintiffs on what has been going on and the fact that that is ongoing, but that is one piece of the ongoing discovery that's happening here.

MS. BAUMAN: To be clear, plaintiff -- sorry. To be clear, plaintiffs agree that Yale searches of

custodians and all of the other discovery in this case specifically related to complaints should continue. But at this point, we have not received any other update from the government regarding preelectronic searches despite being instructed to do so in March 2025.

The government did share that they found an individualized tracker dating from 2016 in the Office of Congressional and Legislative Affairs documents, as well as then they identified the four potentially responsive NARA series, which plaintiffs were under the understanding that the government would begin to review. It was then in September of 2025 that we were told that the government would not review those, and at that point, this is why we asked the Court to intervene.

MS. KELLEY: Your Honor, this is Emily. If I may suggest one further point with respect to the status updates.

Again, we have requested the meet and confers in the past. We have provided updates. We don't think it's appropriate to require, like, any specific timing on required meet and confers. We think that will slow the process down.

But more importantly, discovery is ongoing.

There isn't a current discovery deadline we are bumping up against. And everything that we've said and, frankly, that plaintiff said has shown that we have been doing our due diligence and researching the issues. We followed up specific to the Court's March instructions and that is reflected in our papers.

THE COURT: Okay. But the question is a simple one: Has the government undertaken to review these four categories of documents? Have you done more than identify the categories? Have you actually looked at the documents?

MS. KELLEY: Your Honor, we have not specifically looked at the documents because we do believe that, in this instance, the burden should be shifted to plaintiffs, and that's what we agree with plaintiffs is ripe for the Court's decision.

THE COURT: So the four categories are all publicly available?

MS. KELLEY: Correct. They are in the National Archives physical locations. A member of the public can go and they can even make copies.

THE COURT: So what you're saying is plaintiffs' counsel should travel to D.C., look through 11,000 pages and use whatever publicly available copying system there might be at the

National Archives to make copies of any documents that they think are responsive to their discovery requests; is that right?

MS. KELLEY: Well, Your Honor, to clarify, a couple of the locations are in D.C., a couple are in Boston.

THE COURT: Okay.

MS. KELLEY: The --

THE COURT: They have to go north or south on the train. It doesn't really matter.

MS. KELLEY: Well, you know, I believe they are also --

THE COURT: They're going to be using the publicly available copying machines that are available at the National Archives.

MS. KELLEY: Your Honor, my understanding is that members of the public can also bring in their own copying machines or can take pictures. I think there is more details available from the National Archives.

But also they don't necessarily need to travel. I mean, they are represented by an international law firm with a D.C. location.

THE COURT: Okay. Let me ask you this: Are you willing to send electronically the 11,000 pages

to plaintiffs' counsel?

MS. KELLEY: Your Honor, the pages are not in electronic format. The process by which those types of things would have to be copied by the NARA can be very involved. We think it's far more efficient for all parties involved if plaintiffs review and then they can make copies of just the materials they are interested in. We would have to do the same process. We don't have any special abilities that they don't have here. Your -- sorry.

THE COURT: So give me a sense of how these documents are maintained.

MS. KELLEY: This is Emily Kelley. Sure, Your Honor.

Our declaration from our archivist Robyn Rodgers lays these out in detail. But essentially, there are, you know, preelectronic files, files that no longer are maintained by the VA for one of however many reasons, they go to the National Archives. Those documents are not organized by subject matter, which Robyn explains can be for many reasons. Partially because they could cover many subject matters, it can be subjective. So instead, they're more organized categories such as office and year.

So the ones we identified, for example, are

administrative files from, say, 1965. And so to know whether or not anything in those files is actually responsive to plaintiffs' request, one would have to flip through them page by page.

Now, there are other files potentially available for review which any member of the public can look on the NARA online catalog to see where those files are located, approximately how many pages are in there, whether they're publicly or whether there is anything that's not publicly available in those pages, whether they've ever been scanned electronically, which, unfortunately, in our case seems that they have not been. And that's essentially the process.

And so when a person wants to review these documents, they can essentially make an appointment. They -- there is, I believe, a training that any member of the public or the government would have to go through, you know, very brief training, and then they can access the documents. They can make copies as needed. And that is our understanding of how these particular files that we identified are maintained, although some of them are in D.C. and some are in Boston.

THE COURT: Okay. Anything further on the

complaints issue?

MS. BAUMAN: We want to be -- this is Bessie Bauman.

We want to be clear that the issue that plaintiffs have here is just with the search for preelectronic records generally. Our discussion about the National Archives is symptomatic of this discussion because that is the only place the government has provided at least even some potentially responsive places where we could find documents. But we're still ultimately searching for preelectronic documents across a variety of VA units. As we discussed in March 2025, that could be the administrator, that could be the secretary, that could be the Office of Congressional Affairs as well as other VA units which the VA is best suited to understand in its own evolution of the agency.

And so while the National Archives is, of course, the issue we're discussing now, this is emblematic of a broader issue that the government has not searched and has not provided updates on its search for preelectronic records across the VA.

MS. KELLEY: Your Honor, this is Emily Kelley. May I briefly address that?

THE COURT: Sure.

MS. KELLEY: As we explain through our declarants' statements, if they're preelectronic, the way government files are organized, they would be in National Archives or federal archives records' possession. They wouldn't be with VA anymore. That's why we tried to lay out in as much detail as possible how that process works so that we could then work with plaintiffs to figure out what they are interested in. We're not really getting anything back from plaintiffs other than go look at everything from 80 years from who knows how many sources. So I think that's where we're at.

MS. BAUMAN: Your Honor, if I could respond briefly.

To be clear, plaintiff have provided a prioritized list of the series which the government identified as potentially responsive, and we are willing to work with the government as it begins its review of those documents and continues to find complaints as plaintiffs have defined prior.

And so we are willing to move forward, but that means the government would need to review the very archives that it identified, especially given now that the government is saying that this is the only place where -- that those preelectronic

documents could be stored.

THE COURT: All right. And are the two sides -- would you find it meaningful and productive to meet and confer further, or do you think that this is an issue that has to be resolved? Because Ms. Kelley has indicated that -- I understood her to say that she was interested in further meet and confer.

MS. BAUMAN: Your Honor, this is Bessie Bauman.

No, we don't believe this is -- it would be productive to have another meet and confer. At this point, at our last meet and confer, the government was very clear that it was not going to review the NARA archives which it itself identified itself could be potentially responsive. That means, going back to first principles, the government is not fulfilling its obligation to conduct a reasonable inquiry into the documents in its own possession.

And furthermore, the government is best suited to conduct this review. We ask this Court to order the government to begin reviewing the NARA archives that it identified.

MS. KELLEY: Your Honor, this is Emily Kelley.

And, yes, to confirm, we believe that the discussion about NARA records more generally is ongoing. We do think this is an appropriate situation under Rule 34 for a requirement to make materials available for inspection where plaintiffs review the documents that we have identified for them. We are talking specifically of the four locations that we identified because plaintiffs, despite our repeated requests, haven't identified any other locations they want searched, although they can peruse the catalogs themselves.

THE COURT: Well, Rule 34, my recollection is that basically says when you have identified responsive documents, you can make them available as opposed to sending copies to the plaintiffs. That's not what you're talking about. You're talking about come search our documents, right?

MS. KELLEY: Your Honor, yes. We think in this particular narrow -- out of many, many discovery requests, this issue, we think the burden and the cost should appropriately be shifted to plaintiffs. They know what they seem to want. They've identified the materials. We do not think the requests are reasonable. We do not have a reason to think there necessarily are or aren't responsive materials in

there, and we think that in this one instance where they're requiring us to look for a needle in a haystack, that they should appropriately bear that burden of looking through materials that are available to them.

THE COURT: Well, that argument almost proves too much. Any time a plaintiff sues a large entity, the same argument could be made: We can't possibly search the e-mails of our 5,000 employees who are in the sales department so you're going to have to do it, or we have, you know, a warehouse full of old historical records. We can't be bothered to look through there; you're going to have to do it. What's different about this situation?

MS. KELLEY: Well, Your Honor, I think that's an apples to oranges comparison. We're not saying that. In fact, as far as e-mail searches go, we are doing extensive e-mail searches with numerous agreed-upon search terms that the parties have --

THE COURT: Pass the e-mails. Bad example.

We've got files and files and file cabinets full of documents, come look through and copy whatever you want. We're not going to look through those for you. Why should that be the rule?

MS. KELLEY: So -- uh-huh. So first of all,

I would say still not comparable because we identified specific locations of files that are consistent with what we understand plaintiffs are asking for.

But our point here is that plaintiffs requests are not reasonable in the first instance. We don't think that their broad request for searching of all administrative files is reasonable. What we do think is a reasonable compromise here is that having identified these files for plaintiff, letting them know how to go about looking at them, that they could do that. They could have done that any time these past few months. I mean, this is -- this is available.

THE COURT: You could look at them any time over the past few months as well. It's been since March that this issue has been up, and you've just acknowledged you haven't looked at any of these documents. So it's hard to shift blame for where we are on one side or the other. Neither side has done anything, apparently.

MS. KELLEY: Your Honor, that's simply not true. There are so many discovery streams ongoing right now. We've produced thousands of documents.

THE COURT: I understand. I understand. But

with respect to these documents, they're in your possession. You could have looked at them over the last nine months and you didn't, and yet you're blaming the plaintiffs for not going through the training process and traveling to Washington and Boston and doing it themselves. Let's just keep focused on the issue and not on faults here.

Ms. Bauman, let's take up the other issue that is the --

MS. BAUMAN: Yes, Your Honor.

Going back to the sampling privacy concerns, Your Honor is correct in saying that for each of the privacy statutes that the government has identified could be applicable in these situations, that for each of them, disclosure is permissible with a court order.

The one wrinkle in that is, as you mentioned, Section 7332 which requires good cause. And here plaintiffs do meet that good cause. The statute contemplates that good cause is defined as serving the public interests as well as the need for the documents weighed against the potential injury to the individuals whose information is disclosed.

Here the information is -- the need is very high. This is information that goes to the heart of

plaintiffs' case. In order to show that the VA responded -- that the VA should have responded to racial discrimination and benefits adjudication, plaintiffs need to show that racial disparities existed in the first place, and the sampling is the only way we can get that data and that information from the government. There is no other way plaintiffs can obtain this information.

Further, this is very much in the public interest. This is a proposed nationwide class action that speaks to redress the harms that black veterans have faced over time.

With that being said, it's important to note that plaintiffs maintain that the regulation that the government cites, 38 CFR 1.493, is invalid specifically because plaintiffs have already met everything that's contemplated in the statute. We meet the good cause. Now this Court can decide whether to issue a court order and we think it should.

But the regulation itself, one, we contend is invalid; but even if it is valid, there is no reason why the processes outlined in that regulation can't be done in a generalized way. Specifically, the VA has mass infrastructure to issue notice to relevant

veterans, and this Court can handle any objections in-camera. And for example, plaintiffs have identified other situations where other courts have done the very same thing.

For example, with student information, individuals whose information is being disclosed have 30 days to respond to this notice. The notice will be -- the objection will be filed under seal and then this Court could deal with any potential objections that way. There is no way -- there is no reason to believe that the processes outlined in this regulation can't be done in a generalized fashion.

And, furthermore, as Your Honor noted, that is only for a specific subset of veterans whose conditions relate to drug and alcohol abuse, HIV and sickle cell anemia which, as Your Honor correctly notes, could be a small subset of this group and may not -- and is at this point hypothetical to the plaintiffs as well.

THE COURT: All right. Ms. Kelley.

MS. KELLEY: Your Honor, thank you. Yes, this is Emily Kelley. A few initial points.

The regulation is absolutely valid. We discuss on page 4 of our reply brief the fact that it was enacted pursuant to specific statutory authority

to enact procedures, including procedures and criteria for the issuance and scope of court orders, for files that would be released without veteran consent. So there is simply no basis to argue it's invalid. And it is, again, surprising that plaintiffs want to argue that a regulation that is designed solely to protect veterans should be struck down as invalid.

Further, it's incorrect to say that these could be generalized. First of all, when you get into the practicalities of it, it's only a subset of the people whose files were randomly pulled actually had 7332 material. In order to determine that, these files would have to be reviewed in full first. So that completely defeats this idea of this being an easier process. Otherwise, we'd have to notify all of the veterans whose random files are pulled and say there is a chance that you have 7332 material in here.

And then, you know, I think again plaintiffs are oversimplifying without any citation or basis how simple they think this process can be. It cannot be generalized. These hearings have to be private, confidential and in-camera. You can't just bring in a group of vets together and say, okay, we're going

to release your files. You have to do it individual by individual, and it has to be done on the Court's time.

Also the application process, it's heightened above what even the Privacy Act requires. Plaintiffs haven't even made an application. They don't have a legally recognized interest. It's higher than good cause. It's a legally recognized interest. And in fact, they have said they don't actually need these files. They just want to pick out specific pieces of information from them.

You know, so this is not a wrinkle. This is a major, serious issue about veterans' rights.

THE COURT: All right. One detail that I wanted to get sorted out is the time frames that the plaintiff is seeking to have samples taken from. I believe Ms. Kelley indicated that there was an agreement that they were looking for 11,000 files which I understand to be two sample periods with 5500 each; is that correct?

MS. BAUMAN: Your Honor --

MS. KELLEY: Your Honor, this is --

MS. BAUMAN: Your Honor, this is Bessie Bauman.

To clarify, you are correct that the

plaintiffs are seeking 11,000 additional randomized disability claims. But after the government provided the 5,500 claims from 2006 to 2024, we shared with the government, after the September meet and confer, an adjusted stratification for the remaining years. That stratification is 5,5000 sample claims from 1945 to 1960, then 4,000 claims from 1961 to 1990, and then 1,500 claims from 1991 to 2006. And this is specifically to adjust for the fact that the government provided a sample of 5,500 for the most recent time period.

MS. KELLEY: And, Your Honor, this is Emily Kelley.

Again, that 5,500 covered over 20 years, 44,000 rows of data.

As far as the other time periods, as we lay out in our brief, those are artificial divides that plaintiffs have created. We've discussed how based on veterans' "C" numbers, there may be a way to approximate what time periods they're from because the smaller the "C" number, the older the file is. But even that process is not going to be simple. We'll have to pull, see what we get, potentially go back and pull more based on these "C" numbers. So it's -- I just want to make sure it's clear as far as

the process goes.

THE COURT: Well, with respect to that last issue, if you have an approximate "C" or range of "C" numbers for each of these dates, date ranges, if somebody that you think is in the '45 to '60 period and it turns out they were really better classified as 1962, is there any objection just to use the "C" numbers rather than having to go through the -- in other words, you might have a stray here or there that was outside the "C" number range that you thought was the calendar range that we're looking at.

Let me hear from either side if there is any concern about a stray file being in a different period.

MS. BAUMAN: Your Honor, this is Bessie Bauman.

Plaintiffs are fine with that. The "C" file, we'll adjust that on the end in the statistical analysis, so that's fine with us.

But we want to be clear, in prior conversations with the government, we were also notified that not all veterans' files have "C" file numbers, and we want to be clear that there may be some missing individuals for those whom don't have "C" file numbers and we'd want to account for in this

data analysis process or this sample point process, rather.

MS. KELLEY: Your Honor, this is Emily Kelley.

I mean, yes, it -- I think Bessie's point is correct; but it would be more complicated, potentially, than that. The "C" numbers are, in theory, the best approximation we have, certainly. As Your Honor is aware, we don't believe that this is an appropriate process in any event.

THE COURT: Yeah. All right. And then I wanted to ask about the 1945 to 1960 period. That seems to be the period where the plaintiffs are seeking the greatest number of files, and yet it's probably the period in which there are the fewest living veterans. To be a veteran in 1960, you had to be born in 1942 or earlier which is, what, 83 years ago. So that period seems to be maybe inappropriately weighted in terms of the sampling, but I'm going to throw that out there for everybody's consideration.

The other issue there that I wanted to raise is by breaking in the 1990-'91 period, you have a very long period between '61 and '90 and then a very short period between '91 and I think it's '05,

since the '06 had been produced, and perhaps those periods ought to be closer to each other anyway.

MS. BAUMAN: Your Honor, this is Bessie.

THE COURT: Yeah. Go ahead, please.

MS. BAUMAN: Yes, Your Honor.

So just to clarify, the reason why you now see these kind of differences in the years is because we now essentially have an oversampling of the most recent 20 years, and that's why we've adjusted the numbers. Originally, our request was for 5,500 claims from each of three areas starting from 1945 to 19 --

THE COURT: Well --

MS. BAUMAN: I'm sorry. Go ahead.

THE COURT: I got that. That's my understanding. It was -- go ahead.

MS. BAUMAN: And we understand if -- we are willing to return to our statistical effort and discuss further what it would mean to reduce the sampling from 1945 to 1960. But the reason why we've gotten to the 11,000 number is to ensure an accurate and sufficient statistical analysis, and that's the reason behind all this, and the stratification across the years. It will be important to capture the differences, the demographic variation over time in

order to reach an ultimate number for what the disparity was from 1945 to present, and that's the reason why plaintiffs are asking for these buckets of data.

MS. KELLEY: Your Honor, this is Emily. I'm sorry.

THE COURT: Let me just cut in and then you can be heard, Ms. Kelley.

I would have thought that the period 1945 to 1975 or '80 might be the appropriate break point, and then '80 to, I don't know, I'm not sure where to break it. The point is '45 to '60 is going to have very few veterans still living. '61 to '90 is a much longer period than '91 to 2005. So between '61 and 2005, why wouldn't you break it in the middle? In other words, you can get the number you want in terms of the total number of statistics, but it seems very heavily weighted toward the early period of time.

MS. BAUMAN: Your Honor, this is Bessie Bauman.

We understand your question, and I think some of the reason why plaintiffs chose these specific time periods was because it aligned with different wartime periods which could capture underlying differences across those groups and that the

statistical analysis would be sufficiently representative enough to conclude an ultimate disparity across all these of those periods.

THE COURT: Ms. Kelley, you wanted to be heard there.

MS. KELLEY: Thank you, Your Honor.

I just wanted to flag that, as the Court recognized, in terms of whether a veteran would be alive, the plaintiffs, the named plaintiff, the only named plaintiff who has any claims about benefits applications from the 1940s is Mr. Monk, Sr.'s estate. He is deceased. He died in the 1980s. There is no named plaintiff that has any allegations about applying for benefits between 1940s and 1970s. And we understand that some of these issues will go to the merits later on, but we think this is even more indicative of why these requests are inappropriate.

As far as a sheer number of claims, we've offered to provide more from the 20-year time period that we have the data for. You know, that could be done if it was from that 20-year time period.

THE COURT: Okay. Thank you. This has been a helpful discussion.

I think we should also just note that

discovery obviously needs to have a deadline extended and presumably the class certification deadline needs to be extended. Can you meet and confer and propose some dates?

MS. KELLEY: Your Honor, this is Emily Kelley.

The parties jointly filed a request on the record about this. Essentially, because the outcome of this motion for protective order can have such an outside impact on how long discovery will take, we mutually requested that the parties be allowed to meet and confer within -- I think it was two weeks of when the Court issues an order on this motion, which we will plan to do.

THE COURT: All right. That's fine. I'm hopeful in getting a ruling out in the next ten days or so.

MS. KELLEY: Your Honor, if I may, it's Emily Kelley again.

If that is the case, we would potentially ask for more time given we know the holidays and with the Yale Law Clinic schedule, if the parties could be permitted to discuss about potentially extending our time frame for holding that meet and confer, we want to make sure that we discuss the issues with the

constituents so we can have a more productive meet and confer.

THE COURT: Well, we'll see how it goes. I mean, you can start talking now, presumably.

And putting this issue aside, you know whatever discovery -- what other discovery you might need so you can have some sense, if you're going to take three depositions or if you're going to take 30 depositions, is going to have a big impact on the schedule. So those kind of issues, I think, you can talk about even before you receive a ruling.

Yeah, look, I'm happy to be reasonable in terms of how much time it takes to get a schedule in place, but I don't think it necessarily needs to await -- your discussions need to await a formal ruling. So --

MS. KELLEY: Your Honor, understood, yes. Thank you. This is Emily Kelley again.

I don't want to take up too much of your time, but I have received a little bit of clarity on a question you asked earlier.

Alcoholism and drug abuse can be service-connected on a secondary basis, and compensation can be paid for the substance abuse disability and for conditions caused by it. Sickle

cell disease itself can also be service connected, although sickle cell traits cannot be.

So just to clarify that certainly benefits files can be related to those issues.

THE COURT: All right. Thank you.

Anything else that we should take up today?

MS. BAUMAN: Your Honor, plaintiffs just want to be totally clear that we actually agree with the government on all the proposed privacy safeguards for handling any resulting data in the claims, and we will follow all of those proposed privacy safeguards. So whatever it is, we will certainly be sure to keep records separate, ensure that everyone -- everything is attorney's eyes only, et cetera. So we want to make sure that's clear.

THE COURT: All right. And there was a suggestion in the government's brief that only clinic students who have entered an appearance, I think, should be permitted to see the documents. Do you agree with that?

MS. BAUMAN: Yes. We also agree to maintain all the claims in a separate database and destroy that database upon termination of the litigation.

THE COURT: All right. Thank you.

MS. KELLEY: Your Honor, this is Emily

Kelley.

While we appreciate that, as stated in our brief, those safeguards, while potentially sufficient to satisfy the Privacy Act, we don't think are sufficient to satisfy the process that is needed to enter an order under 7332.

THE COURT: All righty. Okay. Anything else?

Thank you so much. We'll be in touch soon.

(PROCEEDINGS ADJOURNED, 2:36 p.m.)

C E R T I F I C A T E

RE: CONLEY F. MONK, JR. V. UNITED STATES OF AMERICA
No. 3:22-cv-01503-SRU

I hereby certify that the within and foregoing is a true and accurate transcript taken in the aforementioned matter to the best of my skill and ability.

/s/_Melissa J. Cianciullo______

MELISSA J. CIANCIULLO, RDR, CRR, CRC
Official Court Reporter
United States District Court
915 Lafayette Boulevard
Bridgeport, CT 06604
(203) 606-1794