## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CONLEY F. MONK, *et al*.,
      Plaintiffs,

      v.

UNITED STATES,
      Defendant.

No. 3:22-cv-1503 (SRU)

## ORDER ON MOTION FOR PROTECTIVE ORDER

    The United States (the "government") moves pursuant to Rule 26(c)(1) of the Federal Rules of Civil Procedure for a protective order prohibiting discovery related to plaintiffs' requests for data sampling of initial disability benefits claims and records of complaints. *See generally* Doc. No. 141. Plaintiffs oppose the government's motion, arguing that the relevant privacy statutes do permit disclosure of the requested records and that plaintiffs' requests are not vague, overbroad, or unduly burdensome. Doc. No. 145 at 6-8. For the following reasons, I **deny** the government's motion, **doc. no. 141**, order production of the requested documents, and enter a more specific protective order addressed to the use and maintenance of those documents.

## I.     Standard of Review

    Normally, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). *See also Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession.").

The broad scope of discovery is constrained by "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). A court "*must* limit the frequency or extent of discovery" after determining:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;
> (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C) (emphasis added).

If a party "from whom discovery is sought" moves for a protective order, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The party seeking the protective order bears "the burden of showing good cause exist[s] for the issuance of that order." *Brown v. Astoria Fed. Sav. & Loan Ass'n*, 444 F. App'x 504, 505 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 142 (2d Cir. 2004)).

Good cause exists "when a party shows that disclosure will result in a clearly defined, specific and serious injury." *In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (internal quotation marks omitted) (quoting *Shingara v. Skiles*, 420 F.3d 301, 306 (3d Cir. 2005)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Uniroyal Chem. Co. Inc. v. Syngenta Crop Prot.*, 224 F.R.D. 53, 56 (D. Conn. 2004) (internal quotation marks omitted) (quoting *Wilcock v. Equidev Cap. L.L.C.*, 2001 WL 913957, at *1 (S.D.N.Y. Aug. 14, 2001)). *See also*

*Joseph L. v. Connecticut Dep't of Child. & Fams.*, 225 F.R.D. 400, 402 (D. Conn. 2005) ("To establish good cause under Rule 26(c), courts require a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." (internal citation and quotation marks omitted)).

Upon a finding of good cause, a court may enter a protective order that does one or more of the following:  forbids the discovery; specifies terms for the discovery; prescribes a discovery method; forbids inquiry into certain matters; limits the scope of discovery to certain matters; and designates who may be present while conducting discovery.  Fed. R. Civ. P. 26(c)(1).

## II.    Background

I assume the parties' familiarity with plaintiffs' factual allegations and the case's procedural history.[1]  Additionally, I assume the parties' knowledge of the context in which the relevant discovery disputes arose.[2]  On March 24, 2025, I held a status conference in which the parties' discussed the discovery disputes and I ordered the government to file a motion for a protective order on the remaining disagreements.  Doc. No. 138; Doc. No. 139 at 1-2.

On April 14, 2025 the government filed a motion for a protective order on two unresolved issues:  (1) plaintiffs' requests for data-sampling "of demographic and benefits-related information" for an 80-year period; and (2) plaintiffs' requests for formal and informal complaints received by entities and custodians within the Department of Veterans Affairs (the "VA") over the past 80 years.  Doc. No. 141 at 1.  Plaintiffs filed an opposition to the government's motion on May 5, 2025.  *See generally* Doc. No. 145.

---

[1] I previously denied the government's motion to dismiss on March 29, 2024, doc. no. 83, and the government's motion for leave to appeal pursuant to section 1292(b) on February 11, 2025, doc. no. 115.

[2] In their briefing, the parties describe at length the discovery requests and communications preceding the government's motion.  *See* Doc. No. 141-1 at 7-17; Doc. No. 145 at 8-12.

On October 1, 2025, I granted the government's motion to stay the telephonic hearing on the motion for a protective order due to the lapse in federal appropriations at the end of the day on September 30, 2025. Doc. No. 161 at 1-2; Doc. No. 162. The lapse in federal appropriations ended on November 12, 2025. Doc. No. 163 at 1. I held a motion hearing on the government's motion for a protective order on December 4, 2025. Doc. No. 166.

*A. Data-sampling of demographic and benefits-related information from 1945 to present*

Plaintiffs request data from veterans' initial applications for disability benefits since 1945. Doc. No. 141-1 at 8-9; Doc. No. 141-6 at 59-60; Doc. No. 145 at 8-9. Plaintiffs initially requested the government to pull 5,500 initial disability claims from three distinct "eras" using "a random number generation procedure,"[3] for a total of 16,500 initial disability claims.[4] *Id.* The time ranges comprising each era are: (1) 1945 to 1960; (2) 1961 to 1990; and (3) from 1991 to present. *Id.* Plaintiffs' current proposal seeks data including eleven variables for each initial disability claim pulled.[5] Doc. No. 141-1 at 10.

Although the government agreed to produce data from 5,500 initial disability claims from 2006 to the present containing plaintiffs' requested variables, the government objects to

---

[3] Plaintiffs offered to provide "an example program for accomplishing this random number generation procedure, coded in STATA, R, or SAS." Doc. No. 141-6 at 59. If the VA decided to "construct its own program, [p]laintiffs request[ed] that VA document the process and provide a copy of the statistical program used and the seed for the random number generator to help us replicate the sample." *Id.*

[4] The government has agreed to produce 5,500 initial disability claims from 2006 to the present. Doc. No. 141-1 at 13; Doc. No. 145 at 28 n.14.

[5] Plaintiffs' original request included the following twelve variables:

> 1. The date of the initial disability claim[;] 2. The type of disability compensation claim[;] 3. The race, ethnicity, and gender of the claimant[;] 4. Whether the claim was granted or denied[;] 5. If the claim was granted, the disability rating (0% - 100%) assigned by [the] VA[;] 6. The VA regional office handling the claim[;] 7. The claimant's dates of service, as of the filing of the initial disability claim[;] 8. The claimant's branch(es) of service, as of the filing of the initial disability claim[;] 9. Whether the claimant was deployed to a combat zone[;] 10. The claimant's last rank, as of the filing of the initial disability claim[;] 11. The claimant's military occupational specialty (MOS), as of the filing of the initial disability claim[;] 12. The claimant's character of discharge, as of the filing of the initial disability claim.

Doc. No. 141-1 at 9-10; Doc. No. 141-6 at 59-60. After discussions with the government, plaintiffs no longer request data on whether the claimant was deployed in a combat zone. Doc. No. 141-1 at 10 ("Plaintiffs confirmed their proposal did not seek veteran names or addresses and dropped their request for the 'combat zone' variable.").

producing the same information for initial disability claims filed prior to 2006. *Id.* at 11-13. The government's primary issue with plaintiffs' data-sampling request is that "pre-2006 benefits-related information" is not stored electronically "in a form that can be processed by a computer" and, therefore, "it is not possible to generate the data sampling plaintiffs seek." *Id.* at 10.

The government states that pre-2006 veterans' benefits claims are stored "either in hard copy format" at Federal Records Center ("FRC") locations or in an internal VA platform called the Veterans Benefits Management System ("VBMS").[6] *Id.* at 11. A computer program is unable to process and pull the eleven variables into a report for either storage method; the records would "require a manual review to identify" the variables because "the information exists in the documents themselves." *Id.*

The government also takes issue with what it characterizes as "artificially categoriz[ing] claims information into different eras." *Id.* at 11-12 (internal quotation marks omitted). Veterans' disability benefits files "are assigned file numbers sequentially based on when an initial disability benefits claim is filed, but they are not otherwise organized or tracked by date." *Id.* at 11. Although the government admits that a reviewer "could try to use file numbers to approximate the date of a veteran's initial disability benefits claim," the only way to confirm the year is to review the file. *Id.* at 11-12. Finally, the government states that "various statutes and regulations prohibit[] [the] VA" from producing unredacted files. *Id.* at 12.

For the above reasons, the government argues that requiring it to "review, redact, and produce" pre-2006 initial disability benefits claims would be "unduly burdensome, inconsistent with discovery obligations, and disproportional to the needs of the case." *Id.* at 12.

---

[6] Although the government alleges disability benefits files were not consistently "digitized and stored" in VBMS prior to 2012, some pre-2012 claims may be on VBMS if a veteran's file has been "copied and digitized for any reason, including if a veteran has filed additional claims after 2012." Doc. No. 141-1 at 11.

*B. Formal and informal complaints received by entities and custodians within the VA from 1945 to present*

The government also objects to plaintiffs' requests for "formal and informal complaints . . . received by the VA from any source[,] []including veterans, veterans organizations, civil rights groups, elected officials and their staff, . . . regarding actual or suspected racial disparities in VA housing, education, or disability compensation benefits."[7] Doc. No. 141-1 at 13. Plaintiffs request records of complaints from January 1, 1945 to the present. *Id.* at 13-14. Plaintiffs' stated interest is in "complaints submitted by large institutional actors to units of VA dedicated to receiving such complaints" and proposed a "non-exhaustive list of VA complaint-intake units to be searched."[8] *Id.* at 15 (internal quotation marks omitted).

The government states that "it is in the process of collecting and reviewing electronically stored documents for 30 custodians, across almost all of [the units plaintiffs listed] as well as electronic records of Under Secretaries for Benefits and others." *Id.* at 15-16 (emphasis omitted). However, it remains concerned that it is unlikely to find responsive materials "through an exhaustive search of units or custodians that [the government] has no reason to believe would have such materials." *Id.* at 17 (emphasis omitted). Further, the government alleges plaintiffs "have provided no clear definition of 'complaints' or 'institutional actors,' other than to identify a few non-exclusive 'examples.'" *Id.*

---

[7] Specifically, plaintiffs requested complaints related to the following topics: (1) "actual or suspected racial disparities in VA housing, education, or disability compensation benefits"; (2) "stress, emotional distress, trauma, and/or anxiety experienced by veterans as a result of applying for benefits, being denied benefits, and appealing denials of benefits"; and (3) "the experiences of Black veterans applying for VA housing, education, or disability compensation benefits." Doc. No 141-1 at 13-14.

[8] Plaintiffs' list contained the following entities: "legislative affairs offices; VSO liaisons; public affairs offices; community engagement offices; Minority Veterans Outreach Program; Property Appraisal and Valuation Equity ("PAVE") Task Force; Minority Veterans Program Coordinator; Center for Minority Veterans; Advisory Committee on Minority Veterans; Equity Assurance Office; External Civil Rights Complaints Program; Veteran Experience Office; Office of Enterprise Integration; Office of Field Operations; Office of Performance Analysis and Integrity, and all other specific units within VA designed to handle complaints." Doc. No. 141-1 at 15 n.8; Doc. No. 141-6 at 68.

### III.    Discussion

The government argues there is good cause for a protective order denying plaintiffs'

request for data-sampling of veterans' initial benefits requests for claims filed before 2006. Doc.

No. 141 at 1. Further, the government claims plaintiffs' demand for informal and formal

complaints should be denied as premature or, if the issue is ripe, determined to be "vague,

overbroad, and unduly burdensome." *Id.* at 1-2; Doc. No. 141-1 at 42-43.

*A. Data-sampling of demographic and benefits-related information from 1945 to present*

The government objects to producing data from pre-2006 initial disability benefits claims

because: (1) "[s]everal statutes and regulations limit the ability of the VA to disclose

[unredacted,] randomly selected veterans' disability benefits files . . . without those veterans'

consent"; and (2) "[p]roduction of redacted benefits file documents would be unduly

burdensome," disproportionate to the needs of the case, and improperly require the government

to create work product. Doc. No. 141-1 at 19-20, 29.

Plaintiffs suggest three ways in which the government could produce data from pre-2006

initial disability claims while satisfying the government's "privacy and burden concerns." Doc.

No. 145 at 6-7. Those options involve ordering the government to: (1) disclose unredacted files

pursuant to a court order providing additional privacy safeguards; (2) produce redacted,

randomized benefit files excluding any information "other than [p]laintiffs' requested

variables[;]" or (3) extract the requested variables from the files without creating work product.

*Id.*

1. Whether the Privacy Act, 38 U.S.C. § 5701, or 38 U.S.C. § 7332 prohibit
   disclosure of unredacted veterans' benefits files

The government points to three statutes limiting disclosure of veterans' benefits files

absent a court order and good cause: The Privacy Act of 1974, 5 U.S.C. § 522a (the "Privacy

Act"); 38 U.S.C. § 5701 ("section 5701"); and 38 U.S.C. § 7332 ("section 7332").  Doc. No. 141-1 at 19-20.

The Privacy Act, among other things, delineates procedures for agency disclosure of records.  *See generally* 5 U.S.C. § 522a.  Under the Privacy Act, the VA is required to "safeguard an individual against an invasion of personal privacy" by "[c]ollect[ing], maintain[ing], us[ing], or disseminat[ing] any record of identifiable personal information in a manner that [en]sures that such action is for a necessary and lawful purpose, that the information is correct and accurate for its intended use, and that adequate safeguards are provided to prevent misuse of such information."  38 C.F.R. § 1.576(a)(4).  Disclosure of VA records to third parties requires written consent from "the individual to whom the record pertains, *unless* disclosure of the record would be . . . pursuant to the order of a court of competent jurisdiction."  5 U.S.C. § 552a(b)(12) (emphasis added).

Section 5701 specifically governs veterans' benefits claims records.  *See generally* 38 U.S.C. § 101, *et seq.* (statutory provisions relating to veterans' benefits).  Under section 5701, "[a]ll files, records, reports, and other papers and documents pertaining to any claim under any of the laws administered by the Secretary . . . shall be confidential and privileged, and no disclosure thereof shall be made except as provided in this section."  38 U.S.C. § 5701(a).  Section 5701 also provides that "[t]he Secretary shall [disclose] such files, records, reports, and other papers and documents . . . [w]hen required by process of a United States court to be produced in any suit or proceeding therein pending."  *Id.* at § 5701(b)(2).

Implementing regulations also require a court order before the VA discloses veterans' benefits claimants' records.  *See* 38 C.F.R. § 1.511(b).  Additionally, regulations designate procedures the VA must follow in disclosing records pursuant to court orders.  *See* 38 C.F.R. §

1.576(c) (describing how the VA must "keep an accurate accounting" of disclosures); 38 C.F.R.

§ 1.511(d) (stating record custodians must "make reasonable efforts to notify [a claimant] that

[their] records were disclosed to another person under compulsory legal process").

Finally, the government points to 38 U.S.C. § 7332 as prohibiting disclosure of:

Records of the identity, diagnosis, prognosis, or treatment of any patient or subject which are maintained in connection with the performance of any program or activity (including education, training, treatment, rehabilitation, or research) relating to drug abuse, alcoholism or alcohol abuse, infection with the human immunodeficiency virus, or sickle cell anemia which is carried out by or for the Department under this title . . . .

38 U.S.C. § 7332(a)(1). Those records may be disclosed without the patient's written consent if

authorized by a court order "granted after application showing good cause" for disclosure. *Id.* §

7332(b)(2)(D). A court determines whether good cause exists by "weigh[ing] the public interest

and the need for disclosure against the injury to the patient or subject, to the physician-patient

relationship, and to the treatment services." *Id.* The court order "shall impose appropriate

safeguards against unauthorized disclosure." *Id.*

The government does not dispute that the Privacy Act and section 5701 allow disclosure

pursuant to a court order of the information plaintiffs seek. Doc. No. 141-1 at 21-23. Further,

both parties agree that any court-ordered disclosure of unredacted veterans' disability benefits

records must contain adequate safeguards. *Id.* at 23-25; Doc. No. 145 at 6-7. However, the

government argues that 38 C.F.R. § 1.493 imposes additional procedures limiting disclosure of

the information from initial disability benefits claims that plaintiffs request. [9] Doc. No. 141-1 at

---

[9] The government also cites 38 C.F.R. § 1.491, which restricts the "disclosure of confidential communications made by a patient to a treatment program in the course of diagnosis, treatment, or referral for treatment," as an additional barrier to plaintiffs' requests. Doc. No. 141-1 at 26; 38 C.F.R. § 1.491. That regulation is immaterial here because plaintiffs do not request confidential communications by patients to treatment programs.

25-26.  In response, plaintiffs argue that:  (1) section 1.493 is *ultra vires*; and (2) if section 1.493

is valid, plaintiffs satisfy its requirements.  Doc. No. 145 at 18-25.

First, it is not readily apparent that 38 C.F.R. § 1.493 applies to the records plaintiffs

seek.  The implementing regulations governing release of information from VA *claimant* records

are grouped under 38 C.F.R. §§ 1.500-1.527.  Conversely, "[t]he provisions of §§ 1.460 through

1.499 . . . pertain to any program or activity, including education, treatment, rehabilitation or

research, which relates to drug abuse, alcoholism or alcohol abuse, infection with the human

immunodeficiency virus, or sickle cell anemia."  38 C.F.R. ch. 1, pt. 1.  Moreover, records "[f]or

purposes of §§ 1.460 through 1.499" are defined as "any information received, obtained or

maintained, . . . *for the purpose of seeking or performing VA program or activity functions*

relating to drug abuse, alcoholism, tests for or infection with the human immunodeficiency virus,

or sickle cell anemia regarding an identifiable patient."  38 C.F.R. § 1.460 (emphasis added).  "A

program or activity function relating to drug abuse, alcoholism, infection with the human

immunodeficiency virus, or sickle cell anemia includes evaluation, treatment, education,

training, rehabilitation, research, or referral for one of [those] conditions."  *Id*.  Perhaps most

importantly, "[s]ections 1.460 through 1.499 of this part *do not apply* if such diagnosis or other

information is not received, obtained or maintained for the purpose of seeking or performing a

[VA] function or activity relating to drug abuse, alcoholism, infection with the human

immunodeficiency virus, or sickle cell anemia for the patient in question."  *Id.* (emphasis added)

("[Sections 1.460 through 1.499] do not apply to records or information contained therein, the

disclosure of which . . . could not reasonably be expected to disclose the fact that a patient has

been connected with a VA program or activity function relating to drug abuse, alcoholism,

infection with the human immunodeficiency virus, or sickle cell anemia.").[10]

Section 1.460 also contains examples of records that are and are not covered by sections

1.460 through 1.499.  38 C.F.R. § 1.460(1)-(2).  The examples demonstrate that records merely

referencing a patient's drug abuse or alcoholism do not automatically bring them within the

purview of sections 1.460 through 1.499.[11]  *Id.*

The government broadly asserts that the records plaintiffs request are "highly likely" to

contain information about veterans "who suffer from or sought treatment at any time for any of

these illnesses."  Doc. No. 141-1 at 25.  However, under section 1.460, records of a diagnosis or

treatment alone are not subject to the requirements in section 1.493.  Instead, the records must be

"received, obtained or maintained . . . *for the purpose of seeking or performing VA function or*

*activity functions* relating to drug abuse, alcoholism, tests for or infection with the human

immunodeficiency virus, or sickle cell anemia regarding an identifiable patient."  38 C.F.R. §

1.460 (emphasis added).  The government does not contend that the records contained in a

veteran's disability benefits file are "received, obtained, or maintained" to seek or perform a VA

---

[10] Section 1.460 also states that when a "diagnosis or other information, not originally received or obtained for the purpose of obtaining or providing one of the above program or activity functions, is subsequently used in connection with such program or activity functions, those original entries become a 'record'" under section 1.460 through 1.499.  38 C.F.R. § 1.460.  However, the very next sentence of section 1.460 starts with the word "[s]egregability," which serves to exclude from the definition of "records" any information that "could not reasonably be expected to disclose the fact that a patient has been connected with a VA program or activity function relating to drug abuse, alcoholism, infection with the human immunodeficiency virus, or sickle cell anemia."  *Id.*

[11] For example,

> The following are . . . instances whereby records or information related to alcoholism or drug abuse are not covered by the provisions of §§ 1.460 through 1.499 of this part:  (i) A patient with alcoholic delirium tremens is admitted for detoxification, treated and released with no counseling or treatment for the underlying condition of alcoholism. . . . (iv) A patient is admitted to the emergency room suffering from a possible drug overdose. The patient is treated and released; a history and diagnosis of drug abuse may be documented in the hospital summary. The patient is not offered treatment for the underlying conditions of drug abuse, nor is treatment sought by the patient for that condition.

38 C.F.R. § 1.460(2).

activity or function related to the illnesses listed in section 1.460.  *See generally* Doc. No. 141-1.

Nor does the government show the unredacted disability benefits files could "reasonably be

expected to disclose the fact that a patient has been connected with a VA program or activity

function relating to drug abuse, alcoholism, infection with the human immunodeficiency virus,

or sickle cell anemia."  *Id.*; 38 C.F.R. § 1.460.

Because plaintiffs are not seeking medical records "received, obtained, or maintained . . .

for the purpose of seeking or performing VA program or activity functions relating to drug

abuse, alcoholism, tests for or infection with the human immunodeficiency virus, or sickle cell

anemia," section 1.493 does not apply to their request for a data-sampling of demographic and

benefits-related information from pre-2006 disability benefits files.[12]  I do not reach the issue of

whether section 1.493 is *ultra vires* because section 1.493 does not apply to the information

plaintiffs request.[13]

To the extent that information covered by 38 U.S.C. § 7332 may be in unredacted

veterans' disability benefits files, the statute provides an adequate procedure and standard for

protecting against unauthorized disclosure.  The statute requires that I assess whether plaintiffs

have shown good cause in their request for unredacted disability benefits files by "weigh[ing] the

---

[12] Additionally, the procedures within section 1.493 are inapposite to the information plaintiffs request.  Plaintiffs do not request a court order disclosing "patient records," but instead records of disability benefits claims.  *See* 38 C.F.R. § 1.493.

[13] Even if section 1.493 does apply to plaintiffs' requests, I conclude that plaintiffs have a "legally recognized interest in the disclosure" because the records are "discoverable**,** likely relevant, and potentially admissible," VA has had "more than adequate[] notice of the request and need for records," and the records "are not available from any other source."  38 C.F.R. § 1.493; *Snapp v. United Transp. Union*, 2014 WL 5365552, at *2 (W.D. Wash. Oct. 21, 2014).  As discussed in this ruling, I determine that the plaintiffs have shown good cause exists for requiring the government to produce the records.  *See* 38 C.F.R. § 1.493.  "[T]he Court—not the VA—makes this determination." *Snapp*, 2014 WL 5365552, at *2.  I conducted hearings on plaintiffs' request on March 24, 2025 and December 4, 2025.  Docs. No. 138, 166.  Finally, the protective order issued by this ruling meets the requirements of section 1.493 by limiting disclosure of the records, protecting the patient, and protecting the physician-patient relationship. *See* 38 C.F.R. § 1.493.

public interest and the need for disclosure against the injury to the patient or subject, to the physician-patient relationship, and to the treatment services."  38 U.S.C. § 7332(b)(2)(D).

Plaintiffs request unredacted veterans' benefits files to establish whether "racial disparities in [the] VA's benefits administration" existed and, if so, "which VA leaders knew or should have known."  Doc. No. 145 at 16.  The records plaintiffs seek are "discoverable because they are 'relevant to [a] party's claim or defense' and are 'reasonably calculated to lead to the discovery of admissible evidence.'"  *Johnson v. Atria Senior Living Grp., Inc.*, 2011 WL 13232093, at *1 (D. Conn. May 17, 2011) (quoting Fed. R. Civ. P. 26(b)(1)).  The information within the veterans' disability benefits files that plaintiffs request will allow plaintiffs to complete their planned data-sampling, which is directly relevant to their underlying claims of historic racial disparities.  I see no other means by which plaintiffs would be able "to obtain a random sample of claim outcomes by race."  Doc. No. 145 at 16.  The government provides no alternative method for procuring the same data for the same periods.[14]  Plaintiffs assert their proposed nationwide class action will potentially "vindicate the rights of generations of Black veterans who have suffered emotional distress as a result of encounters with a discriminatory VA benefits system that failed to provide them and their families with care and support their faithful service had earned."  *Id.*  Plaintiffs' stated purpose in obtaining the information is entirely consistent with the public interest.

---

[14] The parties briefly mention the possibility of imputing "the 2006-forward data to the entire time period."  Doc. No. 147 at 7-8; Doc. No. 145 at 28 n.14.  Although the government casts doubt on whether data from the entire liability period is "unconditionally necessary," imputing the 2006-forward data would almost certainly not provide an accurate representation of data from claims filed in a significant portion of the liability period.  Doc. No. 147 at 7.  "[T]he G.I. Bill's 'creation of . . . middle-class America' (by giving $95 billion to veterans and their families between 1944 and 1971) was 'deliberately designed to accommodate Jim Crow.'"  *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 392 (2023) (Jackson, J., dissenting) (quoting I. Katznelson, *When Affirmative Action Was White: An Untold History of Racial Inequality in Twentieth-Century America* 113-114 (2005)).  Failing to provide access to pre-2006 initial disability benefits claims would prevent plaintiffs from meaningfully analyzing data from a period during which the VA, through the G.I. bill, provided *billions* of dollars of benefits to veterans.

Plaintiffs seek particular variables from initial veterans' disability benefits claims to facilitate data sampling; they do not propose using the information within the unredacted disability benefits files for any other purpose. Subject to adequate safeguards, disclosure of those records will not cause particularized injury "to the patient or subject, to the physician-patient relationship, and to the treatment services." 38 U.S.C. § 7332. If plaintiffs are ultimately successful in proving their claim that the VA benefits system discriminated against Black veterans by failing to provide them with proper disability benefits, then many of the veterans whose disability benefits files are disclosed, subject to stringent safeguards, will actually benefit from the disclosure.

I expressed during the March 24, 2025 status conference and motion hearing that plaintiffs' requests for data from 16,500 initial disability benefits claims, divided into 5,500 claims from three distinct eras, seems reasonable regardless of whether that data is electronically available. Doc. No. 139 at 1. The parties' briefing has not changed my assessment.

The data plaintiffs request, as contained in veterans' disability benefits files, is essential to their claims and proportional to the needs of their case. Weighing the public interest in addressing government discrimination in the provision of benefits against the potential injury to the veterans whose disability benefits files are ultimately produced in litigation, I find good cause to order the government to produce 11,000 unredacted veterans' disability benefits files. Pursuant to plaintiffs' request during the December 4, 2025 hearing, the VA shall produce the following number of randomly selected initial disability benefits claims files for three time periods: (1) 5,500 initial disability benefits claims from 1945-1960; (2) 4,000 initial disability benefits claims from 1961-1990; and (3) 1,500 initial disability benefits claims from 1991-2006. An appropriately restrictive protective order covering the unredacted veterans' disability benefits

files is sufficient to provide "appropriate safeguards against unauthorized disclosure" of the information in those files.  38 U.S.C. § 7332(b)(2)(D).

I find it unnecessary to reach the parties' arguments for and against the government producing redacted veterans' benefits files or extracting the requested variables from veterans' benefits files because plaintiffs have shown good cause for disclosing the unredacted benefits files.

The government, however, has not shown good cause exists for entering its requested protective order.  In seeking a protective order under Rule 26, the government must show disclosure will "result in a clearly defined, specific and serious injury."  *See In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006) (internal quotation marks omitted) (quoting *Shingara v. Skiles*, 420 F.3d 301, 306 (3d Cir. 2005)).  The government must provide "specific examples" or "articulated reasoning" as opposed to "[b]road allegations of harm."  *Uniroyal Chem. Co. Inc. v. Syngenta Crop Prot.*, 224 F.R.D. 53, 56 (D. Conn. 2004) (internal quotation marks omitted) (quoting *Wilcock v. Equidev Cap. L.L.C.*, 2001 WL 913957, at *1 (S.D.N.Y. Aug. 14, 2001)).

The government's arguments for entering a protective order prohibiting disclosure of the benefits files do not meet that standard.  No work product of the government will be disclosed because plaintiffs will be creating their own work product from the produced files.  The government has not demonstrated that disclosure would violate the relevant privacy statutes, nor that a "clearly defined, specific and serious injury" will occur should plaintiffs have access to the information they request.  *In re Terrorist Attacks on Sept. 11, 2001*, 454 F. Supp. 2d at 222 (internal quotation marks omitted) (quoting *Shingara*, 420 F.3d at 306).  Nor has the government

provided specific examples of harm it, or the veterans whose disability benefits files are produced, will suffer due to disclosure of the benefits files to plaintiffs.

For all the above reasons, I **deny** the government's motion for a protective order as it concerns plaintiffs' data-sampling of demographic and benefits-related information from 1945 to present.

> B. *Formal and informal complaints received by entities and custodians within the VA from 1945 to present*

The government argues plaintiffs' requests for complaints, that is, plaintiffs' requests for production 1, 23, and 25, remain unripe because "extensive collections and review are already underway" and "nonprivileged, responsive materials . . . will be produced."  Doc. No. 141-1 at 40; Doc. No. 145 at 34.  The government describes its efforts to search for responsive materials from "30 identified potential custodians."[15]  *Id.*  Additionally, the government describes its ongoing efforts to locate potentially responsive VA administrator files, both electronic and paper, possessed by the National Archives and Records Administration ("NARA") and the Office of Congressional and Legislative Affairs ("OCLA").  *Id.* at 11, 17, 40-42.  Alternatively, the government asserts that, if plaintiffs' requests are ripe, then "they are vague, overbroad, and unduly burdensome."  *Id.* at 42.  The government also argues that plaintiffs failed to adequately define what information they request, including by defining the terms "formal or informal complaints," "experiences," or "institutional actors."  *Id.* at 44 (internal quotation marks omitted).

---

[15] The government lists those custodians as including:
> [C]urrent and former Under Secretaries for VA Benefits as well as individuals from:  the External Civil Rights Discrimination Complaints Program within the Office of Resolution Management; the Center for Minority Veterans; Office of the Chief of Staff; Office of Field Operations; Office of Performance Analysis and Integrity; Compensation Services; Office of Equity Assurance; Office of Congressional and Legislative Affairs; and Special Assistants to the Secretary for Veterans Service Organizations Liaison, among others.

Doc. No. 141-1 at 40.

Plaintiffs reiterate their request for information that they articulated during the March 24 status conference and motion hearing.  Doc. No. 145 at 35.  Specifically, plaintiffs seek "an order compelling the government to search for correspondence from advocacy groups and other institutional actors complaining about discrimination of VA benefits and [the] VA's response." *Id.* (internal quotation marks omitted) (quoting Doc. No. 140 at 5).  Further, Plaintiffs list several examples of organizations who might have submitted those complaints:  "veteran services organizations, members of Congress[,] or civil rights organizations."  Doc. No. 145 at 35 (internal quotation marks omitted) (quoting Doc. No. 140 at 5-6).  Plaintiffs acknowledge the information the government provides about its efforts to investigate responsive paper records. Doc. No. 145 at 36.  However, plaintiffs assert that the government fails to provide information about the time required to retrieve VA Administrator files, how long "it would take to complete a review for relevance," and "what would be involved in searching the paper files of units responsible for legislative affairs/liaising with legislators."  *Id.*  Plaintiffs argue that the government's failure to provide a timeline and commit to reviewing and producing paper records "highlight[s] the need for the Court's intervention at this time."  *Id.* at 37.

Plaintiffs request that I deny without prejudice the government's motion for a protective order on this issue and instead order the government "to provide updates to [p]laintiffs about the status of its investigation every two weeks for the next month, with a deadline for the Parties to complete their meet-and-confer about how to perform a search for responsive paper records within 45 days."  *Id.*  Further, plaintiffs propose "that the [p]arties file a status report to the Court about the outcome of that meet-and-confer (either an agreement or a dispute) seven days before a status conference to be held on this issue in approximately sixty days."  *Id.*

Plaintiffs' request for complaints, as iterated during the March 24 status conference and

motion hearing, does not exceed the permissible bounds of discovery.  *See Conservation L.*

*Found., Inc. v. Shell Oil Co.*, 2023 WL 5434760, at *11 (D. Conn. Aug. 22, 2023) ("[D]iscovery

has long encompassed information about 'the existence, description, nature, custody, condition,

and location of any documents or other tangible things and the identity and location of persons

who know of any discoverable matter.'" (quoting Fed. R. Civ. P. 26 advisory committee's note

to 2015 amendments)).  There is no indication that plaintiffs' request is "unreasonably

cumulative or duplicative" or can be obtained from another "more convenient, less burdensome,

or less expensive" source. Fed. R. Civ. P. 26(b)(2)(C).  Nor is it apparent that plaintiffs' request

is disproportionate to the needs of the case or that the burden of production outweighs the

requested information's likely benefit.  *Conservation L. Found., Inc.*, 2023 WL 5434760, at *12.

As stated above, plaintiffs seek to determine both whether racial disparities in veterans'

disability benefits administration existed and the level of the VA's knowledge of any disparities

should they exist.  Doc. No. 145 at 11, 35.  Their requests are not based on "pure speculation and

conjecture" and are "reasonably calculated to lead to the discovery of admissible evidence." *In*

*re PE Corp. Sec. Litig.*, 221 F.R.D. 20, 23 (D. Conn. 2003) (internal citation and quotation marks

omitted).  Plaintiffs illustrate the type of complaints they pursue by attaching correspondence to

the VA from the Congressional Black Caucus and NAACP leaders about potential racial

discrimination.  *See* Doc. No. 145-1 at 23-81.  Further, the government's claims that plaintiffs'

requests for complaints are too "vague" fall flat.  Doc. No. 141-1 at 42-43.  The definition

provided to the government and recounted in plaintiffs' brief, as well as the discovery efforts the

government has already untaken, demonstrate that plaintiffs' requests are specific enough to

comply with discovery obligations.  *See* Doc. No. 145 at 11 (defining complaints as

"communications, inquiries, or concerns sent from institutional actors—civil rights organizations such as the NAACP, veterans' services organizations, or members of Congress—to VA regarding identified or alleged racial disparities in VA benefits adjudications.").

During the December 4, 2025 hearing, the parties described an impasse regarding 11,000 potentially responsive administrator files that are publicly available at NARA locations in Washington, D.C. and Boston.  *See* Doc. No. 169 at 18-35.  Despite over eight months passing since the parties requested the court's help in resolving their dispute, the government admitted during the hearing that it had not reviewed any non-electronic records because it believes the burden is on plaintiffs to do so.  *Id.* at 22-23, 25.  The government argues that because the documents are publicly available, the plaintiffs should bear the burden of traveling in person to the NARA locations and photocopying the physical records they seek.  *Id.* at 18-19, 25-26.

The purpose of discovery does not support the government's contentions.  Plaintiffs are entitled to discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The government cites no caselaw to support their proposition that, because the NARA files are publicly accessible in person, the government has no obligation to produce the documents to plaintiffs.  Conversely, the Supreme Court has stated "either party may compel the other to disgorge whatever facts he has in his possession."  *Hickman v. Taylor*, 329 U.S. 495, 507 (1947).  "Under the [Federal Rules of Civil Procedure], the only express limitations are that the information sought is not privileged[] and is relevant to the subject matter of the pending action."  *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 30 (1984).  The government must turn over those documents whether a member of the public can access them or not.

Further, although the NARA files are "available to any member of the public to review in person, subject to completing orientation requirements," they are not equally, readily accessible to both parties in this action.  Doc. No. 141-1 at 42.  This is not a scenario where the documents are held by a third party and both the government and plaintiffs would encounter the same difficulties in retrieving the files.  Here, the NARA files are in the government's possession and are not readily accessible to plaintiffs.  If plaintiffs travel to NARA locations in person, they would not be allowed to remove physical documents.  Doc. No. 141-2 ¶ 19.  Instead, they could "make physical copies on machines" at the archives or "bring flatbed scanners and cameras" into the archives.  *Id.* ¶ 20.  The burden on plaintiffs to travel out-of-state, search through records files, and manually copy NARA records exceeds the burden on the government to produce the 11,000 potentially responsive administrator files.[16]

At this point, the issue is now ripe because it is clear the government will not produce VA Administrator files stored in paper format.  Accordingly, I **deny** the government's motion and order the government to produce the 11,000 administrator files it identified as potentially responsive to plaintiffs' discovery requests.  It is unclear, however, whether there are outstanding requests for OCLA records.  To the extent the government is in possession of OCLA records responsive to plaintiffs' requests, the government is also ordered to produce those records.

---

[16] Notably, in a declaration submitted by the government, senior archivist Robyn Rodgers states that "[c]opies of select records may also be ordered through the website," though the process of ordering records "depends on the kind of record requested."  Doc. No. 141-2 ¶ 17.  Further, Rodgers mentions "reproduction requests" in her declaration.  *Id.* ¶ 21 ("How quickly NARA can process a reproduction request depends in part on the size of the request, the location of the material, whether the relevant material is already digitized, and whether NARA is also addressing other requests.").  Therefore, it appears the government has the capacity to produce copies of records without requiring those who ordered the records to come in person to NARA locations and physically create copies of the records themselves.

## IV.    Conclusion

Accordingly, the government's motion for a protective order is **denied** to the extent that it seeks to prevent disclosure of unredacted veterans' disability benefits files.  Doc. No. 141.  The government is ordered to produce unredacted veterans' disability benefits files in accordance with plaintiffs' requests for data-sampling from the pre-2006 eras.  The records are subject to the stipulated protective order already in place and will be considered "Attorney's Eyes Only" pursuant to that order.  Doc. No. 99 at 2.

The unredacted veterans' disability benefits files produced pursuant to this order will be subject to the following additional protections:

(1) Student access is permitted only by those students who have entered an appearance following approval by the Court;

(2) Plaintiffs may not use the records for any purpose other than their statistical analysis, including attempting to identify or contact potential purported class members;

(3) Plaintiffs' counsel shall maintain and provide to the government a complete list of every individual who reviews any of the benefits files, together with that person's address and a list of every benefits file that individual accessed. The government's custodian of records shall take reasonable steps to provide notice to the veterans whose disability benefits files are produced according to this order pursuant to 38 C.F.R. § 1.511(d); and

(4) Veteran information obtained from the records shall be maintained by plaintiffs' counsel in a separate database, not to be comingled in any way with any other information. Access to that database shall be restricted to persons directly involved in prosecution of this case, e.g., counsel, student counsel, and experts.  The database shall not be connected to the internet. The database and all benefits files shall be destroyed promptly following the final determination

of the litigation, and the ultimate destruction of the database and benefits files shall be confirmed by plaintiffs' counsel.

The government's motion for a protective order is also **denied** to the extent that it seeks to prevent disclosure of records of formal and informal complaints received by entities and custodians within the VA from 1945 to present.  Doc. No. 141.  The government is ordered to produce NARA and OCLA records responsive to plaintiffs' requests for production numbers 1, 23, and 25.  Additionally, the parties will submit a joint status report in 45 days informing the Court of any outstanding issues concerning plaintiffs' requests for production numbers 1, 23, and 25.

So ordered.

Dated at Bridgeport, Connecticut, this 22nd day of January 2026.


/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge