# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CONLEY F. MONK JR. et al.,<br>Plaintiffs, | : | No. 3:22-cv-01503 (SRU) |
| v. | : | |
| UNITED STATES OF AMERICA,<br>Defendant. | : | September 10, 2024 |

**DEFENDANT USA'S OBJECTIONS AND RESPONSES TO PLAINTIFFS' SECOND SET OF INTERROGATORIES**

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, Defendant, The United States of America, ("Defendant") hereby responds to "Plaintiff's Second Set of Interrogatories to Defendant United States of America" dated June 12, 2024 ("Interrogatories").

**DEFENDANT'S PRELIMINARY STATEMENT**

Defendant responds to Plaintiffs' Interrogatories as it interprets and understands them. In the event that Plaintiffs subsequently assert an interpretation of any of the Interrogatories that differs from Defendant's interpretation or understanding, Defendant reserves the right to supplement or amend its objections and/or answers.

Defendant reserves the right to object as to the competency, relevancy, materiality and/or admissibility of the information disclosed pursuant to its answers to the Interrogatories.

These responses are made solely for the purpose of this pending action. The responses are based solely on information presently known to Defendant. Subsequent discovery, independent investigation, or legal research and analysis may result in additions to, changes in and/or variations from the responses set forth herein.

Defendant objects to Plaintiffs' Interrogatories to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other privilege or protection that may be applicable. Any undertaking to answer and

respond to these requests should be understood to exclude privileged and confidential information.

Defendant objects to Plaintiffs' Interrogatories to the extent they seek information that would invade the privacy interests of any of its employees, veterans, or other non-parties to this litigation. Any undertaking to answer and respond to these Interrogatories should be understood to exclude the disclosure of any information that would violate the Health Insurance Portability and Accountability Act ("HIPAA"), the Privacy Act of 1974, or other privacy laws.

**OBJECTIONS AND RESPONSES TO SPECIFIC INTERROGATORIES**

1. Identify and describe in detail all ways in which the VA, from January 1, 1945 to present, has collected or aggregated data regarding the demographic characteristics of applicants for VA housing, education, and disability compensation benefits programs, including but not limited to applicants' race, ethnicity, amount of income, source of income, employment status, education level, character of discharge, rank on date of discharge, outcome of the benefit application, and/or the reason for the outcome.

**RESPONSE:**

Defendant objects to Interrogatory No. 1 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines. Defendant objects further to Interrogatory No. 1 in that it contains subparts and is compound, conjunctive, and/or disjunctive. Defendant objects further to Interrogatory No. 1 as more properly the subject of witness testimony and/or document production that is currently in process. Defendant objects further to Interrogatory No. 1 as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. Plaintiffs' demand for "all ways" the VA has "collected or aggregated data" regarding unlimited "demographic characteristics" of applicants for multiple types of benefits, from 1945 to present, seeks untoward

volumes of information, from a myriad of sources, for a period of over 80 years; Interrogatory No. 1 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

Subject to and without waiving the foregoing objections:

The Veterans Benefits Administration ("VBA") offers a wide range of benefits to veterans, service members, and their families and survivors. The mission of VBA is to serve as a leading advocate for these groups, delivering with excellence veteran-centered and personalized benefits and services that honor their service, assist in their readjustment, enhance their lives, and engender their full trust. VBA is responsible for administering and delivering an array of federally authorized benefits and services to eligible veterans and their dependents and survivors. The VA expends billions of dollars in benefits annually for millions of veterans, their dependents, and survivors. Benefits and services administered by VBA fall under seven major program areas: (1) Compensation; (2) Pension and Fiduciary; (3) Education, (4) Insurance, (5) Home Loan Guaranty, (6) Veteran Readiness and Employment, and (7) Outreach, Transition and Economic Development.

Information relating to a veteran's benefits claim, including documents submitted by the veteran, claims outcomes, and, in some cases, character of discharge, is specific to that individual and included in the veteran's digitized benefits file in the Veterans Benefits Management System ("VBMS"). If a veteran submits information relating to or containing the demographic information described in Interrogatory 1, it may be contained in their benefits file. However, the existence or lack of such data in a benefits file would be specific to the individual veteran and may depend on the type of benefit sought. Similarly, veteran benefits application "outcomes" are individualized determinations that necessarily rely on a variety of factors specific to the individual veteran's

application.

Some demographic information may be collected or sought as necessary and appropriate for the specific benefit for which the veteran applies. Education level information is collected through VA Forms 22-1990 (Application for VA Education Benefits) and 22-5490 (Dependents' Application for VA Education Benefits). Employment status and source of income is collected through VA Forms 21-8940 (Veteran's Application for Increased Compensation Based on Unemployability), 21-4192 (Request for Employment Information in Connection with Claim for Disability Benefits), and 21-4140 (Employment Questionnaire). VA Form 20-0986 (Eligibility Determination for Character of Discharge (COD) Request Form) is a request form for an eligibility determination for Character of Discharge. VBA does not collect race and ethnicity data about veterans as part of the disability claims process, the education benefits process, or employment benefits process.

Through the Home Loans benefits program, home loans are provided by private lenders and VA guarantees a portion of the loan. Federal law requires VA lenders to comply with fair housing laws, including the Fair Housing Act, Title VIII of the Civil Rights Act of 1968 and amendments, which prohibits discrimination in the housing process, including lending. The Home Mortgage Disclosure Act of 1975 and amendments require certain financial institutions to collect and report information about ethnicity, race, and sex of applicants. VA Forms 26-1820 (Report and Certification of Loan Disbursement) and 26-8149 (Report of Automatic Manufactured Home and/or Lot Loan) collect race and ethnicity data in connection with loan benefits. VA Form 26-6681 (Financial Statement) collects race, ethnicity, education, and employment data. VA Form 26-6705(b) (Credit Statement of Prospective Purchaser) collects race, ethnicity, income, and employment data. Data is obtained from applicants on a voluntary and self-reported basis, and VA relies on third party lenders for collection.

Collection of information for loan guarantees has changed over time consistent with changes

in the loan guaranty process. Prior to 1995, lenders would send the entire loan file to VA. A loan was either closed on a prior-approval basis (wherein VA would review and approve the loan), or on a delegated basis wherein the lender used their authority to approve and close loans without the express approval of the Secretary. For loans closed through the prior-approval basis, i.e., submitted to VA for approval, loan information collected would include an applicant's race, ethnicity, amount of income, employment status, education level, outcome of the benefit application, and/or the reason for the outcome. Following VA's disposition, it would store the physical file to later be shipped to archives. Loans closed using delegated authority would be submitted to VA by the lender after the lender approved and closed the loan. VA would then issue evidence of guaranty with a Loan Guaranty Certification ("LGC"). Information collected for loans closed with delegated authority would include the applicant's race, ethnicity, amount of income, source of income, employment status, and education level. Following VA's disposition, it would store the physical file to later be shipped to archives. Denied loans were not reported to VA.

In 1998, VA reduced the number of documents lenders were required to submit to obtain an LGC, and a full file was only requested if the loan was selected for audit. Documentation from audited loans was retained in the same manner as loan files received for guaranty prior to 1998. If a loan was not selected for audit, the loan information collected would include an applicant's race, ethnicity, and amount of income. Loans submitted for prior approval or selected for audit would include an applicant's race, ethnicity, amount of income, source of income, employment status, and education level.

In 2004, after VA introduced its current electronic system, lenders were no longer required to submit loan documents to VA as they were able to obtain the LGC electronically. VA only requested physical loan files for loans selected for audit and prior approval loans. Then, starting in 2016, all loan files for loans selected for audit and loans for prior approval were required to be

submitted electronically. If a loan was not selected for audit, the loan information collected would include an applicant's race, ethnicity, and amount of income. Loans submitted for prior approval or selected for audit would include an applicant's race, ethnicity, amount of income, source of income, employment status, and educational level.

Additionally, veterans who are Native American or married to a Native American may be eligible for the Native American Direct Loan Program ("NADL"). Veterans applying for an NADL mortgage must provide proof of tribal membership, typically in the form of a tribal membership ID card.

Responding further, VBA publishes an Annual Benefits Report that summarizes the benefits programs, identifies the current level of program participation, and provides profiles of beneficiaries. Among other things, VBA benefits are detailed by gender. Beginning in 2002, the Annual Report began to include the number of VA loans guaranteed per fiscal year by race and ethnicity, including total loan amount, average loan amount, total guaranty amount, and average guaranty amount. Current and archived reports, dating back to 1999, are available at: https://www.benefits.va.gov/REPORTS/abr/. Historical Annual Reports, detailing services provided by VA for each fiscal year, including benefits, from 1922 to 1998, are available at https://www.va.gov/vetdata/report.asp.

Responding further, in 2017, the VA Office of Data Governance and Analytics ("ODGA") published "Minority Veteran Report: Military Service History and VA Benefit Utilization Statistics," available at https://www.va.gov/vetdata/docs/SpecialReports/Minority_Veterans_Report.pdf. This report was updated in November 2020. Numerous other reports discussing benefits utilization by certain groups, including women and minority veterans, are available at: https://www.va.gov/vetdata/report.asp.

Responding further, the VA is currently working with the Center for Minority Veterans

("CMV") to develop a dashboard (also referred to as a data instrument panel) to improve collection of data on race and sex and plans to standardize the forms used by VA to collect such data. These efforts, which involve VA's Data Governance Council, the Office of Enterprise Integration, the VA-DOD Joint Data and Analytics Executive Committee, and the CMV, are ongoing.

Responding further, Defendant refers Plaintiffs to its other responses herein, its previously provided responses to Plaintiffs' First Set of Interrogatories, and materials produced to Plaintiffs through FOIA requests and litigation and-reproduced in this matter, including data referenced in the Amended Complaint and the Affidavit of Daniel Cunningham, produced at *Black Veterans Project v. United States Dept. of Veterans Affairs*, 21-cv-00935-VLB (D. Conn.), ECF No. 28-42.

2. Identify and describe in detail all measures VA has taken (e.g., training, supervision, auditing, data analysis, record-keeping, or any other preventative or corrective measure), if any, to identify, assess, measure, address, and/or mitigate racial disparities in VBA claims adjudication in VA housing, education, and disability compensation benefits programs, from January 1, 1945 to present.

**RESPONSE:**

Defendant objects to Interrogatory No. 2 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines. Defendant objects further to Interrogatory No. 2 in that it contains subparts and is compound, conjunctive, and/or disjunctive. Defendant objects further to Interrogatory No. 2 as more properly the subject of witness testimony and/or document production that is currently in process. Defendant further objects to Interrogatory No. 2 as argumentative in that it improperly relies on an assumption of racial disparities in VBA claims adjudication. Defendant objects further to Interrogatory No. 2 as overbroad, unduly burdensome, vague and ambiguous, and

seeking information beyond the scope of Rule 26. Plaintiffs' demand for "all measures" the VA has taken "to identify, assess, measure, address, and/or mitigate racial disparities" in adjudication of multiple types of benefits, from 1945 to present, seeks untoward volumes of information, from a myriad of sources, for a period of over 80 years. "Racial disparities" is not defined and is susceptible to multiple conflicting interpretations. Interrogatory No. 2 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

Subject to and without waiving the foregoing objections:

The VA is committed to identifying and eliminating racial disparities in benefits decisions and is actively working towards that important goal. As discussed in Defendant's Response to Interrogatory 1 above, VA administers billions of dollars' worth of benefits per year to millions of veterans, their dependents, and survivors.

The VA maintains numerous, often overlapping initiatives in furtherance of eliminating barriers and ensuring that all veterans are treated fairly and equally so that they may receive benefits to which they may be entitled. These include, but are not limited to: the Minority Veterans Outreach Program; the Property Appraisal and Valuation Equity ("PAVE") Task Force and enhanced oversight procedures to ensure equity in relation to home loans; free interpretation and language assistance to veterans and family members; and engagement with veterans, legal aid and private attorneys, Veterans Service Organizations ("VSO"), and stakeholders in improving usability and accessibility of claims forms, among other things, through interactions including listening sessions, summits, and congressional roundtables. Further, VA has special emphasis outreach involving the following groups: Women Veterans, LGBTQ+ Veterans, Former Prisoner of War, Elderly Veterans, Justice involved Veterans, Homeless Veterans, Indigent Veterans, Rural Veterans, Faith-based and

Neighborhood Partnerships, and Military Sexual Trauma involved Veterans.

The primary goal of the Minority Veterans Outreach Program is to promote the use of VA benefit programs by traditionally underserved groups. Regional Offices are required to designate one Minority Veterans Program Coordinator ("MVPC") to ensure that, within the Regional Office's jurisdiction, information for VA benefits is provided to all veterans regardless of race. The MVPC establishes and maintains contact with minority organizations within the local area(s) served by the Regional Office to present information concerning VA benefits, hear possible concerns, and answer questions. They keep abreast of the impact policies and laws may have on minority veterans. The MVPC also works with other VA staff to identify gaps in benefits delivery to minority veterans and afford equal access to and knowledge of all benefits. The MVPC is also responsible for working with tribes in providing benefits information and assistance. For fiscal year 2024, VA has conducted over 2,200 events with over 3,600 hours of outreach for minority veterans. More information regarding the Minority Veterans Outreach Program is available at https://benefits.va.gov/PERSONA/veteran-minority.asp.

Responding further, VBA training curriculum addresses the need for compensation claims processors to make decisions with fairness and courtesy and without personal feelings. Processors have a responsibility to serve all veterans and their dependents and survivors in a fair and accurate manner. VA also provides trainings regarding bias and discrimination. Training materials have been produced at USA000004486-5943.

Responding further, the CMV is the VA model for inter-and intra-agency cooperation, to ensure all veterans receive equal service regardless of race, origin, religion, or gender. It was established by Public Law 103-446, November 2, 1994. 38 U.S.C. § 317 reflects the current responsibilities of the CMV. The Center Director serves as principal advisor to the VA Secretary on the adoption and implementation of policies and programs affecting minority veterans. CMV serves

as an advocate for minority veterans by conducting outreach activities to promote the awareness and use of VA benefits and services.

Responding further, the VA Secretary appointed the Advisory Committee on Minority Veterans ("ACMV") pursuant to Public Law 103-446 § 510, November 2, 1994. ACMV consists of veterans who are members of respective minority groups and are recognized authorities in fields pertinent to the needs of the minority group they represent. ACMV responsibilities include: Advising the Secretary and Congress on VA's administration of benefits and provisions of healthcare, benefits, and services to minority veterans; providing an annual report to Congress outlining recommendations, concerns and observations on VA's delivery of services to minority veterans; meeting with VA officials, Veteran Service Organizations, and other stakeholders to assess the Department's efforts in providing benefits and outreach to Minority Veterans; making periodic site visits and holding town hall meetings with Veterans to address their concerns. Among other things, efforts by VA and the ACMV to look into and address concerns about perceived racial disparities in benefits are discussed in ACMV annual reports, available at: https://www.va.gov/centerforminorityveterans/acmv/.

In June 2023, the VA announced that it had established an Equity Assurance Office that is charged with executing a comprehensive Equity Assurance Plan, including identifying any disparities that may exist, understanding their root causes, and eliminating them. This is a key element of VA's efforts to implement President Biden's January 20, 2021 Executive Order 13985 on Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, and EO 14091, which charged the Federal Government with advancing equity for all, including communities that have long been underserved, and addressing systemic racism in policies and programs. Additional information is available at: https://department.va.gov/wp-content/uploads/2024/02/final_VBA-Benefits-Equity-Assurance-Plan.pdf. The 2024 Equity Action

Plan details additional equity progress updates and accomplishments, and is available at: https://department.va.gov/wp-content/uploads/2024/02/Department-of-Veterans-Affairs-Equity-Action-Plan.pdf.

Responding further, Defendant refers Plaintiffs to its other responses herein and its previously provided responses to Plaintiffs' First Set of Interrogatories.

3. Identify and describe in detail all measures VA has taken, if any, to ensure that racial bias in the military discharge and military justice systems did not and do not cause racial disparities in VBA claims adjudications, from January 1, 1945 to present.

**RESPONSE:**

Defendant objects to Interrogatory No. 3 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines. Defendant objects further to Interrogatory No. 3 as more properly the subject of witness testimony and/or document production that is currently in process. Defendant further objects to Interrogatory No. 3 as argumentative in that it improperly relies on an assumption of racial bias in military discharge and military justice systems. Defendant objects further to Interrogatory No. 3, which seeks "all measures" the VA has taken "to ensure that racial bias" in discharges or military justice systems "do not cause racial disparities" in adjudication of benefits, for a period of over 80 years, as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. "Racial disparities" is not defined and is susceptible to multiple conflicting interpretations. Interrogatory No. 3 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

Subject to and without waiving the foregoing objections:

Congress provided that only individuals who were discharged from service "under conditions other than dishonorable" are considered veterans and are eligible for VA benefits. 38 U.S.C. § 101(2). To determine whether an individual's "other than honorable" (previously "undesirable") discharge qualifies as "dishonorable" for purposes of certain VA benefits, the VA makes a "character of discharge" ("COD") assessment pursuant to regulations adopted in 38 C.F.R. § 3.12(c) & (d). A COD assessment is not necessary for individuals who receive honorable discharges.

While VA determines COD for purposes of benefits eligibility, Congress did not provide any means for VA to alter a former servicemember's discharge status. Only military branches, and their associated boards, can determine and/or alter discharge status. The VA is required to consider discharge status when making a COD determination for purposes of assessing entitlement to benefits. 38 U.S.C. § 101(2); 38 C.F.R. § 3.12.

Responding further, VBA has provided guidance to disability compensation claims processors to identify and mitigate racial disparities associated with military discharges. Responding further, Defendant refers Plaintiffs to 89 Fed. Reg. 82, 32361 (Apr. 26, 2024), Rule to Update and Clarify Regulatory Bars to Benefits Based on Character of Discharge, available at https://www.federalregister.gov/documents/2024/04/26/2024-09012/update-and-clarify-regulatory-bars-to-benefits-based-on-character-of-discharge.

VA encourages all service members to apply for healthcare and benefits regardless of their COD. Further, a claimant who disagrees with the VA's COD assessment may appeal through the Veterans' Judicial Review Act ("VJRA") process and, even if a claimant does not appeal, final COD assessments may be reopened based upon new and material evidence, 38 U.S.C. § 5108 (2012), or revised based on clear and unmistakable error, 38 U.S.C. § 5109A.

4. Identify and describe in detail all formal or informal VBA investigations, if any,

conducted following or in response to complaints regarding racial disparities in VA housing, education, and disability compensations benefits programs, from January 1, 1945 to present, including but not limited to the response to complaints received by Willie Clark and Mike Frueh via email on December 5, 2017 at 5:27 PM. A copy of the email is attached as Exhibit A.

**RESPONSE:**

Defendant objects to Interrogatory No. 4 to the extent it seeks confidential communications between attorney and client and/or confidential materials prepared by or for counsel in anticipation of litigation, on the basis that such information is protected from disclosure by the attorney-client privilege and/or the work product doctrines. Defendant objects further to Interrogatory No. 4 in that it contains subparts and is compound, conjunctive, and/or disjunctive. Defendant objects further to Interrogatory No. 4 as more properly the subject of witness testimony and/or document production that is currently in process. Defendant further objects to Interrogatory No. 4 as argumentative in that it improperly relies on assumptions and characterizations regarding the subject matter and context of the communications contained in the referenced Exhibit A. Defendant objects further to Interrogatory No. 4, which demands "all formal and informal VBA investigations" in response to "complaints" regarding "racial disparities" in multiple types of benefits programs, for a period of over 80 years, as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. "Racial disparities," "complaints," and "investigations" are not defined and are susceptible to multiple conflicting interpretations. Interrogatory No. 4 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

Subject to and without waiving the foregoing objections:

External parties, including veterans, caregivers, family members, or other individuals serving

in a fiduciary capacity to a veteran may make a complaint under Title VI, Title IX, the Age Discrimination Act of 1975, Section 504 of the Rehabilitation Act of 1973, and various civil rights Executive Orders such as 13166, 12250, 13160, and 13166, through the VA's External Civil Rights Complaints Program. The External Civil Rights Complaints Program Manager tracks the complaints and follows up with the complainant if more information is needed. External complaints are then referred, on a case-by-case basis, to the appropriate VA administration—the VBA, Veterans Health Administration, or National Cemetery Administration—so that it may look into the allegations further. Additional information regarding the External Civil Rights Complaints Program is contained in the Declaration of Sterling Akins, previously produced to Plaintiffs at *Black Veterans Project v. United States Dept. of Veterans Affairs*, 21-cv-00935-VLB (D. Conn.), ECF No. 28-22. From 1999 to approximately 2017-2018, an External Affairs Officer was responsible for the duties currently undertaken by the External Civil Rights Complaints Program Manager. Additionally, from 2017-2018 to 2019, the Office of Resolution Management, Resolution Support Center was responsible for the duties currently undertaken by the External Civil Rights Complaints Program Manager.

The External Civil Rights Complaints Program aims to be the formal intake office for receiving and processing external complaints. However, veterans have always had the option to lodge discrimination complaints with whichever office they prefer. Further, each VBA central office and regional office works with its Equal Employment Opportunity office to address and resolve discrimination complaints.

If a veteran complains of discrimination in the context of disagreeing with and/or appealing benefits decisions, such complaints are included in their benefits claims files. Like all benefits-related determinations, such complaints are reviewed and considered on an individual basis, utilizing the established processes for disputing or appealing benefits-related decisions and as further provided under the VJRA. Claims processors follow applicable regulations and guidance to develop and

decide claims. Decision makers are expected to follow this guidance, which does not permit bias or discrimination against a claimant based on personal characteristics such as race.

Depending on the nature of a discrimination complaint, a complaint may be routed to VA Office of General Counsel for adjudication. Again, any such complaints must be analyzed on an individual basis to assess whether the individual complainant experienced discrimination or bias.

Responding further, in relation to education benefits, the VA GI Bill Feedback Tool is a system for students to submit complaints relating to educational institutions. Complaints are reviewed and a determination is made whether the matter requires further investigation or referral to another agency. Upon receipt of a complaint or referral, VA performs compliance surveys to review school practices based on the allegations to determine if any discrimination has occurred. VA shares findings with the State Approving Agency of jurisdiction who can suspend or withdraw program approval based on the findings.

Responding further, the document located at "Exhibit A" to Plaintiffs' Second Set of Interrogatories concerned an Equal Employment Opportunity ("EEO") grievance by an individual VA employee, which was handled pursuant to the VA Office of Resolution Management, Diversity & Inclusion's ("ORMDI") EEO Discrimination Complaint Process.

Responding further, Defendant refers Plaintiffs to its other responses herein and its previously provided responses to Plaintiffs' First Set of Interrogatories, including studies conducted to assess potential disparities or perceived disparities, explore possible root causes, and address them.

5. Identify the names and positions of the senior-most members of the Senior Executive Service, federally appointed VA staff, and VBA personnel who, in each year from and inclusive of 1945 to present, were responsible for (a) developing, approving, or implementing VA diversity initiatives related to veteran benefits; (b) creating, modifying, reviewing, and/or approving data collection and retention policies and practices for VA housing, education, and/or

disability compensation benefits programs; and/or (c) creating, modifying, reviewing, and/or approving reports, presentations, or any other material summarizing and/or analyzing data arising from or related to VA housing, education, and disability compensation benefits programs.

**RESPONSE:**

Defendant objects to Interrogatory No. 5 in that it contains subparts and is compound, conjunctive, and/or disjunctive. Defendant further objects to Interrogatory No. 5 as argumentative in that it improperly relies on assumptions regarding employee roles and responsibilities. Defendant objects further to Interrogatory No. 5 as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. Plaintiffs' demand for the identities and positions of multitudinous federal workers, holding numerous roles or titles, "responsible for" various broad and vague duties, from 1945 to present, seeks untoward volumes of information, from a myriad of sources, for a period of over 80 years. "Senior-most members," "federally appointed VA staff," "responsible for," "implementing," "reviewing," and "diversity initiatives" are not defined and are susceptible to multiple conflicting interpretations. Interrogatory No. 5 is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the issues.

Subject to and without waiving the foregoing objections:

"Diversity initiatives" can encompass various programs and constituents, including the Office of Equity Assurance ("OEA")—a newly formed office to review all aspects of benefits programs and data and initiate internal and independent studies to examine any notable gaps or variances in benefits decisions for underserved veterans and create recommendations—ORMDI, the I*DEA Task Force—an interdisciplinary team of subject matter experts from across the VA formed by the Secretary in 2021 to evaluate existing policies, programs, and organizational structures

enterprise-wide—the Center for Women Veterans, and the CMV, among others.

Under Secretaries for VA Benefits include: Raymond John Vogel (1994-1997); Joseph Thompson (1997-2001); Daniel Cooper (2002-2008); Patrick W. Dunne (2008-2010); Michael Walcoff (2010-2011); Allison A. Hickey (2011-2015); Thomas Murphy (2016-2018; 2021-2022); Paul R. Lawrence (2018-2021); and Joshua Jacobs (2022-present).

Cheryl Rawls is the current Executive Director of the Office of Equity Assurance, and was appointed in December 2023. The previous Acting Executive Director was Laurine Carson.

Responding further, VBA Records Officers are responsible for developing and maintaining policies and procedures for the development, maintenance, storage, and disposition of VBA records. These officers include: Beverly Young, Records Management Officer (2008-2010); Jeff Norris, Records Management Officer (2010); Lisa Guderjohn, Records Management Officer (2010-2012); Kenya Buggs, Records Management Officer (2013-2014); Dwayne Jones, Senior Records Management Officer (2014-2017); and Keith Kimmons (VBA Chief of Records Manager) (2018 – Present).

Responding further, the Office of Performance Analysis and Integrity ("OPA&I) develops and maintains VBA's Enterprise Data Warehouse, publishes authoritative operating performance reports, ad hoc data reports, data mines, and provides statistical evaluations of VBA activities to gain insight into the workload and operations that support VBA missions. The OPA&I Executive Director role has been held by: Bowron Rupert (2002-2003); Wichard Ruth (2004-2006); Mark Bologna (2006-2009); William Kane (2009-2012); Mark Seastrom (2012-2021); and Elaine Saiz (2022-Present).

The ODGA is the VA's authoritative clearinghouse for the collection, analysis, and dissemination of information about veterans and VA programs and is responsible for leading data management, data analysis, and business intelligence capabilities to inform VA-wide decision

making. This office has been restructured over time and has been led by: Dat Tran, Director of Data Management & Analysis Service, Office of Policy, Office of Policy & Planning (2006 – 2008); Dat Tran, Director of National Center for Veterans Analysis & Statistics, Office of Policy, Office of Policy & Planning (2008-2011); Dat Tran, Deputy Assistant Secretary, ODGA, Office of Policy & Planning (2011-2016); Susan Sullivan, Deputy Assistant Secretary, ODGA, Office of Enterprise Integration (2016-2018); Dat Tran, Executive Director of ODGA, Office of Enterprise Integration (2018-2019); Kshemendra Paul, Executive Director & VA Chief Data Officer, ODGA, Office of Enterprise Integration (2019 – 2022); Lisa Rosenmerkel, Executive Director & VA Chief Data Officer, ODGA, Office of Enterprise Integration (Present).

6. Identify all of Your employees or contractors who conducted data analysis regarding the relationship between race and outcomes of VA benefits adjudication from January 1, 1945 to the present, including those responsible for the 2017 analysis of PTSD outcome claims by race.

**RESPONSE:**

Defendant objects to Interrogatory No. 6 as argumentative in that it improperly relies on assumptions or characterizations regarding data analyses relating to benefits adjudication outcomes. Defendant objects further to Interrogatory No. 6 as overbroad, unduly burdensome, vague and ambiguous, and seeking information beyond the scope of Rule 26. "Conducted" is not defined and is susceptible to multiple conflicting interpretations. Interrogatory No. 6, which seeks the identities and positions of potentially numerous employees and contractors "who conducted data analysis" regarding the "relationship" between race and benefits outcomes for a period of over 80 years, is not proportional to the needs of the case, considering the importance of the issues at stake in this litigation, the amount in controversy, the parties' relative access to information and resources, the burden and expense of the proposed discovery, and the importance of the discovery in resolving the

issues.

Subject to and without waiving the foregoing objections:

In and around 2005-2006, the Institute for Defense Analyses ("IDA") conducted a study titled "Analysis of Differences in Disability Compensation in the Department of Veterans Affairs." This study discussed, among other things, disability compensation for minority veteran groups. David E. Hunter was IDA Director of Cost Analysis and Research Division and Project Leader. Raymond Boland, Kristen Guerrera, Brian Rieksts, and David Tate of IDA were also involved with this study.

In and around 2008-2009, IDA conducted a study titled "Analysis of Differences in Current Patterns of Claims Submitted for Disability Compensation at the Veterans Benefits Administration." This study discussed, among other things, disability compensation for minority veteran groups. David E. Hunter was IDA Director of Cost Analysis and Research Division and Project Leader. Dennis DeRiggi, Kenton Fasana, Alexander Gallo, Matthew Gonwa, C. Vance Godron, Charles Kaylor, Kevin Mills, Brian Rieksts, David Tate, and R. William Thomas of IDA were also involved with this study.

Responding further, with regards to the 2017, 2018-2019, and 2022-2023 studies described in Defendant's Response to Plaintiffs' First Set of Interrogatories, Interrogatory 11: Timothy Goliver, current VBA OPA&I Assistant Director for Advanced Analytics, served as primary VBA analyst.

Responding further, with regards to the 2017 study described in Defendant's Response to Plaintiffs' First Set of Interrogatories, Interrogatory 11: Patrick McFadden, then OPA&I Assistant Director for Advanced Analytics, and Ashley Robin, Chief of Advanced Analytics, served as VBA managers. Mark Seastrom was the Director for OPA&I at the time of the study. The study was conducted by contractor Accenture. Sabrina Khan and Benjamin Stone were the Accenture leads on the study.

Responding further, with regards to the 2018-2019 study described in Defendant's Response

to Plaintiffs' First Set of Interrogatories, Interrogatory 11: Mark Seastrom was the Director for OPA&I at the time of the study. VA analyst Jose Castro-Haedo was also involved. The study was conducted by contractor Lewin Group. Colin Doyle was the Lewin Group lead on the study. Projesh Ghosh, Amanda Pereira, Brian Mercer, and Todd Ruppel of Lewin Group were also involved.

Responding further, with regards to the 2022-2023 study described in Defendant's Response to Plaintiffs' First Set of Interrogatories, Interrogatory 11: Ken Smith and Elaine Saiz were the Executive Directors for OPA&I during the time of the study. Jose Castro-Haedo (Senior Operations Research Analyst), Philip Heinrich (Senior Program Analyst), Amy Adler (Senior Program Analyst), Jason Marr (Senior Program Analyst), Slava Fazio (née Butkovich) (Data Scientist), Ariana Hammersmith (Program Analyst) of the VA were also involved with this study. The study was conducted by contractor MITRE. Seamus Clancy was the MITRE lead on the study. Alex Brofos, Michael Downs, Edward Ferraro, Christopher Jones, Amanda Mason-Singh, Jennifer McCleary-Sills, Marc Vilain, Bahaa Fam, Kirbi Joe, and Rosa Prieto Choy of MITRE were also involved.

**CERTIFICATION**

I, Michael T. Newman, hereby state that I am Chief Counsel, Torts Law Group, Office of General Counsel, U.S. Department of Veterans Affairs; that, as such, I am authorized to verify the foregoing Answers to Interrogatories; that I have reviewed the Interrogatories and have prepared the foregoing Answers to Interrogatories; that I have no personal knowledge of the facts, but to the best of my information and belief, based upon my investigation and research into the books, records, and other information available to Department of Veterans Affairs and upon discussions with other Department of Veterans Affairs employees regarding this cause, the answers are correct. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing certification is true and correct.

Michael T. Newman, Chief Counsel, Torts Law Group    Dated: September 10, 2024

DEFENDANT,
THE UNITED STATES OF AMERICA

By Its Attorneys:

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

VANESSA ROBERTS AVERY
United States Attorney

JAMES G. TOUHEY, JR.
Director, Torts Branch

CHRISTOPHER R. BENSON
Assistant Director, Torts Branch

/s/ Jillian Rose Orticelli
Michelle L. McConaghy (ct27157)
Jillian Rose Orticelli (ct28591)
Assistant United States Attorneys
450 Main Street, Rm. 328
Hartford, CT 06103
Tel.: (860) 947-1101
Fax: (860) 760-7979
Email: Michelle.McConaghy@usdoj.gov
Jillian.Orticelli@usdoj.gov

Emily M. Kelley (phv207548)
Irina Majumdar (phv207971)
Trial Attorneys
United States Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4400
Email: Emily.m.kelley@usdoj.gov
Irina.m.majumdar@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify pursuant to Federal R. Civ. P. 5(b) that a copy of the foregoing was served upon all counsel of record this date, via e-mail.

/s/ Jillian Rose Orticelli
Jillian Rose Orticelli (ct28591)
Assistant United States Attorney